

# Report of the Internal Review Committee on the Case of <u>L.S. v. R.L.</u>

November 23, 2021

**<u>Table of Contents</u>**

I.   Executive Summary ................................................................................................ 2

II.  Charge to the Committee .................................................................................... 3

III. Membership of the Committee ............................................................................ 3

IV.  The Committee's Process .................................................................................... 5

V.   Intimate Partner Violence and the Law of "Abuse" Under RSA 173-B ............... 6

VI.  The Current State of the Law .............................................................................. 7

VII. The Procedures Followed in this Case ................................................................ 10

VIII.   The Facts of this Case ................................................................................... 13

IX.  Analysis of the Court's Decision ........................................................................ 18

X.   The Committee's Observations about the Current State of the Law ................... 20

XI.  Recommendations ............................................................................................. 22

XII. Conclusion ......................................................................................................... 27

Appendix A – Unpublished Cases Discussed by the Committee ................................. 28

## I.   <u>Executive Summary</u>

The Internal Review Committee was tasked with reviewing the facts and circumstances surrounding the denial of a final Domestic Violence Order of Protection in the matter of <u>L.S. v. R.L.</u> in the 10th Circuit Court – Hampton Family Division.[1] The Committee considered both the procedures by which the decision was made and the substance of the decision itself. The Committee reviewed the applicable statutes, case law, both precedential and non-precedential, and the Circuit Court's Domestic Violence Protocols. The Committee also reviewed the written record in the case, listened to a recording of the hearing on the issuance of a final order, and interviewed the presiding justice, Judge Polly Hall.

Based upon its review, the Committee concluded that the final hearing was conducted in accordance with all applicable laws and protocols, as well as the principles of procedural fairness and proper judicial conduct. Additionally, and mindful that it was not tasked with serving as a court of appeal, the Committee concluded that the court's decision to deny a final protective order represented a reasonable application of current New Hampshire law to the facts of the case as she understood them.

The Committee's review also revealed several areas in which court practices could be improved. Therefore, the Committee recommends that the New Hampshire Judicial Branch:

(1)    Conduct a comprehensive review of protection order related forms to ensure that the forms provide clear guidance to the public about the legal standards for obtaining an order, assist parties in explaining their experiences in the context of those standards, and help judges more readily analyze requests for protection.

(2)    Develop easy to use tools to ensure that survivors of intimate partner violence are aware of, and can easily access, all protection order options, including domestic violence and stalking orders of protection, divorce and parenting restraining orders, and civil restraining orders issued by the Superior Court.

(3)    Work with relevant stakeholders to update the legal definition of "abuse" to reflect the current understanding about the nature of intimate partner violence and the risk factors for further violence.

(4)    Increase awareness of non-precedential Supreme Court opinions in protection order cases among attorneys, advocates, and the public so that they can better understand how courts are interpreting and applying RSA chapter 173-B and respond appropriately.

---

[1] The Committee acknowledges that the names of the both plaintiff and defendant have been widely reported in the media. However, consistent with current Judicial Branch practice to protect the privacy of survivors of intimate partner violence in court orders and other documents posted to the Court's website, the Committee will refer to the parties by their initials. *See, e.g.*, L.C. v. W.C., __ N.H.__, 2021 WL 2964587 (2021) (utilizing initials to protect the identities of the parties in an appeal from an order of protection). However, for the sake of clarity, the Committee will refer to earlier published cases in which initials were not utilized by the captions given to those cases by the Supreme Court.

(5)      Provide clear guidance to plaintiffs and defendants in protection order cases about what to expect at the final hearing, what legal standards the court will apply, and how to prepare for the hearing.

(6)      Explore what steps the court system can take to ensure that survivors of intimate partner violence receive the assistance of both legal counsel and victim advocates at protection order hearings and in appellate proceedings.

(7)      Offer training by court personnel to victim advocates and others who assist survivors in completing protection order petitions and preparing for hearings on how courts review and decide protection order cases.

## II.    <u>Charge to the Committee</u>

Immediately upon learning of the shooting involving the parties in the matter of <u>L.S. v. R.L.</u> in Salem, Massachusetts on November 15, 2021, New Hampshire Supreme Court Chief Justice Gordon J. MacDonald called for an internal review of the case. The Internal Review Committee was charged with conducting the review in an expeditious, but thorough, manner to provide an immediate public accounting of the case. A separate multidisciplinary task force is being formed for purposes of conducting a systemic review of domestic violence cases in the court system.

The scope of the Committee's review was limited to analyzing the substance of the court's decision in <u>L.S. v. R.L.</u> and the manner in which the decision was reached. The Committee was tasked with determining whether appropriate procedures were followed and whether the decision reached by the court was permissible within the bounds of current law. Importantly, the Committee was not tasked with deciding whether the decision was "correct" in the sense that the Committee would have reached the same result, but rather whether a reasonable judge, acting in good faith, could reach the same result as the trial court.[2] The Committee was charged with analyzing the facts and circumstances of <u>L.S. v. R.L.</u> and making recommendations for improvement to court practices and procedures in domestic violence protective order cases.

## III.    <u>Membership of the Committee</u>

The Committee was comprised of six members selected by New Hampshire Supreme Court Chief Justice Gordon J. MacDonald and Circuit Court Administrative Judge David D. King. Committee members were selected based on their expertise and experience in domestic violence policy, Circuit Court procedures, and the applicable law. A brief biography of each Committee member follows. The Committee was chaired by Judge Susan Carbon of the Circuit Court.

**Honorable Susan B. Carbon, Chair:** Judge Carbon is a Circuit Court Judge on Senior Status after having served for 30 years. She is a former Director of the Office on Violence Against Women at the US Department of Justice (OVW), and is a past president of the National Council of Juvenile and Family Court Judges (NCJFCJ) and the New Hampshire Bar Association. She is

---

[2] *See* Sup. Ct. R. 38, Canon 2.2, cmt. 3 (noting that "When applying and interpreting the law, a judge sometimes may make good-faith errors of fact or law. Errors of this kind do not violate [the rule requiring judges to uphold and apply the law]").

a consultant to OVW, NCJFCJ, and the National Domestic Violence Fatality Review Initiative. She is a member of the national technical assistance team for the OVW/NCJFCJ Firearms Technical Assistance Project addressing the intersection of domestic violence and firearms, and is also on a committee to revise the Model Code as it relates to domestic violence and parenting. She has trained judges, advocates, law enforcement, and others across the country and internationally, and is the author of several books and articles related to judicial administration and domestic violence. She also served on the Governor's Commission on Domestic and Sexual Violence and chaired its Domestic Violence Fatality Review Committee. She currently serves on the state's Judicial Conduct Committee.

**Honorable Erin B. McIntyre:** Judge McIntyre was appointed to the New Hampshire Circuit Court in 2017. Prior to that, she was employed as counsel for the New Hampshire Department of Education. For over a decade, Judge McIntyre was an Assistant District Attorney in Norfolk County, Massachusetts where she led the Juvenile Unit. She specialized in Domestic Violence and Sexual Assault prosecutions. After moving to New Hampshire in 2010, she served as the Director of the Strafford County Child Advocacy Center before leaving that position to become the Director of the Hillsborough County Child Advocacy Center, New Hampshire organizations tasked with coordinating child abuse investigations. Throughout her career, she has received extensive training in domestic violence and has worked with victims of violence. She is a graduate of Dartmouth College and Case Western University School of Law.

**Honorable Melissa Countway:** Judge Countway was appointed to the Circuit Court in 2017. Prior to that, she was the Belknap County Attorney for over six years. During that time, she prosecuted numerous felony level domestic violence cases. Her past experiences include working as a police prosecutor and running a general law practice. She attended the University of New Hampshire and spent five years teaching middle school math and science after earning her Master's Degree in Education. She then attended the University of North Carolina at Chapel Hill, and returned to her home state of New Hampshire, beginning her legal career as a law clerk to Chief Justice David Brock at the New Hampshire Supreme Court. She is currently a member of the Police Standards and Training Council and presiding judge in the 3rd Circuit - Ossipee - Family and District Divisions.

**Honorable Jacalyn A. Colburn:** Judge Colburn was appointed to the New Hampshire Superior Court bench in 2009 and presently sits as the supervisory judge in Hillsborough County - Southern District and presides over the Hillsborough County Adult Drug Court. A graduate of the University of New Hampshire and University of New Hampshire School of Law, she began her legal career as a staff attorney for the New Hampshire Public Defender. She later served as Managing Attorney of the organization's Merrimack County office and as statewide Director of Legal Services. In addition to her judicial duties, Judge Colburn serves as an adjunct professor of law at the University of New Hampshire School of Law and as a member of board of New Futures. She previously served on the New Hampshire Lawyers Assistance Program board, the New Hampshire Bar Association's Professionalism Committee, the Board of Governors' Task Force on Public Sector and Public Interest Law, as a Practical Skills Instructor, and as a panelist at a variety of Continuing Legal Education seminars. She is a recipient of the Merrimack County Bar Association Lawyer of the Year award and the New Hampshire Bar Foundation's Frank Rowe Kenison Award.

**Sarah Freeman, Esq.:** Attorney Freeman joined the New Hampshire Judicial Branch in 2019 as the Domestic Violence Program Manager and transitioned to the role of Circuit Court Administrator in July 2021. Previously, she worked as a crisis center advocate at Voices Against Violence in Plymouth NH, Attorney Freeman graduated from Hofstra University School of Law magna cum laude. Thereafter, she represented survivors of domestic violence in New York City as a staff attorney with Safe Horizons, the nation's largest victim services agency. After returning to New Hampshire, she was employed as the Executive Director of a small nonprofit that worked to enhance substance misuse services in New Hampshire and served on the Board of Directors of Turning Points Network in Claremont, NH.

**Ryan C. Guptill, Esq.:** Attorney Guptill serves as the Supervisory Staff Attorney for the Circuit Court and has also been appointed as court referee. As a Staff Attorney, he provides legal, policy, and programmatic advice and support to the judges and administrators of the Circuit Court. Attorney Guptill regularly develops and presents legal education and training for judges and court staff. Prior to joining the Judicial Branch, Attorney Guptill was a staff attorney for the New Hampshire Public Defender, where he represented hundreds of clients in cases ranging from driving offenses to homicide and also served as a drug court team member. Attorney Guptill received his law degree, *summa cum laude*, from Georgetown University Law Center. He currently serves as Chair of the New Hampshire Supreme Court Committee on Character and Fitness.

## IV.    The Committee's Process

In reviewing the case of <u>L.S. v. R.L.</u>, the Committee sought to conduct a thorough review while also responding to the urgent need for public clarity about the case. The Committee met in-person[3] for approximately seven hours on November 19, 2021. Members of the Committee spent many more hours reviewing the case record and conducting legal research, discussing the case, and drafting this report.

The Committee reviewed the written record of the case in detail, breaking down L.S.'s petition by the date of each alleged act by R.L. The Committee also listened to the thirteen minute and fourteen second audio recording of the October 20, 2021 hearing in the case repeatedly, both as a group and individually. On November 19, 2021, the Committee conducted an approximately one-hour long interview of Judge Polly Hall, who presided over the case.

In addition, the Committee conducted an extensive review of relevant statutes, protocols, and case law, both published and unpublished. For example, the Committee examined more than fifteen New Hampshire Supreme Court decisions issued with respect to the subject of credible present threat under RSA chapter 173-B since the statute was completely overhauled in 1999.[4] Committee members also conducted research on particular legal questions suggested by the facts of <u>L.S. v. R.L.</u>

---

[3] With the exception of Judge Colburn, who participated via telephone.
[4] N.H. Laws 1999, 240:3 (repealing and reenacting RSA ch. 173-B).

After reviewing the facts and the applicable law, the Committee discussed the case at length and made unanimous findings about both the procedures applied and the substance of the court's decision. The Committee also developed a set of recommendations based on its findings. The Committee's findings and recommendations form the bulk of this report.

## V.    Intimate Partner Violence and the Law of "Abuse" Under RSA 173-B

Intimate partner violence ("IPV") is a pattern of coercive behaviors used by one partner to maintain power and control over another partner in an intimate relationship. The range of behaviors include, but are not limited to, interfering with the victim's employment or housing, humiliating or degrading the victim, intimidating or manipulating the victim, controlling the victim's finances including access to public resources, interfering with medical care, damaging the victim's relationship with loved ones, undermining the victim's parenting, and threats or acts of physical or sexual violence.[5] Coercive and controlling behavior can impact all areas of a victim's independence and autonomy – physical, emotional, psychological, financial, medical, and otherwise.  In fact, the tactics used by a coercive controlling abuser may be limitless due to the unique nature of each relationship. Circuit Court judges receive training on this broad understanding of IPV from both internal and external experts during their initial training, as well as through ongoing judicial education programs and specialized national trainings.[6]

This expansive societal understanding of IPV is distinguished from New Hampshire's legal definition of "abuse" for purposes of obtaining a domestic violence order of protection under state law.  Under New Hampshire law, a victim seeking a domestic violence order of protection must prove all three of the following elements: (1) a qualifying relationship; (2) that the defendant recently committed one of the statutorily enumerated criminal acts; and (3) that the defendant's conduct constitutes a credible present threat to the petitioner's safety as defined by case law.[7] Notably, the fact that the defendant has physically assaulted or threatened the victim does not, by itself, rise to the legal standard of a credible present threat.[8]  Moreover, there are many forms of IPV that do not fall within the legal definition of "abuse" for purposes of obtaining an order of protection, but which are nonetheless harmful.

Circuit Court judges hearing domestic violence order of protection cases are not tasked with determining whether a petitioner is the victim of IPV as broadly understood. Instead, "the ultimate question before the court…is whether the actions complained of took place and whether

---

[5] *See e.g.*, Kimberly A. Crossman, *An Overview and Evaluation of Classifying the Types of Intimate Partner Violence*, Battered Women's Justice Project (2019), https://www.bwjp.org/2019-11-14-ppt-1-per-page.pdf; *Understand Relationship Abuse*, National Domestic Violence Hotline (2021),  https://www.thehotline.org/identify-abuse/understand-relationship-abuse/; *What is Domestic Violence?*, New Hampshire Coalition Against Domestic and Sexual Violence (2021), https://www.nhcadsv.org/domestic-violence.html; *What is Domestic Abuse?*, United Nations (2021), https://www.un.org/en/coronavirus/what-is-domestic-abuse.

[6] Of note, in December 2017, Judge Hall attended the Enhancing Judicial Skills in Domestic Violence Cases program of the National Judicial Institute on Domestic Violence, a partnership of the National Council of Juvenile and Family Court Judges and Futures Without Violence. Many other Circuit Court judges have also attended this training. This highly interactive, multi-day training is led by national experts in domestic violence. The Judicial Branch utilized federal funds specifically earmarked for judicial education related to domestic violence to cover the costs associated with this and related educational opportunities.

[7]  RSA 173-B; s*ee* Sec. VI, *infra* for a more detailed legal analysis of the element of credible present threat.

[8] *See* Tosta v. Bullis, 156 N.H. 763 (2008).

they constitute abuse within the meaning of RSA 173-B."[9] A victim of even severe, pervasive IPV will not be eligible for an order of protection if the defendant's conduct does not fit within the restrictive definition of abuse outlined in New Hampshire law.

## VI.    <u>The Current State of the Law</u>

To obtain a final domestic violence order of protection under RSA chapter 173-B, the plaintiff must show "abuse" by a preponderance of the evidence.[10] "Abuse" has three elements: (1) the existence of a qualifying relationship between the plaintiff and defendant; (2) the commission or attempted commission by the defendant of one or more criminal acts specified in the statute; and (3) a finding that such misconduct constitutes a credible present threat to the petitioner's safety.[11] In the case of <u>L.S. v. R.L.</u>, the Court found that the third element, credible present threat, was not established.[12] Thus, the Committee focused on the current law defining credible present threat.

To constitute a credible present threat, the defendant's conduct must threaten the plaintiff's physical safety, as opposed to his or her emotional or financial wellbeing.[13] Additionally, the defendant's threat to the plaintiff's physical safety must be ongoing and specific.[14] The plaintiff must "show more than a generalized fear for personal safety based upon past physical violence and more recent non-violent harassment to support a finding that a credible threat to her safety exists."[15] Even when stalking or harassment-type behaviors are coupled with a history of physical violence and known weapon possession, they will not support a finding of credible present threat absent some additional, current threat of physical violence.[16]

The threshold misconduct to support a finding of abuse need not immediately precede the filing of a domestic violence petition.[17] However, "[i]ncidents that are too distant in time and non-specific cannot support a finding of abuse."[18] In evaluating whether alleged misconduct constitutes a credible threat, the court should consider both the passage of time since an incident of misconduct occurred and the nature and extent of the misconduct.[19]

The challenges facing courts in applying this standard, and the distinction between IPV, understood broadly, and the law of "abuse," are illustrated by the recent New Hampshire

---

[9] N.H. Cir. Ct., Dom. Violence Protocols, Ch. 1, Sec. E (hereinafter "Protocols").
[10] RSA 173-B:5, I; Achille v. Achille, 167 N.H. 706, 716 (2015).
[11] RSA 173-B:1, I; Achille, *supra* note 10, at 716.
[12] L.S. v. R.L., Dom. Violence Final Order of Dismissal, 10th Cir. Ct. – Hampton Fam. Div., No. 641-2021-DV-00070 (Oct. 20, 2021).
[13] Knight v. Maher, 161 N.H. 742, 745–46 (2011) (finding no credible threat despite "substantial evidence that the defendant's conduct negatively affected the plaintiff's emotional or financial well-being").
[14] Tosta, *supra* note 8, at 767; Achille, *supra* note 10, at 716.
[15] Tosta, *supra* note 8, at 676 (quotation omitted); Achille, *supra* note 10, at 716; Alexander v. Evans, 147 N.H. 441, 442-43 (2002).
[16] *See* Alexander, *supra* note 15, at 442-43 (2002) (finding no credible threat where defendant, who had a history of physical violence and was known to possess weapons, repeatedly violated marital restraining order, made false allegations to police about plaintiff, and harassed plaintiff with repeated notes, calls, and "rude gestures").
[17] Achille, *supra* note 10, at 716.
[18] *Id.* at 716-17 (quotation omitted).
[19] *Id.* at 718.

Supreme Court case of S.K. v. J.M.[20] This case is particularly relevant to the Committee's review because Judge Hall stated in her interview that she specifically had this case in mind when considering whether to issue a final protective order in the matter of L.S. v. R.L.

In S.K. v. J.M., the defendant appealed a Circuit Court decision granting a final domestic violence order of protection to the plaintiff. The Supreme Court held that the trial court erred in determining that the defendant posed a credible threat to the safety of the plaintiff and reversed without a formal reported opinion.[21]

In S.K. v. J.M., the parties were married in 2004 and resided together in another state with their minor children. The plaintiff testified to a history of severe IPV, including multiple incidents in 2016 where the defendant physically assaulted her and threatened her, including with a handgun and a baseball bat. These incidents were contemporaneous to a prior period of discord in the relationship. There were further incidents of abuse in 2017 and in February and April 2018, including violence towards the minor children. However, between April 2018 and December 2019, the parties lived together without further physical violence.

In late December 2019, the plaintiff and the children left the home at the defendant's direction. The defendant clenched his fists and told the plaintiff that if she didn't leave, he would hit her. The defendant insisted that the plaintiff give him all the house keys and grabbed the keys out of the plaintiff's hand. The plaintiff and the children fled to New Hampshire. En route to New Hampshire, the plaintiff had to repeatedly ask the defendant, via text, for money because the defendant controlled her access to her finances. After fleeing to New Hampshire, the plaintiff and defendant maintained "minimal" contact via text messages and the defendant was "callous" and "petty" towards her. The defendant also engaged in controlling behavior, such as disconnecting her cell phone, threatening to withhold financial support, and threatening to report the plaintiff to the police for kidnapping the children.

In February 2020, the plaintiff filed for divorce in the state from which she had fled. Immediately after the defendant was served with the divorce petition, the defendant sent the plaintiff an email stating "good bye." The plaintiff testified that she understood the "good bye," in the context of the defendant's history of threats and violence, to be a death threat and that she was very afraid of the defendant. A month later, the plaintiff filed for a domestic violence order of protection.

The Circuit Court ruled that the defendant had committed abuse based on the prior assaults and criminal threatening. It further ruled that, in the context of the entire relationship and the defendant's recent controlling behavior, the defendant posed a credible threat to the plaintiff's safety. It made this ruling despite the fact that the defendant remained out of state and that travel was limited by the COVID-19 pandemic, because there was nothing to stop the defendant from coming to New Hampshire if he so chose.

---

[20] S.K. v. J.M, N.H. Sup. Ct., No. 2020-0264 (June 4, 2021) (non-precedential).

[21] See Sup. Ct. R. 20(2). Because the Supreme Court did not issue a formal written opinion, the order in S.K. v. J.M. was not posted publicly on the Supreme Court's website or made available in legal databases such as Westlaw or Lexis. However, consistent with longstanding Circuit Court practice, a copy of the decision and a summary prepared by staff was circulated internally to judges in August 2021, approximately two months prior to the final hearing in the L.S. v. R.L. case.

On appeal, the Supreme Court held that the plaintiff failed to prove that the defendant's conduct constituted a credible present threat to her safety under RSA 173-B:1, I. The Court noted that there was "substantial evidence" of the defendant's "controlling behaviors" and "troubling testimony" about incidents of "severe domestic violence" in 2016, 2017, and 2018. The Court also noted the Circuit Court's finding that while the "good bye" email might appear innocuous, it was threatening and triggered the plaintiff's fear of the defendant. However, the Supreme Court noted that the last incident of physical maltreatment by the defendant took place a little less than two years prior to the filing of the petition, that the plaintiff and defendant had resided together for twenty months thereafter, that after the December 2019 incident, the parties lived separately and maintained limited communications, and that the defendant was not physically present in New Hampshire and travel was limited due to COVID-19.

The Court noted that the defendant's controlling and manipulative behavior "surely had a negative impact on S.K.'s emotional and financial well-being." However, while the Court did not "condone" the defendant's behavior, it held that "the inquiry under RSA chapter 173-B necessitates a different focus." Taking all this evidence into account, the Supreme Court concluded that the plaintiff did not establish that she had more than a generalized fear of the defendant or a speculative fear for her physical safety. Thus, the Circuit Court erred in finding that the defendant posed a credible present threat to the plaintiff's safety and granting a final protective order.

The Committee found that S.K. v. J.M. illustrates the stark differences between current public or academic understanding of the threat posed by perpetrators of IPV and the narrow definition of "credible present threat" under RSA chapter 173-B. It also demonstrates how a trial judge who understands the dynamics of IPV including manipulation, coercion, and harassment may still be unable to make the legally required finding that such behavior constitutes a "credible present threat to the plaintiff's physical safety."[22]

Similarly, in J.G. v. P.S.[23] the plaintiff alleged IPV behaviors such as retaliation and turning off the electricity to the home, coupled with a single simple assault. In this instance, the Circuit Court granted an order of protection, but it was reversed by the Supreme Court based on the lack of "an ongoing pattern of behavior." The Court noted that the plaintiff's fear was only generalized. Thus a final order of protection could not issue.

The case of L.B. v. B.P.[24] again contained evidence of IPV, including the defendant engaging in harassment, disclosing "disgusting, horrible" things about the plaintiff on social media, driving by her home and suspected tracking and refusal to follow a parenting plan. A Circuit Court judge granted an order of protection. While the Supreme Court noted that the defendant's behavior was "appalling" and likely affected the plaintiff's emotional well-being, the evidence was insufficient to find that his behavior presented an on-going credible threat to physical safety and therefore a final order of protection could not issue.

---

[22] S.K., *supra* note 20, at 4 (citation and quotation omitted).
[23] J.G. v. P.S., N.H. Sup. Ct., No. 2016-0646 (Apr. 21, 2017) (non-precedential).
[24] L.B. v. B.P., N.H. Sup. Ct., No. 2018-0199 (Aug. 23, 2018) (non-precedential).

## VII.    The Procedures Followed in this Case

The Committee considered the procedures utilized by Judge Hall in reaching a determination on the final domestic violence protective order. The Committee considered whether the hearing was conducted in accordance with the Circuit Court Domestic Violence Protocols,[25] the Code of Judicial Conduct,[26] and the principles of procedural fairness.  The Committee found that the court's conduct of the hearing complied with all applicable laws and protocols. Indeed, the manner in which she conducted the hearing exemplified best practices for conducting final hearings on domestic violence petitions. The Committee considered the following specific procedural issues.

### Necessity of a Hearing

At the start of the hearing, the court noted that R.L. had not appeared, despite being served with a notice of hearing. Unlike in certain other case types, however, where the failure of a defendant to appear permits the court to issue an order by default, the domestic violence statutes require the court to find "abuse" as defined by RSA 173-B:1, I before the court may issue a final order of protection.[27] Thus, it was appropriate for the court to conduct a hearing even in the absence of the defendant, as the court was still required to make the statutory findings before a final order could be issued.

### Demeanor and Interaction with Plaintiff

Judges are required to "be patient, dignified, and courteous to litigants."[28] Judge Hall demonstrated all these qualities during the hearing in L.S. v. R.L. The court was courteous and respectful in her interactions with the plaintiff. Despite having a twenty-two-page docket consisting of approximately seventy cases across multiple case types on the date of the hearing, the court permitted the plaintiff ample time to state her case. The court did not rush, interrupt or cut-off the plaintiff while she was speaking. The court also appropriately relaxed normal courtroom procedure by allowing the plaintiff to remain seated during her testimony, which is consistent with putting a litigant more at ease in the courtroom.

### Procedural Fairness

Procedural fairness is a broad concept that relates to the fairness, perceived and actual, of how decisions are made rather than to the fairness of the outcome the decision-making process.[29] Central elements of procedural fairness are: voice, meaning litigants are given the opportunity to tell their story; neutrality, meaning decision-makers are unbiased and trustworthy; and understanding, meaning that litigants understand their rights and how and why a decision is

---

[25] *See* Fam. Div. Admin. Order 2007-06 (Sep. 11, 2007); Dist. Ct. Admin. Order 2007-67 (Sept. 11, 2007) (making compliance with the Domestic Violence Protocols mandatory); RSA 490-F:2 (Circuit Court has the jurisdiction, powers, and duties of the former District Court and Judicial Branch Family Division).

[26] *See* Sup. Ct. R. 38.

[27] *Compare* RSA 540:14, I (permitting court to issue judgment for plaintiff in landlord and tenant case based upon default of defendant) *with* RSA 173-B:5, I (requiring a showing of "abuse" before the court may grant relief).

[28] Sup. Ct. R. 38, Canon 2.2.

[29] Greg Berman and Emily Gold, Procedural Fairness from the Bench, 51 Judges' J. 2, 22 (2012).

made.[30] These principles are also embodied in the Code of Judicial Conduct, which requires that judges perform their duties fairly and impartially, but also permits judges to make reasonable efforts to "facilitate the ability of all litigants, including self-represented litigants, to be fairly heard."[31]

During the hearing in L.S. v. R.L., the court exemplified the principles of procedural fairness. To begin with, the court clearly and accurately articulated to the plaintiff how the hearing would proceed and the legal standards she was required to apply to make a ruling in the case. The court referred back to these standards on several occasions, reminding the plaintiff of what the court was required to consider as she presented her case. By explaining and referring to the statutory findings she was required to make, the court promoted the plaintiff's understanding of the legal framework governing the case so she could structure her presentation to meet that framework.

Additionally, the court asked several open-ended questions which gave the plaintiff the opportunity to directly address the issue of credible present threat. For example, the court asked the plaintiff to speak about recent events and to tell the court what prompted the plaintiff to file a petition in September 2021. These questions appropriately aided the plaintiff in being fairly heard and focused her on the key issue facing the court – whether the defendant was a credible present threat to the plaintiff's safety - without crossing the line into advocacy.[32] The court also took other steps, such as describing non-verbal gestures made by the plaintiff for the record, to ensure that her opportunity to be heard was not undermined by the fact that she was unrepresented by counsel.

Finally, the Committee found no evidence to suggest that the court was anything but fair and impartial during the conduct of the hearing.[33] Likewise, the Committee did not find any evidence to suggest that the court was neither objective nor open-minded when she conducted the hearing.[34]

**Control of Presentation of Evidence**

Judge Hall exercised appropriate control over the presentation of evidence during the final hearing. The court in a domestic violence order of protection case has broad discretion in managing the proceedings before it, including in the admission or exclusion of evidence.[35] While the technical rules of evidence do not apply to order of protection hearings, evidence presented must be relevant and material and the court may exclude evidence that does not meet this standard.[36] The court exercised this discretion to admit photographs of injuries to the plaintiff, which L.S. testified were not the result of consensual acts, and to exclude evidence of a

---

[30] Id.

[31] Sup. Ct. R. 38, Canon 2.2.

[32] See Walker v. Walker, 158 N.H. 602, 606 (2009) (discussing line between appropriate judicial inquiry and acting as counsel for a party).

[33] Sup. Ct. R. 38, Canon 2.2(A) ("A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially").

[34] Sup. Ct. R. 38, Canon 2.2 cmt. 1 ("To ensure impartiality and fairness to all parties, a judge must be objective and open-minded").

[35] In re Sawyer, 161 N.H. 11, 18 (2010); In re Morrill, 147 N.H. 116, 118 (2001)

[36] See RSA 173-B:3, VIII; Morrill, supra note 35, at 118.

"contract" between the plaintiff and defendant related to what the judge stated on the record that she understood to be consensual sexual activities.[37] The court explained to the plaintiff the reason for excluding the "contract," namely that consensual sexual activities were not a predicate criminal act under the statute. The plaintiff did not contradict the court's stated understanding of the "contract" evidence.

**Absence of an Advocate or Attorney**

At the final protective order hearing, L.S. was unrepresented by counsel and was not accompanied by a domestic violence advocate. While the reasons for the absence of counsel or an advocate are beyond the scope of this review, the Committee did consider the court's response to the absence of both at the hearing. At the start of the hearing, the plaintiff mentioned to the court that she had attempted to obtain a domestic violence advocate from HAVEN[38] to support her at the hearing, but that it had not worked out. The court expressed sympathy for the plaintiff's inability to obtain assistance and, shortly thereafter, asked the plaintiff if she was prepared to proceed. The plaintiff indicated that she was prepared and did not ask for a continuance of the hearing to obtain assistance or ask any questions about continuing the case. The Committee concluded that the court appropriately went forward with the hearing based on the plaintiff's affirmation that she was prepared to proceed.

**The Court's Written Order**

On the same day as the hearing, the court issued a brief written order dismissing the case. The speed with which the order was issued is in accordance with the Domestic Violence Protocols, which provide that, "[i]f possible, decisions should be rendered on the date of the hearing."[39] This Protocol is based on the significant personal safety and personal liberty issues at stake for parties in protection order cases. However, the imperative for quick decisions means judges simply do not have the time to craft detailed written orders in most protection order cases.

The order was issued on a standardized court form.[40] The court both checked the box noting that the court was not making a finding of "abuse" as defined by RSA chapter 173-B and typed a brief written order explaining her reasoning for that finding, namely that the court could not find that the defendant posed a present credible threat to the plaintiff. The court use of the standardized order form is consistent with Circuit Court practice, where time constraints and the high volume of cases do not permit judges to issue lengthy narrative orders in most cases. The forms are also designed to promote consistency across the court system, facilitate proper entry and removal of orders of protection in the National Crime Information Center's law enforcement database, and to permit the court system to accurately track data related to these cases.

---

[37] When the Committee refers to "consensual" sex here, it refers to the narrow, legal sense of the word, which requires a victim to indicate "by speech or conduct" that consent is not freely given to constitute a sexual assault which could serve as a predicate offense for an order of protection. *See, e.g.,* RSA 632-A:2, I(m); RSA 173-B:1, I(c).

[38] HAVEN is a Portsmouth, NH-based non-profit, violence prevention and support services agency.

[39] Protocols, *supra* note 9, at Ch. 7, Protocol 36.

[40] N.H. Cir. Ct., Dom. Violence Final Order of Dismissal, NHJB-2580-DF (07/01/2011).

## VIII.  The Facts of this Case

The Committee carefully reviewed the factual record to determine what evidence was before the court at the time the trial court determined that the element of credible present threat was not established. In conducting its factual analysis, the Committee focused only on information available to the Court at the time of the October 20, 2021 hearing, rather than viewing that information in light of subsequent events. The Committee noted that it had several advantages which were not available to the trial court in evaluating the facts of the case, including the benefit of seven uninterrupted hours to review the case,[41] the ability to listen to a recording of the hearing multiple times,[42] and six sets of eyes and ears poring over the record. Finally, because the plaintiff adopted her petition for relief as part of her testimony, the Committee considered both the plaintiff's testimony at the hearing and the written allegations in the petition, which appear to have been written with the assistance of a non-lawyer third party, in determining the facts of the case.

### Overview

Based upon the petition and the plaintiff's testimony, the Committee infers that L.S. and R.L. were in a long-term, intimate relationship, lasting at least five years. This relationship was ongoing at least until the month prior to the petition being filed on September 21, 2021. The parties lived together in L.S.'s home until approximately September 6, 2021 (Labor Day). The Committee found that the relationship described by L.S. bears numerous hallmarks of IPV, including the use of a wide variety of coercion and control tactics by R.L.

Turning to the specific acts by R.L. described by the plaintiff, the Committee found that they fall into two broad categories, those occurring "in the past"[43] and those occurring within the month immediately preceding the filing of the petition on September 21, 2021. This distinction is critically important in light of the case law limiting when past acts of violence can support a finding that a defendant poses a credible present threat.

### Events Occurring in the Past

In both her petition and her testimony, the plaintiff described a number of acts by the defendant that occurred "in the past" or "previously," without specifying a more precise timeframe for the acts. These acts include:

- R.L. was "sexually violent and coercive" and that, in his relationship with the plaintiff, "sex is used as punishment."[44] In her petition, the plaintiff described acts such as "unwanted anal intercourse, smothering covering both mouth and nose, hitting private

---

[41] A review of the court's docket from October 20, 2021 reveals that the trial judge was scheduled for hearings in approximately seventy cases over the course of the day.

[42] Circuit Court judges typically do not have the benefit of reviewing recordings or transcripts of hearings before issuing decisions in protection orders cases and must rely on their own memory of the hearing in making decisions.

[43] L.S. v. R.L., Dom. Violence Pet., 10th Cir. Ct. – Hampton Fam. Div., No. 641-2021-DV-00070, 1, 3, (Sep. 21, 2021) (hereinafter "Petition").

[44] *Id.* at 3.

parts, using language of rape, slavery, and control."[45] At the hearing on the petition, the plaintiff characterized R.L.'s actions as "threats of sexual violence to [L.S.] as forms of punishment"[46] and stated R.L. makes "deals," sometimes in writing, about various sexual acts as punishment, including tying up the plaintiff, holding her breath, rough sex, sex with other men in front of R.L., anal sex, and hitting the plaintiff's private parts.

During her interview with the committee, Judge Hall stated that she understood the plaintiff's testimony to mean that the defendant was coercive and controlling in their sexual relationship, but that the sexual acts themselves were legally consensual, at least recently. Judge Hall explained that she understood the "contract" offered by the plaintiff to mean that the plaintiff had contracted or agreed to engage in the sexual acts previously described.

During the hearing, the court stated this understanding on the record when the plaintiff sought to introduce the sexual "contract" into evidence. The plaintiff did not contradict this understanding.[47] Additionally, it was not clear from the petition or the plaintiff's testimony whether this pattern of coercive sexual conduct was still ongoing at the time of the petition.

▪ In 2016, R.L. assaulted the plaintiff, causing bruises to her chest, legs, and genital area. These injuries were shown in the photographs presented to the court. The plaintiff later testified it had been some time since "physical stuff" had happened because the defendant was "enjoying control" over the plaintiff.[48] The trial court interpreted the plaintiff's testimony to mean that R.L. had not engaged in physically or sexually assaultive behavior since 2016. This conclusion was not unreasonable in light of the plaintiff's testimony at the hearing.

▪ R.L. informed the plaintiff of previous acts of violence against third parties in his past related to his participation in criminal organizations.

▪ R.L. had previously attempted suicide, which the plaintiff perceived as demonstrating an attitude of not caring about consequences.

▪ R.L. previously called L.S.'s place of employment and her family and told them "horrible things" about L.S.[49]

---

[45] *Id.*

[46] L.S. v. R.L., Final Hearing, 10th Cir. Ct. – Hampton Fam. Div., No. 641-2021-DV-00070 (Oct. 20, 2021) (hereinafter "Hearing"). The Committee did not have access to a written transcript at the time of its review. As such, quotes from the hearing reported are based on the audio recording of the hearing and may not exactly match those found in any official transcript prepared at a later date.

[47] The Committee recognizes that an unrepresented and unaided litigant may not recognize the need to correct a judge's misimpression or feel comfortable doing so, particularly when discussing difficult issues such as sexual behavior and sexual assault. Thus, the Committee recommends that the Court system explore additional methods to ensure that plaintiffs in protection order cases receive the assistance of attorneys and advocates.

[48] Hearing, *supra* note 46.

[49] *Id.*

- R.L. kept the plaintiff isolated, "emotionally abused," and "financially abused" for years.[50]

## Events Occurring in the Month Preceding the Petition

In her petition, the plaintiff described a series of acts occurring between August 27, 2021 and the filing of the petition on September 21, 2021. She also testified about many of the same acts during the hearing. With the time afforded to it, the Committee correlated the dates of acts described in the petition with those discussed at the hearing. These acts include:

- August 27, 2021:

  - R.L. reorganized his guns in front of L.S. while he was angry in what L.S. perceived as an attempt to intimidate her.

  - During the final hearing, L.S. described the incident involving the firearms and then stated, "If he was angry, then he would make threats of, um, you know, um trying, using like very rough language like that he was going to rape me and that he was going to make me pay." [51] The Committee could not determine whether L.S. was referring to a specific threat made on August 27, 2021 or more generally describing the types of things R.L. would say when he was angry.

- During the week of August 30, 2021, R.L. learned that L.S. had rented a room at a yacht club by searching through her emails.

- September 6, 2021:

  - R.L. tracked L.S. to Marblehead, Massachusetts using her cell phone. He sent her text messages indicating that he knew where she was and using language such as "I will make you pay."[52]

  - L.S. agreed to meet R.L. at the Marblehead Lighthouse in a public park. L.S. wanted to meet R.L. in public because of the nature of his text messages.

  - At the park, R.L. yelled profanities at L.S., referring to her as a "c--t" and stating "I am going to f--k you up. I am going to f--k up your whole life. Everything you hold dear, I will f--k it up. You can't trust anything to be okay anymore. I am going to turn your world upside down. You'll see. You'll pay. You chose this."[53]

  - R.L.'s extreme anger and L.S.'s knowledge of his previous abuse made L.S. afraid to return to the home she had shared with him. L.S. did not return to the home for some time after the incident on September 6, 2021.

---

[50] *Id.*

[51] *Id.*

[52] Petition, *supra* note 43, at 3.

[53] *Id.*

> o L.S. stated that R.L.'s screamed threats at the park were the main reason she chose to file a petition and, in light of events in the following weeks, she took "I will make you pay" as a threat to her physical safety.

- In the weeks following September 6, 2021, R.L. texted L.S. and "blackmailed" her. L.S. did not explain what she meant by "blackmail."

- On September 8, 2021, R.L. texted L.S. "My friend from RI says hi. Remember that guy that did you that favor."[54] L.S. took this as a reference to a person whom L.S. understood had, at R.L.'s direction, broken the jaw of a third person who R.L. believed was blackmailing L.S. with videos. L.S. understood this message to be a threat to her.

- September 15, 2021:

> o R.L. "blackmailed" L.S. into agreeing to talking to him at their home at 6:00 PM.[55] L.S. did not specify what the "blackmail" entailed.

> o When the scheduled time to go to the house approached, L.S. feared returning and instead went to the local police, who recommended that she seek a restraining order.

> o While still at the police station, a tenant residing in L.S.'s home texted her to say that R.L. had left the home with a pet. L.S. then returned to the home to grab some personal items.

> o While L.S. was at the home, R.L. returned. R.L. gave her a "a final ultimatum, 'You be my sex slave Thursday to Sunday and this can all be over.'"[56] L.S. testified at the hearing that the "ultimatum" consisted of R.L. telling L.S. that he would share "sordid details" of her personal life with her family and employer if she did not agree to be his "sex slave" for five days.[57]

> o A friend of L.S., who had gone with her to the house, called the police at some point after R.L. returned to the home and a police officer arrived while R.L. was discussing the "ultimatum."

> o The police officer directed R.L. to return the house keys to L.S. and to leave the home, which he did. R.L. was not arrested and there was nothing in the court record to indicate that police took further action on that date.

> o After R.L. left the home, L.S. discovered that R.L. had taken a number of items from the home that belonged to L.S.

> o L.S. did not stay in the home after R.L. left because of R.L.'s anger.

---

[54] *Id.* at 1.
[55] *Id.* at 3.
[56] *Id.*
[57] Hearing, *supra* note 46.

- Immediately after September 15, 2021, R.L. began texting and calling L.S.'s family and employers on a near daily basis, telling them "terrible things" about L.S. L.S. feared that because R.L. was not getting a response from her family or employer, his anger was escalating.[58]

- L.S. stated that she did not feel safe to have R.L. around her because she perceived that he was experiencing "loss of control" of L.S.[59]

**The Trial Court's Understanding of the Facts**

In reviewing the facts of the case with Judge Hall, it became clear that that there was a difference between the discrete acts described by the plaintiff in her petition and what the trial court understood to be the focus of the plaintiff's concerns at the final hearing. Specifically, while the plaintiff described a wide variety of acts in the month prior to the petition, the court understood from L.S.'s testimony that her primary concern was the threat that R.L. would either "blackmail" her into engaging in a relationship with him or that he would cause her reputational and emotional harm by harassing L.S.'s friends and family and sharing embarrassing information about her with others. Thus, the court understood L.S.'s testimony about R.L.'s statements such as the threat to "turn your world upside down" and the "final ultimatum," to mean that if L.S. did not continue the relationship with R.L., he would harm her reputation. The court understood the plaintiff's expressed fear for her physical safety to be a generalized fear about what the defendant might do in the future, rather than a specific fear of imminent violence as required to establish a credible present threat.[60] Judge Hall noted that her perception about the lack of present threat was strengthened by the absence of any testimony about acts of physical violence since 2016.

Judge Hall also stated that the plaintiff's testimony, and what she perceived as the focus on blackmail, rather than physical safety, affected how she interpreted the plaintiff's petition, contributing to her decision to deny a final order despite having granted a temporary order. Judge Hall noted that, while she considered both the petition and the plaintiff's testimony in making her factual conclusions, she placed more emphasis on the testimony because the petition appeared to have been written by a third-party rather than by the plaintiff. The Committee noted that the body of petition was typed, but the petitioner signed the petition by hand at court. The substantive text of the petition is entirely in the third person and reads as if a third party typed a summary of information provided by L.S. The Committee found that this method of presenting the plaintiff's experiences, while certainly permissible, was somewhat confusing and more difficult to follow than if the information had been presented in the first person, consistent with the structure of the rest of the form petition.[61] This also contributed to the court placing greater emphasis on what she heard directly from the plaintiff during the hearing.

With the benefit of time and the recording of the hearing, the Committee was able to identify additional statements from the plaintiff indicating that she feared for her physical safety. Judge

---

[58] *Id.*

[59] *Id.*

[60] *Cf.* Alexander, *supra* note 15.

[61] N.H. Cir. Ct. Dom. Violence Petition, NHJB-2050-DF (July 21, 2014).

Hall, who did not review the audio of the hearing prior to meeting with the committee, candidly admitted that she did not recall all of these statements from the hearing. The Committee notes that trial judges have the discretion to ask clarifying questions to better understand the testimony in protective order cases.[62] In this case, for example, it would likely have been beneficial to ask the plaintiff to explain her statement in connection with the August 27, 2021 incident that when R.L. was angry he would make threats "like" he was going to rape her, in order to determine the nature of any threat actually made on August 27th. However, judges are not required to ask clarifying questions and must take care not to cross the fine line between attempting to understand testimony and becoming an advocate for one party.[63]

Overall, the differences between the trial court's understanding of the facts and the Committee's summary of the facts in this report reflect the fact that trial judges have to make decisions based on their recollection of a hearing and their impressions of the parties, including their demeanor, tone, and other non-verbal cues. Moreover, a judge must take in all of this information while also taking notes, because no transcript or recording of the hearing is generally available.[64] The judge must simultaneously monitor the time to ensure that hearing does not exceed its allotted length. What may be obvious to a reviewer parsing a written document word-by-word, reading a transcript, or repeatedly listening to a recording may come across very differently to a judge conducting a hearing. In light of this reality, and considering the record as a whole, the Committee found that the court's understanding of the facts was not unreasonable, even if other jurists or the members of the Committee may have reached different factual conclusions.

## IX.    Analysis of the Court's Decision

After establishing what information was before the court at the time the decision to deny a final protective order was made, the Committee turned to an analysis of the court's legal conclusions. In doing so, the Committee was mindful that under our system of government, it is the role of the judicial branch to interpret and apply the law, not create it. Judges take an oath to apply the law to the best of their ability. Judges of lower courts, such as the Circuit Court, are bound to follow decisions of higher courts interpreting the law. Even the most experienced judges can interpret the law differently – none being "wrong" – especially in circumstances where the law is not explicitly and consistently defined. Still, they must apply the law as it exists and their orders must be consistent with it. They cannot write the law to fit their wishes or to seek an outcome that the law does not permit. With those principles in mind, the Committee concluded that the court applied the statutory law, as interpreted by New Hampshire Supreme Court precedent, in good faith and that her decision was not unreasonable given the current state of the law.

**The Trial Court's Reasoning**

During her interview, Judge Hall explained that her conclusion that the plaintiff did not prove that the defendant was a credible present threat was based on several factors, including the absence of any act of physical violence committed by the defendant since 2016, her

---

[62] *See* Walker, *supra* note 32, at 606.

[63] *See id.*; Sup. Ct. R. 38, Canon 2.2.

[64] The Committee could clearly hear the sound of the court taking handwritten notes during the hearing on the audio recording.

understanding that R.L.'s threats were mainly related to "blackmail" and reputational or emotional harm, her finding that L.S.'s expressed fear was primarily related to the "blackmail" and a generalized fear of what R.L. might do, rather than fear of a specific physical threat, and three New Hampshire Supreme Court cases addressing the issue of credible present threat. Specifically, Judge Hall cited the published case of <u>Tosta v. Bullis</u> and the unpublished cases of <u>S.K. v. J.M.</u> and <u>L.B. v. B.P.</u> Based on these factors, the court concluded that while R.L.'s behavior was controlling and coercive, and demonstrated his anger at L.S.'s attempt to end the relationship, it did not establish a credible present threat to L.S.'s physical safety as defined by current law. Judge Hall explained further that, in the absence of a recent act of violence or what she understood as an explicit threat of violence, she felt constrained by case law to find as she did.

**The Committee's Legal Analysis**

The Committee reviewed the trial court's legal conclusion regarding credible present threat to determine if it was unreasonable in light of current case law. The Committee considered both aspects of the credible present threat analysis – the nature of the threat and whether it was ongoing and specific.

First, the committee considered whether the trial court reasonably concluded that the threat to the plaintiff was primarily to her emotional or reputational well-being, rather than to her physical safety. Under current Supreme Court precedent, to constitute a credible present threat, the defendant's conduct must threaten the plaintiff's physical safety, as opposed to his or her emotional or financial wellbeing.[65] "Appalling" behavior, such as harassing a plaintiff by disclosing highly personal and private negative information about the plaintiff to others, does not rise to the level of present a threat to physical safety standing alone.[66] Nor does such behavior support a finding of a credible threat even when coupled with a history of physical violence if there has not been a recent violent act or serious threat of violence.[67] This is true even when a plaintiff testifies, based on his or her own personal history with the defendant, that seemingly non-violent or ambiguous actions are actually threatening.[68]

Given the state of the law, a judge who understood the facts as the trial court did – namely that the last act of physical violence occurred in 2016 and that R.L.'s conduct towards L.S. in the month prior to filing the petition primarily consisted of threats to disclose negative information about L.S. to others and other non-violent harassment – could reasonably conclude that the plaintiff failed to demonstrate the threat posed by R.L. was primarily physical in nature. A judge could reasonably reach this conclusion despite the plaintiff's expressed, subjective fear for her physical safety.

Second, the committee considered whether the trial court reasonably concluded that any threat of physical harm to the plaintiff was generalized, rather than ongoing and specific. To support the issuance of a protective order, the plaintiff must demonstrate that the threat to his or her physical

---

[65] Knight, *supra* note 13, at 745–46
[66] L.B., *supra* note 24, at 2; Knight, *supra* note 13, at 745-46
[67] *See* Alexander, *supra* note 15, at 442-43.
[68] Tosta, *supra* note 8, at 765 (plaintiff repeatedly expressed fear of defendant), 767-68; S.K., *supra* note 20, at 4-5.

safety is ongoing and specific, rather than generalized.[69] A generalized fear, even if based on a history of physical violence, will not support a finding of credible present threat, particularly where the plaintiff and defendant have continued to have contact or reside together after the occurrence of the violence acts.[70] In this legal context, a judge who understood the facts as the trial court did could reasonably conclude that L.S.'s expressed fear was generalized and non-specific in nature and that the defendant's recent acts did not present a specific and ongoing threat of physical violence toward the plaintiff. This is particularly true given the fact that L.S. continued to reside with R.L. after the last act of physical violence in 2016 and continued to have some contact with him in the month prior to the filing of the petition, factors which case law suggests augur against find a credible present threat.

Considering the facts of the case as the trial court understood them, the Committee found that court made a decision which was consistent with a reasonable understanding of the law. The Committee noted that a different judge, hearing the same evidence, could have reasonably determined that R.L.'s threats to L.S.'s <u>were</u> physical in nature. A judge with that understanding would have engaged in a different legal analysis and could permissibly have found that R.L. posed a credible present threat, even though there was no recent act of physical violence.[71] However, as in any review of this nature, the Committee was limited to considering the written record and a recording of the hearing. The Committee did not have the opportunity to observe the plaintiff's demeanor, attitude, and presentation or to hear her testimony in real time. Given those limitations, the Committee cannot say that the trial court's factual or legal conclusions were unreasonable or outside the bounds of New Hampshire law.

## X.    The Committee's Observations about the Current State of the Law

While analyzing the trial court's legal conclusions, the Committee examined the cases cited by Judge Hall in detail. In so doing, the Committee made several observations about the current state of the law which suggest areas for potential reform.

The first case cited by Judge Hall, <u>Tosta v. Bullis</u>, was decided in 2008. In <u>Tosta</u>, the Supreme Court found insufficient evidence of a credible present threat where the defendant assaulted the plaintiff nine months prior to the petition and the plaintiff continued living with the defendant. Immediately before the plaintiff filed the petition, the defendant had unexpectedly moved out of their shared home following a period of rising tensions and was seen driving around the plaintiff's home and her sister's home on the day the petition was filed.[72] The court in <u>Tosta</u> also cited a 2002 case, <u>In the Matter of Alexander and Evans</u>, for the principle that a plaintiff must "show more than a generalized fear for personal safety based upon past physical violence and more recent non-violent harassment to support a finding that a credible threat to her safety exists."[73] In <u>Alexander</u>, the Supreme Court found no credible present threat where the defendant, who had a history of physical violence and was known to possess weapons, repeatedly violated a

---

[69] Tosta, *supra* note 8, at 767 (2008); Achille, *supra* note 10, at 716

[70] Tosta, *supra* note 8, at 767; Achille, *supra* note 10, at 716; Alexander, *supra* note 15, at 442-43.

[71] *See* In the Matter of McArdle and McArdle, 162 N.H. 482, 487 (2011) (court not required to find commission of a violent act to make a finding of credible present threat)

[72] Tosta, *supra* note 8, at 765.

[73] *Id.* at 768 *citing* Alexander, *supra* note 15, at 441-43.

divorce restraining order, made false allegations to police about the plaintiff, and harassed the plaintiff with repeated notes, calls, and "rude gestures" in the months leading up to the petition.[74]

L.B. v. B.P., a 2018 case, also cited Alexander in finding no credible threat to the plaintiff where the defendant engaged in harassment, sending dozens of text messages to the plaintiff, disclosed "disgusting, horrible" things about the plaintiff on social media, driving by her home, refusal to return her children to her according to their agreed upon schedule, and was suspected of following her.[75] S.K. v. J.M., a 2021 case, cited both Tosta and Alexander for its conclusion that the defendant's controlling behaviors and implicit threat in the lead up to the petition were insufficient to establish a credible threat where the last act of physical violence occurred more than a year before the plaintiff filed for relief.[76]

In considering these cases and the broader body of law dealing with "abuse" under RSA chapter 173-B, the Committee identified four areas for further consideration.

First, the Committee observed that, given the nature of our system of law in which new cases are decided by reference to prior decisions, trial court judges are bound to follow cases decided decades earlier, at a time when the common understanding of IPV was dramatically different than it is today. The Alexander case, which stands for the principle that past violence coupled with current, non-violent harassment does not support a finding of a credible present threat, has guided judicial decision making about what constitutes "abuse" for nearly twenty years. The Committee's review of the line of cases based on Alexander strongly suggests that a review of that principle by the Supreme Court or the legislature in light of modern understandings of IPV is in order. Yet Alexander, and cases based on Alexander, continue to be binding on Circuit Court judges to the present day.

Second, the Committee noted that current statutory and case law defining "abuse" fails to capture the true scope of IPV and the coercive control tactics utilized by perpetrators. Current law also does not appear to recognize how a pattern of seemingly non-violent or non-abusive behaviors may serve as a precursor to violence. Nor does current law incorporate evidence-based practices for identifying violence risk.

Third, the Committee found that current case law has, in essence, created a Catch-22 for certain victims of IPV. As Tosta shows, unless there is an act of violence or serious threat of violence in close proximity to the filing of the petition, the victim's decision to remain in the same residence as the perpetrator may undermine the victim's claim of a credible present threat.[77] The unspoken reasoning supporting this conclusion – that if a victim were truly afraid or in danger, he or she would have fled the home – reinforces one of the most pernicious and damaging myths associated with IPV and utterly fails to recognize that there are numerous barriers to IPV victims breaking away from perpetrators.[78] However, as S.K. v. J.M. demonstrates, if a victim of IPV

---

[74] Alexander *supra* note 15, at 441-43.
[75] L.B., *supra* note 24, at 1-2.
[76] S.K., *supra* note 20, at 4.
[77] Tosta, *supra* note 8, at 768.
[78] *See generally Why Do Victims Stay?,* National Coalition Against Domestic Violence (2021), https://ncadv.org/why-do-victims-stay.

manages to flee a perpetrator, the victim's ability to flee and live separately from the perpetrator can also be used to undermine his or her claim of a credible present threat, even if he or she sees warning signs of impending violence based on the history of IPV. While skilled counsel or advocates may be able to assist a victim in distinguishing his or her experiences from this case law, an unrepresented, unaided litigant will face substantial difficulties in doing so or, more likely, be unaware of the need to do so.

Fourth, the Supreme Court's current practice of not publicly disseminating certain decisions in cases under RSA chapter 173-B creates a disconnect between the public and practitioners' understanding of the state of the law and that of judges. Since October 2014, the Supreme Court has regularly published final orders in non-confidential cases decided without a formal published opinion online.[79] Even prior to 2014, such orders were included in legal research databases such as Westlaw and Lexis. While these orders are not binding,[80] they are often reviewed by attorneys, judges, and the public for their persuasive value, particularly when the non-binding orders address facts similar to those facing a trial court. Circuit Court judges receive these orders and, precedential or persuasive, do their best to apply them to their decisions since failing to do so may be grounds for an appeal.

Despite the fact that protection order cases are not a confidential case type,[81] the Supreme Court has recently chosen not to publicly post "final merits orders that might disclose confidential or protected information, such as the identity or whereabouts of a party who sought a domestic-violence or civil-stalking protective order."[82] It also appears the Court no longer provides such opinions to legal research databases. While the Committee strongly supports measures to protect the confidential or protected information of IPV survivors, it also observed that current practice creates a disconnect between how judges understand the law and how the public understands it. In this case, the trial court's consideration of the legal issues was strongly influenced by two recent unpublished cases which L.S. would not have been able to access unless she physically went to the Supreme Court and requested the case files.

## XI.     Recommendations

During the course of its review, the Committee developed seven recommendations to improve the handling of cases in which survivors of IPV seek civil orders of protection from the court. Because of the limited scope of the Committee's charge, these recommendations are primarily focused on improving processes and procedures within the court system.

**Recommendation 1: Conduct a Comprehensive Review of Protection Order Related Forms**

During the course of its review, the Committee examined the Domestic Violence Petition form in detail. Both the Committee and Judge Hall noted that the petition in this case was somewhat confusing and difficult to follow. The Committee ultimately needed to create its own timeline of

---

[79] *Case Orders- Supreme Court*, N.H. Judicial Branch (2021), https://www.courts.nh.gov/our-courts/supreme-court/orders-and-opinions/case-orders.
[80] Sup. Ct. R. 20(2).
[81] Sup. Ct. R. 12(1)(b).
[82] *Case Orders*, *supra* note 79.

the events described in the petition in order to better understand the allegations made by the plaintiff, a tool the trial court simply did not have time to create.

The Committee concluded that the confusing nature of the petition in this case resulted, in part, from the layout of the form itself, which calls for the plaintiff to provide an unstructured narrative describing the alleged abuse. Additionally, the petition in this case appears to have been typed into an electronic version of the form, which provides only a limited amount of space for the plaintiff to describe his or her allegations and does not contain an easy method of attaching additional pages of allegations. In this case, it appears that the limited space afforded the plaintiff led the person preparing the form to forego the use of paragraphs to help organize the information presented in a more understandable manner. Thus, it appears the structure of the form contributed to the confusing way in which the plaintiff's allegations were presented.

Additionally, the petition does not actually describe the elements a plaintiff is required to prove in order to obtain relief, nor does it provide a structure to help the plaintiff meet the legal standard, such as providing separate sections for the plaintiff to allege particular acts of abuse and to describe why the defendant is a present credible threat. Additionally, the form does not make clear to the plaintiff that any fact upon which he or she wishes to rely in order to obtain an order of protection must be alleged, at least generally, in the petition.[83] Given that the protection order process is intended to be an informal one, accessible to individuals without the assistance of counsel,[84] the addition of clear guidance and structure to the petition may be helpful to plaintiffs.

Based on these observations, the Committee recommends that the Judicial Branch undertake a comprehensive review of the forms utilized in connection with protection order cases to ensure that they provide clear guidance to those seeking protection about the legal standards for obtaining an order, assist plaintiffs in explaining their experiences in the context of those standards, and help judges more readily analyze requests for protection.

Finally, the Committee also noted that, currently, petitions for Domestic Violence Orders of Protection and Stalking Orders of Protection utilize separate forms. Both types of protective orders are available to victims of IPV and provide similar protections, but have different legal standards, meaning that an IPV victim may be entitled to one kind of protection but not the other. The Committee recommends that the Judicial Branch explore whether it would be feasible and advisable to develop a single form which allows victims of IPV to request protection under both the domestic violence and stalking protective order statutes simultaneously.

**Recommendation 2: Develop Better Tools to Ensure that Survivors of IPV Can Access All Protection Order Options**

In reviewing the facts of this case and the applicable law, the Committee noted that had L.S. filed for a stalking protective order, rather than a domestic violence order of protection, she would not have been required to prove the defendant was a "present credible threat."[85] Instead, provided

---

[83] In the Matter of Aldrich and Gauthier, 156 N.H. 33, 34–35 (2007); RSA 173-B:3, I.
[84] *See* RSA 173-B:3, III.
[85] *Compare* RSA 173-B:1, I *with* RSA 633:3-a, I(a)-(b).

that the plaintiff established that the defendant engaged in a "course of conduct," as defined by statute, all she would be required to prove was that the defendant's conduct caused her to fear for her personal safety.[86] The Committee believed that it was likely L.S. could have met this lower standard for relief. Additionally, L.S. may have been able to seek a civil restraining order in Superior Court in the event her case did not meet the criteria for either a domestic violence or stalking order of protection.

Currently, the Judicial Branch provides information about the various types of restraining and protective orders available to individuals on its website.[87] However, the Judicial Branch does not provide any tools or worksheets to help unrepresented litigants decide which type of protection to seek. Nor does the Judicial Branch automatically provide information about all the available forms of protection to litigants when they file for one type of protection.

The Committee recommends the Judicial Branch develop an easy to use tool or worksheet to ensure that survivors of IPV are aware of, and can easily access, all protection order options, including domestic violence and stalking orders of protection, divorce and parenting restraining orders, and civil restraining orders issued by the Superior Court.[88] The Committee further recommends that the use of this tool be mandated or strongly encouraged at the time a request for a protective order is filed, to ensure that survivors are aware of which forms of relief are most likely to be granted based on the facts of their case.

**Recommendation 3: Update the Legal Definition of "Abuse" to Reflect the Reality of IPV**

In reviewing the relevant law, the Committee noted both that the statutory definition of "abuse" in RSA chapter 173-B and, in particular, the way case law has defined the concept of a "credible present threat" over the past twenty years, is not reflective of current understandings of IPV. Despite being trained on the current research about the dynamics of IPV, Circuit Court judges hearing protection order cases are required to apply precedents based on an outdated understanding of IPV.

The Committee recommends that the multidisciplinary task force led by Justice Hantz Marconi carefully examine the disconnect between the legal definition of "abuse" and reality of IPV and work with relevant stakeholders to update the definition. The Committee further recommends that the task force consider how to incorporate modern risk assessment tools into the protection order process in a manner that both enhances victims' safety and complies with due process.

**Recommendation 4: Increase Awareness of Non-Precedential Opinions in Protection Order Cases Among Attorneys, Advocates, and the Public**

During the Committee's review, it was clear that the trial court's thinking about the case was influenced by several non-precedential, but persuasive, Supreme Court cases. As noted above, these non-precedential cases are not easily accessible to the general public or practitioners. Thus,

---

[86] RSA 633:3-a, I.

[87] *See Orders of Protection and Restraining Orders*, N.H. Judicial Branch (2021), https://www.courts.nh.gov/self-help/restraining-orders.

[88] *See, e.g.,* N.H. HB 246 (2021) (proposing such a tool in the context of a vulnerable adult protective order).

there is a disconnect between how judges understand the law of abuse, particularly as it applies to particular factual scenarios, and how the public and, critically, advocates and attorneys assisting victims of IPV in seeking protection orders, understand the law.

To remedy this disconnect and better assist litigants in protection order cases to prepare, the Committee recommends that the Supreme Court explore ways to resume posting non-precedential protection order cases on its website and sharing them with legal research databases while still protecting the privacy and security of IPV survivors. Public dissemination of these cases will also assist in the development of the law and help advocates and lawmakers better assess the need for legal reform.

### Recommendation 5: Provide Clear Guidance to Plaintiffs and Defendants in Protection Order Cases on What to Expect at the Final Hearing and How to Prepare Their Case

When litigants like L.S. are not represented by counsel or assisted by an advocate, they may not know what to expect in a final hearing on a domestic violence order of protection or how to prepare their case. For example, they may be unaware of the legal standard for obtaining relief, particularly because the common understanding of what constitutes "abuse" is dramatically different from the definition of "abuse" under RSA chapter 173-B. The Circuit Court offers a number of resources, including videos and checklists, to assist unrepresented litigants in preparing for court.[89] However, none of these resources are automatically provided to litigants in protection order cases. Instead, litigants must go online or call the Trial Court Information Center to obtain these materials. Additionally, many of the materials available focus on process, rather than assisting litigants to prepare substantively.

The Committee concluded that it was consistent with the Judicial Branch's role to provide additional legal information to unrepresented litigants in order to facilitate their ability to be fairly heard at the final hearing.[90] Therefore, the Committee recommends a review of all legal information materials currently provided by the Circuit Court and the development of guidance materials that are provided automatically to all litigants in protection order cases. These materials should be written in plain and accessible language and should clearly advise litigants of the applicable legal standards and procedures. These materials should also assist litigants in preparing for hearings and organizing their presentation to the court, while also being mindful of the court's role as a neutral arbiter rather than advocate for one side or the other.

### Recommendation 6: Explore Steps the Court Can Take to Ensure Survivors of IPV Receive the Assistance of Counsel and Victim Advocates

The plaintiff in this case was not represented by counsel and did not have the assistance of a victim advocate at the hearing. A substantial body of research indicates that litigants who are represented by counsel are far more likely to succeed in obtaining relief than unrepresented

---

[89] *See, e.g., Orders of Protection and Restraining Orders, supra* note 87.

[90] Sup. Ct. R. 38, Canon 2.2(B) ("A judge may make reasonable efforts, consistent with the law and court rules, to facilitate the ability of all litigants, including self-represented litigants, to be fairly heard").

litigants.[91] An advocate could have appeared alongside the plaintiff, offering support and guidance through the hearing.[92] While the Committee cannot speculate as to whether the presence of either counsel or an advocate would have changed the outcome of this matter, there is no doubt the plaintiff would have benefited from the assistance of one or both.

Unfortunately, the plaintiff's lack of counsel was not uncommon. Between 2010 and 2020, only 11.6 percent, on average, of plaintiffs seeking domestic violence orders of protection were represented by counsel in the Circuit Court. For plaintiffs seeking stalking orders of protection, only an average of 4.6 percent were represented by counsel. Therefore, while courts are not responsible for providing counsel in protective order cases in the same way they are in criminal cases, the Committee recommends that the Judicial Branch explore what steps the court system can take to facilitate access to counsel and victim advocates at protection order hearings. The Committee further recommends that the systemic task force work with the legal and advocacy communities to expand access to services for survivors of IPV.

Additionally, during its review of the relevant law, the Committee observed that virtually all appellate decisions involving protection order cases involved appeals by defendants of trial court decisions granting orders of protection. Thus, while there is substantial case law defining cases in which the court *should not* grant protection, there is much less appellate guidance as to when the court *should* grant protection. Put another way, a judge reviewing the body of law associated with protection order cases will often see other judges being overturned for granting protection but almost never see a judge being overturned for denying protection. In order to help develop a more balanced body of case law defining the contours of when a judge should, and should not, grant a protection order, the Committee recommends that the systemic task force explore ways to enhance access to appellate counsel for plaintiffs to appeal the denial of protection orders.

**Recommendation 7: Offer Training to Victim Advocates and Others Who Assist Survivors in Completing Petitions and Preparing for Hearings**

During the course of the review, the Committee repeatedly noted the disconnect between the legal findings a judge is required to make before issuing a domestic violence order of protection and the broader understanding of IPV among advocates and the public. In particular, the Committee noted that L.S. specifically discussed concepts such as coercive control that are central to an understanding of IPV but did not directly address the legal standard the court was required to apply. In order to help bridge the gap between the reality of IPV and the issues a court must consider, the Committee recommends that the Judicial Branch develop and offer trainings, conducted by court personnel, for victim advocates and others who assist survivors in completing protection order petitions and preparing for hearings. These trainings should focus on how courts review and decide protection order cases, including discussing a framework for presenting the experiences of survivors that accounts for binding legal precedents.

---

[91] *See, e.g.,* Russell Engler, *Connecting Self-Representation to Civil Gideon: What Existing Data Reveal about When Counsel is Most Needed*, 37 Fordham Urb. L.J. 37 (2010) (reviewing research).

[92] Protocols, *supra* note 9, at Ch. 7, Protocol 7.

## XII.    <u>Conclusion</u>

After its review of <u>L.S. v. R.L.</u>, the Committee concluded that L.S. experienced IPV. However, the Committee, and Judge Hall, were required to evaluate the case within the narrow confines of New Hampshire's law on "abuse." In that context, the Committee considered the procedures used to decide the case, the factual findings made by the court, and the legal conclusions reached by the court based on those findings. Based on its review, the Committee reached the following conclusions:

- The court complied with all applicable laws and protocols applicable to protection order final hearings and conducted the hearing in accordance with the principles of procedural fairness.

- While reasonable jurists could interpret the facts of this case differently, the court's understanding of the facts was not unreasonable based on the totality of the record.

- The court's decision to deny a final protective order was a reasonable application of current New Hampshire law to the facts of the case as she understood them.

During its review, the Committee identified a number of areas for improvement, both to court processes and to the law regarding IPV more generally. The Committee looks forward to working with the systemic review task force established by the Supreme Court and other stakeholders to improve the handling of cases involving IPV in New Hampshire's courts and ensure that survivors of IPV receive effective protection from the courts.

**Appendix A – Unpublished Cases Discussed by the Committee**

# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT

**In Case No. 2020-0264, <u>S.K. v. J.M.</u>, the court on June 4, 2021, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case.  The defendant, J.M., appeals a final domestic violence protective order issued by the Circuit Court (<u>Vetanze</u>, J.), arguing, <u>inter alia</u>, that the circuit court erred in finding that he posed a credible threat to the safety of the plaintiff, S.K.  <u>See</u> RSA 173-B:5 (Supp. 2020).  We reverse.

I

The pertinent facts and procedural posture, established by the record, are as follows.  The parties were married in 2004.  The parties resided in another state with their minor children, but on December 26, 2019, S.K. and the children left the family home at J.M.'s direction.  According to S.K., J.M. was "clenching his fists" while he "told [her that she] had to leave the house and if [she] didn't, he would hit [her]."  As J.M. was yelling at S.K. to leave the house, he "said he wanted all the house keys" and "grabbed the keys out of [S.K.'s] hand."  S.K. and the children left the home and fled to New Hampshire. While traveling to New Hampshire, S.K. repeatedly asked J.M., via text message, "for money for gas and food for the children" because "[s]he had no independent access to money" and J.M. "controlled the amount of money available on her debit card."  Her text messages to J.M. also "document[ed] that her physical ouster from the home was not her wish."  J.M. "himself admitted that he 'sent' [S.K.] away, with the children."

In February 2020, S.K. filed for divorce in the state from which she fled. On February 25, approximately ten hours after J.M. was served with S.K.'s petition for divorce, S.K. received an email from J.M. that said only "good bye." Almost a month later, on March 19, 2020, S.K. filed a domestic violence petition in New Hampshire, and a temporary order of protection was issued that day.  The circuit court held a final hearing on the petition, telephonically, in April 2020.  Both S.K. and J.M. testified.  The circuit court found that it lacked personal jurisdiction over J.M., a nonresident, but that it had subject matter jurisdiction under RSA chapter 173-B (2014 & Supp. 2020).

In her testimony, S.K. described the December 26, 2019 incident and past instances of what the circuit court found to be severe domestic violence.

S.K. testified that in December 2016, J.M. hit her so hard that her shoulder was injured and that he threatened her with physical violence on at least three occasions, one of which involved a handgun and another of which involved a baseball bat.  The circuit court noted that these incidents in December 2016 occurred around the same time that the parties were going through "a contentious time in the relationship" and were contemplating separation.  S.K. also testified that in December 2017, J.M. grabbed her arms and pulled one behind her back, telling her that he would break her arm.  She also testified to two occasions — one in February 2018 and the other in April 2018 — when J.M. was physical toward their minor children.  S.K. acknowledged that the "last time [she] alleged anything physical happened" was in April 2018.  J.M. denied all allegations of abuse.

For the twenty months between April 2018 and December 26, 2019, the parties lived together continuously, without further incidence of physical violence.  In the months immediately following the December 26 incident, S.K. and J.M. maintained minimal contact through text messages and emails, in which, as found by the circuit court, J.M. was "callous[]" and "petty" toward S.K.  In one email, J.M. told S.K. that she was "responsible now for the car payment, insurance, and cell phone."  S.K. testified that this email "actually scared" her because she "need[s] the car and the phone in case [their child] has to go to the hospital," she has no job, no financial assets, and J.M "just gets more control."  S.K. also testified that after she arrived in New Hampshire, J.M. "threatened to withhold financial support, threatened to report her for kidnapping [the children,] and actually disconnected her" cell phone.

J.M. also sent S.K. the February 25 "good bye" email, which she testified violated a standing order in the parties' pending divorce proceedings.  When it was pointed out on cross-examination that the content of the email did not include a threat against her life, S.K. replied, "The word he wrote said goodbye.  In my brain it feels like a threat.  He's threatened . . . for so many years to kill me that goodbye feels like he's saying you'll be dead.  Goodbye."  The circuit court found that while this email "could appear innocuous," S.K.'s "actual fear of the Defendant was triggered by the communication," and that S.K. had testified "that to her, the message conveyed something more sinister and permanent than a simple good bye."  When asked if she was "still afraid" of J.M., S.K. testified, "Yes.  I'm very afraid of him. . . . I don't think he'll ever stop."

The circuit court concluded that S.K. established "abuse" by a preponderance of the evidence.  RSA 173-B:5; see RSA 173-B:1, I (Supp. 2020). It found that J.M. committed "[a]ssault or reckless conduct" and "[c]riminal threatening," and that when "[c]onsidering the entire context of the parties' separation, against the backdrop of past physical violence, coupled with

2

[J.M.'s] overall controlling behaviors," J.M. posed a credible threat to S.K.'s safety. It made this latter finding "despite the physical distance of the parties," and "[e]ven though travel has been limited due to the COVID-19 pandemic," because "nothing would stop [J.M.] from traveling to New Hampshire if that was his intention." Accordingly, the circuit court issued a final domestic violence protective order against J.M. See RSA 173-B:5. J.M. moved for reconsideration, which the circuit court denied. This appeal followed.

II

On appeal, J.M. argues that there was insufficient evidence to support the circuit court's conclusion that he posed a credible threat to S.K.'s safety. We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidentiary support or tainted by error of law. Achille v. Achille, 167 N.H. 706, 715 (2015); see RSA 173-B:3, VI (2014). "When performing this review, we accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony." Achille, 167 N.H. at 715-16 (quotation omitted). "We view the evidence in the light most favorable to the [plaintiff]." Id. at 716 (quotation omitted).

To obtain relief under RSA chapter 173-B, a plaintiff must show abuse by a preponderance of the evidence. Id.; see RSA 173-B:5, I. We have construed "abuse" as requiring: (1) the commission or attempted commission of one or more of several criminal acts as enumerated in RSA 173-B:1, I; and (2) a finding that such misconduct constitutes a credible present threat to the plaintiff's safety. Achille, 167 N.H. at 716; see RSA 173-B:1, I. The threshold misconduct that will support a finding of abuse need not immediately precede the filing of the domestic violence petition. Achille, 167 N.H. at 716. The threat posed by such conduct to a plaintiff's safety, however, must be ongoing. Id. Incidents that are too distant in time and non-specific cannot support a finding of abuse under RSA chapter 173-B. Id. Additionally, a plaintiff must "show more than a generalized fear for personal safety based upon past physical violence and more recent non-violent harassment to support a finding that a credible threat to [his or] her safety exists." Id. (quotation omitted); accord Tosta v. Bullis, 156 N.H. 763, 768 (2008); see Knight v. Maher, 161 N.H. 742, 745-46 (2011) (clarifying that, in order for a defendant to constitute an ongoing, credible threat, the threat must be to the plaintiff's physical safety).

As to the first requirement of threshold misconduct, the circuit court found that J.M. engaged in "[a]ssault or reckless conduct" and "[c]riminal threatening." See RSA 173-B:1, I. The circuit court did not identify what specific acts constituted this criminal conduct, but in its narrative order, it credited S.K.'s testimony to find that there were "incidents of severe domestic violence which occurred between 2016 and 2018," and credited S.K.'s

testimony about the incident on December 26, 2019, which prompted S.K. to flee to New Hampshire with the children.  See Achille, 167 N.H. at 715-16 (according considerable weight to the trial court's judgments on witness credibility and the weight of testimony).  We do not understand J.M. to argue on appeal that there was insufficient evidence to support the circuit court's finding of threshold misconduct; therefore, we consider whether the evidence was sufficient to support a finding that he posed a credible present threat to S.K.'s safety.

J.M. argues that the circuit court's finding of a credible threat was made in error because the evidence did not demonstrate that he posed a credible present threat to S.K.'s physical safety.  We agree.

Domestic violence protective orders are to be utilized when a victim has shown a need for protection from a credible present threat to his or her safety.  Knight, 161 N.H. at 745; see RSA 173-B:5.  Given this statutory objective, we have required the plaintiff to demonstrate more than a generalized fear for his or her physical safety based upon past physical violence and more recent non-violent harassment to establish that a credible present threat exists.  Knight, 161 N.H. at 744-46 (concluding evidence of defendant's harassing text messages and emails to plaintiff and numerous false accusations and false reports against him was insufficient to constitute a credible present threat to plaintiff's physical safety despite his testimony that this conduct "raised concerns for [his] safety"); see Tosta, 156 N.H. at 768 (concluding there was insufficient evidence of a credible present threat, and also of threshold misconduct, where parties lived together without physical violence for the nine months between the criminal misconduct and the filing of the petition); In the Matter of Alexander and Evans, 147 N.H. 441, 441-43 (2002) (concluding defendant's repeated violations of a no-contact order while divorce proceedings were ongoing with plaintiff, and defendant's false allegations to police, were insufficient to constitute a credible threat); see also Gooden-Sinclair v. Sinclair, No. 2016-0646, 2017 WL 1436110, at *1-2 (N.H. Apr. 21, 2017) (unpublished order) (concluding plaintiff's fear that defendant would retaliate "if [she] do[es] something that he doesn't like or doesn't agree with" was only a generalized fear, insufficient to constitute a credible threat).  Even "substantial evidence that the defendant's conduct negatively affected the plaintiff's emotional or financial well-being" is insufficient to warrant a protective order under RSA chapter 173-B when the evidence does not show "an ongoing, credible threat to the plaintiff's physical safety."  Knight, 161 N.H. at 745-46.

Here, there was substantial evidence of J.M.'s "controlling behaviors," and there was troubling testimony about incidents of severe domestic violence in December 2016, December 2017, and in February and April of 2018.  Additionally, S.K. testified that, to her, the February 25 "good bye" email, seemingly sent in response to her filing for divorce, was threatening, and the

circuit court found that this email "could appear innocuous" but that it "triggered" S.K.'s fear of J.M.  Nevertheless, there was insufficient evidence to support a finding that, when S.K. filed her petition on March 19, 2020, J.M. presented a credible present threat to S.K.'s physical safety to warrant protection under RSA chapter 173-B.  See id.; Tosta, 156 N.H. at 767-68.

S.K. testified that the last incident of any physical mistreatment occurred in April 2018 and that the parties had lived together continuously without apparent incident for twenty months thereafter, until the incident on December 26, 2019.  See Tosta, 156 N.H. at 767.  As noted, the circuit court did not specifically identify the December 26 incident as the threshold misconduct, or a part thereof, constituting "[a]ssault or reckless conduct" and "[c]riminal threatening," but even if we were to construe the incident as such, our conclusion remains the same.  In the months immediately following that incident, the parties, then living apart and in separate states, maintained limited communication, albeit strained, which the circuit court found demonstrated J.M.'s control of the family finances, his attempts to manipulate custody decisions, and his "callous[]" and "petty" approach to S.K.  While this conduct, which we do not condone, surely had a negative effect on S.K.'s emotional and financial well-being, the inquiry under RSA chapter 173-B necessitates a different focus.  See Knight, 161 N.H. at 745-46.

No evidence was presented that J.M. was at any relevant time physically present in New Hampshire.  The circuit court reasoned that "nothing would stop [J.M.] from traveling to New Hampshire if that was his intention," but it also noted "the physical distance of the parties" and the fact that "travel has been limited due to the COVID-19 pandemic."  Although S.K. argues on appeal that J.M. "follow[ed] [her] to New Hampshire," her argument is predicated only on evidence that J.M. sent text messages and emails, "was monitoring her phone," "knew where she was," and "could have easily driven" to her location.

Taken as a whole and viewed in the light most favorable to S.K., the evidence did not establish that, at the time she filed her petition on March 19, 2020, S.K. had more than a generalized fear of J.M. or had more than a speculative fear for her physical safety.  See Knight, 161 N.H. at 745-46; Tosta, 156 N.H at 768; Gooden-Sinclair, 2017 WL 1436110, at *1-2.  Thus, the evidence in this case did not support a finding that the defendant posed a credible present threat to S.K.'s safety.  See Knight, 161 N.H. at 745-46; Tosta, 156 N.H at 768; Gooden-Sinclair, 2017 WL 1436110, at *1-2.

Accordingly, it was error to enter a final domestic violence protective order against the defendant.  Because we reverse the order for this reason, we need not address J.M.'s other arguments that the circuit court lacked personal jurisdiction under Hemenway v. Hemenway, 159 N.H. 680 (2010), lacked

subject matter jurisdiction to address custody and visitation of the minor children, and violated his constitutional rights to bear arms and parent his children.

<u>Reversed</u>.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Timothy A. Gudas,
Clerk**

Distribution:
3rd N.H. Circuit Court - Ossipee Family Division, 664-2020-DV-00022
Honorable Melissa B. Countway
Honorable David D. King
Christine C. List, Esquire
Diana G. Bolander, Esquire
Carolyn Koegler, Supreme Court
Lin Willis, Supreme Court
File

# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

## In Case No. 2016-0646, <u>Jo-Anna Gooden-Sinclair v. Paul Sinclair</u>, the court on April 21, 2017, issued the following order:

The defendant, Paul Sinclair (husband), appeals an order of the Circuit Court (<u>Emery</u>, J.) granting a domestic violence order of protection to the plaintiff, Jo-Anna Gooden-Sinclair (wife). He contends that: (1) the evidence was insufficient to establish that he posed a credible present threat to the wife, <u>see</u> RSA 173-B:5, I (Supp. 2016); and (2) the trial court "failed to consider and properly apply the defense of justification of use of force in defense of premises," <u>see</u> RSA 627:7 (2016). We reverse.

We first address whether the evidence established that the husband posed a credible present threat to the wife. We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidentiary support or tainted by error of law. <u>Hurley v. Hurley</u>, 165 N.H. 749, 750 (2013). We view the evidence in the light most favorable to the plaintiff. <u>Id</u>.

RSA 173-B:5, I, predicates relief for domestic violence upon a showing of "abuse" by a preponderance of the evidence. <u>Hurley</u>, 165 N.H. at 750. "Abuse," as defined in RSA 173-B:1, I (Supp. 2016), means the commission or attempted commission by, among others, a "former sexual or intimate partner" of one or more enumerated criminal acts, including assault, <u>see</u> RSA 631:1-:3 (2016), when such conduct "constitute[s] a credible present threat to the [plaintiff's] safety." The trial court "may consider evidence of such acts, regardless of their proximity in time to the filing of the petition, which, in combination with recent conduct, reflects an ongoing pattern of behavior which reasonably causes or has caused the [plaintiff] to fear for . . . her safety or well-being." RSA 173-B:1, I.

In this case, the evidence supports the trial court's finding that the husband assaulted the wife on September 12, 2016. Although we do not condone assault, taken as a whole, the husband's conduct in this case does not support the second finding required by the statute — that the husband posed "a credible <u>present</u> threat to the [wife's] safety." RSA 173-B:1, I (emphasis added).

Although the wife testified that she feared for her safety during the assault, she did not testify to any acts, either before or after the assault, that would reflect "an ongoing pattern of behavior" that would reasonably cause her "to fear for . . . her safety or well-being." RSA 173-B:1, I; <u>cf</u>. <u>Achille v. Achille</u>, 167 N.H. 706, 718 (2015) (stating second violent act six months prior to act that incited petition

"evidenced an ongoing pattern of violent behavior").  The wife described the shut-off of electricity to the residence as the husband's "form of retaliation" and testified that she was fearful that the husband would retaliate after the assault.  However, she did not articulate any particular concerns that the husband would threaten her safety, only a generalized fear, stating "if I do something that he doesn't like or doesn't agree with, he does something in retaliation."  See Knight v. Maher, 161 N.H. 742, 745 (2011) (stating that credible present threat requires "more than a generalized fear for personal safety").

The wife testified that she did not feel safe living in the marital home "because someone is going into the house when I'm not there" and "[f]amily members are coming on the property."  However, she did not accuse the husband of trying to intimidate her in the house.  See id. at 756 (stating that plaintiff's speculation that unknown people might harm him did not establish that defendant posed a credible present threat).  The wife argues that, immediately prior to the assault, the husband knew she was coming to his place of business and waited for her.  She does not, however, explain how this behavior demonstrates a pattern of behavior or poses a credible present threat to her safety.

Accordingly, we conclude that, even viewed in the light most favorable to the wife, the evidence does not support the finding that the husband posed a credible present threat to her safety.  See Hurley, 165 N.H. at 750.  Because we reverse for this reason, we need not address the husband's second argument.

<u>Reversed</u>.

HICKS, LYNN, and BASSETT, JJ., concurred.

**Eileen Fox,
Clerk**

Distribution:
9th N.H. Circuit Court - Manchester Family Division, 656-2016-DV-00431
Honorable John C. Emery
Honorable Edwin W. Kelly
Donald A. Kennedy, Esquire
Lucinda N. Hopkins, Esquire
Timothy Gudas, Supreme Court
Allison Cook, Supreme Court
Irene Dalbec, Supreme Court
File

# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

### In Case No. 2018-0199, <u>Lisa Bailey v. Brendan Poelaert</u>, the court on August 23, 2018, issued the following order:

Having considered the briefs and record submitted on appeal, we conclude that oral argument is unnecessary in this case. <u>See</u> <u>Sup. Ct. R.</u> 18(1). We reverse.

The defendant, Brendan Poelaert, appeals an order of the Circuit Court (<u>Pendleton</u>, J.) granting a domestic violence final order of protection to the plaintiff, Lisa Bailey. <u>See</u> RSA 173-B:5 (Supp. 2017). The defendant argues that the trial court erred, in part, by finding that he presents a credible present threat to the plaintiff's safety. We agree.

We review sufficiency of the evidence claims as a matter of law and uphold the trial court's findings and rulings unless they are lacking in evidentiary support or erroneous as a matter of law. <u>Achille v. Achille</u>, 167 N.H. 706, 715 (2015). We defer to the trial court's judgments on the credibility of the witnesses and the weight to be given testimony. <u>Id</u>. at 715-16.

To obtain relief under RSA chapter 173-B, the plaintiff must show "abuse" by a preponderance of the evidence. <u>Id</u>. at 716. "Abuse" is defined in RSA 173-B:1 to include the commission or attempted commission of one or more of several criminal acts, including criminal threatening as defined in RSA 631:4 and harassment as defined in RSA 644:4, constituting a credible present threat to the plaintiff's safety. <u>Id</u>.

The record shows that the parties have two children together and lived together for nine years before separating in August 2017. On January 23, 2018, the plaintiff filed a domestic violence petition seeking an order of protection from the defendant. In her petition, the plaintiff asserted that the defendant had been harassing her, as well as her boyfriend and other friends, through text messages. She also asserted that he had started to drive by her home when she had the children. The trial court granted her a temporary order of protection pending a final hearing.

At the final hearing on January 29, 2018, the plaintiff testified that on January 2, 2018, the defendant asked her if she was dating anyone. When she told him that she had started dating someone, the defendant refused to return the children to her according to their agreed-upon schedule. The plaintiff first

contacted the police, and then the defendant's attorney, with whom she negotiated a parenting plan.

The plaintiff testified that the defendant constantly asked her about her boyfriend. She received 42 texts, primarily focused on questions about her boyfriend, in the seven days leading up to the filing of her petition. On January 19, 2018, she saw the defendant drive by her residence. She suspected that the defendant was following her, and that he had placed a listening device in her parents' home.

The plaintiff also testified that the defendant contacted her boyfriend and friends of the boyfriend on social media disclosing personal medical information about her. She testified that she sought a restraining order because the defendant had gone to "great lengths to reach out to these people saying disgusting, horrible things."

After the hearing, the trial court granted the plaintiff's request for a protective order. The trial court found that the defendant's conduct violated RSA 644:4, was threatening, and that it constituted a present credible threat to the plaintiff's safety because his "behavior went on beyond request to stop such communications."

Domestic violence protective orders are to be utilized when a victim has shown a need for protection from an ongoing, credible threat to his or her safety. RSA 173-B:5, I; Achille, 167 N.H. at 716. Given this statutory objective, we have required a plaintiff to show more than a generalized fear for personal safety based upon non-violent harassment to support a finding that a credible threat to her safety exists. In the Matter of Alexander and Evans, 147 N.H. 441, 441-43 (2002) (holding that while unwanted telephone calls and rude gestures made by the defendant to the plaintiff were enough to support a finding of harassment, they were insufficient to support a finding that the defendant's conduct constituted a credible threat to the plaintiff's safety).

Assuming, without deciding, that the defendant's conduct constituted criminal threatening and harassment, there was no evidence that he had threatened the plaintiff's physical safety. The defendant's conduct is appalling, and it likely does negatively affect the plaintiff's emotional well-being. However, the plaintiff's speculation that the defendant was following her, and that he had placed a listening device in her parents' home, was insufficient to support a finding that he represented an ongoing, credible threat to her physical safety. Accordingly, it was error for the trial court to enter a final domestic violence protective order. Our decision, however, is without prejudice to the plaintiff's ability to seek any other form of relief that may be available to her in the trial court. Given our decision, we need not address the defendant's remaining

issues.  See <u>Antosz v. Allain</u>, 163 N.H. 298, 302 (2012) (declining to address parties' other arguments where holding on one issue is dispositive).

<u>Reversed</u>.

Lynn, C.J., and Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Eileen Fox,**
**Clerk**

Distribution:
10th N.H. Circuit Court - Portsmouth Family Division, 670-2018-DV-00005
Honorable John T. Pendleton
Honorable Edwin W. Kelly
Keri J. Marshall, Esq.
Sharon J. Rondeau, Esq.
Amy C. Connolly, Esq.
Timothy A. Gudas, Supreme Court
Allison R. Cook, Supreme Court
File