1

2

3

4

5

6      DOMESTIC VIOLENCE TASK FORCE VIRTUAL MEETING

7                    January 11, 2022

8                    Held via Webex

9

10

11     PRESENT:

12          Hon. Anna Barbara Hantz Marconi,

13     Associate Justice, New Hampshire Supreme Court

14          Hon. Susan Carbon, Circuit Court Judge

15          Hon. Diane Nicolosi, Superior Court Judge

16          Hon. John Yazinski, Circuit Court Judge

17          Mary Barton, Clerk, Circuit Court

18          Merrill Beauchamp, Director, Victim &

19     Witness Program

20          Kathy Beebe, Executive Director, Haven NH

21          Kristyn Bernier, Investigator, Belknap

22     County Attorney's Office

23          Steven Endres, Assistant County Attorney,

24     Merrimack County

25          Martha Ann Hornick, Grafton County



1    Attorney

2        Mary Krueger, Attorney, NHLA

3        Lynda Ruel, Director, Office of

4    Victim/Witness Assistance, NH DOJ

5        Scott Hampton, Director, Ending the

6    Violence

7        David Hobbs, Hampton, NH Association of

8    Chiefs of Police

9        Lyn Schollett, Executive Director, New

10   Hampshire Coalition

11       Amanda Grady Sexton, Director of Public

12   Affairs, New Hampshire Coalition

13       Jon Strasburger, New Hampshire

14   Association of Criminal Defense Attorneys

15       David Vicinanzo, Attorney, DOVE Program

16       Patricia LaFrance, Attorney, The Black

17   Law Group

18       Betsy Paine, Attorney, CASA NH

19       Pam Dodge, NHBA DOVE Program & 603 Legal

20       Sarah Freeman, Circuit Court

21   Administrator

22       Jean Kilham, Manager, NHJB Domestic

23   Violence Program

24       Erin Jasina, Director, NHLA DV Program

25       Anne Zinkin,  Supervisory Law Clerk, NHSC



Domestic Violence Task Force - 1/11/22

1          JUSTICE HANTZ MARCONI:  Okay.

2     Welcome to the first of several meetings

3     of the task force on review of domestic

4     violence cases in the judicial system.

5     We are meeting today for an hour, plus or

6     minus, focusing our attention on charge

7     1, which is a review of the existing

8     court practice and procedures.

9          We did have a late-breaking

10    submission to the Dropbox from Kristyn

11    Bernier, which is great.  She surveyed

12    folks she works with on the front lines,

13    as we say, and has some additional input

14    on process issues.  So we will get around

15    to that, but I wanted to alert you that

16    that has been uploaded to the Dropbox.

17         We will take attendance kind of sort

18    of from the list of participants.  I'm

19    not going to go through that, in

20    interests of time.  And I want to start

21    out with, A, thanking you for your

22    participation once again.

23         Talking a little bit -- and I'm

24    happy to have feedback about, I'll say,

25    administrative matters, procedure, how

Domestic Violence Task Force - 1/11/22

1    we're going to do this.  We have the

2    Dropbox that we have documents uploaded

3    to.  You'll see in your agenda we've

4    uploaded the charge outline.  And Jean

5    Kilham has been wonderful at adding some

6    edits and focusing some of those items

7    that I listed that were really kind of a

8    brain dump.  So that is much appreciated.

9        We have the domestic violence

10   protocols that the court's been operating

11   with.  Those are uploaded.  And we have

12   three administrative orders.  Two are

13   COVID related, and one deals with the DV

14   protocols being made mandatory.  So those

15   are core documents.  And then we have

16   Kristyn Bernier's survey of folks and

17   input from folks on the front line about

18   process issues.

19       So we will be doing this with each

20   of our meetings, this uploading relevant

21   documents.  We have been getting some

22   public comment from the publicly posted

23   email comment address.  So those, as they

24   relate to various charges, will be

25   uploaded.  So you'll have access to those

Domestic Violence Task Force - 1/11/22

1      also.

2           And we will keep that process open,

3      following this meeting and following each

4      meeting on each charge, so that if

5      someone has a comment, public comment

6      that should be added in there, that's

7      what we're sort of here for.

8           In that same vein, as we only have

9      limited time to discuss these issues, if

10     any individual member of the task force

11     has additional comments to submit,

12     picking up on an issue that we talk

13     about, or additional information

14     something triggers, then feel free to

15     email that to Lisa Merrill or Anne

16     Zinkin, and we will also distribute that

17     to the group.

18          So this is a rolling process.  It's

19     not one and done.  We're going to be

20     taking the charges one at a time.  But

21     our total task force project will be open

22     for the next several weeks, until we wrap

23     it up and summarize our recommendations.

24     So that's sort of the general process.

25          We are livestreaming, and we're



Domestic Violence Task Force - 1/11/22

 1       recording so that these -- we've already

 2       had inquiry from various entities,

 3       stakeholders, interested parties who

 4       might not be able to pay attention to the

 5       meeting but would like to see it later.

 6       So we will have that available to folks

 7       as well.

 8            And then as we move through and

 9       discuss what we're focused on, we will

10       decide what of what we've discussed we

11       want to post not in Dropbox but on the

12       court's website.  So there will be

13       documents that we're going to want to

14       identify to post on the website to

15       support the video of us discussing these

16       things.

17            So process questions?  Does that

18       make sense to everybody?  Yes?  No?

19       Okay.  And speak up if you have a

20       question.  I don't know about these

21       raising-hand things, so I think we can

22       all just work with unmute yourself and

23       jump right in.

24            What we've put down on the agenda,

25       again, is merely guideposts for our

Domestic Violence Task Force - 1/11/22

1          discussion for the time we have today.

2          And so I've just listed kind of in order,

3          or in a time line, various aspects of the

4          domestic violence practice and procedure

5          as we move through the process, starting

6          with the petition process.

7                And two of the administrative orders

8          I'll just draw your attention to, one in

9          2020, which provided for -- allowed for

10         electronic submission of domestic

11         violence petitions.  And 2021 provided

12         and allowed for electronic signatures on

13         the petitions.  So those, obviously, were

14         two administrative changes that were

15         made, in light of the pandemic, to the

16         petition process.

17                But what we'd like to hear now is

18         anyone's experience with the petition and

19         filing process, particularly the crisis

20         centers who deal particularly with the

21         advocates and with the petitioners, the

22         plaintiffs, the survivors in these cases,

23         and what hurdles, if any, are met in the

24         petition process or any improvements that

25         can be made.

Domestic Violence Task Force - 1/11/22

1          MS. BEEBE:  Now that there's a

2     separate time to talk about the charge

3     of --

4          JUSTICE HANTZ MARCONI:  I'm hearing

5     someone.

6          MS. BEEBE:  Oh, can you hear me?

7     It's Kathy Beebe.

8          JUSTICE HANTZ MARCONI:  Ah.  You're

9     very faint again.

10         MS. BEEBE:  Okay.  Can you hear me

11    now?

12         JUSTICE HANTZ MARCONI:  A little

13    better, but it's very faint.

14         MS. BEEBE:  All right.  Let me see

15    what I can do.  I'll come back to you.

16         JUSTICE HANTZ MARCONI:  Okay.

17         MS. KRUEGER:  This is Mary Krueger.

18    And perhaps Kathy will talk about some of

19    this as well.  So there are a few issues

20    that come up that we care about at New

21    Hampshire Legal Assistance.

22         We work very closely with the

23    Coalition and with our partner crisis

24    centers, and we actually meet quarterly

25    to talk about a variety of issues,

Domestic Violence Task Force - 1/11/22

1        including what's happening in the courts

2        for victims and survivors and including

3        these cases.  So there seems to be some

4        inconsistency around what courts are

5        doing with regards to making a decision

6        on the petition itself, and maybe an

7        uptick in circumstances where courts will

8        set it for a hearing but not actually

9        issue any temporary orders.

10              And the protocols address those

11       scenarios in some detail.  And it's

12       unclear to me whether the protocols are

13       always being followed around that, mainly

14       if a court decides that there's not

15       enough to issue temporary orders, but

16       there's something there that needs to be

17       understood more, warranting a file

18       hearing.

19              The court ought to, one, have the

20       judge talk to the petitioner at that time

21       to assess the situation.  Maybe there's

22       additional details that the protocols say

23       the judge can, in case law, support.

24              Add those additional details to the

25       petition if those things were left out



Domestic Violence Task Force - 1/11/22

1       that might show that there is imminent

2       danger present to warrant issuing a

3       temporary order or advising that the

4       petitioner or plaintiff can withdraw

5       their petition without prejudice so that

6       the defendant doesn't need to know that

7       that was filed if there's a safety

8       concern that once a defendant's put on

9       notice that something's been filed and

10      there's no orders in place, that can be

11      an incredibly dangerous time.

12          So that's an issue that we've seen.

13      And the protocols, I think, do a decent

14      job of addressing those things.  But

15      perhaps they could be tightened up a bit.

16      But I'm not sure they're always being

17      followed.  So I think that needs to be

18      brought up with this group.

19          JUSTICE HANTZ MARCONI:  Good

20      insight.  So A, are the protocols being

21      followed; B, are there improvements to

22      the protocols that could be made to

23      address situations where a petition, on

24      its face, may be some level of

25      insufficient on whether the court should



Domestic Violence Task Force - 1/11/22

1       take additional action and/or allow for a

2       withdrawal without prejudice.  Is that a

3       good summary?

4           Others experiencing something

5       similar?

6           MS. PAINE:  I would just note, Your

7       Honor -- it's Betsy Paine -- that when

8       we've drafted those protocols, we saw

9       this coming.  But I think it may have

10      gotten worse for folks.  And I would --

11      I'd look to the gap between the AG's

12      protocol for law enforcement and the

13      court protocol and the ability of

14      entities to assess for lethality.

15          And what's happened is that on the

16      law enforcement side and on -- in the

17      victim advocacy community, there's been

18      huge strides forward in assessing

19      lethality.

20          And there's not really a way, a

21      mechanism to do that in the situation

22      that Attorney Krueger described so well,

23      because if the petition with a pro se

24      petitioner doesn't meet the law, there's

25      no sort of safety net there for a victim,



Domestic Violence Task Force - 1/11/22

1    in terms of assessing the actual

2    lethality of what's happening in the

3    case.  And I think that may be the case

4    that got us to the convening of this task

5    force.

6         MS. FREEMAN:  To clarify, I believe

7    we're talking about Protocol 5-15, for

8    those of you who don't know where to find

9    it.

10         JUSTICE HANTZ MARCONI:  That's good.

11    So this disconnect, if you will, thoughts

12    for how we bridge that gap?

13         CHIEF HOBBS:  Excuse me.  Dave Hobbs

14    from Hampton, if I could.  In terms of

15    the screening for the lethality

16    assessment, we do that when we go to

17    calls for service, when people don't

18    necessarily want to see us.

19         When somebody is going to the court,

20    that tells me that they're looking for

21    help; they're looking for something.  And

22    I think that's a good opportunity where

23    they're going to be forthcoming to --

24    more forthcoming to try to seek that

25    help.

Domestic Violence Task Force - 1/11/22

1          If there was some sort of screening

2     process in the petition, where if they

3     rated high, just like we have on our

4     forms, that we could get them in touch

5     with somebody, maybe separate from the

6     court process but some sort of advocate

7     that could help them make some sort of

8     safe plan from the beginning.

9          JUSTICE HANTZ MARCONI:  And your

10    screening process, your scaling, if you

11    will, that's an --

12         CHIEF HOBBS:  Yeah.

13         JUSTICE HANTZ MARCONI:  -- available

14    document that the court could take a look

15    at?

16         CHIEF HOBBS:  Yep.  I'm talking

17    about the LAP screen.  I believe it's in

18    that, the AG's -- law enforcement AG

19    protocols that was sent out today.

20         JUSTICE HANTZ MARCONI:  Okay.

21         CHIEF HOBBS:  But it's in there.

22         JUSTICE HANTZ MARCONI:  Okay.

23         CHIEF HOBBS:  But I think that's a

24    good opportunity to -- they're not

25    always -- people -- victims aren't always

Domestic Violence Task Force - 1/11/22

1          that willing to answer when we're there.

2          But we're there in the heat of the

3          crisis, where they have the time to kind

4          of gather their thoughts to go to court.

5          I think they might -- that might be more

6          beneficial.

7                JUSTICE HANTZ MARCONI:   And this

8          would be something the advocacy community

9          could, perhaps, help guide victims

10         through, or is it something that the

11         court should be doing independently of

12         the advocacy community?

13              INV. BERNIER:   I like the idea of

14         using the lethality assessment protocol,

15         just like we do in law enforcement,

16         potentially putting that as part of the

17         petition packet.   It's a one-page

18         document.   It's based on -- this program

19         was started in Maryland, if I'm not

20         mistaken.   It's a nationwide program.

21              We've refined it in New Hampshire.

22         And again, it's a one-page document.

23         It's a checklist.   It's a yes or no

24         thing.   And you have a couple criteria.

25         But if a petitioner is signing and



Domestic Violence Task Force - 1/11/22

1    swearing to the document in their

2    affidavit, that could be part of that

3    swearing.  Swearing on that document, as

4    well, could be a part of that for a judge

5    to take a look at.

6         And that could be, maybe, a question

7    that it -- a question, too, that a judge

8    may want to ask that petitioner with

9    regard to if they've checked off any of

10   those boxes.  It would be really easy to

11   institute, I would think.

12        JUSTICE HANTZ MARCONI:  So that's

13   sort of some overlap between the inquiry

14   made by the court on receiving the

15   petition and also something we're going

16   to get to subsequently, which is

17   improvement in forms.  So those are good

18   observations.

19        MS. FREEMAN:  Lynda --

20        JUDGE YAZINSKI:  I think it's

21   a (indiscernible) --

22        MS. FREEMAN:  Lynda might be able to

23   correct me, but I believe that the

24   lethality assessment protocol was

25   developed specifically to connect victims



Domestic Violence Task Force - 1/11/22

1        with advocates at the scene of a crime.

2        And it's not particularly tailored to

3        people coming into the court for help.

4               There's a variety of screening tools

5        out there that are used for different

6        purposes, whether it's identifying a

7        family in DCYF who might need to be

8        referred to an advocate.  But I would

9        just caution that the lethality

10       assessment protocol, though evidence-

11       based and unique for New Hampshire, may

12       have a different rule than the person

13       walking into the court may need

14       assistance with.

15              But Lynda, please -- or anyone

16       correct me if I'm misstating that.

17              JUDGE YAZINSKI:  I think Sarah's

18       correct.  It's Jack Yazinski.  The

19       lethality assessment is always referred

20       to, when I get a call from the police

21       with a victim looking for protection.

22       When a vic -- when someone comes into

23       court and files the petition itself, what

24       a judge looks at is the -- whether or not

25       there are allegations that constitute



Domestic Violence Task Force - 1/11/22

1      abuse, as defined by the statute.

2          We are trained, and I know domestic

3      violence is one of the areas that Circuit

4      Court judges receive the most training

5      in.  We receive the most training in

6      domestic violence.  And that has been

7      true in my entire career on the bench.

8          So you look to see if there are

9      facts that establish that abuse, as

10     defined by the statute, has been pled in

11     some way.  If it hasn't been pled, then I

12     will meet with the petitioner and ask

13     specific questions to determine if there

14     is something she or he could add to the

15     petition that makes it fit and is

16     appropriate for temporary orders.

17         Betsy -- Ms. Paine will remember

18     there was a time when courts almost never

19     checked off the no-finding box schedule

20     for a hearing.  And I think in my career,

21     I may not have done that more than two

22     times.  And I couldn't tell you the last

23     time that I did it.

24         But what I think would occur is

25     the -- in that situation the most is that

Domestic Violence Task Force - 1/11/22

1        the victim has arrived at the court and

2        does not have access to an advocate,

3        because I do find if we can get an

4        advocate to the court while the victim is

5        there, most of the time, that petition

6        gets granted on a temporary basis because

7        it includes enough facts.

8             However, the times when we can't get

9        an advocate to the court -- and that's

10       more often than I'd like -- the victim is

11       on their own, trying to meet the

12       statutory requirements of 173-B without

13       ever having read it, in a state of panic,

14       where they're worried about losing their

15       house, worried about losing their

16       children, and are frightened that they're

17       going to be harmed.

18            And while they're dealing with all

19       of those things, they're trying to fill

20       out a form that it is -- it's not a very

21       difficult form, but if you don't know --

22       if you don't know what it is that you

23       need to say --

24            MR. VICINANZO:  Yeah.

25            JUDGE YAZINSKI:  -- it can be an



Domestic Violence Task Force - 1/11/22

1        impossible form to fill out.  So in my

2        perspective, the initial meeting with an

3        advocate, having an advocate available is

4        the key to getting that temporary order

5        in a form that immediately gets granted.

6            MS. JASINA:  And this is Erin Jasina

7        at New Hampshire Legal Assistance, just

8        following up on that.  And they may be

9        filling out the wrong form.  They may be

10       filling out a form for a domestic

11       violence petition, when they should be

12       filling out a stalking petition.  And

13       they don't know the difference.

14           A pro se person, a person who may

15       not have an advocate with them may not

16       know which form is the best form to fill

17       out, given their particular

18       circumstances.  So I think that piece

19       plays into it as well.

20           JUDGE YAZINSKI:  Final comment, and

21       I will stop.  That's a very, very good

22       point.  My staff here is actually very,

23       very good at telling the victim that the

24       relationship doesn't qualify; it's a

25       stalking issue, or you -- relationship

Domestic Violence Task Force - 1/11/22

1        does qualify, and it's a domestic

2        violence issue.

3               But in the event that I get a form

4        that indicates someone has been stalked,

5        as opposed to abuse has occurred, I have

6        my staff go back out and just attach the

7        new front page to the petition.

8               And I think that's a training issue,

9        Justice Hantz, for -- Marconi -- for the

10       entire state, the entire system.

11              MS. HORNICK:  While you're talking

12       about training -- and I'm -- this is just

13       a quick -- just a solid question.  And if

14       there are public who are listening or who

15       are going to chime in, they may not know

16       the answer to this question either.

17              Judge Yazinski, when you talk about

18       the fact that you Circuit Court judges

19       get the most training on -- in this

20       particular subject of any other training,

21       what does that actually equate to?  How

22       many hours, or how many days, how many

23       weeks?  Is it annual?  Is it biannual?

24              JUDGE YAZINSKI:  Yeah.  So Marcie, I

25       would like to say it is annual, but it's

Domestic Violence Task Force - 1/11/22

 1          certainly intense when we train new

 2          judges.  Up until our -- the budget

 3          crisis of a number of years ago, each

 4          judge was actually sent to a week-long

 5          National Council training on domestic

 6          violence.

 7               When the budget got cut to the point

 8          where we have no educational travel fund,

 9          all of the training has taken place in-

10          state.  And again, I believe it occurs --

11          it's some -- in some form annually.  But

12          those trainings tend to be day-long

13          trainings and sometimes two-day

14          trainings.

15               And they go beyond RSA 173-B.  The

16          trainings entail psychologists appearing

17          and talking about the subtle subtleties

18          of abuse.  We have survivors who have --

19          who speak about their journey through

20          both the system and relationships.  We

21          have training on the impact of domestic

22          violence and children.

23               So it is fairly broad.  However,

24          knowing that a person -- a husband's

25          controlling behavior and verbal abuse,

Domestic Violence Task Force - 1/11/22

1        financial control, shutting the person

2        out from family and friends, we all know

3        that that is abuse.  But the legislature

4        has decided it's not, or at least has not

5        told us that it is, statutorily.

6            But we do use those things when we

7        form orders in parenting cases and when

8        we form orders in divorce cases.  So it's

9        not strictly confined to an action under

10       173-B.

11           JUSTICE HANTZ MARCONI:  Thank you.

12           MS. FREEMAN:  To clarify one point,

13       we do use federal VAWA STOP funds to be

14       able to send judges out of state and also

15       bring external consultants in.

16       Unfortunately, due to COVID, those

17       opportunities have been limited due to

18       travel restrictions.  But that is

19       something that is happening for new

20       judges when those organizations are still

21       holding those trainings.

22           MS. RUEL:  And I'd just like to say

23       I think the judge is definitely on to

24       something because we train law

25       enforcement at the AG's office, through



Domestic Violence Task Force - 1/11/22

```
 1        protocols and our conference, to not have

 2        victims fill out their -- the incident

 3        report to write down if they're a victim

 4        of crime, like, all of the details.  We

 5        train them not to do that, for all the

 6        reasons that the judge outlined in when

 7        he was speaking to us.

 8             So I think it's interesting that we

 9        have that expectation of our victims of

10        domestic violence through the restraining

11        order process.  So I throw that out as

12        something to continue to explore.

13             I'm a big supporter of the victim

14        being able to have their own process.

15        But I also will have learned over the

16        years that they don't know what we're

17        looking for for information.  And I think

18        the judge outlined that really clearly.

19             JUSTICE HANTZ MARCONI:  Well, and I

20        will just add to this a perspective that

21        in watching the rollout of e-Filing, an

22        unintended benefit, if you will, of the

23        e-Filing process in Circuit Court in

24        other areas, because family and domestic

25        violence, because of all the
```



Domestic Violence Task Force - 1/11/22

1       confidentiality issues, is not a

2       candidate for ready e-Filing because of

3       all the technological issues.  So that's

4       coming last.

5              But when you look at other areas of

6       the law, the process of e-Filing almost

7       results in a guided interview kind of

8       process, where questions are asked that

9       prompt answers from people to fill in the

10      information that's required.

11             So you're going in a probate thing.

12      Is this a -- is there a trust?  Is the

13      person -- has the person died?  What are

14      you looking for?  And so that -- I just

15      throw that out there as something sort

16      of -- instead of just presenting someone

17      with a form that they don't understand

18      what is necessary, it could be -- and

19      this might get to the form issue again.

20             But we might be able to look at

21      adding to the process, especially if

22      there's not an advocate, but sort of a

23      guided interview to get people where they

24      need to go and get the information that's

25      necessary for the court to be able to

Domestic Violence Task Force - 1/11/22

1       act.  So just a thought.

2               MS. LAFRANCE:  Yeah, I was -- this

3       is Patty (ph.) LaFrance.  I was going to

4       say pretty much the same thing, I think,

5       is -- I use my taxes as an example.

6               I get my tax form, right, from my

7       accountant.  And by the time I finish

8       filling out the checklist of what I did

9       and didn't do during the year, I feel

10      like my taxes are already done.

11              If we could do something like that

12      with the form, where you have, did you do

13      this; did you do that, or maybe -- my tax

14      forms are, like, five or six pages long,

15      but -- and then just specifically

16      tailored to what is defined as abuse,

17      because you're right.  I mean, victims,

18      anybody applying for a restraining order,

19      they really have no idea about what's

20      required to define abuse.

21              So if it was there in front of them,

22      even, like, a little cheat sheet or

23      something that talked about just the

24      what's required to find abuse -- is it

25      criminal threatening; is it property

Domestic Violence Task Force - 1/11/22

1         damage or whatever the case may be -- so

2         I think that would be helpful.

3             And again, maybe I'm putting the

4         cart before the horse, talking about

5         changing the forms.

6             JUSTICE HANTZ MARCONI:  Well, it all

7         kind of goes together.  And so as we

8         don't run out of time, I'm going to -- we

9         have the agenda.  We've got other aspects

10        of the process and procedures that I want

11        to hear about.

12            The hearing process, I know there

13        are issues there.  The distribution of

14        orders, I don't know that it's a hot-

15        button issue, but it would be good to

16        have an understanding if there are issues

17        there; amendments to orders, if they

18        happen, how they happen; withdrawal of

19        petitions; expiration of orders and

20        renewal of orders.  Those are sort of all

21        part of the ball of wax of the overall

22        process.  So don't feel confined.

23            MS. PAINE:  Your Honor, I would ask

24        a question that I don't know the answer

25        to.  And I don't know if in the digital

Domestic Violence Task Force - 1/11/22

1       age, the definition of actual notice

2       under the federal statute, under VAWA,

3       has become redefined to include any kind

4       of electronic service or -- because our

5       statute was tied to the federal law in

6       order to make the firearms provisions of

7       our orders enforceable nationally.

8            And I think that actual notice

9       language comes to us from the federal

10      statute.  And a qualifying order requires

11      that.  And so it would be great to get

12      some feedback from folks who are doing

13      that work at the federal level, to see if

14      there's been any evolution in what

15      constitutes service.

16           JUSTICE HANTZ MARCONI:  It's a good

17      point.  If we don't know, we will find

18      out.  Is anyone actively working with

19      that at the moment?

20           MS. FREEMAN:  Jean and I can

21      confirm.  I'm hesitant to give a legal

22      opinion without doing the research first.

23           JUSTICE HANTZ MARCONI:  We might

24      task you with looking that up.  Okay.

25      Good point, because I feel we've had --



Domestic Violence Task Force - 1/11/22

1          in terms of notice, there's a process, a

2          protocol for telephonic notice in some

3          circumstances.  So it would be worthwhile

4          to know what's required and whether there

5          are, again, improvements that we can

6          make, consistent with the federal law.

7               MS. JASINA:  I was hoping I could

8          just make a general comment as we're kind

9          of going through this process.  I don't

10          think we have to start from scratch.  I

11          think we have a good foundation.  What we

12          have does work in best-case scenarios.

13          It's more of an issue of how it's

14          applied, how the process that is

15          currently in place is applied and that

16          it's not applied consistently statewide,

17          that it varies from court to court.

18               For example, if a plaintiff walks

19          into any courthouse in the state, I would

20          see step one is for there to be contact

21          between the clerk and the community

22          crisis center so that it's possible that

23          then the plaintiff is connected with an

24          advocate.

25               So then step two is, well, what's



Domestic Violence Task Force - 1/11/22

1       the best choice for me in that moment?

2       Is it to file a domestic violence

3       petition?  Is it to file a stalking

4       petition?  Is it to file no petition, and

5       maybe also connecting with legal aid or

6       603 Legal Aid or a private attorney, and

7       then making sure that the protocols are

8       applied.

9           Protocol 5-15 is a great protocol.

10      And when it works, we've had great

11      success with it.  But when it's not

12      applied, we're often seeing victims

13      walking away with no orders in place, no

14      temporary orders in place, but a hearing

15      set.  And for that thirty days, there's

16      high risk of danger.

17          So I just -- I think a lot of what

18      we're dealing with is more of a

19      consistency issue, not necessarily a flaw

20      in the process that we have in place.

21      That's not to say there's not room for

22      improvement, but I've just seen, over the

23      years, that that's -- the consistency of

24      how it's applied may be the larger issue.

25          JUSTICE HANTZ MARCONI:  Well, and



Domestic Violence Task Force - 1/11/22

1      that's part of -- we have processes, but

2      if they aren't being followed, then part

3      of the process is how do you -- how do

4      you raise that issue in real time?  How

5      does a litigant raise that issue in real

6      time so that it's not an anecdote for

7      later that this isn't happening?

8          But as a court system, we would want

9      to be able to address that -- call it

10     noncompliance or that oversight or

11     whatever it is at the time.

12         So for example, if somehow there's a

13     glitch in notice, how do we confirm, if

14     there's a way, that actual notice was

15     given?  Or if clerks are supposed to -- I

16     don't know the answer to this -- contact

17     the crisis center in every case, if that

18     contact somehow falls through,

19     unavailable, whatever, how do we put our

20     finger in the dike in that step of the

21     process?

22         So you're right.  This isn't just

23     about processes we have in place, but

24     it's kind of like a backstop, if there

25     can be one.  And I don't know.  A lot of

Domestic Violence Task Force - 1/11/22

1        that's resources, et cetera.  But if

2        there can be a backstop for when things

3        don't follow the process, or -- you're

4        right.  In best-case scenario, there's an

5        advocate.  There's a legal advocate.

6            But we all know that there aren't

7        enough lawyer hours, and there aren't

8        enough paid legal aid attorneys.  So how

9        do we fill that gap?  I think that's also

10       part of this.  And obviously, that's

11       coming later.  But that's part of what

12       our task is.  And in process, that also

13       can be part of what we're trying to

14       illuminate as gaps in our process.  So I

15       appreciate that inconsistency is an

16       issue.

17           MS. BEEBE:  Folks, hear me now?

18       Y'all hear me?

19           MS. SEXTON:  I would just -- this is

20       Amanda Grady Sexton from the New

21       Hampshire Coalition.  I would absolutely

22       agree with what Erin said in terms of

23       inconsistence, application of our

24       existing protocols, which are largely

25       good.  But they are also extremely



Domestic Violence Task Force - 1/11/22

1      outdated.  And I think that one of the

2      things we should do is recommend that we

3      reconvene a group to update those

4      protocols.

5             And I think one of the things that

6      would be important to do is to ensure

7      that we look at what other states are

8      doing in terms of lethality assessment

9      programs, judicial programs, and bench

10     books to help guide judges in assessing

11     for lethality, because there's just been

12     some extraordinary research that's been

13     done in terms of determining when victims

14     are at high risk.  And I think we should

15     be using it across the board.  So --

16            JUSTICE HANTZ MARCONI:  My

17     understanding is the protocols are, let

18     me say, in process of -- early-stage

19     process of starting the process of

20     updating.  And I do think COVID, et

21     cetera, got in the way, but excellent

22     suggestion.  That should likely be a

23     recommendation here for a regular review.

24     But I think it should be --

25            MS. SEXTON:  Yeah, I think it should



Domestic Violence Task Force - 1/11/22

 1          certainly be multidisciplinary --

 2                    JUSTICE HANTZ MARCONI:  Right.

 3                    MS. SEXTON:  -- in terms of updating

 4          those.

 5                    JUSTICE HANTZ MARCONI:  Right.  And

 6          I also think, in terms of the

 7          consistency -- and again, I'm just -- I'm

 8          spit-balling.  But if there is a -- if we

 9          can establish an avenue for these

10          anecdotes, if you will, or experiences

11          with lack of consistency, but a regular

12          avenue for those to reach the appropriate

13          administrators, that can, too, be part of

14          the process.

15                    Question?

16                    MS. SCHOLLETT:  Hi, Justice Hantz

17          Marconi.  This is Lyn Schollett, also

18          from the Coalition.  And thank you for

19          raising that point.  That's what I was

20          about to say.  I think finding a way to

21          formalize a feedback loop and open

22          communication between the incredible

23          experts that are on this call, who are in

24          the courtrooms regularly, and when we see

25          challenges in the system would be so



Domestic Violence Task Force - 1/11/22

1    incredibly valuable.

2         We'd be hugely supportive of that

3    because we do see --

4         JUSTICE HANTZ MARCONI:  Yeah.  I'm

5    thinking that's something we should think

6    about how that would work, but yes.

7         MS. LAFRANCE:  So I --

8         JUSTICE HANTZ MARCONI:  Go ahead.

9         MS. LAFRANCE:  This is Patty

10   LaFrance.  In terms of the

11   inconsistencies with following the

12   protocols -- and I don't know how -- it's

13   Odyssey, right, the software that the

14   court uses?

15        JUSTICE HANTZ MARCONI:  I believe

16   so, yes.

17        MS. LAFRANCE:  So why can't there be

18   some kind of trigger or popup that comes

19   up?  I mean, at some point, the clerks,

20   the court, they have to get onto that

21   computer and print something out.  So why

22   not popup menus or little popup boxes,

23   like when you try to delete a file,

24   right?  Are you sure you want to delete

25   this, right?

Domestic Violence Task Force - 1/11/22

1          Why can't it be, have you -- has

2     this -- is this person represented by an

3     attorney, or have they been referred to

4     legal aid, or why can't that be

5     incorporated?  It should be an easy

6     software code to put in there, to put a

7     popup, or if it's (indiscernible) --

8          JUSTICE HANTZ MARCONI:  I will

9     (indiscernible), the e-Filing rollout,

10    for some reason, the technology, various

11    products that all go into all the

12    different case types that end up

13    happening, it's not all uniform.  But I

14    am not the tech person, and that's an

15    excellent suggestion.

16         MS. BEEBE:  Can you hear me now?

17    Can anyone hear me now?

18         MR. VICINANZO:  Still faint.

19         MS. BEEBE:  It's driving me crazy.

20    I wanted to follow up to what Erin was

21    saying, though, about the system and it

22    coming down to more having access to

23    those things.

24         One of the -- one of the pieces that

25    we see as a huge gap is the folks that

Domestic Violence Task Force - 1/11/22

 1          are eligible for a DOVE attorney that

 2          make just a little bit too much money but

 3          then don't have the ability to secure any

 4          sort of legal assistance on their own.

 5                And then the other piece is that

 6          it's great to have an advocate there all

 7          the time, but where we're in that kind of

 8          safety-planning support role and not

 9          really able to do or necessarily

10          understand all the nuances of what needs

11          to be included, what we've seen is the

12          ones that have not been -- the ones that

13          have not been granted have been either

14          there's too much information or there's

15          not enough, and that science of finding

16          that exact amount.

17                It's nice to hear the judge talk

18          about if you're not seeing the

19          information that you need, bringing the

20          folks in to find out what is missing so

21          that it can be granted.

22                And then looking at the part in the

23          protocol around -- I think it's 5-19

24          where it talks about if the victim

25          doesn't meet the criteria, then you don't



Domestic Violence Task Force - 1/11/22

1       need to issue the temporary, and you can

2       go right to a permanent.  But then it

3       says, specifically, the danger that that

4       can put the victim in.

5             And so to meet the immediate

6       physical danger is not happening a lot so

7       that they're not being granted.  But then

8       what we know is that that then increases

9       their risk for that lethality.  And so

10      that's where we're seeing folks either

11      not continuing on to try to get it or

12      just trying to stop the process because

13      they -- they're feeling like they're

14      going to be at more danger.

15            And we saw that after the incident

16      that created this commission, was several

17      of the folks that did not want to appear

18      again in that courtroom and would rather

19      just endure the abuse that they were

20      experiencing than worry about it

21      escalating if they weren't able to get

22      the protection that they needed.  So

23      (audio interference) hear me?

24            JUSTICE HANTZ MARCONI:  Right.

25      That --



Domestic Violence Task Force - 1/11/22

1            MS. DODGE:  I'm sorry.  Can you all

2       hear me?  This is Pam Dodge from 603

3       Legal Aid.  One of the things that I

4       think is a big problem -- and I don't

5       know how to resolve it, other than I --

6       maybe one suggestion.

7            When litigants are -- when

8       plaintiffs are going to the court, there

9       isn't an attorney there to give them

10      advice.  So everybody has noted they

11      don't know what they're go -- they don't

12      know what they don't know.  They don't

13      know what to put in that petition.

14           And so one of my thoughts is that if

15      the petition is insufficient, the person

16      talks to the judge, the judge feels like

17      there's more going on and they really

18      want to have that hearing, but there

19      isn't enough to grant the order ex parte,

20      if we had some kind of a clinic model in

21      the courts, where -- can we find some

22      attorneys, maybe a combination of NHLA

23      and private DOVE attorneys to perhaps be

24      at the courthouse to meet with the

25      clients who haven't met that burden?

Domestic Violence Task Force - 1/11/22

1        Perhaps they could withdraw it or leave

2        it there but then have it amended with

3        a -- hopefully, in a very short-term long

4        term.

5            I mean, that's just something that

6        I'm thinking about as I'm listening to

7        all of this is the missing piece is the

8        legal advice and to understand, really,

9        what they need to ask for.

10           JUSTICE HANTZ MARCONI:  That sort of

11       the clinic model or the navigator model,

12       I think, is something that is under

13       consideration by Access to Justice in

14       lots of different areas.

15           But that might also help, for

16       example -- don't know -- but if there is

17       a hearing irregularity.  I know there

18       have been issues raised with whether

19       advocates can accompany victims in their

20       hearings, sit at the table, what the

21       level of disclosure is.

22           So if there are issues with hearing

23       processes, is there a way to remedy those

24       sort of in real time, again, or is this

25       something that becomes an anecdote that

Domestic Violence Task Force - 1/11/22

1        we deal with after the fact?  Same thing

2        with choices, withdrawing petitions or

3        how you go about renewing a petition, so

4        are there areas in the process that we

5        need to look at?

6            MS. DODGE:  Yeah.  The other -- one

7        other thing is that the law school -- I

8        mean, I don't know, and I don't want to

9        speak for them.  But there may be an

10       opportunity for law students to also be

11       part of the resolution here and working

12       with faculty members who can provide the

13       advice and oversight.

14           MS. LAFRANCE:  I mean, that's --

15       they'd have to be, what, Rule 36, right?

16           MS. DODGE:  Right.

17           MS. LAFRANCE:  So that would only be

18       third year.  I think that's how it works.

19       It's been a while since I've been in law

20       school.

21           Dave (ph.) Vicinanzo, is that right?

22           MS. DODGE:  It is typically third

23       year.  But with the DOVE program, because

24       we do a miniseries with second-year

25       Daniel Webster Scholars.  And they, by



Domestic Violence Task Force - 1/11/22

1        Court Rule, are allowed to, under the

2        supervision of an attorney, take cases.

3            JUSTICE HANTZ MARCONI:  And maybe

4        that's something we should look at too.

5        And again, this gets to options to

6        increase legal manpower, which is a later

7        topic.  But we may want to look at the

8        rules.

9            And that's the other thing, previews

10       of coming attractions, but advocates.

11       I'm going to want to do a dive into how

12       we expand the advocacy core, if you will,

13       and whether there are options to provide

14       sort of semi-targeted advocates in

15       certain circumstances.  I don't know.

16           Certainly, folks in here who are

17       training the advocates and know sort of

18       how they get qualified, maybe there are

19       ways to tweak that process, which I'd

20       like to hear about.

21           All right.  Anything else with

22       current practice and procedure?  And

23       again, this is not a single opportunity

24       and then we're done.  This is the

25       beginning of a discussion.  And if you



Domestic Violence Task Force - 1/11/22

1    close up your Webex today and think of

2    something, feel free to write it down and

3    send it in, and we will share it with

4    everyone.

5       MS. DODGE:  I do have one other

6    concern.  And I don't know if it's

7    ongoing because I haven't heard a lot

8    about it.  But at some point in the fall,

9    we were having a lot of clients in some

10   areas where service was not being

11   perfected on the defendants.  And it

12   was -- the law enforcements just didn't

13   have the bandwidth to get the defendants

14   served.

15       And therefore, by the time the

16   hearing was coming around, they hadn't

17   been served, so the case gets continued.

18   And it seems to me -- and as I was

19   reviewing the protocols again, is there

20   an opportunity, if the law -- if the

21   particular law enforcement division

22   doesn't have the bandwidth for service,

23   can we get it off to the sheriff's

24   office?

25       And is there -- can we provide more

Domestic Violence Task Force - 1/11/22

1      guidance on that?  Because for plaintiffs

2      just to be waiting, not knowing, and have

3      this order that really hasn't even been

4      served is really unsettling for them.

5          JUSTICE HANTZ MARCONI:  And are you

6      talking about the order after the

7      petition or -- well, after the temporary

8      hearing?  You aren't talking --

9          MS. DODGE:  Yes.

10         JUSTICE HANTZ MARCONI:  -- about

11     further orders; it's just that one?  Yep.

12         MS. DODGE:  The service -- the

13     petition itself.

14         JUSTICE HANTZ MARCONI:  Yeah.  What

15     do people think about that?  What's our

16     law enforcement guy think about that, or

17     are you able to sort of survey your

18     membership and find out if it's -- if

19     there's an issue and if there's a

20     solution?

21         INV. BERNIER:  I think sometimes the

22     service issue depends, just as much as

23     we're talking about inconsistency in

24     training across the board with different

25     core professionals, that falls into play

Domestic Violence Task Force - 1/11/22

1      with law enforcement as well.

2          Some of your smaller agencies that

3      might have part-time individuals, less

4      supervision, less access to resources,

5      maybe less experience, might not know

6      the -- be able to pick up the phone and

7      call other agencies.

8          I know from years with Portsmouth,

9      we would pull out the stops, in terms of

10     locating that individual, contacting

11     other law enforcement agencies where that

12     individual might be.  Oftentimes you'll

13     have a subject that will try to dodge

14     service.  But we were always successful

15     in that.  And a lot of it comes down to

16     communicating within agencies.

17         We all -- as the Hampton chief can

18     attest to, we share a lot of clientele.

19     And we all do work very closely together.

20     So it's about having those -- if you

21     don't pick up the phone and make those

22     phone calls and encouraging those

23     agencies that may have fewer personnel or

24     less training not to be wary of picking

25     up the phone and asking for help, whether

Domestic Violence Task Force - 1/11/22

1      it be the local sheriffs' departments,

2      State Police, or some of your bigger

3      agencies where that defendant may be

4      work-wise or staying.

5          It's about making sure the agencies

6      realize how imperative it is to get that

7      Serve Ace (ph.) app and then making it a

8      priority in knowing who to call.

9          JUSTICE HANTZ MARCONI:  So that

10     could just be some communication,

11     education, and emphasis that interagency

12     cooperation is a thing and is available.

13         CHIEF HOBBS:  Yeah, I would agree

14     with Kristyn.  I mean, I -- we get

15     notified from the court.  I think other

16     departments are probably different,

17     smaller departments, which might delay

18     some of the service, which goes back to,

19     I guess, completely separate from the

20     petition process.

21         I think there needs to be some sort

22     of help with getting somebody, some

23     safety plan in place, an advocate type

24     thing or a role to be involved with them

25     from the beginning if there is a delay in

Domestic Violence Task Force - 1/11/22

1    the service or -- we know people violate

2    these orders.  And so aside from the

3    petition, I think having somebody take

4    some steps when they need to to keep

5    themselves safe is important.

6        JUSTICE HANTZ MARCONI:  Outside of

7    the court process, and again, that would

8    be something advocates are trained to

9    provide.  So they've got one foot in

10   court and one out, I guess, is one way to

11   look at it.

12       All right.  Any other thoughts on

13   process, thoughts on our process?  Does

14   this work for people?  I mean, is this

15   sort of focus on one thing at a time a

16   way forward, so we get randomly doing

17   things?

18       And again, this is just the

19   beginning of the conversation.  My

20   expectation is we will continue to share

21   thoughts.  We will summarize those things

22   as we go through, and at the end, and

23   come up with our recommendations.

24       MS. PAINE:  Justice Hantz Marconi,

25   is there a time line yet for these orders



Domestic Violence Task Force - 1/11/22

 1          to go into the e-Filing system?  Is there

 2          any way to anticipate that change as we

 3          think about this work, or should we just

 4          continue on as if we're going to be in

 5          the old system for a period of time?

 6               JUSTICE HANTZ MARCONI:  We're going

 7          to be in the old system for a period of

 8          time.  e-Filing has run into some

 9          technical hurdles, if you will.  And then

10          these cases are behind the others that

11          are awaiting some bandwidth changes.

12               So we should work with what is, for

13          now, which would mean, for example, the

14          guided interview idea would have to be

15          done on paper, not electronically like

16          TurboTax, which would be great.  But the

17          time line's not set.

18               With respect to this meeting, I am

19          thinking, unless we have more input --

20          and we have time --

21               MS. LAFRANCE:  I just had another --

22          a quick thought on service, because I

23          literally just had this happen to me

24          today with a client who got a restraining

25          order.



Domestic Violence Task Force - 1/11/22

1              The protocols say that the court

2       will take care of service, right?  If

3       someone, like my client today, has an

4       attorney, who -- us family law attorneys

5       are used to serving divorce petitions,

6       parenting petitions, ex partes.  Can they

7       be given the option of the attorneys

8       handling the service?  I mean, because we

9       have contacts with the sheriff's

10      department as well.  So it might ease up.

11             And I understand this isn't for

12      everybody, only somebody who has an

13      attorney.  And I know we're trying to

14      work on getting everybody an attorney.

15      But we might also have contact.  If we

16      know the other party, if we've already

17      been involved with the other party, we

18      might be aware that they have -- and I

19      mean, it happens all the time in

20      parenting petitions, divorce petitions.

21      If I know they're represented by counsel,

22      will you agree to accept service on their

23      behalf?

24             It doesn't happen a hundred percent

25      of the time, but I think giving a



Domestic Violence Task Force - 1/11/22

1          petitioner or plaintiff that option of

2          having their attorney take care of the

3          service might ease the burden on the

4          courts just a bit.

5              MS. FREEMAN:  The other service

6          issue that comes up rarely -- but it

7          comes up -- is when someone lives in

8          another country or is out of state, where

9          it creates a complicating factor because

10         our law enforcement, largely, is highly

11         trained in serving the way New Hampshire

12         does it and the way New Hampshire

13         statutes require it.

14             But whenever we go outside of our

15         borders, it is complicating because not

16         other -- other states don't serve the way

17         that we do.  And other countries

18         certainly don't.  So I think it's the

19         other complicating piece.

20             JUSTICE HANTZ MARCONI:  Right.

21         Constables in Massachusetts, at least it

22         was when I was practicing down there, so

23         yes, it is a different process.  And it

24         may be that is an area where there could

25         be some guidance documents created to

Domestic Violence Task Force - 1/11/22

1          help folks.

2                 All right.  This is helpful, of

3          course.  We will summarize comments,

4          topics, areas of focus.  We will

5          circulate that.  We have the documents

6          that we've been working with, the

7          protocols, the administrative orders,

8          which are more ministerial, but -- and my

9          thought would be -- unless people

10         disagree, is we would upload the

11         protocols to the public website, so that

12         people know what we're talking about, and

13         the administrative orders.

14                And once we've arrived at a summary

15         of our discussion and some, again, focal

16         points -- I'm not concluding anything

17         today, so everybody can continue to

18         comment -- we'll upload that as well.

19         And then we'll move on to our next

20         discussion point.  Does that work?  I see

21         nodding heads.  Good.  Any final

22         thoughts?

23                JUDGE YAZINSKI:  Justice Marconi?

24         Yeah.  Can I make one request of this

25         group?  If you would look at the petition

Domestic Violence Task Force - 1/11/22

1      itself and think about and then comment

2      on what you might suggest to make the

3      form more user-friendly.

4          I have often thought -- several

5      people brought this up -- that listing

6      out the actual things that constitute

7      abuse, have a checkbox and then a place

8      to explain it, it would be much more

9      user-friendly than what we have now,

10     which is a paragraph and then a large

11     open space.

12         But I'd be curious to know if others

13     have suggestions or thoughts about how to

14     make that form and that first page more

15     user-friendly.

16         JUSTICE HANTZ MARCONI:  I think

17     that's a good request, and it will

18     dovetail into -- I forget which charge,

19     where we look at all the forms.  But

20     given this discussion we've had today, I

21     think that's a good segue.  Get your

22     pencils out --

23         FEMALE SPEAKER:  It's charge 2, so

24     that would be tomorrow.

25         JUSTICE HANTZ MARCONI:  Okay.  Then



Domestic Violence Task Force - 1/11/22

1    that's tomorrow.  So everybody get your

2    pencils out.  You have homework.  And we

3    will take that up first thing tomorrow.

4        All right.  I appreciate -- and take

5    a look at Jean's amended review of

6    existing court practice and procedure.

7    She very definitely filled out a skeletal

8    outline, all good information.  And I

9    appreciate your time.  I appreciate your

10   attention.  And I think we are off to a

11   good start.

12       FEMALE SPEAKER:  I misspoke.  It's

13   charge 4.  Don't listen to me.

14       JUSTICE HANTZ MARCONI:  Oh, okay.

15   Well, okay.  Then you have -- you still

16   have homework, but you have a little over

17   a week to get that done.

18       All right.  And any suggestions for

19   improving the process, feel free to let

20   me know.  My feelings don't get hurt, so

21   feel free to give me an email and let me

22   know what we can do to make this even

23   better.  Thank you, all.

24       IN UNISON:  Thank you.

25       (End of audio)



C E R T I F I C A T I O N

I, Cheryl Odom, certify that the
foregoing transcript is a true and
accurate record of the proceedings.

_____

Cheryl Odom (CDLT-186)

TTA-Certified Digital Legal Transcriber

eScribers

352 Seventh Avenue, Suite #604

New York, NY 10001

Date:   February 28, 2022



**A**

**ability** 11:13
36:3
**able** 6:4 15:22
22:14 23:14
24:20,25 30:9
36:9 37:21
43:17 44:6
**absolutely** 31:21
**abuse** 17:1,9
20:5 21:18,25
22:3 25:16,20
25:24 37:19
51:7
**accept** 48:22
**access** 4:25 18:2
35:22 39:13
44:4
**accompany**
39:19
**accountant** 25:7
**accurate** 53:5
**Ace** 45:7
**act** 25:1
**action** 11:1 22:9
**actively** 27:18
**actual** 12:1 27:1
27:8 30:14
51:6
**add** 9:24 17:14
23:20
**added** 5:6
**adding** 4:5
24:21
**additional** 3:13
5:11,13 9:22
9:24 11:1
**address** 4:23
9:10 10:23
30:9
**addressing**
10:14
**administrative**
3:25 4:12 7:7
7:14 50:7,13
**Administrator**
2:21
**administrators**
33:13

**advice** 38:10
39:8 40:13
**advising** 10:3
**advocacy** 11:17
14:8,12 41:12
**advocate** 13:6
16:8 18:2,4,9
19:3,3,15
24:22 28:24
31:5,5 36:6
45:23
**advocates** 7:21
16:1 39:19
41:10,14,17
46:8
**Affairs** 2:12
**affidavit** 15:2
**AG** 13:18
**AG's** 11:11
13:18 22:25
**age** 27:1
**agencies** 44:2,7
44:11,16,23
45:3,5
**agenda** 4:3 6:24
26:9
**ago** 21:3
**agree** 31:22
45:13 48:22
**Ah** 8:8
**ahead** 34:8
**aid** 29:5,6 31:8
35:4 38:3
**alert** 3:15
**allegations**
16:25
**allow** 11:1
**allowed** 7:9,12
41:1
**Amanda** 2:11
31:20
**amended** 39:2
52:5
**amendments**
26:17
**amount** 36:16
**and/or** 11:1
**anecdote** 30:6
39:25

**anecdotes** 33:10
**Ann** 1:25
**Anna** 1:12
**Anne** 2:25 5:15
**annual** 20:23,25
**annually** 21:11
**answer** 14:1
20:16 26:24
30:16
**answers** 24:9
**anticipate** 47:2
**anybody** 25:18
**anyone's** 7:18
**app** 45:7
**appear** 37:17
**appearing** 21:16
**application**
31:23
**applied** 28:14,15
28:16 29:8,12
29:24
**applying** 25:18
**appreciate**
31:15 52:4,9,9
**appreciated** 4:8
**appropriate**
17:16 33:12
**area** 49:24
**areas** 17:3 23:24
24:5 39:14
40:4 42:10
50:4
**arrived** 18:1
50:14
**aside** 46:2
**asked** 24:8
**asking** 44:25
**aspects** 7:3 26:9
**assess** 9:21
11:14
**assessing** 11:18
12:1 32:10
**assessment**
12:16 14:14
15:24 16:10,19
32:8
**assistance** 2:4
8:21 16:1
19:7 36:4

**Assistant** 1:23
**Associate** 1:13
**Association** 2:7
2:14
**attach** 20:6
**attendance** 3:17
**attention** 3:6 6:4
7:8 52:10
**attest** 44:18
**attorney** 1:23
2:1,2,15,16,18
11:22 29:6
35:3 36:1 38:9
41:2 48:4,13
48:14 49:2
**Attorney's** 1:22
**attorneys** 2:14
31:8 38:22,23
48:4,7
**attractions**
41:10
**audio** 37:23
52:25
**available** 6:6
13:13 19:3
45:12
**avenue** 33:9,12
53:19
**awaiting** 47:11
**aware** 48:18

**B**

**B** 10:21
**back** 8:15 20:6
45:18
**backstop** 30:24
31:2
**ball** 26:21
**bandwidth**
42:13,22 47:11
**Barbara** 1:12
**Barton** 1:17
**based** 14:18
16:11
**basis** 18:6
**Beauchamp**
1:18
**Beebe** 1:20 8:1,6
8:7,10,14

31:17 35:16,19
**beginning** 13:8
41:25 45:25
46:19
**behalf** 48:23
**behavior** 21:25
**believe** 12:6
13:17 15:23
21:10 34:15
**Belknap** 1:21
**bench** 17:7 32:9
**beneficial** 14:6
**benefit** 23:22
**Bernier** 1:21
3:11 14:13
43:21
**Bernier's** 4:16
**best** 19:16 29:1
**best-case** 28:12
31:4
**Betsy** 2:18 11:7
17:17
**better** 8:13
52:23
**beyond** 21:15
**biannual** 20:23
**big** 23:13 38:4
**bigger** 45:2
**bit** 3:23 10:15
36:2 49:4
**Black** 2:16
**board** 32:15
43:24
**books** 32:10
**borders** 49:15
**box** 17:19
**boxes** 15:10
34:22
**brain** 4:8
**bridge** 12:12
**bring** 22:15
**bringing** 36:19
**broad** 21:23
**brought** 10:18
51:5
**budget** 21:2,7
**burden** 38:25
49:3
**button** 26:15

**C**

C 53:1,1
call 16:20 30:9
  33:23 44:7
  45:8
calls 12:17 44:22
candidate 24:2
Carbon 1:14
care 8:20 48:2
  49:2
career 17:7,20
cart 26:4
CASA 2:18
case 9:23 12:3,3
  26:1 30:17
  35:12 42:17
cases 3:4 7:22
  9:3 22:7,8 41:2
  47:10
caution 16:9
CDLT-186
  53:11
center 28:22
  30:17
centers 7:20
  8:24
certain 41:15
certainly 21:1
  33:1 41:16
  49:18
certify 53:3
cetera 31:1
  32:21
challenges 33:25
change 47:2
changes 7:14
  47:11
changing 26:5
charge 3:6 4:4
  5:4 8:2 51:18
  51:23 52:13
charges 4:24
  5:20
cheat 25:22
checkbox 51:7
checked 15:9
  17:19
checklist 14:23
  25:8

Cheryl 53:3,11
chief 12:13
  13:12,16,21,23
  44:17 45:13
Chiefs 2:8
children 18:16
  21:22
chime 20:15
choice 29:1
choices 40:2
Circuit 1:14,16
  1:17 2:20 17:3
  20:18 23:23
circulate 50:5
circumstances
  9:7 19:18 28:3
  41:15
clarify 12:6
  22:12
clearly 23:18
clerk 1:17 2:25
  28:21
clerks 30:15
  34:19
client 47:24 48:3
clientele 44:18
clients 38:25
  42:9
clinic 38:20
  39:11
close 42:1
closely 8:22
  44:19
Coalition 2:10
  2:12 8:23
  31:21 33:18
code 35:6
combination
  38:22
come 8:15,20
  46:23
comes 16:22
  27:9 34:18
  44:15 49:6,7
coming 11:9
  16:3 24:4
  31:11 35:22
  41:10 42:16
comment 4:22

4:23 5:5,5
  19:20 28:8
  50:18 51:1
comments 5:11
  50:3
commission
  37:16
communicating
  44:16
communication
  33:22 45:10
community
  11:17 14:8,12
  28:21
completely
  45:19
complicating
  49:9,15,19
computer 34:21
concern 10:8
  42:6
concluding
  50:16
conference 23:1
confidentiality
  24:1
confined 22:9
  26:22
confirm 27:21
  30:13
connect 15:25
connected 28:23
connecting 29:5
consideration
  39:13
consistency
  29:19,23 33:7
  33:11
consistent 28:6
consistently
  28:16
Constables
  49:21
constitute 16:25
  51:6
constitutes
  27:15
consultants
  22:15

contact 28:20
  30:16,18 48:15
contacting 44:10
contacts 48:9
continue 23:12
  46:20 47:4
  50:17
continued 42:17
continuing
  37:11
control 22:1
controlling
  21:25
convening 12:4
conversation
  46:19
cooperation
  45:12
core 4:15 41:12
  43:25
correct 15:23
  16:16,18
Council 21:5
counsel 48:21
countries 49:17
country 49:8
County 1:22,23
  1:24,25
couple 14:24
course 50:3
court 1:13,14,15
  1:16,17 2:20
  3:8 9:14,19
  10:25 11:13
  12:19 13:6,14
  14:4,11 15:14
  16:3,13,23
  17:4 18:1,4,9
  20:18 23:23
  24:25 28:17,17
  30:8 34:14,20
  38:8 41:1
  45:15 46:7,10
  48:1 52:6
court's 4:10
  6:12
courthouse
  28:19 38:24
courtroom

37:18
courtrooms
  33:24
courts 9:1,4,7
  17:18 38:21
  49:4
COVID 4:13
  22:16 32:20
crazy 35:19
created 37:16
  49:25
creates 49:9
crime 16:1 23:4
criminal 2:14
  25:25
crisis 7:19 8:23
  14:3 21:3
  28:22 30:17
criteria 14:24
  36:25
curious 51:12
current 41:22
currently 28:15
cut 21:7

**D**

damage 26:1
danger 10:2
  29:16 37:3,6
  37:14
dangerous 10:11
Daniel 40:25
Date 53:25
Dave 12:13
  40:21
David 2:7,15
day-long 21:12
days 20:22
  29:15
DCYF 16:7
deal 7:20 40:1
dealing 18:18
  29:18
deals 4:13
decent 10:13
decide 6:10
decided 22:4
decides 9:14
decision 9:5

**defendant** 10:6
  45:3
**defendant's**
  10:8
**defendants**
  42:11,13
**Defense** 2:14
**define** 25:20
**defined** 17:1,10
  25:16
**definitely** 22:23
  52:7
**definition** 27:1
**delay** 45:17,25
**delete** 34:23,24
**department**
  48:10
**departments**
  45:1,16,17
**depends** 43:22
**described** 11:22
**detail** 9:11
**details** 9:22,24
  23:4
**determine** 17:13
**determining**
  32:13
**developed** 15:25
**Diane** 1:15
**died** 24:13
**difference** 19:13
**different** 16:5
  16:12 35:12
  39:14 43:24
  45:16 49:23
**difficult** 18:21
**digital** 26:25
  53:13
**dike** 30:20
**Director** 1:18,20
  2:3,5,9,11,24
**disagree** 50:10
**disclosure** 39:21
**disconnect**
  12:11
**discuss** 5:9 6:9
**discussed** 6:10
**discussing** 6:15
**discussion** 7:1

  41:25 50:15,20
  51:20
**distribute** 5:16
**distribution**
  26:13
**dive** 41:11
**division** 42:21
**divorce** 22:8
  48:5,20
**document** 13:14
  14:18,22 15:1
  15:3
**documents** 4:2
  4:15,21 6:13
  49:25 50:5
**dodge** 2:19 38:1
  38:2 40:6,16
  40:22 42:5
  43:9,12 44:13
**doing** 4:19 9:5
  14:11 27:12,22
  32:8 46:16
**DOJ** 2:4
**domestic** 1:6
  2:22 3:3 4:9
  7:4,10 17:2,6
  19:10 20:1
  21:5,21 23:10
  23:24 29:2
**DOVE** 2:15,19
  36:1 38:23
  40:23
**dovetail** 51:18
**drafted** 11:8
**draw** 7:8
**driving** 35:19
**Dropbox** 3:10
  3:16 4:2 6:11
**due** 22:16,17
**dump** 4:8
**DV** 2:24 4:13

_____
          **E**
_____
**E** 53:1
**e-Filing** 23:21
  23:23 24:2,6
  35:9 47:1,8
**early-stage**
  32:18

**ease** 48:10 49:3
**easy** 15:10 35:5
**edits** 4:6
**education** 45:11
**educational** 21:8
**either** 20:16
  36:13 37:10
**electronic** 7:10
  7:12 27:4
**electronically**
  47:15
**eligible** 36:1
**email** 4:23 5:15
  52:21
**emphasis** 45:11
**encouraging**
  44:22
**Endres** 1:23
**endure** 37:19
**enforceable** 27:7
**enforcement**
  11:12,16 13:18
  14:15 22:25
  42:21 43:16
  44:1,11 49:10
**enforcements**
  42:12
**ensure** 32:6
**entail** 21:16
**entire** 17:7
  20:10,10
**entities** 6:2
  11:14
**equate** 20:21
**Erin** 2:24 19:6
  31:22 35:20
**escalating** 37:21
**eScribers** 53:17
**especially** 24:21
**establish** 17:9
  33:9
**et** 31:1 32:20
**event** 20:3
**everybody** 6:18
  38:10 48:12,14
  50:17 52:1
**evidence-** 16:10
**evolution** 27:14
**ex** 38:19 48:6

**exact** 36:16
**example** 25:5
  28:18 30:12
  39:16 47:13
**excellent** 32:21
  35:15
**Excuse** 12:13
**Executive** 1:20
  2:9
**existing** 3:7
  31:24 52:6
**expand** 41:12
**expectation** 23:9
  46:20
**experience** 7:18
  44:5
**experiences**
  33:10
**experiencing**
  11:4 37:20
**experts** 33:23
**expiration** 26:19
**explain** 51:8
**explore** 23:12
**external** 22:15
**extraordinary**
  32:12
**extremely** 31:25

_____
          **F**
_____
**F** 53:1
**face** 10:24
**fact** 20:18 40:1
**factor** 49:9
**facts** 17:9 18:7
**faculty** 40:12
**faint** 8:9,13
  35:18
**fairly** 21:23
**fall** 42:8
**falls** 30:18 43:25
**family** 16:7 22:2
  23:24 48:4
**February** 53:25
**federal** 22:13
  27:2,5,9,13
  28:6
**feedback** 3:24
  27:12 33:21

**feel** 5:14 25:9
  26:22 27:25
  42:2 52:19,21
**feeling** 37:13
**feelings** 52:20
**feels** 38:16
**FEMALE** 51:23
  52:12
**fewer** 44:23
**file** 9:17 29:2,3,4
  34:23
**filed** 10:7,9
**files** 16:23
**filing** 7:19
**fill** 18:19 19:1
  19:16 23:2
  24:9 31:9
**filled** 52:7
**filling** 19:9,10
  19:12 25:8
**final** 19:20
  50:21
**financial** 22:1
**find** 12:8 18:3
  25:24 27:17
  36:20 38:21
  43:18
**finding** 33:20
  36:15
**finger** 30:20
**finish** 25:7
**firearms** 27:6
**first** 3:2 27:22
  51:14 52:3
**fit** 17:15
**five** 25:14
**flaw** 29:19
**focal** 50:15
**focus** 46:15 50:4
**focused** 6:9
**focusing** 3:6 4:6
**folks** 3:12 4:16
  4:17 6:6 11:10
  27:12 31:17
  35:25 36:20
  37:10,17 41:16
  50:1
**follow** 31:3
  35:20

**followed** 9:13
 10:17,21 30:2
**following** 5:3,3
 19:8 34:11
**foot** 46:9
**force** 1:6 3:3
 5:10,21 12:5
**foregoing** 53:4
**forget** 51:18
**form** 18:20,21
 19:1,5,9,10,16
 19:16 20:3
 21:11 22:7,8
 24:17,19 25:6
 25:12 51:3,14
**formalize** 33:21
**forms** 13:4
 15:17 25:14
 26:5 51:19
**forthcoming**
 12:23,24
**forward** 11:18
 46:16
**foundation**
 28:11
**free** 5:14 42:2
 52:19,21
**Freeman** 2:20
 12:6 15:19,22
 22:12 27:20
 49:5
**friends** 22:2
**frightened** 18:16
**front** 3:12 4:17
 20:7 25:21
**fund** 21:8
**funds** 22:13
**further** 43:11

**G**

**gap** 11:11 12:12
 31:9 35:25
**gaps** 31:14
**gather** 14:4
**general** 5:24
 28:8
**getting** 4:21
 19:4 45:22
 48:14

**give** 27:21 38:9
 52:21
**given** 19:17
 30:15 48:7
 51:20
**giving** 48:25
**glitch** 30:13
**go** 3:19 12:16
 14:4 20:6
 21:15 24:24
 34:8 35:11
 37:2 38:11
 40:3 46:22
 47:1 49:14
**goes** 26:7 45:18
**going** 3:19 4:1
 5:19 6:13
 12:19,23 15:15
 18:17 20:15
 24:11 25:3
 26:8 28:9
 37:14 38:8,17
 41:11 47:4,6
**good** 10:19 11:3
 12:10,22 13:24
 15:17 19:21,23
 26:15 27:16,25
 28:11 31:25
 50:21 51:17,21
 52:8,11
**gotten** 11:10
**Grady** 2:11
 31:20
**Grafton** 1:25
**grant** 38:19
**granted** 18:6
 19:5 36:13,21
 37:7
**great** 3:11 27:11
 29:9,10 36:6
 47:16
**group** 2:17 5:17
 10:18 32:3
 50:25
**guess** 45:19
 46:10
**guidance** 43:1
 49:25
**guide** 14:9 32:10

**guided** 24:7,23
 47:14
**guideposts** 6:25
**guy** 43:16

**H**

**Hampshire** 1:13
 2:10,12,13
 8:21 14:21
 16:11 19:7
 31:21 49:11,12
**Hampton** 2:5,7
 12:14 44:17
**handling** 48:8
**Hantz** 1:12 3:1
 8:4,8,12,16
 10:19 12:10
 13:9,13,20,22
 14:7 15:12
 20:9 22:11
 23:19 26:6
 27:16,23 29:25
 32:16 33:2,5
 33:16 34:4,8
 34:15 35:8
 37:24 39:10
 41:3 43:5,10
 43:14 45:9
 46:6,24 47:6
 49:20 51:16,25
 52:14
**happen** 26:18,18
 47:23 48:24
**happened** 11:15
**happening** 9:1
 12:2 22:19
 30:7 35:13
 37:6
**happens** 48:19
**happy** 3:24
**harmed** 18:17
**Haven** 1:20
**heads** 50:21
**hear** 7:17 8:6,10
 26:11 31:17,18
 35:16,17 36:17
 37:23 38:2
 41:20
**heard** 42:7

**hearing** 8:4 9:8
 9:18 17:20
 26:12 29:14
 38:18 39:17,22
 42:16 43:8
**hearings** 39:20
**heat** 14:2
**Held** 1:8
**help** 12:21,25
 13:7 14:9 16:3
 32:10 39:15
 44:25 45:22
 50:1
**helpful** 26:2
 50:2
**hesitant** 27:21
**Hi** 33:16
**high** 13:3 29:16
 32:14
**highly** 49:10
**Hobbs** 2:7 12:13
 12:13 13:12,16
 13:21,23 45:13
**holding** 22:21
**homework** 52:2
 52:16
**Hon** 1:12,14,15
 1:16
**Honor** 11:7
 26:23
**hopefully** 39:3
**hoping** 28:7
**Hornick** 1:25
 20:11
**horse** 26:4
**hot-** 26:14
**hour** 3:5
**hours** 20:22
 31:7
**house** 18:15
**huge** 11:18
 35:25
**hugely** 34:2
**hundred** 48:24
**hurdles** 7:23
 47:9
**hurt** 52:20
**husband's** 21:24

**I**

**idea** 14:13 25:19
 47:14
**identify** 6:14
**identifying** 16:6
**illuminate** 31:14
**immediate** 37:5
**immediately**
 19:5
**imminent** 10:1
**impact** 21:21
**imperative** 45:6
**important** 32:6
 46:5
**impossible** 19:1
**improvement**
 15:17 29:22
**improvements**
 7:24 10:21
 28:5
**improving** 52:19
**in-** 21:9
**incident** 23:2
 37:15
**include** 27:3
**included** 36:11
**includes** 18:7
**including** 9:1,2
**inconsistence**
 31:23
**inconsistencies**
 34:11
**inconsistency**
 9:4 31:15
 43:23
**incorporated**
 35:5
**increase** 41:6
**increases** 37:8
**incredible** 33:22
**incredibly** 10:11
 34:1
**independently**
 14:11
**indicates** 20:4
**indiscernible**
 15:21 35:7,9
**individual** 5:10
 44:10,12

individuals 44:3
information
  5:13 23:17
  24:10,24 36:14
  36:19 52:8
initial 19:2
input 3:13 4:17
  47:19
inquiry 6:2
  15:13
insight 10:20
institute 15:11
insufficient
  10:25 38:15
intense 21:1
interagency
  45:11
interested 6:3
interesting 23:8
interests 3:20
interference
  37:23
interview 24:7
  24:23 47:14
INV 14:13 43:21
Investigator
  1:21
involved 45:24
  48:17
irregularity
  39:17
issue 5:12 9:9,15
  10:12 19:25
  20:2,8 24:19
  26:15 28:13
  29:19,24 30:4
  30:5 31:16
  37:1 43:19,22
  49:6
issues 3:14 4:18
  5:9 8:19,25
  24:1,3 26:13
  26:16 39:18,22
issuing 10:2
items 4:6

J

Jack 16:18
January 1:7

Jasina 2:24 19:6
  19:6 28:7
Jean 2:22 4:4
  27:20
Jean's 52:5
job 10:14
John 1:16
Jon 2:13
journey 21:19
judge 1:14,15,16
  9:20,23 15:4,7
  15:20 16:17,24
  18:25 19:20
  20:17,24 21:4
  22:23 23:6,18
  36:17 38:16,16
  50:23
judges 17:4
  20:18 21:2
  22:14,20 32:10
judicial 3:4 32:9
jump 6:23
Justice 1:13 3:1
  8:4,8,12,16
  10:19 12:10
  13:9,13,20,22
  14:7 15:12
  20:9 22:11
  23:19 26:6
  27:16,23 29:25
  32:16 33:2,5
  33:16 34:4,8
  34:15 35:8
  37:24 39:10,13
  41:3 43:5,10
  43:14 45:9
  46:6,24 47:6
  49:20 50:23
  51:16,25 52:14

K

Kathy 1:20 8:7
  8:18
keep 5:2 46:4
key 19:4
Kilham 2:22 4:5
kind 3:17 4:7
  7:2 14:3 24:7
  26:7 27:3 28:8

30:24 34:18
  36:7 38:20
know 6:20 10:6
  12:8 17:2
  18:21,22 19:13
  19:16 20:15
  22:2 23:16
  26:12,14,24,25
  27:17 28:4
  30:16,25 31:6
  34:12 37:8
  38:5,11,12,12
  38:13 39:16,17
  40:8 41:15,17
  42:6 44:5,8
  46:1 48:13,16
  48:21 50:12
  51:12 52:20,22
knowing 21:24
  43:2 45:8
Kristyn 1:21
  3:10 4:16
  45:14
Krueger 2:2
  8:17,17 11:22

L

lack 33:11
LaFrance 2:16
  25:2,3 34:7,9
  34:10,17 40:14
  40:17 47:21
language 27:9
LAP 13:17
large 51:10
largely 31:24
  49:10
larger 29:24
late-breaking
  3:9
law 2:17,25 9:23
  11:12,16,24
  13:18 14:15
  22:24 24:6
  27:5 28:6 40:7
  40:10,19 42:12
  42:20,21 43:16
  44:1,11 48:4
  49:10

lawyer 31:7
learned 23:15
leave 39:1
left 9:25
legal 2:19 8:21
  19:7 27:21
  29:5,6 31:5,8
  35:4 36:4 38:3
  39:8 41:6
  53:13
legislature 22:3
lethality 11:14
  11:19 12:2,15
  14:14 15:24
  16:9,19 32:8
  32:11 37:9
level 10:24
  27:13 39:21
light 7:15
limited 5:9
  22:17
line 4:17 7:3
  46:25
line's 47:17
lines 3:12
Lisa 5:15
list 3:18
listed 4:7 7:2
listen 52:13
listening 20:14
  39:6
listing 51:5
literally 47:23
litigant 30:5
litigants 38:7
little 3:23 8:12
  25:22 34:22
  36:2 52:16
lives 49:7
livestreaming
  5:25
local 45:1
locating 44:10
long 25:14 39:3
look 11:11 13:14
  15:5 17:8 24:5
  24:20 32:7
  40:5 41:4,7
  46:11 50:25

51:19 52:5
looking 12:20,21
  16:21 23:17
  24:14 27:24
  36:22
looks 16:24
loop 33:21
losing 18:14,15
lot 29:17 30:25
  37:6 42:7,9
  44:15,18
lots 39:14
Lyn 2:9 33:17
Lynda 2:3 15:19
  15:22 16:15

M

making 9:5 29:7
  45:5,7
Manager 2:22
mandatory 4:14
manpower 41:6
Marcie 20:24
Marconi 1:12
  3:1 8:4,8,12,16
  10:19 12:10
  13:9,13,20,22
  14:7 15:12
  20:9 22:11
  23:19 26:6
  27:16,23 29:25
  32:16 33:2,5
  33:17 34:4,8
  34:15 35:8
  37:24 39:10
  41:3 43:5,10
  43:14 45:9
  46:6,24 47:6
  49:20 50:23
  51:16,25 52:14
Martha 1:25
Mary 1:17 2:2
  8:17
Maryland 14:19
Massachusetts
  49:21
matters 3:25
mean 25:17
  34:19 39:5

40:8,14 45:14
46:14 47:13
48:8,19
**mechanism**
11:21
**meet** 8:24 11:24
17:12 18:11
36:25 37:5
38:24
**meeting** 1:6 3:5
5:3,4 6:5 19:2
47:18
**meetings** 3:2
4:20
**member** 5:10
**members** 40:12
**membership**
43:18
**menus** 34:22
**merely** 6:25
**Merrill** 1:18
5:15
**Merrimack** 1:24
**met** 7:23 38:25
**miniseries** 40:24
**ministerial** 50:8
**minus** 3:6
**missing** 36:20
39:7
**misspoke** 52:12
**misstating** 16:16
**mistaken** 14:20
**model** 38:20
39:11,11
**moment** 27:19
29:1
**money** 36:2
**move** 6:8 7:5
50:19
**multidisciplin...**
33:1

**N**
**N** 53:1
**National** 21:5
**nationally** 27:7
**nationwide**
14:20
**navigator** 39:11

**necessarily**
12:18 29:19
36:9
**necessary** 24:18
24:25
**need** 10:6 16:7
16:13 18:23
24:24 36:19
37:1 39:9 40:5
46:4
**needed** 37:22
**needs** 9:16 10:17
36:10 45:21
**net** 11:25
**never** 17:18
**new** 1:13 2:9,12
2:13 8:20
14:21 16:11
19:7 20:7 21:1
22:19 31:20
49:11,12 53:21
**NH** 1:20 2:4,7
2:18
**NHBA** 2:19
**NHJB** 2:22
**NHLA** 2:2,24
38:22
**NHSC** 2:25
**nice** 36:17
**Nicolosi** 1:15
**no-finding**
17:19
**nodding** 50:21
**noncompliance**
30:10
**note** 11:6
**noted** 38:10
**notice** 10:9 27:1
27:8 28:1,2
30:13,14
**notified** 45:15
**nuances** 36:10
**number** 21:3
**NY** 53:21

**O**
**O** 53:1
**observations**
15:18

**obviously** 7:13
31:10
**occur** 17:24
**occurred** 20:5
**occurs** 21:10
**Odom** 53:3,11
**Odyssey** 34:13
**office** 1:22 2:3
22:25 42:24
**Oftentimes**
44:12
**Oh** 8:6 52:14
**okay** 3:1 6:19
8:10,16 13:20
13:22 27:24
51:25 52:14,15
**old** 47:5,7
**once** 3:22 10:8
50:14
**one-page** 14:17
14:22
**ones** 36:12,12
**ongoing** 42:7
**open** 5:2,21
33:21 51:11
**operating** 4:10
**opinion** 27:22
**opportunities**
22:17
**opportunity**
12:22 13:24
40:10 41:23
42:20
**opposed** 20:5
**option** 48:7 49:1
**options** 41:5,13
**order** 7:2 10:3
19:4 23:11
25:18 27:6,10
38:19 43:3,6
47:25
**orders** 4:12 7:7
9:9,15 10:10
17:16 22:7,8
26:14,17,19,20
27:7 29:13,14
43:11 46:2,25
50:7,13
**organizations**

22:20
**ought** 9:19
**outdated** 32:1
**outline** 4:4 52:8
**outlined** 23:6,18
**outside** 46:6
49:14
**overall** 26:21
**overlap** 15:13
**oversight** 30:10
40:13

**P**
**packet** 14:17
**page** 20:7 51:14
**pages** 25:14
**paid** 31:8
**Paine** 2:18 11:6
11:7 17:17
26:23 46:24
**Pam** 2:19 38:2
**pandemic** 7:15
**panic** 18:13
**paper** 47:15
**paragraph**
51:10
**parenting** 22:7
48:6,20
**part** 14:16 15:2
15:4 26:21
30:1,2 31:10
31:11,13 33:13
36:22 40:11
**part-time** 44:3
**parte** 38:19
**partes** 48:6
**participants**
3:18
**participation**
3:22
**particular** 19:17
20:20 42:21
**particularly**
7:19,20 16:2
**parties** 6:3
**partner** 8:23
**party** 48:16,17
**Patricia** 2:16
**Patty** 25:3 34:9

**pay** 6:4
**pencils** 51:22
52:2
**people** 12:17
13:25 16:3
24:9,23 43:15
46:1,14 50:9
50:12 51:5
**percent** 48:24
**perfected** 42:11
**period** 47:5,7
**permanent** 37:2
**person** 16:12
19:14,14 21:24
22:1 24:13,13
35:2,14 38:15
**personnel** 44:23
**perspective** 19:2
23:20
**petition** 7:6,16
7:18,24 9:6,25
10:5,23 11:23
13:2 14:17
15:15 16:23
17:15 18:5
19:11,12 20:7
29:3,4,4 38:13
38:15 40:3
43:7,13 45:20
46:3 50:25
**petitioner** 9:20
10:4 11:24
14:25 15:8
17:12 49:1
**petitioners** 7:21
**petitions** 7:11,13
26:19 40:2
48:5,6,20,20
**ph** 25:3 40:21
45:7
**phone** 44:6,21
44:22,25
**physical** 37:6
**pick** 44:6,21
**picking** 5:12
44:24
**piece** 19:18 36:5
39:7 49:19
**pieces** 35:24

**place** 10:10 21:9
    28:15 29:13,14
    29:20 30:23
    45:23 51:7
**plaintiff** 10:4
    28:18,23 49:1
**plaintiffs** 7:22
    38:8 43:1
**plan** 13:8 45:23
**play** 43:25
**plays** 19:19
**please** 16:15
**pled** 17:10,11
**plus** 3:5
**point** 19:22 21:7
    22:12 27:17,25
    33:19 34:19
    42:8 50:20
**points** 50:16
**police** 2:8 16:20
    45:2
**popup** 34:18,22
    34:22 35:7
**Portsmouth**
    44:8
**possible** 28:22
**post** 6:11,14
**posted** 4:22
**potentially**
    14:16
**practice** 3:8 7:4
    41:22 52:6
**practicing** 49:22
**prejudice** 10:5
    11:2
**present** 1:11
    10:2
**presenting**
    24:16
**pretty** 25:4
**previews** 41:9
**print** 34:21
**priority** 45:8
**private** 29:6
    38:23
**pro** 11:23 19:14
**probably** 45:16
**probate** 24:11
**problem** 38:4

**procedure** 3:25
    7:4 41:22 52:6
**procedures** 3:8
    26:10
**proceedings**
    53:5
**process** 3:14
    4:18 5:2,18,24
    6:17 7:5,6,16
    7:19,24 13:2,6
    13:10 23:11,14
    23:23 24:6,8
    24:21 26:10,12
    26:22 28:1,9
    28:14 29:20
    30:3,21 31:3
    31:12,14 32:18
    32:19,19 33:14
    37:12 40:4
    41:19 45:20
    46:7,13,13
    49:23 52:19
**processes** 30:1
    30:23 39:23
**products** 35:11
**professionals**
    43:25
**program** 1:19
    2:15,19,23,24
    14:18,20 40:23
**programs** 32:9,9
**project** 5:21
**prompt** 24:9
**property** 25:25
**protection** 16:21
    37:22
**protocol** 11:12
    11:13 12:7
    14:14 15:24
    16:10 28:2
    29:9,9 36:23
**protocols** 4:10
    4:14 9:10,12
    9:22 10:13,20
    10:22 11:8
    13:19 23:1
    29:7 31:24
    32:4,17 34:12
    42:19 48:1

    50:7,11
**provide** 40:12
    41:13 42:25
    46:9
**provided** 7:9,11
**provisions** 27:6
**psychologists**
    21:16
**public** 2:11 4:22
    5:5 20:14
    50:11
**publicly** 4:22
**pull** 44:9
**purposes** 16:6
**put** 6:24 10:8
    30:19 35:6,6
    37:4 38:13
**putting** 14:16
    26:3

_____

**Q**
**qualified** 41:18
**qualify** 19:24
    20:1
**qualifying** 27:10
**quarterly** 8:24
**question** 6:20
    15:6,7 20:13
    20:16 26:24
    33:15
**questions** 6:17
    17:13 24:8
**quick** 20:13
    47:22

_____

**R**
**R** 53:1
**raise** 30:4,5
**raised** 39:18
**raising** 33:19
**raising-hand**
    6:21
**randomly** 46:16
**rarely** 49:6
**rated** 13:3
**reach** 33:12
**read** 18:13
**ready** 24:2
**real** 30:4,5 39:24
**realize** 45:6

**really** 4:7 11:20
    15:10 23:18
    25:19 36:9
    38:17 39:8
    43:3,4
**reason** 35:10
**reasons** 23:6
**receive** 17:4,5
**receiving** 15:14
**recommend**
    32:2
**recommendati...**
    32:23
**recommendati...**
    5:23 46:23
**reconvene** 32:3
**record** 53:5
**recording** 6:1
**redefined** 27:3
**referred** 16:8,19
    35:3
**refined** 14:21
**regard** 15:9
**regards** 9:5
**regular** 32:23
    33:11
**regularly** 33:24
**relate** 4:24
**related** 4:13
**relationship**
    19:24,25
**relationships**
    21:20
**relevant** 4:20
**remedy** 39:23
**remember** 17:17
**renewal** 26:20
**renewing** 40:3
**report** 23:3
**represented**
    35:2 48:21
**request** 50:24
    51:17
**require** 49:13
**required** 24:10
    25:20,24 28:4
**requirements**
    18:12
**requires** 27:10

**research** 27:22
    32:12
**resolution** 40:11
**resolve** 38:5
**resources** 31:1
    44:4
**respect** 47:18
**restraining**
    23:10 25:18
    47:24
**restrictions**
    22:18
**results** 24:7
**review** 3:3,7
    32:23 52:5
**reviewing** 42:19
**right** 6:23 8:14
    25:6,17 30:22
    31:4 33:2,5
    34:13,24,25
    37:2,24 40:15
    40:16,21 41:21
    46:12 48:2
    49:20 50:2
    52:4,18
**risk** 29:16 32:14
    37:9
**role** 36:8 45:24
**rolling** 5:18
**rollout** 23:21
    35:9
**room** 29:21
**RSA** 21:15
**Ruel** 2:3 22:22
**rule** 16:12 40:15
    41:1
**rules** 41:8
**run** 26:8 47:8

_____

**S**
**safe** 13:8 46:5
**safety** 10:7
    11:25 45:23
**safety-planning**
    36:8
**Sarah** 2:20
**Sarah's** 16:17
**saw** 11:8 37:15
**saying** 35:21

**says** 37:3
**scaling** 13:10
**scenario** 31:4
**scenarios** 9:11
  28:12
**scene** 16:1
**schedule** 17:19
**Scholars** 40:25
**Schollett** 2:9
  33:16,17
**school** 40:7,20
**science** 36:15
**Scott** 2:5
**scratch** 28:10
**screen** 13:17
**screening** 12:15
  13:1,10 16:4
**se** 11:23 19:14
**second-year**
  40:24
**secure** 36:3
**see** 4:3 6:5 8:14
  12:18 17:8
  27:13 28:20
  33:24 34:3
  35:25 50:20
**seeing** 29:12
  36:18 37:10
**seek** 12:24
**seen** 10:12 29:22
  36:11
**segue** 51:21
**semi-targeted**
  41:14
**send** 22:14 42:3
**sense** 6:18
**sent** 13:19 21:4
**separate** 8:2
  13:5 45:19
**serve** 45:7 49:16
**served** 42:14,17
  43:4
**service** 12:17
  27:4,15 42:10
  42:22 43:12,22
  44:14 45:18
  46:1 47:22
  48:2,8,22 49:3
  49:5

**serving** 48:5
  49:11
**set** 9:8 29:15
  47:17
**Seventh** 53:19
**Sexton** 2:11
  31:19,20 32:25
  33:3
**share** 42:3 44:18
  46:20
**sheet** 25:22
**sheriff's** 42:23
  48:9
**sheriffs'** 45:1
**short-term** 39:3
**show** 10:1
**shutting** 22:1
**side** 11:16
**signatures** 7:12
**signing** 14:25
**similar** 11:5
**single** 41:23
**sit** 39:20
**situation** 9:21
  11:21 17:25
**situations** 10:23
**six** 25:14
**skeletal** 52:7
**smaller** 44:2
  45:17
**software** 34:13
  35:6
**solid** 20:13
**solution** 43:20
**somebody** 12:19
  13:5 45:22
  46:3 48:12
**something's**
  10:9
**sorry** 38:1
**sort** 3:17 5:7,24
  11:25 13:1,6,7
  15:13 24:15,22
  26:20 36:4
  39:10,24 41:14
  41:17 43:17
  45:21 46:15
**space** 51:11
**speak** 6:19

  21:19 40:9
**SPEAKER**
  51:23 52:12
**speaking** 23:7
**specific** 17:13
**specifically**
  15:25 25:15
  37:3
**spit-balling** 33:8
**staff** 19:22 20:6
**stakeholders** 6:3
**stalked** 20:4
**stalking** 19:12
  19:25 29:3
**start** 3:20 28:10
  52:11
**started** 14:19
**starting** 7:5
  32:19
**state** 18:13
  20:10 21:10
  22:14 28:19
  45:2 49:8
**states** 32:7 49:16
**statewide** 28:16
**statute** 17:1,10
  27:2,5,10
**statutes** 49:13
**statutorily** 22:5
**statutory** 18:12
**staying** 45:4
**step** 28:20,25
  30:20
**steps** 46:4
**Steven** 1:23
**stop** 19:21 22:13
  37:12
**stops** 44:9
**Strasburger**
  2:13
**strictly** 22:9
**strides** 11:18
**students** 40:10
**subject** 20:20
  44:13
**submission** 3:10
  7:10
**submit** 5:11
**subsequently**

  15:16
**subtle** 21:17
**subtleties** 21:17
**success** 29:11
**successful** 44:14
**suggest** 51:2
**suggestion** 32:22
  35:15 38:6
**suggestions**
  51:13 52:18
**Suite** 53:19
**summarize** 5:23
  46:21 50:3
**summary** 11:3
  50:14
**Superior** 1:15
**supervision** 41:2
  44:4
**Supervisory**
  2:25
**support** 6:15
  9:23 36:8
**supporter** 23:13
**supportive** 34:2
**supposed** 30:15
**Supreme** 1:13
**sure** 10:16 29:7
  34:24 45:5
**survey** 4:16
  43:17
**surveyed** 3:11
**survivors** 7:22
  9:2 21:18
**Susan** 1:14
**swearing** 15:1,3
  15:3
**system** 3:4 20:10
  21:20 30:8
  33:25 35:21
  47:1,5,7

_____
          **T**
_____
**T** 53:1,1
**table** 39:20
**tailored** 16:2
  25:16
**take** 3:17 11:1
  13:14 15:5
  41:2 46:3 48:2

  49:2 52:3,4
**taken** 21:9
**talk** 5:12 8:2,18
  8:25 9:20
  20:17 36:17
**talked** 25:23
**talking** 3:23
  12:7 13:16
  20:11 21:17
  26:4 43:6,8,23
  50:12
**talks** 36:24
  38:16
**task** 1:6 3:3 5:10
  5:21 12:4
  27:24 31:12
**tax** 25:6,13
**taxes** 25:5,10
**tech** 35:14
**technical** 47:9
**technological**
  24:3
**technology**
  35:10
**telephonic** 28:2
**tell** 17:22
**telling** 19:23
**tells** 12:20
**temporary** 9:9
  9:15 10:3
  17:16 18:6
  19:4 29:14
  37:1 43:7
**tend** 21:12
**term** 39:4
**terms** 12:1,14
  28:1 31:22
  32:8,13 33:3,6
  34:10 44:9
**thank** 22:11
  33:18 52:23,24
**thanking** 3:21
**they'd** 40:15
**thing** 14:24
  24:11 25:4
  40:1,7 41:9
  45:12,24 46:15
  52:3
**things** 6:16,21

9:25 10:14
18:19 22:6
31:2 32:2,5
35:23 38:3
46:17,21 51:6
**think** 6:21 10:13
10:17 11:9
12:3,22 13:23
14:5 15:11,20
16:17 17:20,24
19:18 20:8
22:23 23:8,17
25:4 26:2 27:8
28:10,11 29:17
31:9 32:1,5,14
32:20,24,25
33:6,20 34:5
36:23 38:4
39:12 40:18
42:1 43:15,16
43:21 45:15,21
46:3 47:3
48:25 49:18
51:1,16,21
52:10
**thinking** 34:5
39:6 47:19
**third** 40:18,22
**thirty** 29:15
**thought** 25:1
47:22 50:9
51:4
**thoughts** 12:11
14:4 38:14
46:12,13,21
50:22 51:13
**threatening**
25:25
**three** 4:12
**throw** 23:11
24:15
**tied** 27:5
**tightened** 10:15
**time** 3:20 5:9,20
7:1,3 8:2 9:20
10:11 14:3
17:18,23 18:5
25:7 26:8 30:4
30:6,11 36:7

39:24 42:15
46:15,25 47:5
47:8,17,20
48:19,25 52:9
**times** 17:22 18:8
**today** 3:5 7:1
13:19 42:1
47:24 48:3
50:17 51:20
**told** 22:5
**tomorrow** 51:24
52:1,3
**tools** 16:4
**topic** 41:7
**topics** 50:4
**total** 5:21
**touch** 13:4
**train** 21:1 22:24
23:5
**trained** 17:2
46:8 49:11
**training** 17:4,5
20:8,12,19,20
21:5,9,21
41:17 43:24
44:24
**trainings** 21:12
21:13,14,16
22:21
**Transcriber**
53:13
**transcript** 53:4
**travel** 21:8
22:18
**trigger** 34:18
**triggers** 5:14
**true** 17:7 53:4
**trust** 24:12
**try** 12:24 34:23
37:11 44:13
**trying** 18:11,19
31:13 37:12
48:13
**TTA-Certified**
53:13
**TurboTax** 47:16
**tweak** 41:19
**two** 4:12 7:7,14
17:21 28:25

**two-day** 21:13
**type** 45:23
**types** 35:12
**typically** 40:22

────────

**U**

**unavailable**
30:19
**unclear** 9:12
**understand**
24:17 36:10
39:8 48:11
**understanding**
26:16 32:17
**understood** 9:17
**Unfortunately**
22:16
**uniform** 35:13
**unintended**
23:22
**unique** 16:11
**UNISON** 52:24
**unmute** 6:22
**unsettling** 43:4
**update** 32:3
**updating** 32:20
33:3
**upload** 50:10,18
**uploaded** 3:16
4:2,4,11,25
**uploading** 4:20
**uptick** 9:7
**use** 22:6,13 25:5
**user-friendly**
51:3,9,15
**uses** 34:14

────────

**V**

**valuable** 34:1
**varies** 28:17
**variety** 8:25
16:4
**various** 4:24 6:2
7:3 35:10
**VAWA** 22:13
27:2
**vein** 5:8
**verbal** 21:25
**vic** 16:22
**Vicinanzo** 2:15

18:24 35:18
40:21
**victim** 1:18
11:17,25 16:21
18:1,4,10
19:23 23:3,13
36:24 37:4
**Victim/Witness**
2:4
**victims** 9:2
13:25 14:9
15:25 23:2,9
25:17 29:12
32:13 39:19
**video** 6:15
**violate** 46:1
**violence** 1:6 2:6
2:23 3:4 4:9
7:4,11 17:3,6
19:11 20:2
21:6,22 23:10
23:25 29:2
**VIRTUAL** 1:6

────────

**W**

**waiting** 43:2
**walking** 16:13
29:13
**walks** 28:18
**want** 3:20 6:11
6:13 12:18
15:8 26:10
30:8 34:24
37:17 38:18
40:8 41:7,11
**wanted** 3:15
35:20
**warrant** 10:2
**warranting** 9:17
**wary** 44:24
**watching** 23:21
**wax** 26:21
**way** 11:20 17:11
30:14 32:21
33:20 39:23
46:10,16 47:2
49:11,12,16
**ways** 41:19
**we'll** 50:18,19

**we're** 4:1 5:7,19
5:25 6:9,13
12:7 14:1,2
15:15 23:16
28:8 29:12,18
31:13 36:7
37:10 41:24
43:23 47:4,6
48:13 50:12
**we've** 4:3 6:1,10
6:24 10:12
11:8 14:21
26:9 27:25
29:10 36:11
48:16 50:6,14
51:20
**Webex** 1:8 42:1
**website** 6:12,14
50:11
**Webster** 40:25
**week** 52:17
**week-long** 21:4
**weeks** 5:22
20:23
**Welcome** 3:2
**weren't** 37:21
**willing** 14:1
**withdraw** 10:4
39:1
**withdrawal** 11:2
26:18
**withdrawing**
40:2
**Witness** 1:19
**wonderful** 4:5
**work** 6:22 8:22
27:13 28:12
34:6 44:19
46:14 47:3,12
48:14 50:20
**work-wise** 45:4
**working** 27:18
40:11 50:6
**works** 3:12
29:10 40:18
**worried** 18:14
18:15
**worry** 37:20
**worse** 11:10

**worthwhile** 28:3
**wrap** 5:22
**write** 23:3 42:2
**wrong** 19:9

**X**

**Y**

**Y'all** 31:18
**Yazinski** 1:16
    15:20 16:17,18
    18:25 19:20
    20:17,24 50:23
**Yeah** 13:12
    18:24 20:24
    25:2 32:25
    34:4 40:6
    43:14 45:13
    50:24
**year** 25:9 40:18
    40:23
**years** 21:3 23:16
    29:23 44:8
**Yep** 13:16 43:11
**York** 53:21

**Z**

**Zinkin** 2:25 5:16

**0**

**1**

**1** 3:7
**10001** 53:21
**11** 1:7
**173-B** 18:12
    21:15 22:10

**2**

**2** 51:23
**2020** 7:9
**2021** 7:11
**2022** 1:7 53:25
**28** 53:25

**3**

**352** 53:19
**36** 40:15

**4**

**4** 52:13

**5**

**5-15** 12:7 29:9
**5-19** 36:23

**6**

**603** 2:19 29:6
    38:2
**604** 53:19

**7**

**8**

**9**