1

2

3

4

5

6      DOMESTIC VIOLENCE TASK FORCE VIRTUAL MEETING -

7                    January 25, 2022

8                    Held via Webex

9

10

11     PRESENT:

12          Hon. Anna Barbara Hantz Marconi,

13     Associate Justice, New Hampshire Supreme Court

14          Hon. Susan Carbon, Circuit Court Judge

15          Hon. Diane Nicolosi, Superior Court Judge

16          Hon. John Yazinski, Circuit Court Judge

17          Mary Barton, Clerk, Circuit Court

18          Merrill Beauchamp, Director, Victim &

19     Witness Program

20          Kathy Beebe, Executive Director, Haven NH

21          Kristyn Bernier, Investigator, Belknap

22     County Attorney's Office

23          Steven Endres, Assistant County Attorney,

24     Merrimack County

25          Martha Ann Hornick, Grafton County



```
1    Attorney
2    Mary Krueger, Attorney, NHLA
3         Lynda Ruel, Director, Office of
4    Victim/Witness Assistance, NH DOJ
5         Scott Hampton, Director, Ending the
6    Violence
7         David Hobbs, Hampton, NH Association of
8    Chiefs of Police
9         Lyn Schollett, Executive Director, New
10   Hampshire Coalition
11        Amanda Grady Sexton, Director of Public
12   Affairs, New Hampshire Coalition
13        Jon Strasburger, New Hampshire
14   Association of Criminal Defense Attorneys
15        David Vicinanzo, Attorney, DOVE Program
16        Patricia LaFrance, Attorney, The Black
17   Law Group
18        Betsy Paine, Attorney, CASA NH
19        Sarah Freeman, Circuit Court
20   Administrator
21        Erin Jasina, Director, NHLA DV Program
22        Anne Zinkin, NHSC Supervisory Law Clerk
23
24
25
```



Domestic Violence Task Force - 1/25/22

1        JUDGE HANTZ MARCONI:  Hello task

2    force on DV cases in the judicial system.

3    This is our meeting to discuss Charge 5,

4    explore opportunities to increase access

5    to legal counsel and advocates.  Before

6    we do that though, I want to take stock

7    of where we are, where we're going, how

8    we're going to do this because it's just

9    a lot and I know we've been doing these

10   meetings, two a week, kind of breakneck

11   speed on a broad topic, which has taken

12   lots of twists and turns and detours.  We

13   had a wonderful public hearing last week.

14   We are gathering comments still through

15   the comment line, the email line, and I

16   believe the phone line.  So there's a lot

17   of information.  And I know we feel like

18   we are barely touching upon the issues in

19   these hour-plus sessions.  So there is a

20   method to the madness.

21       You, members of the task force, are

22   people who have been brought together

23   because of your experience in this area.

24   So the method, which I tried to relay, is

25   to focus on different, on each of the

Domestic Violence Task Force - 1/25/22

1      charges and pull that information from

2      your experienced brains; either through

3      this discussion, which sparks things and

4      then afterwards or before; as you submit

5      things.  So for example, on the issue of

6      expanding the definition of domestic

7      violence, we've been directed to statutes

8      in Hawaii and, like Oregon, if you will,

9      that are two states who have ventured

10     into that arena.

11          MS. ZINKIN:  California.

12          JUDGE HANTZ MARCONI:  California,

13     sorry.  So and that is just, that's sort

14     of the purpose of this discussion, is to

15     share, trigger, and provide a basis.

16          We have five people, Jean Kilham,

17     Erin Jasina, Anne Zinkin from our, I'll

18     put her aside.  Sarah -- I'm thinking

19     Sarah Palermo (ph.), that's not right,

20     Freeman and Pam Dodge, who I look at as

21     people who spend or spent in Sarah's

22     case, we know it's their job to focus on

23     domestic violence.  These are domestic

24     violence program managers, so that's what

25     they do.



Domestic Violence Task Force - 1/25/22

1          And Anne has been volunteered by the

2    court to join that effort to pull the

3    comments, the suggestions, the input and

4    put structure to it and try and write

5    this report, which can then be circulated

6    back to the task force for further input

7    and massaging, but I'm not expecting this

8    group to write the report.  I think that

9    would be unwieldy and not sort of -- not

10   in line with your other jobs that you're

11   all doing.

12          So input on that process I'm happy

13   to receive, but that's kind of the point

14   of this process is to touch upon these

15   issues.  We are not reinventing the

16   wheel.  I think there's been a lot of

17   thought homework done over the years by

18   lots of different groups.  And if we can

19   pull the best of that knowledge to form

20   the basis for our recommendations, that's

21   what we're trying to do to get it done in

22   this time frame.

23          So any thoughts or questions on the

24   process?  We do have these wonderful, I

25   call them our work group, our scriveners,

Domestic Violence Task Force - 1/25/22

1        our executive committee, whatever you

2        want to call them, to pull together

3        everything that we talk about and at the

4        time.  And I'm sure they might have

5        comments about why are you doing this to

6        me.  But we're not going to hear those at

7        this point in time.  So anything from

8        anybody?  Long process, feeling

9        overwhelmed yet? Okay.

10              Charge 5, and again, this is an area

11       where I know a lot of people, Pam, have

12       done a lot of work over the years.  And I

13       know too or have learned since I've

14       started this process that advocates also

15       have the provision of sufficient

16       advocates is also an area that has been

17       looked at by various stakeholder

18       organizations over time.

19              So I will kick this off in the

20       advocacy community.  I just note that we

21       have various, I'll call them silos of

22       advocates.  We have the victim witness

23       advocate community.  We have the

24       advocates through the crisis centers.  I

25       don't know, and again, there is funding,

Domestic Violence Task Force - 1/25/22

```
1     right?  I don't know if all these
2     advocates work the same or whether there
3     are different models for the provision of
4     advocacy services and whether there's
5     room for, my understanding is, most
6     advocates are paid at this point in time.
7     I also understand that in the past there
8     have been, kind of along the CASA model,
9     volunteer advocates.  So I would like to
10    hear whether there are reasonable
11    opportunities for increasing the advocacy
12    community.  If anyone wants to weigh in.
13         MS. BEEBE:  I'll jump in.  We
14    currently have paid staff that are our
15    advocates, but we also, in the past and
16    sometimes currently, have volunteers.
17    Volunteers are a little bit harder to
18    train to do this work because they're not
19    available consistently enough that they
20    have the ability to go to court
21    accompaniments and be able to provide the
22    assistance (indiscernible) or have the
23    experience to deal with some of the more
24    complications that come with that safety
25    planning that often arise.
```



Domestic Violence Task Force - 1/25/22

 1            There's definitely a need to

 2      increase the capacity of advocates

 3      because we have our own set of challenges

 4      in terms of how people access an

 5      advocate, and sometimes it comes where

 6      they directly contact us and we're able

 7      to make the arrangements to be there.

 8      Other times we're relying on the courts

 9      to notify us, and that's done in

10      different ways.  Some will fax over court

11      slips to us, some will make us come pick

12      them up, and some don't even know about

13      them.

14            And then the other challenge with

15      that is that when we have (indiscernible)

16      we sometimes and often, don't hear back

17      from them in order to (indiscernible)

18      that connection so that (indiscernible)

19      there.  I'm starting to look

20      (indiscernible) we're trying to assess

21      how many situations happen where is it a

22      capacity issue, not an advocate able to

23      (indiscernible) or is it a system issue

24      of us not being given the information to

25      (indiscernible).



Domestic Violence Task Force - 1/25/22

1           But looking at the numbers of these

2      cases that go to the courts that cover,

3      it may be (indiscernible) that we cover,

4      and looking at our numbers, there's a big

5      discrepancy there in terms of how many

6      we're actually at in providing services

7      to versus how many are actually

8      happening.  So we do have the additional

9      challenge of there being seven courts,

10     upwards of six accompaniments a day and

11     limited staff to be able to do them.

12          MS. HORNICK:  Kathy, I'm sorry, I

13     didn't catch all of that because you're

14     kind of going in and out.  You said the

15     issue was you have seven somethings and

16     you have six somethings so I --

17          MS. BEEBE:  We have seven courts

18     that we provide accompaniments to.  And

19     so we can have upwards of six hearings a

20     day throughout our geographic region in

21     addition to all of our other

22     accompaniments that we do, with child

23     advocacy centers and other things, so the

24     capacity issue is huge.

25          And that's why it's concerning to me



Domestic Violence Task Force - 1/25/22

1      when I look at how many cases were in

2      those seven courts versus how many

3      accompaniments the actual

4      (indiscernible).  And I know that is an

5      issue capacity wise for the other crisis

6      center program as well.

7           JUDGE HANTZ MARCONI:  And so -- and

8      I understand, and of course the Access to

9      Justice Commission is also looking at

10     again, how you manage your volunteers,

11     manage volunteers in a situation that

12     needs immediate response.  You know, how

13     do you have that sort of accessibility if

14     there were and a volunteer add-on if you

15     will.

16          I wonder too if dividing tasks, some

17     are more pressing than others, or we

18     talked before about assistance filling

19     out petitions, which sometimes there's

20     more advanced time to perform that

21     function so.  And then the question is,

22     is it strictly more funding.  If there

23     were more funding for more advocates,

24     could the crisis centers handle more

25     advocates, or then are we talking space



Domestic Violence Task Force - 1/25/22

1       and resources and other things?

2           MS. BEEBE:  I mean, I like the model

3       of there being advocates available at the

4       courts because the travel is another

5       piece of time in terms of where they're

6       coming from in order to get to the courts

7       and the courts (indiscernible).

8           JUDGE HANTZ MARCONI:  So if there

9       are thirty-four -- let's say, thirty-four

10      court locations, roughly, you would be

11      talking about staffing advocates there on

12      a five-day-a-week basis.  And then --

13          MS. HORNICK:  Do you --

14          JUDGE HANTZ MARCONI:  Go ahead.

15          MS. HORNICK:  I was just going to

16      ask, we've been all made very aware of

17      the inability to find people to fill

18      certain positions.  I mean, I think,

19      people are as aware that is I have

20      become.  Is that a potential issue that

21      you see also, Kath (phonetic), the sort

22      of trained, educated, interested people

23      to fill -- I mean that's a lot of, just

24      the way --

25          MS. SEXTON:  Yeah.  Marcy, I think



Domestic Violence Task Force - 1/25/22

1        that's a great point.  And I would say

2        that we have twelve bona fide crisis

3        centers, so those are advocates that have

4        confidentiality under RSA 173-C.  And

5        every program is very different, and

6        every program has different capacity.

7        Every program, I'll say, is struggling

8        with turnover and inability to hire, and

9        high burnout rates, especially during

10       this pandemic.  And I know that

11       previously we had submitted some

12       information that kind of gave a broader

13       overview of this is what advocates

14       training involves, what sort of the

15       average pay.

16            I'm not sure if folks have had an

17       opportunity to look at that, but I think

18       the one takeaway is that the core

19       services that advocates provide, one of

20       the most important things, is assisting

21       people through these 173-B and 633:3-a

22       processes, and that is people, our crisis

23       centers are primarily and hoping to make

24       themselves available for that process.

25            That's one of the most important



Domestic Violence Task Force - 1/25/22

1     things they do when they're available to

2     do that.  That's not always going to be

3     the case at the twelve different centers.

4     It really is going to be a capacity

5     issue.

6          There was an earlier question about

7     the difference between domestic violence

8     advocates and system based advocates.  I

9     know that we have Merrill and Lynda, who

10    are here, who do the systems base work,

11    but that's on the criminal side, and

12    there are no civil based advocates that

13    are assisting.

14         And I think it's also important to

15    note that through the crisis center

16    advocates, their job is not -- they're

17    not lawyers, they do not, you know, that

18    would be unauthorized practice of law,

19    they're not drafting petitions for folks.

20    But they are helping them to understand

21    what the requirements are, which of

22    course, I think, we've discussed would be

23    advantageous for us to be able to break

24    those down with more clarity so that

25    advocates can be able to help pro se



Domestic Violence Task Force - 1/25/22

1    litigants be able to truly understand

2    what all of the requirements are in order

3    to get a temporary or a final order.

4        JUDGE HANTZ MARCONI:  Right.  Take

5    the legal advice of it and make it

6    more --

7        MS. SEXTON:  Straightforward.

8        JUDGE HANTZ MARCONI:  Yeah.  More

9    straightforward, more fill in the blank

10   and less, I mean, I call it sort of

11   paralegal, but also just your friend

12   who's there to help you but really not.

13   I'd like to break down that barrier

14   against sort of feeling like they're

15   advocating or advising in the practice of

16   law.  Although, it's the same thing that

17   court staff have, that same sort of, and

18   more so with the court staff because they

19   can't offer legal advice ex parte to one

20   side or the other.

21       So there is that hurdle, and I would

22   love to see a way to break that down via

23   the crisis centers, so that the

24   information can get through.  Yes?

25       MS. FREEMAN:  Can I ask a question



Domestic Violence Task Force - 1/25/22

1    about funding?  About fifteen years ago I

2    was a AmeriCorps AVAC advocate, and a

3    number of us were trained specifically to

4    help people in the courthouses to fill

5    out petitions.  We weren't drafting them

6    necessarily, but we were definitely

7    sitting there with a statute and helping

8    people fill them out and exploring

9    options.

10        It seems like there's been a shift

11    in the funding model where there's been

12    more funding put towards housing

13    advocates and perhaps some other types of

14    advocates.  So has there been a shift in

15    some of the federal dollars that are

16    going out to the crisis center and

17    perhaps that's causing some of this

18    change, or is that off base?

19        MS. BEEBE:  I mean, they're still be

20    funding for AmeriCorps.  I think the

21    challenge with AmeriCorps has been

22    getting AmeriCorps applicants to do this

23    work given the high turnover that we were

24    just talking about in people's ability to

25    get other jobs.  We have gotten



Domestic Violence Task Force - 1/25/22

1    additional funding to increase our

2    housing work, but the funding that we

3    utilize to do these types of services has

4    not gone away.  So that's not the impact

5    other than it's the need has increased

6    for us to respond.

7        MS. SEXTON:  Yeah, Sarah, I'm

8    wondering if you're thinking about -- so

9    there has been a shift in the sort of

10   categories that AmeriCorps funding goes

11   toward, and one of those is the financial

12   empowerment area, which is where our

13   crisis center advocates fall under.  And

14   so quite a bit of the work of the

15   AmeriCorps advocates at this time is

16   still working, of course, doing their

17   court based advocacy of the safety

18   planning but also doing the educational

19   pieces related to the financial abuse

20   that they are experiencing.  So there has

21   been a little bit of shift in terms of

22   the programming and the requirements for

23   AmeriCorps.

24       MS. BEEBE:  And just to give you an

25   example at one point there was probably



Domestic Violence Task Force - 1/25/22

1       twenty-six or so AmeriCorps members

2       around the state, and last year there was

3       only nine.  So it's really been a

4       challenge, and for HAVEN that's been four

5       additional full time staff positions that

6       went down to one-and-a-half and now at

7       two.

8               FEMALE SPEAKER:  But if I recall --

9               JUDGE HANTZ MARCONI:  So the decline

10      in AmeriCorps is systemic or cyclical or

11      what?

12              MS. BEEBE:  Well, I think it just

13      speaks to the fact that we need to fill

14      that capacity to do the advocacy, whether

15      it's through a venue like AmeriCorps or

16      having the resources to have more staff.

17      It was just a benefit to us because to

18      have full time people where we were only

19      paying the cash match versus full time

20      paying of benefits and everything else

21      for staff assistants to hire four full

22      time people to replace them at this

23      period in time.

24              JUDGE HANTZ MARCONI:  So crazy

25      question, but that's what I'm here for.

Domestic Violence Task Force - 1/25/22

1       If we consolidated dockets, domestic

2       violence dockets, to not one but maybe

3       regional arenas, it would cut down the

4       number of court locations that you'd need

5       to have, quote, advocates and legal

6       counsel for that matter available.  Does

7       that make sense to look into?  It would

8       cut down on access, it's always a double

9       edged sword.  You concentrate domestic

10      violence cases in one or two courts in a

11      region, if you will, now people are

12      traveling.

13           MR. STRASBURGER:  One concern I

14      would have if we were to consider

15      consolidating the domestic violence

16      matters in centralized locations versus

17      having a separate family division preside

18      locally and regionally over those cases

19      is, back when the family division was

20      started there was this general notion of

21      one family, one judge, who you could have

22      a family division judge who's presiding

23      over a pending parenting case or a

24      divorce action and also a domestic

25      violence petition or in some cases in the



Domestic Violence Task Force - 1/25/22

 1    circuit court a 633 stalking petition

 2    matter.  And I think that there would be

 3    potentially some risk of having a

 4    situation where you have a court that has

 5    pending parenting matters before it,

 6    either in a parenting case or a pending

 7    divorce matter.  And now there's going to

 8    have to be another court with another

 9    judicial officer who doesn't have the

10    experience with that particular family

11    and those parties, having to decide the

12    domestic violence petition matter.

13        So that would just be one concern.

14    I mean, I think, pragmatically,

15    consolidating domestic violence petitions

16    into regions would address a lot of the

17    concern about having advocates and

18    counsel for that matter, I guess, in

19    different spots.

20        But that would just be my one

21    concern because I have seen it really

22    make a difference for people when you

23    have a single judicial officer very

24    familiar with the parties.  And often, as

25    I've said before in our meetings, the



Domestic Violence Task Force - 1/25/22

1       domestic violence petition matter is the

2       first substantive matter that gets heard

3       by the court.  And I think that makes a

4       difference when the court down the line

5       has to also consider maybe a pending

6       parenting case or a divorce case.  So

7       that would just be my one concern would

8       be having them have multiple family

9       division courts deal with the same

10      family.

11              JUDGE HANTZ MARCONI:  Right.  Unless

12      like in complex docket cases the DV

13      attached case moves the whole case to

14      that court.  And again, that would have a

15      host of logistics problems, but I hear

16      the concern.

17              I think one thing that has come up

18      that we're probably going to put on for

19      Charge 7 is that intersection between DV

20      and family cases.  Sometimes it came up

21      at the public hearing whether or not

22      mediation in a connected case is

23      appropriate.  I think the statute starts

24      to and the protocol start to address it,

25      but it doesn't always come through.  So

1          that may be previews of coming

2          attractions, but yes, when you do

3          separate one from the other, I think that

4          causes problems or at least it sounds

5          like it could.

6                  Another crazy idea, and again,

7          that's what I'm here for, is affinity

8          groups, and I do think of this, churches

9          and again I'm thinking CASA model but

10         more, education institutions, businesses,

11         business groups.  I would foresee people,

12         professionals, retirees who would be

13         willing and, in fact, interested in

14         training and being dependable advocates

15         in this space.  And I just wonder if

16         there's been any experience with

17         reaching, outside of the legal community

18         but into social groups, church groups,

19         groups that sort of do-good groups that

20         do good.  And so I wonder what people

21         think of that?

22                MS. PAINE:  Your Honor, if I may

23         speak wearing my CASA hat, you know, we

24         provide a tremendous amount of structure

25         in terms of paid staff who supervise all





Domestic Violence Task Force - 1/25/22

1     those volunteers, and you're right, we

2     are up to over 630 volunteers around New

3     Hampshire who take CASA cases.  And we

4     limit the number they can take, they can

5     only take two.  And we do have to tailor

6     it so that they're -- we have coverage if

7     they're not immediately available for

8     say, a preliminary hearing, the staff is

9     involved.  And so there is a staffing

10    component to building that kind of

11    capacity.

12         And there's a structural component,

13    there are seven regional offices now.  I

14    mean, I think the crisis centers have

15    that structure, and the system is built.

16    But to build it out to support the kinds

17    of volunteers that you would need is

18    another sort of significant effort, I

19    think.

20         JUDGE HANTZ MARCONI:  Right.  And

21    the question is, can you create and train

22    managers?  Chicken and egg; do you just

23    keep hiring advocates, or can you create

24    trained managers to exponentially expand

25    the pool of available people?  And that's



Domestic Violence Task Force - 1/25/22

1      a bigger question as well.  But something

2      I think to be explored.

3           MS. SEXTON:  I think every crisis

4      center does have a pretty robust program

5      for advertising for volunteers and have

6      many volunteers that do work in the

7      courtrooms as well as on the hotlines.  I

8      think that it would certainly be very

9      helpful if folks could help with that

10     effort to encourage people to do this

11     work.

12          I think, again, it will become a

13     capacity issue.  I don't know how much

14     more it can be expanded.  I think that

15     would be dependent upon each center, but

16     all of those groups that you mentioned

17     are tapped into when advertising for

18     volunteers.

19          JUDGE HANTZ MARCONI:  Good.  And I

20     also think there is -- well, there is

21     going to be continuing effort with the

22     Access to Justice Commission to look at,

23     again, ways of leveraging --

24          MS. SEXTON:  Yeah.

25          JUDGE HANTZ MARCONI:  -- volunteers



Domestic Violence Task Force - 1/25/22

1          with a management central structure.  You

2          know, pilot program and landlord-tenant.

3          But I think this could be part of that

4          ongoing effort.

5              MS. BEEBE:  The only piece I would

6          add to that though is that what we see

7          with our volunteers that we use from,

8          again, we tap into all of those places,

9          is that it takes some time for someone to

10         be comfortable going on their own to a

11         court accompaniment, particularly because

12         of not the court procedural stuff but the

13         safety planning stuff.  That people need

14         some time to answer the hotline and get

15         comfortable doing that work with someone

16         in the very next room or same room that

17         they can get support and help from if

18         they're struggling.  But to go out and go

19         to a court accompaniment, it takes a

20         while.  So our volunteers tend to do the

21         other work so that our paid staff that

22         are more seasoned (indiscernible).

23             MS. DODGE:  Can I just ask too?  I'm

24         curious what the agencies, individual

25         agencies have for financial support to



Domestic Violence Task Force - 1/25/22

1       provide oversite of volunteers.  If you

2       build up a really significant volunteer

3       staff, you still have to have paid staff

4       to manage them.  And so my question is,

5       there has to be a lot of funding.  And

6       what's the right salary for that kind of

7       position because you certainly need very

8       highly trained skilled managers to take

9       over volunteers.  And so how much money

10      is enough money to put into the system to

11      make it work?

12           MS. BEEBE:  I will say that we have

13      two full-time positions that oversee the

14      volunteers.

15           MS. DODGE:  Um-hum.

16           MS. BEEBE:  So we have a volunteer

17      manager, and then we have like a client-

18      service volunteer supervisor that helps

19      to do the ongoing check ins and making

20      sure people are up with their training

21      and all of these.  It is an investment,

22      but at the same time we could not provide

23      the level of services that we do with

24      twenty-six paid staff and not the

25      additional thirty plus client service



Domestic Violence Task Force - 1/25/22

1     volunteers that we have helping us.

2          JUDGE HANTZ MARCONI:  And the

3     manager positions' funding, if you will,

4     comes through the regular grant for the

5     whole operation, or are these separate

6     pieces that cover different aspects?

7          MS. BEEBE:  So some of that funding

8     is, some of our federal and state funding

9     can be used for that because they're

10    working with folks doing the allowable

11    activities.  Other funds --

12         JUDGE HANTZ MARCONI:  Yes.

13         MS. BEEBE:  -- are our regular

14    fundraising efforts too.

15         JUDGE HANTZ MARCONI:  Interesting.

16         MS. BEEBE:  Yes.

17         MS. SEXTON:  I just pulled some

18    numbers from a recent report, and it

19    looks like in 2021 collectively with our

20    twelve programs, volunteers providing

21    nearly 60,000 hours of direct service

22    work.  So it is a robust program, and I

23    think --

24         JUDGE HANTZ MARCONI:  Not to put you

25    on the spot, compared to hours of paid



Domestic Violence Task Force - 1/25/22

1    staff, I mean, we don't need that today,

2    but it would be interesting to see the

3    breakdown.

4        MS. FREEMAN:  It would be

5    interesting to see if it was primarily

6    crisis line work where if any of those,

7    or a substantial number of those hours

8    are going to accompaniment for their

9    (indiscernible) court, whatever that may

10    be because you're right, that is a

11    different skill set that takes longer to

12    develop.

13        JUDGE HANTZ MARCONI:  Yes.

14        MS. SEXTON:  And a training

15    requirement under the statute in order to

16    have confidentiality.  So that's --

17        JUDGE HANTZ MARCONI:  Right.

18        MS. SEXTON:  -- people have to be

19    committed to pretty extensive training in

20    order to do this work.

21        JUDGE HANTZ MARCONI:  Yes.

22        MS. BEEBE:  It's also why we tend to

23    find the volunteers that have jobs that

24    can do our night time twenty-four hour

25    support work and less people that can be



Domestic Violence Task Force - 1/25/22

1    available during the day to do

2    accompaniments.

3         JUDGE HANTZ MARCONI:  All right.

4    Pivoting to legal assistance, unless

5    people have more to say on advocates.

6    Again, this isn't the end of the

7    conversation, feel free to --

8         CHIEF HOBBS:  What do other states

9    do?  Do other states rely as much on

10   volunteers or these advocates as New

11   Hampshire?  I would just be interested in

12   what other people are doing.  I think

13   it's in one of the recommendations in the

14   initial report was to expand upon the

15   advocates at the hearings, but I'd be

16   more in favor of it as well at the time

17   of application, especially after looking

18   at the resources provided by the

19   coalition, I thought were great.  With

20   the amount of training that they do and

21   what they're able to offer, especially

22   when somebody goes in to fill out that

23   application and -- we had a case recently

24   where service doesn't happen right away,

25   and that safety planning piece I think is



Domestic Violence Task Force - 1/25/22

1    crucial.  And if service doesn't happen,

2    not for a lack of attempt but just trying

3    to locate, we've had circumstances where

4    the person shows up at the residence

5    trying to gain access.  And I think that

6    safety planning at the time of

7    application is critical, where if an

8    advocate were there, they'd be able to

9    help with that so.  I'm more in favor of

10   at the courts more often than I think

11   they are now.

12        MR. ENDRES:  Well, someone had

13   mentioned advocates at the courts earlier

14   and I maybe misremembering this, but I

15   seem to recall a time fifteen years ago

16   when, at least in Concord, there was an

17   AmeriCorps advocate who is at the

18   courthouse full time through the crisis

19   center in New Hampshire.  And again, my

20   recollection was that an issue had come

21   up where the court didn't like the fact

22   that the advocate had access to the

23   clerk's office, and that was the end of

24   the advocate at the courthouse.

25        But I seem to recall at one point at



Domestic Violence Task Force - 1/25/22

1      least, there were advocates in the

2      courthouses sort of waiting for people to

3      walk in and apply for protective orders.

4          CHIEF HOBBS:  So I guess just to go

5      back on that real quick was looking over

6      this.  It provided a lot of information,

7      but what do other states do and what are

8      they paying.  I'm looking at the average

9      pay here for -- you know, we're trying to

10     build upon that program, well, it might

11     be a funding thing where more funding is

12     needed to make that happen.  So I'd just

13     be curious to see what other states are

14     doing in terms of that.

15         INV. BERNIER:  I'd like to stir

16     something into this that's totally

17     outside the court system.  And when I

18     spent a bazillion years at Portsmouth PD,

19     and Portsmouth has a full time advocate.

20     We had an AmeriCorps advocate for a

21     number of years.  We ended up with a part

22     time position that was grant funded, and

23     then I had the previous chief put

24     together a job description, and there are

25     two grants that fund it currently.  A

1        VAWA grant and I can't remember what the

2        other one is offhand.

3            There is something to be said, the

4        system itself can't necessarily fund all

5        these things and volunteer organizations

6        and nonprofits.  But there is something

7        to be said about kicking some of this

8        back to the local level in partnering

9        with your law enforcement agencies to be

10       able to have an advocate with your

11       department that's not only there to go in

12       for victim based crimes in court or

13       working with the investigators and the

14       officers prior to getting kicked up to

15       the county attorney's level where an

16       advocate is assigned.  But our advocate

17       would go and do those things over at the

18       court.

19           I know that a lot of agencies don't

20       have those types of resources, but

21       certainly your bigger departments do.

22       There's nothing to be said that a lot of

23       towns share prosecutors.  They do job

24       share with prosecutors who are, you know,

25       four or five towns might join in.  There

Domestic Violence Task Force - 1/25/22

1       is no reason why that couldn't be kicked

2       around and throw that back at the local

3       level as well, and then you're leaving it

4       up to a community to hire that person.

5       Obviously, they would go through a

6       standard training et cetera, but it was a

7       phenomenal asset to have as an

8       investigator as a front line officer and

9       have that individual be able to work with

10      the court system as well.

11           JUDGE HANTZ MARCONI:  Yeah.  I had

12      experience with a case in Hudson where

13      there was a local police affiliated

14      advocate who worked both on the criminal

15      side and in the civil DV side.  That's

16      interesting.

17           CHIEF HOBBS:  I would love to have a

18      victim advocate.  That would be very

19      helpful.

20           MS. FREEMAN:  The challenge with a

21      law enforcement based advocate because

22      they're not typically under RSA 173 state

23      confidentiality, correct me if I'm wrong.

24      So they can provide some of that safety

25      planning support, but it's not



Domestic Violence Task Force - 1/25/22

1       confidential in the same way.  So it does

2       get another body in there who can help,

3       and sometimes a body is better than no

4       one, but it does it have that drawback

5       under our current statute.

6              JUDGE HANTZ MARCONI:  And the

7       statute could -- could, perhaps at the

8       request of maybe some I don't know,

9       chiefs of police, could be expanded to

10      include those folks under 173-C maybe.

11             INV. BERNIER:  I think it's also,

12      it's in a sense of drawback with that

13      confidentiality piece in terms of victims

14      reporting something to that advocate.

15      However, when you have those

16      partnerships, I can't tell you how many

17      times that Bree (ph.) and I, and one or

18      two people from HAVEN and a DOVE attorney

19      would end up in a courtroom with a victim

20      together.  So if you have that open

21      communication, then that advocate, say at

22      the local department level, understands

23      what their role and isn't and is

24      partnering with those resources from your

25      crisis centers, and the victim



Domestic Violence Task Force - 1/25/22

1      understands the do's and don'ts, then

2      you're at least plugging something in so

3      that you have an availability for those

4      services because that person can

5      certainly go over and do a petition and

6      be available with the police department

7      in terms of when the crime is happening

8      and to help responding that, but it's

9      really more kind of a segue way maybe.

10     But working in conjunction with the

11     services that we already have out there

12     so that you don't necessarily need that

13     confidentiality piece for the role that

14     the advocate would play in that setting.

15          JUDGE HANTZ MARCONI:  Interesting.

16          FEMALE SPEAKER:  Also, I would just

17     like to say that we have had quite a few

18     of our -- where's Merrill?  Merrill,

19     around the state, some of our assistance-

20     based advocates subpoenaed as witnesses.

21     So we just need to be -- I just need to

22     think it out a little bit more.  We just

23     hired someone from Plaistow PD who was a

24     victim advocate, and she partnered with

25     HAVEN all the time and she did know those



Domestic Violence Task Force - 1/25/22

1      dos and don'ts.  And Kristyn, I am very

2      familiar with her advocate, she's a rock

3      star.

4          But I just want to make sure that

5      people understand because they do have

6      confidentiality, we are the ones that

7      call them for that support because they

8      can do so much more than we can.

9          Merrill?

10         MS. BEAUCHAMP:  I would agree with

11     that.  There have been very few

12     occasions -- well, I shouldn't say very

13     few, but I have accompanied victims to

14     district court to help them with

15     restraining orders, but it's not

16     something that's typically in the systems

17     based, at least the county attorney's

18     office advocates' ability to even do

19     something like that because of all of our

20     other responsibilities.  So we rely

21     heavily on our relationships and

22     communications with the crisis services

23     to ensure that there's an advocate that

24     can accompany a victim to get a civil

25     protective order.



Domestic Violence Task Force - 1/25/22

1          We have in Hillsborough County, I

2     want to say, absolutely our two largest

3     police departments do have victim

4     advocates in their domestic violence

5     unit.  And we have a handful of other

6     police departments, Hudson being one of

7     them, that actually have a police

8     department advocate.

9          They may have a little bit more

10    time, and as Kristyn said, you know,

11    they're a little bit more on the local

12    level and have good relationships with

13    the crisis service too.  But again, the

14    confidentiality, you have to be very

15    clear with victims who are insisting

16    about that and feel much more comfortable

17    when we do have the resources of a crisis

18    service advocate to help with the

19    petition.

20         JUDGE HANTZ MARCONI:  All right.

21    Pivoting to lawyers, legal counsel.  We

22    know we have the DOVE program, which

23    doesn't provide enough legal services

24    despite all Pam's efforts.  And I also

25    know that the Access to Justice



Domestic Violence Task Force - 1/25/22

1      Commission is looking at ways to increase

2      pro bono participation across the board.

3      That may be CLE credit or there are all

4      sorts of initiatives over there.

5          But what are the needs here, in this

6      space that would make the most sense?

7      Again, lawyers assigned on a case-by-case

8      basis, lawyers available at the crisis

9      centers, lawyers available at the

10     courthouse.  What's the wish list?

11     Lawyers available to police departments?

12         MS. DODGE:  That might be

13     something -- I think building

14     partnerships with police departments is

15     something that's been on my wish list for

16     a long time.  So I do think that's

17     certainly something to consider.

18         One of the problems that I see is a

19     changing of the guard of the lawyers in

20     private practice.  So there's a different

21     atmosphere, and I'm not -- and this is

22     kind of a broad statement.  So I look at

23     my panel, and I see a lot of attorneys

24     who are retiring, attorneys who have gone

25     to work -- that were in private practice,



Domestic Violence Task Force - 1/25/22

1       but find it more advantageous to go into

2       working for the state or to take other

3       positions because it's very hard to keep

4       up a really good practice and do a lot of

5       volunteer work as well.

6            We work --

7            JUDGE HANTZ MARCONI:  And we do know

8       a little statistic that shocked me, but

9       thanks to Ed Philpot who started

10      advertising, I think it's eighty-five

11      percent of the lawyers in New Hampshire

12      are solo practitioners, solos.

13           MS. DODGE:  And they bear the brunt.

14           JUDGE HANTZ MARCONI:  Right.

15           MS. DODGE:  They really do.  When

16      I'm talking to private attorneys, there's

17      only so much that they can do.  And they

18      get tapped not just from the Pro Bono

19      Program, but from just people in

20      professional settings, church groups, and

21      boards, and I mean, they are tapped

22      constantly, and so it's a juggling act

23      for them.  And there's oftentimes the

24      private attorneys don't have the support

25      staff that they need.  So not only are

Domestic Violence Task Force - 1/25/22

1        they doing the legal work, but they're

2        doing the administrative work too.  So

3        it's a pretty heavy burden on the private

4        bar.

5            We do work with firms, and we work

6        on building relationships with the law

7        school and bringing in Daniel Webster

8        scholars.  It is a constant chasing my

9        tail, reconnecting with lawyers and

10       getting them linked with clients.  And

11       then it's having attorneys in the area or

12       the state where is the greatest need.

13           JUDGE HANTZ MARCONI:  Does it make

14       sense or has COVID taught us anything

15       about perhaps altering, if you will, the

16       scheduling of DV cases in particular --

17           MS. DODGE:  Yes.

18           JUDGE HANTZ MARCONI:  -- remote

19       access to facilitate that geographic --

20           MS. DODGE:  Um-hum.

21           JUDGE HANTZ MARCONI:  -- disparity?

22       I recall back in the day, you're going

23       there for a DOVE case, and you sit

24       through the call of the list.  So that

25       makes it a little more difficult to do it



Domestic Violence Task Force - 1/25/22

1        in an efficient way.

2            MS. DODGE:  Um-hum.  So putting the

3        attorneys on the docket early is

4        certainly a benefit for most of the

5        cases.

6            One thing that I did learn from

7        COVID for experienced attorneys, it's an

8        opportunity for them to help with it

9        where the need is greatest.  So I have

10       attorneys who would do telephonic or

11       Webex hearings anywhere in the state.  So

12       it really expanded possibilities for

13       areas where there was very limited

14       resources.

15           The other thing that I -- I mean,

16       it's kind of (indiscernible) too, from

17       what the attorneys -- the feedback from

18       attorneys because providing offers of

19       proof or other things in the middle of a

20       hearing when you're on a telephonic

21       hearing is problematic.  You also can't

22       see your client's face if you're on the

23       phone, you can't -- I mean it's a very

24       challenging situation to be in.  I mean,

25       I would encourage more Webex hearings if



Domestic Violence Task Force - 1/25/22

1       that would be possible rather than --

2              JUDGE HANTZ MARCONI:  You also have

3       that -- you're right.  You can't submit,

4       often because of the timing, you don't

5       have time to submit documents ahead of

6       time so that everybody has a piece of

7       paper in their hand.  But certainly in

8       many cases that don't need documents for

9       example, a Webex hearing might be

10      sufficient.

11             MS. DODGE:  Yes.  And I do also -- I

12      mean, I think there are a lot of

13      attorneys out there who want to do the

14      work, but there are some firms that are

15      not necessarily pro bono friendly.  And I

16      do think that working and maybe getting

17      some court involvement with those law

18      firms might tip the scales a little bit

19      or recognition that the need is so great

20      and the court appreciates their

21      representation.

22             And it's not -- and I'm not

23      disparaging any firm, I think there are a

24      lot of firms that have a very pro-bono-

25      minded business model.  There are some

Domestic Violence Task Force - 1/25/22

1      firms that don't.  And it would help to

2      have collective voices coming in and

3      saying, this is a huge need in our state.

4           JUDGE HANTZ MARCONI:  This may be a

5      really dumb question, but again, that's

6      what I'm here for.  What about the

7      government lawyers?

8           MS. DODGE:  Well --

9           JUDGE HANTZ MARCONI:  Are they

10     available to you?

11          FEMALE SPEAKER:  Well, I do have an

12     attorney or two that works for the

13     government, but again, it takes a very

14     seasoned attorney to be able to go in and

15     say, hey, I'm going to do this, and I can

16     keep my balance with my day job from my

17     volunteerism.  So I don't think you're

18     going to get that from a new attorney

19     who's not going to have that standing to

20     go into their supervisor and say, this is

21     very important to me and --

22          JUDGE HANTZ MARCONI:  Unless it came

23     from the top, so to speak.

24          MS. DODGE:  Yeah.  Yes.

25          JUDGE NICOLOSI:  I'm curious, Kim, I



Domestic Violence Task Force - 1/25/22

1       know as a judge in Superior Court our

2       petitions, I don't do the 172-B hearings

3       anymore.  But I do often hear restraining

4       orders, and we have a very loose

5       petition, which means there's no real

6       guidance when somebody is looking for

7       something.  And the petition is really

8       important to me because it kind of sets

9       the stage.  And often what I find with

10      pro se people is they get nervous, and

11      then they don't focus their presentation.

12      And it just goes off the rails unless I

13      take a role, and it's always difficult to

14      figure out where to land on doing a

15      direct examination of somebody who's a

16      victim, potentially a victim.  Whether

17      DOVE allows people to do parts of

18      representation?

19          Like instead of coming in and having

20      to appear in court, maybe just having a

21      session by Webex or some means to help

22      somebody do that petition.  We talked a

23      little bit about the guided interviews,

24      and it strikes me that with Webex, a

25      lawyer could really spend an hour with



Domestic Violence Task Force - 1/25/22

1        somebody and just do a really good

2        petition because then I can start my

3        hearing saying is everything in the

4        petition truthful and accurate and begin

5        there, which is what I've started doing,

6        but it means the petition has to really

7        have some structure.

8              MS. DODGE:  I absolutely think there

9        is a lot of value to what you're

10       suggesting.  The DOVE Program has been

11       built on, historically -- and that

12       doesn't mean it can't change, has been

13       built on providing attorneys to represent

14       clients at the hearing itself.

15             JUDGE NICOLOSI:  Um-hum.

16             MS. DODGE:  But I do think, and I

17       know New Hampshire Legal Assistance, and

18       Erin and Mary can talk about this, have

19       really tried to get out and embed lawyers

20       with the different crisis centers, and I

21       think the advocates were very happy with

22       that service.  And again, I don't want to

23       speak for NHLA.  I've had private

24       attorneys do that role in the past as

25       well.  It's, I think, a model that we

Domestic Violence Task Force - 1/25/22

1      should definitely build upon again.  It

2      takes --

3           JUDGE HANTZ MARCONI:  It may be

4      more --

5           MS. DODGE:  -- (indiscernible) --

6           JUDGE HANTZ MARCONI:  -- to do, and

7      it may also be more attractive to

8      practitioners who don't want to go to

9      court.

10          JUDGE NICOLOSI:  Yeah.  And I don't

11     know if this would cross the line or if

12     the courts can do this, but maybe police

13     departments or the crisis centers could

14     do it, but I know in Merrimack County we

15     used to have SCORE program where lawyers

16     would come volunteer their time for just,

17     I think it was an hour we would agree we

18     would come to the Superior Court, spend

19     an hour or two, and I often would go for

20     the whole time, and people would just

21     come in.  And you would sit with them and

22     kind of give them a little bit of time

23     just to help them identify whether they

24     had a case, where they can go to find a

25     lawyer, and just kind of guide them.



Domestic Violence Task Force - 1/25/22

1          MS. DODGE:  Um-hum.

2          JUDGE NICOLOSI:  Way, way back when

3      I had a brother-in-law who had started a

4      program, he was a businessman, and he had

5      paired with a professor from Maryland,

6      and I think a marketing guy.  And the

7      three of them put together this idea,

8      which morphed into (indiscernible) and

9      everything else, where they solicited a

10     lawyer from every state, and they were

11     doing credit cards and worked for

12     companies and the people could call,

13     maybe paired with a lawyer, they'd call

14     an 800 number.

15         The business model was a fifteen-

16     minute model.  The lawyer was supposed to

17     talk with them on average, fifteen

18     minutes.  And that might mean you'd talk

19     to someone for five and you might talk to

20     somebody for thirty, and they paid a flat

21     fee for that service.

22         And it strikes me that maybe a

23     lawyer might be willing to say, okay,

24     I'll be available by Webex for two hours

25     on a Tuesday morning or a Wednesday



Domestic Violence Task Force - 1/25/22

1       afternoon, and whoever calls in, I'll

2       communicate with them on Webex if the

3       other side of that could be provided by

4       the police department or an agency or the

5       court or somebody just to do a petition,

6       to talk through the process and do a

7       petition.

8           MS. DODGE:  And we did something

9       very similar in the family law arena on

10      that where -- for the North Country.  It

11      was called the North County Outreach.

12      Where we linked volunteers with crisis

13      centers up north, and they offered like

14      an afternoon every month for four hours,

15      where they were available by telephone to

16      chat with survivors who needed advice on

17      any -- it wasn't specifically DOVE or

18      protective order related cases, but it

19      was family law or whatever it may have

20      been.  And it was effective for a while,

21      and then it just kind of slowed down so.

22          MS. JASINA:  So I will say that --

23      and that was a great question.  And this

24      is something that NHLA was doing when we

25      first got our VOCA funding.  Actually, it

Domestic Violence Task Force - 1/25/22

1         was the real purpose of our initial VOCA

2         grant was to provide onsite legal

3         assistance to victims and survivors

4         specifically to fill out the petitions.

5              And the reason for doing that was

6         that we thought if we got a victim in a

7         great position with a really strong

8         petition, that if they were not able to

9         obtain representation for the hearing,

10        that they would be in a much better

11        place, better positioned, and more likely

12        for that order to be granted.  And I

13        think -- well, I don't think, I know the

14        program was successful.  The problem with

15        that approach was that we were spending

16        so much time providing those unbundled

17        appointments that it took away from our

18        resources to provide the representation

19        at the court hearings.

20             So when Pro Bono and LARC merged to

21        form 603 Legal Aid, we made a decision

22        between our agencies that NHLA was going

23        to focus our very limited resources on

24        providing the direct representation at

25        the final protective order hearings.  And

Domestic Violence Task Force - 1/25/22

1          then those who were not able to get

2          assistance or representation at the final

3          hearings, either through a DOVE attorney

4          or through NHLA, that those folks could

5          either, before the hearings to get legal

6          advice through 603 Legal Aid through a

7          phone consult, or if we were not able to

8          place that person with an NHLA attorney

9          or a DOVE attorney, that that person

10         would get advice on the process and how

11         to prepare for the hearing.

12              So I would love to be able to go

13         back to a model where we were able to do

14         both.  But with our very limited

15         resources we just haven't been able to do

16         that.

17              I would love to see us do some kind

18         of clinic model be embedded at the

19         courthouse.  We talked about this a few

20         times.  It actually came up through the

21         Family Justice Center model in Strafford

22         County.  We were looking into maybe doing

23         a model clinic there.  But something

24         along the lines of it can be a

25         (indiscernible) clinic that we



Domestic Violence Task Force - 1/25/22

1      participate in or the new eviction clinic

2      that we run.  It would be great to have

3      really a two-step process type clinic.

4      So step 1 there is a petition clinic,

5      where somebody can come in, and there's a

6      legal advocate there who can provide

7      assistance with drafting the petition.

8      And then if there were specific docket

9      days where final protective order

10     hearings were scheduled, then we could

11     have a legal advocate embedded on those

12     days to, you know, here's the file, I

13     need assistance, let me review it, talk

14     to the client very quickly, a conflicts

15     check, and then really just have the

16     ability to jump in and do the hearing, if

17     necessary.

18         I would love to be able to see

19     something like that.  I think we would be

20     interested in partnering with whomever we

21     need to do, whether it's the UNH Law

22     School, private attorneys, NHLA is

23     definitely interested in considering that

24     as an option.

25         And I know we're running out of




Domestic Violence Task Force - 1/25/22

1    time, so I just want to mention, too,

2    that we've definitely looked at and

3    discussed increasing access.  We know

4    that limited resources is a real issue

5    and barrier for people.  But we are

6    working on a bill right now, it's House

7    Bill 1343, and it's scheduled for a

8    hearing tomorrow.  And this would allow

9    certain paraprofessionals who are

10   supervised by attorneys to provide

11   representation in certain types of cases.

12        And right now we're looking at

13   divorce and parenting cases and certain

14   landlord-tenant cases.  It does not

15   include 173-B at this point, but that's

16   certainly something that we could

17   consider adding.  And it would be a pilot

18   program allowing paraprofessionals with

19   particular training and, again,

20   supervised by attorneys, to provide

21   representation in those particular types

22   of cases.  And the pilot would be in the

23   Manchester Circuit Court as well as the

24   Berlin Circuit Court.

25        So I just wanted people to be aware



Domestic Violence Task Force - 1/25/22

1    of that.  We are really trying to be

2    creative in how we can increase access,

3    and that might be one way for us to do

4    it.

5        JUDGE HANTZ MARCONI:  That is great.

6    Does the Access to Justice Commission,

7    are they aware or involved with that at

8    all?

9        MS. JASINA:  Yes.  I believe so.

10       MALE SPEAKER:  Yes.

11       MS. JASINA:  And Mary, I don't know

12   if you want to add anything to what I

13   just said.

14       MS. KRUEGER:  No.

15       MS. SEXTON:  I'd just say really

16   quickly that the federal funding for the

17   civil legal services, specific to

18   domestic violence cases, is highly

19   competitive and is not typically stable,

20   and I think that a very valuable

21   recommendation from this committee would

22   be asking for a specific state

23   appropriation through the next budget to

24   fund this type of service.

25       JUDGE HANTZ MARCONI:  And where does



Domestic Violence Task Force - 1/25/22

 1    that -- it would take some thinking, but

 2    where does it go.  Well, we know where it

 3    comes from, but where does it go into an

 4    agency that dishes out grants, or I mean,

 5    that's sort of the second piece.  How do

 6    we fund these things?  Does it go to the

 7    crisis centers, does it go to NHLA from

 8    the state?  Does it go to -- I don't

 9    know.  So we'd have to track how it would

10    be spent but interesting to have a state

11    component.

12        I think the idea of docket days as

13    opposed to a geographic docket -- and

14    again, I'm sure and Mary Barton is on

15    here.  I'm sure the clerks probably would

16    you know, their hair is going to turn

17    white, but trying to gather the DV cases

18    in certain time frames might help this

19    staffing allocation, so it's not five

20    days a week.  Although we know there are

21    always going to be emergencies.  But

22    outside of that, can you gather DV cases

23    into certain days?

24        JUDGE CARBON:  So just this

25    morning --



Domestic Violence Task Force - 1/25/22

1          JUDGE HANTZ MARCONI:  Go ahead.

2          JUDGE CARBON:  Yeah.  That currently

3     happens --

4          JUDGE HANTZ MARCONI:  Okay.

5          JUDGE CARBON:  -- in Manchester.  So

6     we have certain days where we do final

7     hearings because we have a high enough

8     volume.  It may be easier in a large

9     court to do that as opposed to a smaller

10    court that has fewer dispersed throughout

11    the week.

12         And one other comment on Pam's

13    suggestion though, which can be a great

14    suggestion in terms of how hearings

15    scheduled for pro bono attorneys when

16    they're going to be involved.  At the

17    time though that a petition is filed we

18    don't know that they're going to have a

19    pro bono lawyer.  So we schedule it on

20    the docket, and the hearing notice itself

21    has the date and time.  And often it's

22    subsequent to that time that we get

23    notice that there's an attorney involved.

24    And we can't then reschedule the hearing

25    necessarily.  So that gets a little bit

Domestic Violence Task Force - 1/25/22

1      complicated if we knew the dates and

2      times, then we can work with a Pro Bono

3      Program to try to schedule when a pro

4      bono lawyer might be available, that can

5      happen, but it depends on the model.  And

6      Erin's model might be more workable for

7      that kind of thing.

8           And I just want to come back to one

9      other comment that Pam suggested, that

10     the large firms don't contribute as much

11     pro bono time.  If we actually had

12     numbers that showed us that solo

13     practitioners devote X number of hours or

14     handle so many cases, as opposed to large

15     firm lawyers, some of it was quantifiable

16     that we could take to the chief, I can't

17     imagine that he wouldn't be willing to

18     have a conversation with some of the

19     directors of the large firms.

20          He's a very aggressive supporter of

21     pro bono and ensuring that we're

22     delivering good legal services and Access

23     to Justice.  So if there's a way to

24     actually get some numbers around that, I

25     would think the chief would be very

Domestic Violence Task Force - 1/25/22

1        receptive to hearing that and considering

2        that --

3              JUDGE HANTZ MARCONI:  And that

4        may -- right.  That may be part of, I

5        know again Access to Justice is doing --

6        is looking into models to award CLE

7        credit for pro bono service and that may

8        produce some numbers as well, but yes.

9              MALE SPEAKER:  Yes.

10             JUDGE HANTZ MARCONI:  It's always

11        good to know because when you get the

12        eighty-five solos and then you move up to

13        ninety percent or in firms of five or

14        less, and I know when I was in a small

15        firm, it's hard to balance your pro bono

16        work with your partners' expectations of

17        you pulling your weight.  So it's not an

18        intractable problem.

19             MR. VICINANZO:  Justice, can I

20        address that as somebody who is in a big

21        firm and also a former partner of the

22        Chief Justice, I've been on the receiving

23        end of some of his aggressive pro

24        advocacy.  He's been wonderful on that.

25             And I do have a quick story.



Domestic Violence Task Force - 1/25/22

1    Recently, he set up a task force to

2    address the indigent defense crisis.  And

3    I can tell you that, you know, it's

4    arguable, I kind of feel ashamed

5    sometimes when I hear about all the work

6    that one-lawyer, three-lawyer firms do in

7    the pro bono area and how little

8    relatively the bigger firms do.

9        And these are firms that have

10   probably benefitted disproportionately

11   financially from the legal profession.  I

12   mean, for good reason, but still,

13   arguably, we really owe more to the

14   community than others perhaps.  I think

15   we're very underrepresented.

16       I think a lot of time those folks

17   running large firms are not even

18   litigators, they're real estate lawyers,

19   corporate lawyers, and they're driven

20   largely by immediate partner demands for

21   bottom line performance, things like

22   that.  And they don't hear enough about

23   the need for pro bono representation.

24   It's not that they're not good folks,

25   they are, but sometimes it's easy when



Domestic Violence Task Force - 1/25/22

1      you're in the maelstrom of business to

2      kind of forget about the fact that we're

3      a profession and that we owe something

4      back to the community.

5          What the Chief Justice did recently

6      though was to make a lot of personal

7      phone calls to all the big firms in the

8      state and then followed up with letters

9      to the managing partners and made a

10     personal appeal for lawyers to represent

11     indigent defendants and to take care of

12     some of the backlog.  It worked very,

13     very well.

14         I worked closely with Sarah Hudson

15     at the judicial counsel, and we are now

16     completely caught up, not for long,

17     there's going to be a new wave of

18     indictments soon, and then we'll be

19     behind again.  But at least we did take

20     out the backlog largely, and we're not as

21     desperate as we were a couple of months

22     ago.

23         But I suggested to the Chief Justice

24     that maybe he should try to make this a

25     more permanent feature of big-firm life.



Domestic Violence Task Force - 1/25/22

1        One of the things about it is we have a

2        lot of younger attorneys who never get to

3        go to court and are dying for experience,

4        and this stuff can be very interesting.

5        Certainly a lot more interesting than

6        drafting an extensive lease agreement or

7        something sometimes.  And actually

8        getting into court and actually seeing

9        real human beings and judges or how it

10       works.  So for that reason alone, it's a

11       great training experience for bright,

12       young lawyers that really want the

13       experience and want to actually do some

14       good in society.

15            But it's also something that I think

16       more experienced lawyers, it's really

17       incumbent on them to take on some of the

18       obligations of the profession, and it

19       seems to me this would be well tailored

20       for that.

21            And I can't tell you how influential

22       it is for a judge to call, especially the

23       chief judge and say we need you.  And I

24       really need your help, and I'm going to

25       follow up with you next week for a list

Domestic Violence Task Force - 1/25/22

 1        of people who can help.  It really has

 2        produced some real fruits, and I would

 3        recommend that we think about making

 4        those appeals.  And maybe something to

 5        create some bit of a system something to

 6        make it permanent.  Maybe it's something

 7        where every year there is some sort of a

 8        celebratory dinner or something like that

 9        that kind of builds it into the

10        profession and sort of makes it part of

11        our professional obligations.  I don't

12        think we see enough of that sometimes.

13            JUDGE HANTZ MARCONI:  Well, another

14        little secret from my big-firm experience

15        is demystifying family and domestic

16        violence in particular, trying to get

17        peers, who were colleagues, who were in

18        real estate or in corporate, they're

19        afraid of the issues encountered in

20        domestic violence cases.  They don't

21        think they're competent, and so that's

22        another piece that has to be addressed

23        because they fear they aren't qualified.

24            MR. VICINANZO:  I know.

25            JUDGE HANTZ MARCONI:  And so they



Domestic Violence Task Force - 1/25/22

1        have to deal with that as well.

2              MR. VICINANZO:  Yes.

3              JUDGE NICOLOSI:  Well, we

4        appreciate -- the Superior Court has seen

5        lots of people including you, appearing

6        in a lot of these cases with where

7        conflict counsel, and it's nice to see

8        everybody stepping up and doing it, we

9        really noticed it and appreciate it.

10             MS. DODGE:  You know, Dave, I really

11       like what you're saying.  And the other

12       thing is that pairing somebody like

13       yourself with a newer attorney or even

14       another firm attorney would be a great

15       incentive for --

16             MR. VICINANZO:  Yeah.

17             MS. DODGE:  -- somebody to join the

18       panel.  So not only are we getting that

19       feedback from the justices but also from

20       very seasoned and experienced and well-

21       regarded attorneys in private practice.

22             JUDGE NICOLOSI:  I will say in this

23       day and age I see so few young civil

24       lawyers because so much is resolved by

25       alternative dispute resolution.  We



Domestic Violence Task Force - 1/25/22

1    really, most things like motions for

2    summary judgment, motions to dismiss are

3    decided on paper.  We don't have

4    structuring conferences anymore in

5    person.  So I see very few young lawyers,

6    and it seems to me it's a great

7    opportunity for them to come and see what

8    the inside of a courtroom looks like.

9        MR. VICINANZO:  Yeah.  Yeah.  I'd

10   also just add that people really do like

11   to be asked, and if they haven't been

12   asked in several years -- one of the

13   things recently I looked up Shaheen and

14   Gordon, there was only one lawyer

15   participating in the Chief Justice's

16   effort.

17       And I looked up in Martindale, and I

18   saw -- I know them all.  Well, all of the

19   criminal lawyers, but there's twelve or

20   fifteen of them that do criminal law or

21   ten criminal law, and I called every one

22   of them.  And they all said, oh, I didn't

23   really know it was a problem, so okay,

24   yeah, I can take a couple of cases.  They

25   just need to be -- they're not --

Domestic Violence Task Force - 1/25/22

1    sometimes we're oblivious of what's

2    around us, and sometimes just asking will

3    get results.  So I think as something as

4    simple as asking, and sometimes the

5    asking from the top really could produce,

6    could increase our numbers of people

7    participating.

8         JUDGE HANTZ MARCONI:  All right.

9    We're beyond our soft ending time.  Any

10   other random comments on this -- random

11   or nonrandom on this topic?  And again,

12   this is not the end only the beginning.

13        Any thoughts that come to you while

14   driving home or cooking dinner or

15   whatever it is, feel free to circulate or

16   send in or upload.  Don't forget to look

17   at our documents in Dropbox, there's some

18   good stuff in there.

19        And we will pick it up on Thursday

20   with a little cooperation among all the

21   groups.  I think we started talking about

22   that today, but we will pick it up on

23   Thursday.  Thank you.

24        MR. VICINANZO:  Okay.

25        JUDGE HANTZ MARCONI:  Again, thank



Domestic Violence Task Force - 1/25/22

 1      you.

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Meeting

1                C E R T I F I C A T I O N

2

3        I, Amy Alessi, certify that the foregoing

4        transcript is a true and accurate record

5        of the proceedings.

6

7

8

9        _____

10       Amy Alessi (CDLT-209)

11       TTA-Certified Digital Legal Transcriber

12

13       eScribers

14       352 Seventh Avenue, Suite #604

15       New York, NY 10001

16

17       Date:  March 4, 2022

18

19

20

21

22

23

24

25



**A**

**ability** 7:20
  15:24 35:18
  50:16
**able** 7:21 8:6,22
  9:11 13:23,25
  14:1 28:21
  29:8 31:10
  32:9 42:14
  48:8 49:1,7,12
  49:13,15 50:18
**absolutely** 36:2
  44:8
**abuse** 16:19
**access** 3:4 8:4
  10:8 18:8
  23:22 29:5,22
  36:25 39:19
  51:3 52:2,6
  55:22 56:5
**accessibility**
  10:13
**accompanied**
  35:13
**accompaniment**
  24:11,19 27:8
**accompanime...**
  7:21 9:10,18
  9:22 10:3 28:2
**accompany**
  35:24
**accurate** 44:4
  65:4
**act** 38:22
**action** 18:24
**activities** 26:11
**actual** 10:3
**add** 24:6 52:12
  62:10
**add-on** 10:14
**adding** 51:17
**addition** 9:21
**additional** 9:8
  16:1 17:5
  25:25
**address** 19:16
  20:24 56:20
  57:2
**addressed** 60:22

**administrative**
  39:2
**Administrator**
  2:20
**advanced** 10:20
**advantageous**
  13:23 38:1
**advertising** 23:5
  23:17 38:10
**advice** 14:5,19
  47:16 49:6,10
**advising** 14:15
**advocacy** 6:20
  7:4,11 9:23
  16:17 17:14
  56:24
**advocate** 6:23
  8:5,22 15:2
  29:8,17,22,24
  30:19,20 31:10
  31:16,16 32:14
  32:18,21 33:14
  33:21 34:14,24
  35:2,23 36:8
  36:18 50:6,11
**advocates** 3:5
  6:14,16,22,24
  7:2,6,9,15 8:2
  10:23,25 11:3
  11:11 12:3,13
  12:19 13:8,8
  13:12,16,25
  15:13,14 16:13
  16:15 18:5
  19:17 21:14
  22:23 28:5,10
  28:15 29:13
  30:1 34:20
  36:4 44:21
**advocates'** 35:18
**advocating**
  14:15
**Affairs** 2:12
**affiliated** 32:13
**affinity** 21:7
**afraid** 60:19
**afternoon** 47:1
  47:14
**age** 61:23

**agencies** 24:24
  24:25 31:9,19
  48:22
**agency** 47:4
  53:4
**aggressive** 55:20
  56:23
**ago** 15:1 29:15
  58:22
**agree** 35:10
  45:17
**agreement** 59:6
  ahead 11:14
  41:5 54:1
**Aid** 48:21 49:6
**Alessi** 65:3,10
**allocation** 53:19
**allow** 51:8
**allowable** 26:10
**allowing** 51:18
**allows** 43:17
**altering** 39:15
**alternative**
  61:25
**Amanda** 2:11
**AmeriCorps**
  15:2,20,21,22
  16:10,15,23
  17:1,10,15
  29:17 30:20
**amount** 21:24
  28:20
**Amy** 65:3,10
**Ann** 1:25
**Anna** 1:12
**Anne** 2:22 4:17
  5:1
**answer** 24:14
**anybody** 6:8
**anymore** 43:3
  62:4
**appeal** 58:10
**appeals** 60:4
**appear** 43:20
**appearing** 61:5
**applicants** 15:22
**application**
  28:17,23 29:7
**apply** 30:3

**appointments**
  48:17
**appreciate** 61:4
  61:9
**appreciates**
  41:20
**approach** 48:15
**appropriate**
  20:23
**appropriation**
  52:23
**area** 3:23 6:10
  6:16 16:12
  39:11 57:7
**areas** 40:13
**arena** 4:10 47:9
**arenas** 18:3
**arguable** 57:4
**arguably** 57:13
**arrangements**
  8:7
**ashamed** 57:4
**aside** 4:18
**asked** 62:11,12
**asking** 52:22
  63:2,4,5
**aspects** 26:6
**assess** 8:20
**asset** 32:7
**assigned** 31:16
  37:7
**assistance** 2:4
  7:22 10:18
  28:4 44:17
  48:3 49:2 50:7
  50:13
**assistance-**
  34:19
**Assistant** 1:23
**assistants** 17:21
**assisting** 12:20
  13:13
**Associate** 1:13
**Association** 2:7
  2:14
**atmosphere**
  37:21
**attached** 20:13
**attempt** 29:2

**attorney** 1:23
  2:1,2,15,16,18
  33:18 42:12,14
  42:18 49:3,8,9
  54:23 61:13,14
**attorney's** 1:22
  31:15 35:17
**attorneys** 2:14
  37:23,24 38:16
  38:24 39:11
  40:3,7,10,17
  40:18 41:13
  44:13,24 50:22
  51:10,20 54:15
  59:2 61:21
**attractions** 21:2
**attractive** 45:7
**AVAC** 15:2
**availability** 34:3
**available** 7:19
  11:3 12:24
  13:1 18:6 22:7
  22:25 28:1
  34:6 37:8,9,11
  42:10 46:24
  47:15 55:4
**Avenue** 65:14
**average** 12:15
  30:8 46:17
**award** 56:6
**aware** 11:16,19
  51:25 52:7

**B**

**back** 5:6 8:16
  18:19 30:5
  31:8 32:2
  39:22 46:2
  49:13 55:8
  58:4
**backlog** 58:12
  58:20
**balance** 42:16
  56:15
**bar** 39:4
**Barbara** 1:12
**barely** 3:18
**barrier** 14:13
  51:5

**Barton** 1:17
    53:14
**base** 13:10 15:18
**based** 13:8,12
    16:17 31:12
    32:21 34:20
    35:17
**basis** 4:15 5:20
    11:12 37:8
**bazillion** 30:18
**bear** 38:13
**Beauchamp**
    1:18 35:10
**Beebe** 1:20 7:13
    9:17 11:2
    15:19 16:24
    17:12 24:5
    25:12,16 26:7
    26:13,16 27:22
**beginning** 63:12
**beings** 59:9
**believe** 3:16
    52:9
**Belknap** 1:21
**benefit** 17:17
    40:4
**benefits** 17:20
**benefitted** 57:10
**Berlin** 51:24
**Bernier** 1:21
    30:15 33:11
**best** 5:19
**Betsy** 2:18
**better** 33:3
    48:10,11
**beyond** 63:9
**big** 9:4 56:20
    58:7
**big-firm** 58:25
    60:14
**bigger** 23:1
    31:21 57:8
**bill** 51:6,7
**bit** 7:17 16:14,21
    34:22 36:9,11
    41:18 43:23
    45:22 54:25
    60:5
**Black** 2:16

**blank** 14:9
**board** 37:2
**boards** 38:21
**body** 33:2,3
**bona** 12:2
**bono** 37:2 38:18
    41:15 48:20
    54:15,19 55:2
    55:4,11,21
    56:7,15 57:7
    57:23
**bottom** 57:21
**brains** 4:2
**break** 13:23
    14:13,22
**breakdown** 27:3
**breakneck** 3:10
**Bree** 33:17
**bright** 59:11
**bringing** 39:7
**broad** 3:11
    37:22
**broader** 12:12
**brother-in-law**
    46:3
**brought** 3:22
**brunt** 38:13
**budget** 52:23
**build** 22:16 25:2
    30:10 45:1
**building** 22:10
    37:13 39:6
**builds** 60:9
**built** 22:15
    44:11,13
**burden** 39:3
**burnout** 12:9
**business** 21:11
    41:25 46:15
    58:1
**businesses** 21:10
**businessman**
    46:4

_____
        **C**
**C** 65:1,1
**California** 4:11
    4:12
**call** 5:25 6:2,21

    14:10 35:7
    39:24 46:12,13
    59:22
**called** 47:11
    62:21
**calls** 47:1 58:7
**capacity** 8:2,22
    9:24 10:5 12:6
    13:4 17:14
    22:11 23:13
**Carbon** 1:14
    53:24 54:2,5
**cards** 46:11
**care** 58:11
**CASA** 2:18 7:8
    21:9,23 22:3
**case** 4:22 13:3
    18:23 19:6
    20:6,6,13,13
    20:22 28:23
    32:12 39:23
    45:24
**case-by-case**
    37:7
**cases** 3:2 9:2
    10:1 18:10,18
    18:25 20:12,20
    22:3 39:16
    40:5 41:8
    47:18 51:11,13
    51:14,22 52:18
    53:17,22 55:14
    60:20 61:6
    62:24
**cash** 17:19
**catch** 9:13
**categories** 16:10
**caught** 58:16
**causes** 21:4
**causing** 15:17
**CDLT-209**
    65:10
**celebratory** 60:8
**center** 10:6
    13:15 15:16
    16:13 23:4,15
    29:19 49:21
**centers** 6:24
    9:23 10:24

    12:3,23 13:3
    14:23 22:14
    33:25 37:9
    44:20 45:13
    47:13 53:7
**central** 24:1
**centralized**
    18:16
**certain** 11:18
    51:9,11,13
    53:18,23 54:6
**certainly** 23:8
    25:7 31:21
    34:5 37:17
    40:4 41:7
    51:16 59:5
**certify** 65:3
**cetera** 32:6
**challenge** 8:14
    9:9 15:21 17:4
    32:20
**challenges** 8:3
**challenging**
    40:24
**change** 15:18
    44:12
**changing** 37:19
**Charge** 3:3 6:10
    20:19
**charges** 4:1
**chasing** 39:8
**chat** 47:16
**check** 25:19
    50:15
**Chicken** 22:22
**chief** 28:8 30:4
    30:23 32:17
    55:16,25 56:22
    58:5,23 59:23
    62:15
**chiefs** 2:8 33:9
**child** 9:22
**church** 21:18
    38:20
**churches** 21:8
**circuit** 1:14,16
    1:17 2:19 19:1
    51:23,24
**circulate** 63:15

**circulated** 5:5
**circumstances**
    29:3
**civil** 13:12 32:15
    35:24 52:17
    61:23
**clarity** 13:24
**CLE** 37:3 56:6
**clear** 36:15
**Clerk** 1:17 2:22
**clerk's** 29:23
**clerks** 53:15
**client** 25:25
    50:14
**client's** 40:22
**client-** 25:17
**clients** 39:10
    44:14
**clinic** 49:18,23
    49:25 50:1,3,4
**closely** 58:14
**coalition** 2:10,12
    28:19
**colleagues** 60:17
**collective** 42:2
**collectively**
    26:19
**come** 7:24 8:11
    20:17,25 29:20
    45:16,18,21
    50:5 55:8 62:7
    63:13
**comes** 8:5 26:4
    53:3
**comfortable**
    24:10,15 36:16
**coming** 11:6
    21:1 42:2
    43:19
**comment** 3:15
    54:12 55:9
**comments** 3:14
    5:3 6:5 63:10
**Commission**
    10:9 23:22
    37:1 52:6
**committed**
    27:19
**committee** 6:1

52:21
**communicate**
47:2
**communication**
33:21
**communicatio...**
35:22
**community** 6:20
6:23 7:12
21:17 32:4
57:14 58:4
**companies**
46:12
**compared** 26:25
**competent** 60:21
**competitive**
52:19
**completely**
58:16
**complex** 20:12
**complicated**
55:1
**complications**
7:24
**component**
22:10,12 53:11
**concentrate**
18:9
**concern** 18:13
19:13,17,21
20:7,16
**concerning** 9:25
**Concord** 29:16
**conferences**
62:4
**confidential**
33:1
**confidentiality**
12:4 27:16
32:23 33:13
34:13 35:6
36:14
**conflict** 61:7
**conflicts** 50:14
**conjunction**
34:10
**connected** 20:22
**connection** 8:18
**consider** 18:14

20:5 37:17
51:17
**considering**
50:23 56:1
**consistently**
7:19
**consolidated**
18:1
**consolidating**
18:15 19:15
**constant** 39:8
**constantly** 38:22
**consult** 49:7
**contact** 8:6
**continuing**
23:21
**contribute** 55:10
**conversation**
28:7 55:18
**cooking** 63:14
**cooperation**
63:20
**core** 12:18
**corporate** 57:19
60:18
**correct** 32:23
**counsel** 3:5 18:6
19:18 36:21
58:15 61:7
**Country** 47:10
**county** 1:22,23
1:24,25 31:15
35:17 36:1
45:14 47:11
49:22
**couple** 58:21
62:24
**course** 10:8
13:22 16:16
**court** 1:13,14,15
1:16,17 2:19
5:2 7:20 8:10
11:10 14:17,18
16:17 18:4
19:1,4,8 20:3,4
20:14 24:11,12
24:19 27:9
29:21 30:17
31:12,18 32:10

35:14 41:17,20
43:1,20 45:9
45:18 47:5
48:19 51:23,24
54:9,10 59:3,8
61:4
**courthouse**
29:18,24 37:10
49:19
**courthouses**
15:4 30:2
**courtroom**
33:19 62:8
**courtrooms** 23:7
**courts** 8:8 9:2,9
9:17 10:2 11:4
11:6,7 18:10
20:9 29:10,13
45:12
**cover** 9:2,3 26:6
**coverage** 22:6
**COVID** 39:14
40:7
**crazy** 17:24 21:6
**create** 22:21,23
60:5
**creative** 52:2
**credit** 37:3
46:11 56:7
**crime** 34:7
**crimes** 31:12
**criminal** 2:14
13:11 32:14
62:19,20,21
**crisis** 6:24 10:5
10:24 12:2,22
13:15 14:23
15:16 16:13
22:14 23:3
27:6 29:18
33:25 35:22
36:13,17 37:8
44:20 45:13
47:12 53:7
57:2
**critical** 29:7
**cross** 45:11
**crucial** 29:1
**curious** 24:24

30:13 42:25
**current** 33:5
**currently** 7:14
7:16 30:25
54:2
**cut** 18:3,8
**cyclical** 17:10

_____
**D**
**Daniel** 39:7
**date** 54:21 65:17
**dates** 55:1
**Dave** 61:10
**David** 2:7,15
**day** 9:10,20 28:1
39:22 42:16
61:23
**days** 50:9,12
53:12,20,23
54:6
**deal** 7:23 20:9
61:1
**decide** 19:11
**decided** 62:3
**decision** 48:21
**decline** 17:9
**defendants**
58:11
**defense** 2:14
57:2
**definitely** 8:1
15:6 45:1
50:23 51:2
**definition** 4:6
**delivering** 55:22
**demands** 57:20
**demystifying**
60:15
**department**
31:11 33:22
34:6 36:8 47:4
**departments**
31:21 36:3,6
37:11,14 45:13
**dependable**
21:14
**dependent** 23:15
**depends** 55:5
**description**

30:24
**desperate** 58:21
**despite** 36:24
**detours** 3:12
**develop** 27:12
**devote** 55:13
**Diane** 1:15
**difference** 13:7
19:22 20:4
**different** 3:25
5:18 7:3 8:10
12:5,6 13:3
19:19 26:6
27:11 37:20
44:20
**difficult** 39:25
43:13
**Digital** 65:11
**dinner** 60:8
63:14
**direct** 26:21
43:15 48:24
**directed** 4:7
**directly** 8:6
**Director** 1:18,20
2:3,5,9,11,21
**directors** 55:19
**discrepancy** 9:5
**discuss** 3:3
**discussed** 13:22
51:3
**discussion** 4:3
4:14
**dishes** 53:4
**dismiss** 62:2
**disparaging**
41:23
**disparity** 39:21
**dispersed** 54:10
**disproportion...**
57:10
**dispute** 61:25
**district** 35:14
**dividing** 10:16
**division** 18:17
18:19,22 20:9
**divorce** 18:24
19:7 20:6
51:13

do's 34:1
do-good 21:19
docket 20:12
  40:3 50:8
  53:12,13 54:20
dockets 18:1,2
documents 41:5
  41:8 63:17
Dodge 4:20
  24:23 25:15
  37:12 38:13,15
  39:17,20 40:2
  41:11 42:8,24
  44:8,16 45:5
  46:1 47:8
  61:10,17
doing 3:9 5:11
  6:5 16:16,18
  24:15 26:10
  28:12 30:14
  39:1,2 43:14
  44:5 46:11
  47:24 48:5
  49:22 56:5
  61:8
DOJ 2:4
dollars 15:15
domestic 1:6 4:6
  4:23,23 13:7
  18:1,9,15,24
  19:12,15 20:1
  36:4 52:18
  60:15,20
don'ts 34:1 35:1
dos 35:1
double 18:8
DOVE 2:15
  33:18 36:22
  39:23 43:17
  44:10 47:17
  49:3,9
drafting 13:19
  15:5 50:7 59:6
drawback 33:4
  33:12
driven 57:19
driving 63:14
Dropbox 63:17
dumb 42:5

DV 2:21 3:2
  20:12,19 32:15
  39:16 53:17,22
dying 59:3

— E —
E 65:1
earlier 13:6
  29:13
early 40:3
easier 54:8
easy 57:25
Ed 38:9
edged 18:9
educated 11:22
education 21:10
educational
  16:18
effective 47:20
efficient 40:1
effort 5:2 22:18
  23:10,21 24:4
  62:16
efforts 26:14
  36:24
egg 22:22
eighty-five
  38:10 56:12
either 4:2 19:6
  49:3,5
email 3:15
embed 44:19
embedded 49:18
  50:11
emergencies
  53:21
empowerment
  16:12
encountered
  60:19
encourage 23:10
  40:25
ended 30:21
Endres 1:23
  29:12
enforcement
  31:9 32:21
ensure 35:23
ensuring 55:21

Erin 2:21 4:17
  44:18
Erin's 55:6
eScribers 65:13
especially 12:9
  28:17,21 59:22
estate 57:18
  60:18
et 32:6
everybody 41:6
  61:8
eviction 50:1
ex 14:19
examination
  43:15
example 4:5
  16:25 41:9
executive 1:20
  2:9 6:1
expand 22:24
  28:14
expanded 23:14
  33:9 40:12
expanding 4:6
expectations
  56:16
expecting 5:7
experience 3:23
  7:23 19:10
  21:16 32:12
  59:3,11,13
  60:14
experienced 4:2
  40:7 59:16
  61:20
experiencing
  16:20
explore 3:4
explored 23:2
exploring 15:8
exponentially
  22:24
extensive 27:19
  59:6

— F —
F 65:1
face 40:22
facilitate 39:19

fact 17:13 21:13
  29:21 58:2
fall 16:13
familiar 19:24
  35:2
family 18:17,19
  18:21,22 19:10
  20:8,10,20
  47:9,19 49:21
  60:15
favor 28:16 29:9
fax 8:10
fear 60:23
feature 58:25
federal 15:15
  26:8 52:16
fee 46:21
feedback 40:17
  61:19
feel 3:17 28:7
  36:16 57:4
  63:15
feeling 6:8 14:14
FEMALE 17:8
  34:16 42:11
fewer 54:10
fide 12:2
fifteen 15:1
  29:15 46:17
  62:20
fifteen- 46:15
figure 43:14
file 50:12
filed 54:17
fill 11:17,23
  14:9 15:4,8
  17:13 28:22
  48:4
filling 10:18
final 14:3 48:25
  49:2 50:9 54:6
financial 16:11
  16:19 24:25
financially
  57:11
find 11:17 27:23
  38:1 43:9
  45:24
firm 41:23 55:15

56:15,21 61:14
firms 39:5 41:14
  41:18,24 42:1
  55:10,19 56:13
  57:6,8,9,17
  58:7
first 20:2 47:25
five 4:16 31:25
  46:19 53:19
  56:13
five-day-a-week
  11:12
flat 46:20
focus 3:25 4:22
  43:11 48:23
folks 12:16
  13:19 23:9
  26:10 33:10
  49:4 57:16,24
follow 59:25
followed 58:8
force 1:6 3:2,21
  5:6 57:1
foregoing 65:3
foresee 21:11
forget 58:2
  63:16
form 5:19 48:21
former 56:21
four 17:4,21
  31:25 47:14
frame 5:22
frames 53:18
free 28:7 63:15
Freeman 2:19
  4:20 14:25
  27:4 32:20
friend 14:11
friendly 41:15
front 32:8
fruits 60:2
full 17:5,18,19
  17:21 29:18
  30:19
full-time 25:13
function 10:21
fund 30:25 31:4
  52:24 53:6
funded 30:22

**funding** 6:25
  10:22,23 15:1
  15:11,12,20
  16:1,2,10 25:5
  26:3,7,8 30:11
  30:11 47:25
  52:16
**fundraising**
  26:14
**funds** 26:11
**further** 5:6

_____ G _____

**gain** 29:5
**gather** 53:17,22
**gathering** 3:14
**general** 18:20
**geographic** 9:20
  39:19 53:13
**getting** 15:22
  31:14 39:10
  41:16 59:8
  61:18
**give** 16:24 45:22
**given** 8:24 15:23
**go** 7:20 9:2
  11:14 24:18,18
  30:4 31:11,17
  32:5 34:5 38:1
  42:14,20 45:8
  45:19,24 49:12
  53:2,3,6,7,8
  54:1 59:3
**goes** 16:10 28:22
  43:12
**going** 3:7,8 6:6
  9:14 11:15
  13:2,4 15:16
  19:7 20:18
  23:21 24:10
  27:8 39:22
  42:15,18,19
  48:22 53:16,21
  54:16,18 58:17
  59:24
**good** 21:20
  23:19 36:12
  38:4 44:1
  55:22 56:11

57:12,24 59:14
  63:18
**Gordon** 62:14
**gotten** 15:25
**government**
  42:7,13
**Grady** 2:11
**Grafton** 1:25
**grant** 26:4 30:22
  31:1 48:2
**granted** 48:12
**grants** 30:25
  53:4
**great** 12:1 28:19
  41:19 47:23
  48:7 50:2 52:5
  54:13 59:11
  61:14 62:6
**greatest** 39:12
  40:9
**group** 2:17 5:8
  5:25
**groups** 5:18
  21:8,11,18,18
  21:19,19 23:16
  38:20 63:21
**guard** 37:19
**guess** 19:18 30:4
**guidance** 43:6
**guide** 45:25
**guided** 43:23
**guy** 46:6

_____ H _____

**hair** 53:16
**Hampshire** 1:13
  2:10,12,13
  22:3 28:11
  29:19 38:11
  44:17
**Hampton** 2:5,7
**hand** 41:7
**handful** 36:5
**handle** 10:24
  55:14
**Hantz** 1:12 3:1
  4:12 10:7 11:8
  11:14 14:4,8
  17:9,24 20:11

22:20 23:19,25
  26:2,12,15,24
  27:13,17,21
  28:3 32:11
  33:6 34:15
  36:20 38:7,14
  39:13,18,21
  41:2 42:4,9,22
  45:3,6 52:5,25
  54:1,4 56:3,10
  60:13,25 63:8
  63:25
**happen** 8:21
  28:24 29:1
  30:12 55:5
**happening** 9:8
  34:7
**happens** 54:3
**happy** 5:12
  44:21
**hard** 38:3 56:15
**harder** 7:17
**hat** 21:23
**Haven** 1:20 17:4
  33:18 34:25
**Hawaii** 4:8
**hear** 6:6 7:10
  8:16 20:15
  43:3 57:5,22
**heard** 20:2
**hearing** 3:13
  20:21 22:8
  40:20,21 41:9
  44:3,14 48:9
  49:11 50:16
  51:8 54:20,24
  56:1
**hearings** 9:19
  28:15 40:11,25
  43:2 48:19,25
  49:3,5 50:10
  54:7,14
**heavily** 35:21
**heavy** 39:3
**Held** 1:8
**Hello** 3:1
**help** 13:25 14:12
  15:4 23:9
  24:17 29:9

33:2 34:8
  35:14 36:18
  40:8 42:1
  43:21 45:23
  53:18 59:24
  60:1
**helpful** 23:9
  32:19
**helping** 13:20
  15:7 26:1
**helps** 25:18
**hey** 42:15
**high** 12:9 15:23
  54:7
**highly** 25:8
  52:18
**Hillsborough**
  36:1
**hire** 12:8 17:21
  32:4
**hired** 34:23
**hiring** 22:23
**historically**
  44:11
**Hobbs** 2:7 28:8
  30:4 32:17
**home** 63:14
**homework** 5:17
**Hon** 1:12,14,15
  1:16
**Honor** 21:22
**hoping** 12:23
**Hornick** 1:25
  9:12 11:13,15
**host** 20:15
**hotline** 24:14
**hotlines** 23:7
**hour** 27:24
  43:25 45:17,19
**hour-plus** 3:19
**hours** 26:21,25
  27:7 46:24
  47:14 55:13
**House** 51:6
**housing** 15:12
  16:2
**Hudson** 32:12
  36:6 58:14
**huge** 9:24 42:3

**human** 59:9
**hurdle** 14:21

_____ I _____

**idea** 21:6 46:7
  53:12
**identify** 45:23
**imagine** 55:17
**immediate**
  10:12 57:20
**immediately**
  22:7
**impact** 16:4
**important** 12:20
  12:25 13:14
  42:21 43:8
**inability** 11:17
  12:8
**incentive** 61:15
**include** 33:10
  51:15
**including** 61:5
**increase** 3:4 8:2
  16:1 37:1 52:2
  63:6
**increased** 16:5
**increasing** 7:11
  51:3
**incumbent**
  59:17
**indictments**
  58:18
**indigent** 57:2
  58:11
**indiscernible**
  7:22 8:15,17
  8:18,20,23,25
  9:3 10:4 11:7
  24:22 27:9
  40:16 45:5
  46:8 49:25
**individual** 24:24
  32:9
**influential** 59:21
**information**
  3:17 4:1 8:24
  12:12 14:24
  30:6
**initial** 28:14

48:1
**initiatives** 37:4
**input** 5:3,6,12
**ins** 25:19
**inside** 62:8
**insisting** 36:15
**institutions**
    21:10
**interested** 11:22
    21:13 28:11
    50:20,23
**interesting**
    26:15 27:2,5
    32:16 34:15
    53:10 59:4,5
**intersection**
    20:19
**interviews** 43:23
**intractable**
    56:18
**INV** 30:15 33:11
**investigator**
    1:21 32:8
**investigators**
    31:13
**investment**
    25:21
**involved** 22:9
    52:7 54:16,23
**involvement**
    41:17
**involves** 12:14
**issue** 4:5 8:22,23
    9:15,24 10:5
    11:20 13:5
    23:13 29:20
    51:4
**issues** 3:18 5:15
    60:19

———————
**J**
**January** 1:7
**Jasina** 2:21 4:17
    47:22 52:9,11
**Jean** 4:16
**job** 4:22 13:16
    30:24 31:23
    42:16
**jobs** 5:10 15:25

27:23
**John** 1:16
**join** 5:2 31:25
    61:17
**Jon** 2:13
**judge** 1:14,15,16
    3:1 4:12 10:7
    11:8,14 14:4,8
    17:9,24 18:21
    18:22 20:11
    22:20 23:19,25
    26:2,12,15,24
    27:13,17,21
    28:3 32:11
    33:6 34:15
    36:20 38:7,14
    39:13,18,21
    41:2 42:4,9,22
    42:25 43:1
    44:15 45:3,6
    45:10 46:2
    52:5,25 53:24
    54:1,2,4,5 56:3
    56:10 59:22,23
    60:13,25 61:3
    61:22 63:8,25
**judges** 59:9
**judgment** 62:2
**judicial** 3:2 19:9
    19:23 58:15
**juggling** 38:22
**jump** 7:13 50:16
**Justice** 1:13
    10:9 23:22
    36:25 49:21
    52:6 55:23
    56:5,19,22
    58:5,23
**Justice's** 62:15
**justices** 61:19

———————
**K**
**Kath** 11:21
**Kathy** 1:20 9:12
    42:16
**kick** 6:19
**kicked** 31:14
    32:1

**kicking** 31:7
**Kilham** 4:16
**Kim** 42:25
**kind** 3:10 5:13
    7:8 9:14 12:12
    22:10 25:6
    34:9 37:22
    40:16 43:8
    45:22,25 47:21
    49:17 55:7
    57:4 58:2 60:9
**kinds** 22:16
**knew** 55:1
**know** 3:9,17
    4:22 6:11,13
    6:25 7:1 8:12
    10:4,12 12:10
    13:9,17 21:23
    23:13 24:2
    30:9 31:19,24
    33:8 34:25
    36:10,22,25
    38:7 43:1
    44:17 45:11,14
    48:13 50:12,25
    51:3 52:11
    53:2,9,16,20
    54:18 56:5,11
    56:14 57:3
    60:24 61:10
    62:18,23
**knowledge** 5:19
**Kristyn** 1:21
    35:1 36:10
**Krueger** 2:2
    52:14

———————
**L**
**lack** 29:2
**LaFrance** 2:16
**land** 43:14
**landlord-tenant**
    24:2 51:14
**LARC** 48:20
**large** 54:8 55:10
    55:14,19 57:17
**largely** 57:20
    58:20
**largest** 36:2

**law** 2:17,22
    13:18 14:16
    31:9 32:21
    39:6 41:17
    47:9,19 50:21
    62:20,21
**lawyer** 43:25
    45:25 46:10,13
    46:16,23 54:19
    55:4 62:14
**lawyers** 13:17
    36:21 37:7,8,9
    37:11,19 38:11
    39:9 42:7
    44:19 45:15
    55:15 57:18,19
    58:10 59:12,16
    61:24 62:5,19
**learn** 40:6
**learned** 6:13
**lease** 59:6
**leaving** 32:3
**legal** 3:5 14:5,19
    18:5 21:17
    28:4 36:21,23
    39:1 44:17
    48:2,21 49:5,6
    50:6,11 52:17
    55:22 57:11
    65:11
**let's** 11:9
**letters** 58:8
**level** 25:23 31:8
    31:15 32:3
    33:22 36:12
**leveraging** 23:23
**life** 58:25
**limit** 22:4
**limited** 9:11
    40:13 48:23
    49:14 51:4
**line** 3:15,15,16
    5:10 20:4 27:6
    32:8 45:11
    57:21
**lines** 49:24
**linked** 39:10
    47:12
**list** 37:10,15

39:24 59:25
**litigants** 14:1
**litigators** 57:18
**little** 7:11 16:21
    34:22 36:9,11
    38:8 39:25
    41:18 43:23
    45:22 54:25
    57:7 60:14
    63:20
**local** 31:8 32:2
    32:13 33:22
    36:11
**locally** 18:18
**locate** 29:3
**locations** 11:10
    18:4,16
**logistics** 20:15
**long** 6:8 37:16
    58:16
**longer** 27:11
**look** 4:20 8:19
    10:1 12:17
    18:7 23:22
    37:22 63:16
**looked** 6:17 51:2
    62:13,17
**looking** 9:1,4
    10:9 28:17
    30:5,8 37:1
    43:6 49:22
    51:12 56:6
**looks** 26:19 62:8
**loose** 43:4
**lot** 3:9,16 5:16
    6:11,12 11:23
    19:16 25:5
    30:6 31:19,22
    37:23 38:4
    41:12,24 44:9
    57:16 58:6
    59:2,5 61:6
**lots** 3:12 5:18
    61:5
**love** 14:22 32:17
    49:12,17 50:18
**Lyn** 2:9
**Lynda** 2:3 13:9

## M

**madness** 3:20
**maelstrom** 58:1
**making** 25:19
  60:3
**MALE** 52:10
  56:9
**manage** 10:10
  10:11 25:4
**management**
  24:1
**manager** 25:17
  26:3
**managers** 4:24
  22:22,24 25:8
**managing** 58:9
**Manchester**
  51:23 54:5
**March** 65:17
**Marconi** 1:12
  3:1 4:12 10:7
  11:8,14 14:4,8
  17:9,24 20:11
  22:20 23:19,25
  26:2,12,15,24
  27:13,17,21
  28:3 32:11
  33:6 34:15
  36:20 38:7,14
  39:13,18,21
  41:2 42:4,9,22
  45:3,6 52:5,25
  54:1,4 56:3,10
  60:13,25 63:8
  63:25
**Marcy** 11:25
**marketing** 46:6
**Martha** 1:25
**Martindale**
  62:17
**Mary** 1:17 2:2
  44:18 52:11
  53:14
**Maryland** 46:5
**massaging** 5:7
**match** 17:19
**matter** 18:6 19:2
  19:7,12,18
  20:1,2

**matters** 18:16
  19:5
**mean** 11:2,18,23
  14:10 15:19
  19:14 22:14
  27:1 38:21
  40:15,23,24
  41:12 44:12
  46:18 53:4
  57:12
**means** 43:5,21
  44:6
**mediation** 20:22
**meeting** 1:6 3:3
**meetings** 3:10
  19:25
**members** 3:21
  17:1
**mention** 51:1
**mentioned**
  23:16 29:13
**merged** 48:20
**Merrill** 1:18
  13:9 34:18,18
  35:9
**Merrimack** 1:24
  45:14
**method** 3:20,24
**middle** 40:19
**minded** 41:25
**minute** 46:16
**minutes** 46:18
**misremember...**
  29:14
**model** 7:8 11:2
  15:11 21:9
  41:25 44:25
  46:15,16 49:13
  49:18,21,23
  55:5,6
**models** 7:3 56:6
**money** 25:9,10
**month** 47:14
**months** 58:21
**morning** 46:25
  53:25
**morphed** 46:8
**motions** 62:1,2
**move** 56:12

**moves** 20:13
**multiple** 20:8

## N

**N** 65:1
**nearly** 26:21
**necessarily** 15:6
  31:4 34:12
  41:15 54:25
**necessary** 50:17
**need** 8:1 16:5
  17:13 18:4
  22:17 24:13
  25:7 27:1
  34:12,21,21
  38:25 39:12
  40:9 41:8,19
  42:3 50:13,21
  57:23 59:23,24
  62:25
**needed** 30:12
  47:16
**needs** 10:12 37:5
**nervous** 43:10
**never** 59:2
**new** 1:13 2:9,12
  2:13 22:2
  28:10 29:19
  38:11 42:18
  44:17 50:1
  58:17 65:15
**newer** 61:13
**NH** 1:20 2:4,7
  2:18
**NHLA** 2:2,21
  44:23 47:24
  48:22 49:4,8
  50:22 53:7
**NHSC** 2:22
**nice** 61:7
**Nicolosi** 1:15
  42:25 44:15
  45:10 46:2
  61:3,22
**night** 27:24
**nine** 17:3
**ninety** 56:13
**nonprofits** 31:6
**nonrandom**

  63:11
**north** 47:10,11
  47:13
**note** 6:20 13:15
**notice** 54:20,23
**noticed** 61:9
**notify** 8:9
**notion** 18:20
**number** 15:3
  18:4 22:4 27:7
  30:21 46:14
  55:13
**numbers** 9:1,4
  26:18 55:12,24
  56:8 63:6
**NY** 65:15

## O

**O** 65:1
**obligations**
  59:18 60:11
**oblivious** 63:1
**obtain** 48:9
**Obviously** 32:5
**occasions** 35:12
**offer** 14:19
  28:21
**offered** 47:13
**offers** 40:18
**offhand** 31:2
**office** 1:22 2:3
  29:23 35:18
**officer** 19:9,23
  32:8
**officers** 31:14
**offices** 22:13
**oftentimes** 38:23
**oh** 62:22
**okay** 6:9 46:23
  54:4 62:23
  63:24
**one-and-a-half**
  17:6
**one-lawyer** 57:6
**ones** 35:6
**ongoing** 24:4
  25:19
**onsite** 48:2
**open** 33:20

**operation** 26:5
**opportunities**
  3:4 7:11
**opportunity**
  12:17 40:8
  62:7
**opposed** 53:13
  54:9 55:14
**option** 50:24
**options** 15:9
**order** 8:17 11:6
  14:2,3 27:15
  27:20 35:25
  47:18 48:12,25
  50:9
**orders** 30:3
  35:15 43:4
**Oregon** 4:8
**organizations**
  6:18 31:5
**Outreach** 47:11
**outside** 21:17
  30:17 53:22
**oversee** 25:13
**oversite** 25:1
**overview** 12:13
**overwhelmed**
  6:9
**owe** 57:13 58:3

## P

**paid** 7:6,14
  21:25 24:21
  25:3,24 26:25
  46:20
**Paine** 2:18 21:22
**paired** 46:5,13
**pairing** 61:12
**Palermo** 4:19
**Pam** 4:20 6:11
  55:9
**Pam's** 36:24
  54:12
**pandemic** 12:10
**panel** 37:23
  61:18
**paper** 41:7 62:3
**paralegal** 14:11
**paraprofessio...**

51:9,18
**parenting** 18:23
  19:5,6 20:6
  51:13
**part** 24:3 30:21
  56:4 60:10
**parte** 14:19
**participate** 50:1
**participating**
  62:15 63:7
**participation**
  37:2
**particular** 19:10
  39:16 51:19,21
  60:16
**particularly**
  24:11
**parties** 19:11,24
**partner** 56:21
  57:20
**partnered** 34:24
**partnering** 31:8
  33:24 50:20
**partners** 58:9
**partners'** 56:16
**partnerships**
  33:16 37:14
**parts** 43:17
**Patricia** 2:16
**pay** 12:15 30:9
**paying** 17:19,20
  30:8
**PD** 30:18 34:23
**peers** 60:17
**pending** 18:23
  19:5,6 20:5
**people** 3:22 4:16
  4:21 6:11 8:4
  11:17,19,22
  12:21,22 15:4
  15:8 17:18,22
  18:11 19:22
  21:11,20 22:25
  23:10 24:13
  25:20 27:18,25
  28:5,12 30:2
  33:18 35:5
  38:19 43:10,17
  45:20 46:12

**51:5,25 60:1
61:5 62:10
63:6
people's** 15:24
**percent** 38:11
  56:13
**perform** 10:20
**performance**
  57:21
**period** 17:23
**permanent**
  58:25 60:6
**person** 29:4 32:4
  34:4 49:8,9
  62:5
**personal** 58:6,10
**petition** 18:25
  19:1,12 20:1
  34:5 36:19
  43:5,7,22 44:2
  44:4,6 47:5,7
  48:8 50:4,7
  54:17
**petitions** 10:19
  13:19 15:5
  19:15 43:2
  48:4
**ph** 4:19 33:17
**phenomenal**
  32:7
**Philpot** 38:9
**phone** 3:16
  40:23 49:7
  58:7
**phonetic** 11:21
**pick** 8:11 63:19
  63:22
**piece** 11:5 24:5
  28:25 33:13
  34:13 41:6
  53:5 60:22
**pieces** 16:19
  26:6
**pilot** 24:2 51:17
  51:22
**Pivoting** 28:4
  36:21
**place** 48:11 49:8
**places** 24:8

**Plaistow** 34:23
**planning** 7:25
  16:18 24:13
  28:25 29:6
  32:25
**play** 34:14
**plugging** 34:2
**plus** 25:25
**point** 5:13 6:7
  7:6 12:1 16:25
  29:25 51:15
**police** 2:8 32:13
  33:9 34:6 36:3
  36:6,7 37:11
  37:14 45:12
  47:4
**pool** 22:25
**Portsmouth**
  30:18,19
**position** 25:7
  30:22 48:7
**positioned** 48:11
**positions** 11:18
  17:5 25:13
  38:3
**positions'** 26:3
**possibilities**
  40:12
**possible** 41:1
**potential** 11:20
**potentially** 19:3
  43:16
**practice** 13:18
  14:15 37:20,25
  38:4 61:21
**practitioners**
  38:12 45:8
  55:13
**pragmatically**
  19:14
**preliminary**
  22:8
**prepare** 49:11
**PRESENT** 1:11
**presentation**
  43:11
**preside** 18:17
**presiding** 18:22
**pressing** 10:17

**pretty** 23:4
  27:19 39:3
**previews** 21:1
**previous** 30:23
**previously** 12:11
**primarily** 12:23
  27:5
**prior** 31:14
**private** 37:20,25
  38:16,24 39:3
  44:23 50:22
  61:21
**pro** 13:25 37:2
  38:18 41:15
  43:10 48:20
  54:15,19 55:2
  55:3,11,21
  56:7,15,23
  57:7,23
**pro-bono-** 41:24
**probably** 16:25
  20:18 53:15
  57:10
**problem** 48:14
  56:18 62:23
**problematic**
  40:21
**problems** 20:15
  21:4 37:18
**procedural**
  24:12
**proceedings**
  65:5
**process** 5:12,14
  5:24 6:8,14
  12:24 47:6
  49:10 50:3
**processes** 12:22
**produce** 56:8
  63:5
**produced** 60:2
**profession** 57:11
  58:3 59:18
  60:10
**professional**
  38:20 60:11
**professionals**
  21:12
**professor** 46:5

**program** 1:19
  2:15,21 4:24
  10:6 12:5,6,7
  23:4 24:2
  26:22 30:10
  36:22 38:19
  44:10 45:15
  46:4 48:14
  51:18 55:3
**programming**
  16:22
**programs** 26:20
**proof** 40:19
**prosecutors**
  31:23,24
**protective** 30:3
  35:25 47:18
  48:25 50:9
**protocol** 20:24
**provide** 4:15
  7:21 9:18
  12:19 21:24
  25:1,22 32:24
  36:23 48:2,18
  50:6 51:10,20
**provided** 28:18
  30:6 47:3
**providing** 9:6
  26:20 40:18
  44:13 48:16,24
**provision** 6:15
  7:3
**public** 2:11 3:13
  20:21
**pull** 4:1 5:2,19
  6:2
**pulled** 26:17
**pulling** 56:17
**purpose** 4:14
  48:1
**put** 4:18 5:4
  15:12 20:18
  25:10 26:24
  30:23 46:7
**putting** 40:2

**Q**

**qualified** 60:23
**quantifiable**

**question** 10:21
  13:6 14:25
  17:25 22:21
  23:1 25:4 42:5
  47:23
**questions** 5:23
**quick** 30:5 56:25
**quickly** 50:14
  52:16
**quite** 16:14
  34:17
**quote** 18:5

**R**

**R** 65:1
**rails** 43:12
**random** 63:10
  63:10
**rates** 12:9
**reaching** 21:17
**real** 30:5 43:5
  48:1 51:4
  57:18 59:9
  60:2,18
**really** 13:4
  14:12 17:3
  19:21 25:2
  34:9 38:4,15
  40:12 42:5
  43:7,25 44:1,6
  44:19 48:7
  50:3,15 52:1
  52:15 57:13
  59:12,16,24
  60:1 61:9,10
  62:1,10,23
  63:5
**reason** 32:1 48:5
  57:12 59:10
**reasonable** 7:10
**recall** 17:8 29:15
  29:25 39:22
**receive** 5:13
**receiving** 56:22
**receptive** 56:1
**recognition**
  41:19
**recollection**
  29:20

**recommend**
  60:3
**recommendati...**
  52:21
**recommendati...**
  5:20 28:13
**reconnecting**
  39:9
**record** 65:4
**regarded** 61:21
**region** 9:20
  18:11
**regional** 18:3
  22:13
**regionally** 18:18
**regions** 19:16
**regular** 26:4,13
**reinventing** 5:15
**related** 16:19
  47:18
**relationships**
  35:21 36:12
  39:6
**relatively** 57:8
**relay** 3:24
**rely** 28:9 35:20
**relying** 8:8
**remember** 31:1
**remote** 39:18
**replace** 17:22
**report** 5:5,8
  26:18 28:14
**reporting** 33:14
**represent** 44:13
  58:10
**representation**
  41:21 43:18
  48:9,18,24
  49:2 51:11,21
  57:23
**request** 33:8
**requirement**
  27:15
**requirements**
  13:21 14:2
  16:22
**reschedule**
  54:24
**residence** 29:4

**resolution** 61:25
**resolved** 61:24
**resources** 11:1
  17:16 28:18
  31:20 33:24
  36:17 40:14
  48:18,23 49:15
  51:4
**respond** 16:6
**responding** 34:8
**response** 10:12
**responsibilities**
  35:20
**restraining**
  35:15 43:3
**results** 63:3
**retirees** 21:12
**retiring** 37:24
**review** 50:13
**right** 4:19 7:1
  14:4 20:11
  22:1,20 25:6
  27:10,17 28:3
  28:24 36:20
  38:14 41:3
  51:6,12 56:4
  63:8
**risk** 19:3
**robust** 23:4
  26:22
**rock** 35:2
**role** 33:23 34:13
  43:13 44:24
**room** 7:5 24:16
  24:16
**roughly** 11:10
**RSA** 12:4 32:22
**Ruel** 2:3
**run** 50:2
**running** 50:25
  57:17

**S**

**safety** 7:24
  16:17 24:13
  28:25 29:6
  32:24
**salary** 25:6
**Sarah** 2:19 4:18

  4:19 16:7
  58:14
**Sarah's** 4:21
**saw** 62:18
**saying** 42:3 44:3
  61:11
**scales** 41:18
**schedule** 54:19
  55:3
**scheduled** 50:10
  51:7 54:15
**scheduling**
  39:16
**scholars** 39:8
**Schollett** 2:9
**school** 39:7
  50:22
**SCORE** 45:15
**Scott** 2:5
**scriveners** 5:25
**se** 13:25 43:10
**seasoned** 24:22
  42:14 61:20
**second** 53:5
**secret** 60:14
**see** 11:21 14:22
  24:6 27:2,5
  30:13 37:18,23
  40:22 49:17
  50:18 60:12
  61:7,23 62:5,7
**seeing** 59:8
**seen** 19:21 61:4
**segue** 34:9
**send** 63:16
**sense** 18:7 33:12
  37:6 39:14
**separate** 18:17
  21:3 26:5
**service** 25:18,25
  26:21 28:24
  29:1 36:13,18
  44:22 46:21
  52:24 56:7
**services** 7:4 9:6
  12:19 16:3
  25:23 34:4,11
  35:22 36:23
  52:17 55:22

**session** 43:21
**sessions** 3:19
**set** 8:3 27:11
  57:1
**sets** 43:8
**setting** 34:14
**settings** 38:20
**seven** 9:9,15,17
  10:2 22:13
**Seventh** 65:14
**Sexton** 2:11
  11:25 14:7
  16:7 23:3,24
  26:17 27:14,18
  52:15
**Shaheen** 62:13
**share** 4:15 31:23
  31:24
**shift** 15:10,14
  16:9,21
**shocked** 38:8
**showed** 55:12
**shows** 29:4
**side** 13:11 14:20
  32:15,15 47:3
**significant**
  22:18 25:2
**silos** 6:21
**similar** 47:9
**simple** 63:4
**single** 19:23
**sit** 39:23 45:21
**sitting** 15:7
**situation** 10:11
  19:4 40:24
**situations** 8:21
**six** 9:10,16,19
**skill** 27:11
**skilled** 25:8
**slips** 8:11
**slowed** 47:21
**small** 56:14
**smaller** 54:9
**social** 21:18
**society** 59:14
**soft** 63:9
**solicited** 46:9
**solo** 38:12 55:12
**solos** 38:12

56:12
**somebody** 28:22
  43:6,15,22
  44:1 46:20
  47:5 50:5
  56:20 61:12,17
**somethings** 9:15
  9:16
**soon** 58:18
**sorry** 4:13 9:12
**sort** 4:13 5:9
  10:13 11:21
  12:14 14:10,14
  14:17 16:9
  21:19 22:18
  30:2 53:5 60:7
  60:10
**sorts** 37:4
**sounds** 21:4
**space** 10:25
  21:15 37:6
**sparks** 4:3
**speak** 21:23
  42:23 44:23
**SPEAKER** 17:8
  34:16 42:11
  52:10 56:9
**speaks** 17:13
**specific** 50:8
  52:17,22
**specifically** 15:3
  47:17 48:4
**speed** 3:11
**spend** 4:21
  43:25 45:18
**spending** 48:15
**spent** 4:21 30:18
  53:10
**spot** 26:25
**spots** 19:19
**stable** 52:19
**staff** 7:14 9:11
  14:17,18 17:5
  17:16,21 21:25
  22:8 24:21
  25:3,3,24 27:1
  38:25
**staffing** 11:11
  22:9 53:19

**stage** 43:9
**stakeholder**
  6:17
**stalking** 19:1
**standard** 32:6
**standing** 42:19
**star** 35:3
**start** 20:24 44:2
**started** 6:14
  18:20 38:9
  44:5 46:3
  63:21
**starting** 8:19
**starts** 20:23
**state** 17:2 26:8
  32:22 34:19
  38:2 39:12
  40:11 42:3
  46:10 52:22
  53:8,10 58:8
**statement** 37:22
**states** 4:9 28:8,9
  30:7,13
**statistic** 38:8
**statute** 15:7
  20:23 27:15
  33:5,7
**statutes** 4:7
**step** 50:4
**stepping** 61:8
**Steven** 1:23
**stir** 30:15
**stock** 3:6
**story** 56:25
**Strafford** 49:21
**straightforward**
  14:7,9
**Strasburger**
  2:13 18:13
**strictly** 10:22
**strikes** 43:24
  46:22
**strong** 48:7
**structural** 22:12
**structure** 5:4
  21:24 22:15
  24:1 44:7
**structuring** 62:4
**struggling** 12:7

24:18
**stuff** 24:12,13
  59:4 63:18
**submit** 4:4 41:3
  41:5
**submitted** 12:11
**subpoenaed**
  34:20
**subsequent**
  54:22
**substantial** 27:7
**substantive** 20:2
**successful** 48:14
**sufficient** 6:15
  41:10
**suggested** 55:9
  58:23
**suggesting** 44:10
**suggestion** 54:13
  54:14
**suggestions** 5:3
**Suite** 65:14
**summary** 62:2
**Superior** 1:15
  43:1 45:18
  61:4
**supervise** 21:25
**supervised**
  51:10,20
**supervisor**
  25:18 42:20
**Supervisory**
  2:22
**support** 22:16
  24:17,25 27:25
  32:25 35:7
  38:24
**supporter** 55:20
**supposed** 46:16
**Supreme** 1:13
**sure** 6:4 12:16
  25:20 35:4
  53:14,15
**survivors** 47:16
  48:3
**Susan** 1:14
**sword** 18:9
**system** 3:2 8:23
  13:8 22:15

25:10 30:17
  31:4 32:10
  60:5
**systemic** 17:10
**systems** 13:10
  35:16

————————
**T**
————————
**T** 65:1,1
**tail** 39:9
**tailor** 22:5
**tailored** 59:19
**take** 3:6 14:4
  22:3,4,5 25:8
  38:2 43:13
  53:1 55:16
  58:11,19 59:17
  62:24
**takeaway** 12:18
**taken** 3:11
**takes** 24:9,19
  27:11 42:13
  45:2
**talk** 6:3 44:18
  46:17,18,19
  47:6 50:13
**talked** 10:18
  43:22 49:19
**talking** 10:25
  11:11 15:24
  38:16 63:21
**tap** 24:8
**tapped** 23:17
  38:18,21
**task** 1:6 3:1,21
  5:6 57:1
**tasks** 10:16
**taught** 39:14
**telephone** 47:15
**telephonic** 40:10
  40:20
**tell** 33:16 57:3
  59:21
**temporary** 14:3
**ten** 62:21
**tend** 24:20 27:22
**terms** 8:4 9:5
  11:5 16:21
  21:25 30:14

33:13 34:7
  54:14
**thank** 63:23,25
**thanks** 38:9
**they'd** 29:8
  46:13
**thing** 14:16
  20:17 30:11
  40:6,15 55:7
  61:12
**things** 4:3,5 9:23
  11:1 12:20
  13:1 31:5,17
  40:19 53:6
  57:21 59:1
  62:1,13
**think** 5:8,16
  11:18,25 12:17
  13:14,22 15:20
  17:12 19:2,14
  20:3,17,23
  21:3,8,21
  22:14,19 23:2
  23:3,8,12,14
  23:20 24:3
  26:23 28:12,25
  29:5,10 33:11
  34:22 37:13,16
  38:10 41:12,16
  41:23 42:17
  44:8,16,21,25
  45:17 46:6
  48:13,13 50:19
  52:20 53:12
  55:25 57:14,16
  59:15 60:3,12
  60:21 63:3,21
**thinking** 4:18
  16:8 21:9 53:1
**thirty** 25:25
  46:20
**thirty-four** 11:9
  11:9
**thought** 5:17
  28:19 48:6
**thoughts** 5:23
  63:13
**three** 46:7
**three-lawyer**

57:6
**throw** 32:2
**Thursday** 63:19
  63:23
**time** 5:22 6:4,7
  6:18 7:6 10:20
  11:5 16:15
  17:5,18,19,22
  17:23 24:9,14
  25:22 27:24
  28:16 29:6,15
  29:18 30:19,22
  34:25 36:10
  37:16 41:5,6
  45:16,20,22
  48:16 51:1
  53:18 54:17,21
  54:22 55:11
  57:16 63:9
**times** 8:8 33:17
  49:20 55:2
**timing** 41:4
**tip** 41:18
**today** 27:1 63:22
**tomorrow** 51:8
**top** 42:23 63:5
**topic** 3:11 63:11
**totally** 30:16
**touch** 5:14
**touching** 3:18
**towns** 31:23,25
**track** 53:9
**train** 7:18 22:21
**trained** 11:22
  15:3 22:24
  25:8
**training** 12:14
  21:14 25:20
  27:14,19 28:20
  32:6 51:19
  59:11
**Transcriber**
  65:11
**transcript** 65:4
**travel** 11:4
**traveling** 18:12
**tremendous**
  21:24
**tried** 3:24 44:19

**trigger** 4:15
**true** 65:4
**truly** 14:1
**truthful** 44:4
**try** 5:4 55:3
  58:24
**trying** 5:21 8:20
  29:2,5 30:9
  52:1 53:17
  60:16
**TTA-Certified**
  65:11
**Tuesday** 46:25
**turn** 53:16
**turnover** 12:8
  15:23
**turns** 3:12
**twelve** 12:2 13:3
  26:20 62:19
**twenty-four**
  27:24
**twenty-six** 17:1
  25:24
**twists** 3:12
**two** 3:10 4:9
  17:7 18:10
  22:5 25:13
  30:25 33:18
  36:2 42:12
  45:19 46:24
**two-step** 50:3
**type** 50:3 52:24
**types** 15:13 16:3
  31:20 51:11,21
**typically** 32:22
  35:16 52:19

_____
      U
**Um-hum** 25:15
  39:20 40:2
  44:15 46:1
**unauthorized**
  13:18
**unbundled**
  48:16
**underreprese...**
  57:15
**understand** 7:7
  10:8 13:20

14:1 35:5
**understanding**
  7:5
**understands**
  33:22 34:1
**UNH** 50:21
**unit** 36:5
**unwieldy** 5:9
**upload** 63:16
**upwards** 9:10
  9:19
**use** 24:7
**utilize** 16:3

_____
      V
**valuable** 52:20
**value** 44:9
**various** 6:17,21
**VAWA** 31:1
**ventured** 4:9
**venue** 17:15
**versus** 9:7 10:2
  17:19 18:16
**Vicinanzo** 2:15
  56:19 60:24
  61:2,16 62:9
  63:24
**victim** 1:18 6:22
  31:12 32:18
  33:19,25 34:24
  35:24 36:3
  43:16,16 48:6
**Victim/Witness**
  2:4
**victims** 33:13
  35:13 36:15
  48:3
**violence** 1:6 2:6
  4:7,23,24 13:7
  18:2,10,15,25
  19:12,15 20:1
  36:4 52:18
  60:16,20
**VIRTUAL** 1:6
**VOCA** 47:25
  48:1
**voices** 42:2
**volume** 54:8
**volunteer** 7:9

10:14 25:2,16
  25:18 31:5
  38:5 45:16
**volunteered** 5:1
**volunteerism**
  42:17
**volunteers** 7:16
  7:17 10:10,11
  22:1,2,17 23:5
  23:6,18,25
  24:7,20 25:1,9
  25:14 26:1,20
  27:23 28:10
  47:12

_____
      W
**waiting** 30:2
**walk** 30:3
**want** 3:6 6:2
  35:4 36:2
  41:13 44:22
  45:8 51:1
  52:12 55:8
  59:12,13
**wanted** 51:25
**wants** 7:12
**wasn't** 47:17
**wave** 58:17
**way** 11:24 14:22
  33:1 34:9 40:1
  46:2,2 52:3
  55:23
**ways** 8:10 23:23
  37:1
**we'll** 58:18
**we're** 3:7,8 5:21
  6:6 8:6,8,20
  9:6 20:18 30:9
  50:25 51:12
  55:21 57:15
  58:2,20 63:1,9
**we've** 3:9 4:7
  11:16 13:22
  29:3 51:2
**wearing** 21:23
**Webex** 1:8
  40:11,25 41:9
  43:21,24 46:24
  47:2

**Webster** 39:7
**Wednesday**
  46:25
**week** 3:10,13
  53:20 54:11
  59:25
**weigh** 7:12
**weight** 56:17
**well-** 61:20
**went** 17:6
**weren't** 15:5
**wheel** 5:16
**white** 53:17
**willing** 21:13
  46:23 55:17
**wise** 10:5
**wish** 37:10,15
**witness** 1:19
  6:22
**witnesses** 34:20
**wonder** 10:16
  21:15,20
**wonderful** 3:13
  5:24 56:24
**wondering** 16:8
**work** 5:25 6:12
  7:2,18 13:10
  15:23 16:2,14
  23:6,11 24:15
  24:21 25:11
  26:22 27:6,20
  27:25 32:9
  37:25 38:5,6
  39:1,2,5,5
  41:14 55:2
  56:16 57:5
**workable** 55:6
**worked** 32:14
  46:11 58:12,14
**working** 16:16
  26:10 31:13
  34:10 38:2
  41:16 51:6
**works** 42:12
  59:10
**wouldn't** 55:17
**write** 5:4,8
**wrong** 32:23

**X**

**X** 55:13

**Y**

**Yazinski** 1:16
**yeah** 11:25 14:8
  16:7 23:24
  32:11 42:24
  45:10 54:2
  61:16 62:9,9
  62:24
**year** 17:2 60:7
**years** 5:17 6:12
  15:1 29:15
  30:18,21 62:12
**York** 65:15
**young** 59:12
  61:23 62:5
**younger** 59:2

**Z**

**Zinkin** 2:22 4:11
  4:17

**0**

**1**

**1** 50:4
**10001** 65:15
**1343** 51:7
**172-B** 43:2
**173** 32:22
**173-B** 12:21
  51:15
**173-C** 12:4
  33:10

**2**

**2021** 26:19
**2022** 1:7 65:17
**25** 1:7

**3**

**352** 65:14

**4**

**4** 65:17

**5**

**5** 3:3 6:10

**6**

**60,000** 26:21
**603** 48:21 49:6
**604** 65:14
**630** 22:2
**633** 19:1
**633:3-a** 12:21

**7**

**7** 20:19

**8**

**800** 46:14

**9**