NEW HAMPSHIRE SUPREME COURT - CONCORD

NEW HAMPSHIRE TASK FORCE ON DOMESTIC VIOLENCE
PUBLIC HEARING

MARCH 8, 2022

PUBLIC BRIEFING

APPEARANCES:

Anna Barbara Hantz-Marconi, Chair
Gordon J. MacDonald
Kathy Beebe
Martha Ann Hornick
David Hobbs
Lyn Schollett
Jon Strasburger
Patricia LaFrance
Eric Jasina
Jean Kilham
Anne Zinkin
Sarah Freeman
Elizabeth Payne
Mary Krueger

TRANSCRIPTION COMPANY: eScribers, LLC
7227 N. 16th Street, Suite 207
Phoenix, AZ 85020
(800) 257-0885
www.escribers.net

Proceedings recorded by electronic sound recording; transcript produced by court-approved transcription service.

MS. HANTZ-MARCONI: Good morning, everyone. Over the last two months, I have been privileged to chair this Task Force. The Task Force presented its report to the Supreme Court on March 1st, and today we make that report public. The one-week lag was to give the court time to absorb our report. It's a beautiful 40-some pages plus an addendum. We'd like to give you an overview of the report today. The report and the slides I'm using will be uploaded to the website later today.

This is a report of this Task Force to the court, not a report of the court. We were brought here because last November, a man shot and seriously injured his female partner and then died by suicide. Although the woman had been granted a temporary order of protection, she did not receive a final order of protection after a hearing, at which she had neither an attorney nor a domestic violence advocate to help her. We still don't know if the man ever knew the temporary order had been lifted.

In response to that tragedy and its portrayal in the media, Chf. Justice Gordon MacDonald created an internal committee to review the woman's particular case. That is not this. That committee determined that all procedures and the law were followed, and a reasonable decision was issued by a dedicated and thoughtful judge on the information provided. The case also raised issues such as, why was there no advocate? Why was her petition incomplete and confusing? Why

was there no legal counsel at any stage of the proceedings?

The members of the Task Force include Crisis Center advocates, prosecutors, defense attorneys, judges, court administrators, and others. Many of the Task Force members have worked in the domestic violence field for decades. All members brought unique perspectives, experiences, and skills. Many are with me here today.

And let me just identify: Erin Jasina, who's the Domestic Violence program manager at New Hampshire Legal Assistance.

Chf. Hobbs in Hampton, the chief of police in Hampton.

Jon Strasburger, an attorney, and also who handles defense as well as plaintiff's work in this field.

Kathy Beebe, the executive director of HAVEN Crisis Center in the Seacoast.

Lyn Schollett, who is the executive director of the Coalition Against Domestic and Sexual Violence.

Then we have Dr. Scott Hampton. He is director of Ending the Violence and works with abusers and in the batterer's intervention field.

Next to me is Attorney Patricia LaFrance; decades of experience in many different roles in this field.

To my left, Marcie Hornick, County Attorney up in Grafton County. Again, lots of experience in this field.

We have Jean Kilham, who is the judicial branch's domestic violence program manager.

Anne Zinkin, who is our supervisory and senior law clerk at the New Hampshire Supreme Court.

Next to her, Sarah Freeman, who used to be the domestic violence program manager for years and is now a circuit court administrator for the circuit court administrator for the branch.

Next to her, Elizabeth Payne, senior staff attorney at CASA New Hampshire. And again, plenty of experience in this field.

And at the end, Mary Kreuger, staff attorney with New Hampshire Legal Assistance. Last but not least.

The Task Force was aided by a five-member working group consisting of professionals from the judicial branch and external stakeholders. That would be Sarah, Jean, Anne, and also Erin. My sincere appreciation to them all. We would not be here without their able assistance. The Supreme Court gave this Task Force seven charges, six substantive, one catch all, whatever else we might come up with.

Over a two-month period -- and let me get back on my slides. So here's how we took shape. Here's our list, which you will have available to you. And here are our seven charges, and we'll go through them one by one so you don't have to read that fine print. Over a two-month period, we met

remotely to discuss each charge. We held a public hearing in person at the Supreme Court building. The public was also invited to forward comments electronically, by mail, or drop off. We had a toll-free number the public could call to speak directly with a Task Force representative.

The Task Force purpose was to identify potential issues with regard to handling domestic violence cases in the judicial systems, not necessarily to resolve those issues. The process of identifying issues and offering potential recommendations was collaborative, yet at the same time, touched upon sensitive issues. It also highlighted some common misunderstandings about the different roles of those responding to domestic violence cases.

I applaud the Task Force members for keeping an open mind and hearing concerns that, due to their personal experience or knowledge, they did not share. The hope is that this report and its recommendations are a springboard to action by those working with domestic violence cases in the court system.

What follows, is an overview of this Task Force report. In the report, which you will have, you will see that for each charge, we set the stage, giving background to provide context to the discussion. We then offer preliminary recommendations for follow up. We summarized our discussions. And we made those recommendations for follow up by the branch

or other entities, agencies, departments who had oversight of that particular area.

This today is a high-level review. For more, read the report, and make sure you've got a cup of coffee at your side. It's a lot in there.

Charge 1 was a review of current court practices and procedure. For background, the circuit court where domestic violence and stalking cases are predominantly filed, is the State's busiest trial court. They held 138,000 hearings in 2020.

There were 5,294 domestic violence and civil stalking cases brought in 2020. If there was one hearing per case, that's 5,000 out of 138,000 hearings. If it was a hearing and a half -- some cases have two hearings, preliminary and final -- that would be about 8,000 hearings out of the 138,000 hearings related to this topic. There were, on average, 35 judges sitting in the circuit court in 2020. That is 16 hearings a day, every day, five days a week, 50 weeks a year, not counting the nonhearing cases on their docket.

In 2021, there were 1,000s -- excuse me, 174,000 hearings held, despite the pandemic. So that's remote hearings and in person hearings. That would be 20 hearings a day per judge in the circuit court.

Since the 1990s, the Branch's processing of domestic



violence and stalking cases has been guided by domestic violence protocols, which are currently in the process of being revised yet again. The protocols are, the Task Force determined, comprehensive and effective, but may not be consistently followed. Some protocols risk an appearance of bias, such as a protocol directing -- oh, let me get to these -- directing trial courts to interview a plaintiff if a restraining order is going to be denied, to get more information. That can cause sort of an appearance of the court meddling in the case so to speak.

Others, other protocols pre-suppose adequate space at all courthouses. Protocols require a private space for survivors to fill out petitions. And not all of our courthouses have any such space. I'm thinking Claremont. I'm thinking some of the older courthouses. That's a challenge.

Current court practices also included and emailed pilot project for petitions to be filed electronically. Right now, domestic violence cases are not part of the e-filing environment because of the sensitive information contained therein. However, during COVID, the circuit court rolled out a pilot program through the crisis centers that allowed petitions to be filed by email. And hopefully, that can continue making access a little bit easier.

There are also -- there is also online information and videos directing folks how to file domestic violence

petitions. However, I think the consensus is our current efforts aren't sufficient to simplify the process. The Task Force's primary recommendation with regard to court practice is to have established a standing committee on domestic violence, much as the Branch has one on language access, so that the Branch can maintain focus on domestic violence case processing and best practices as things evolve over time.

Other recommendations raised by the Task Force include continued work on the protocols, continuing to provide information about crisis centers and safety planning, securing additional funding for judicial and staff training, exploring possible locations for litigants who lack home computers to participate electronically, and there's plenty more in the report. Those are a few.

Our second charge was to review the current status of the law. There are five main areas, currently, for relief from domestic violence. The report describes each of these avenues in detail. The Task Force discussions about the law revealed differences of opinion.

For example, there was no consensus as to whether the statutory definition of abuse should be amended, nor was there a consensus as to whether new avenues of relief should be created, such as to combat litigation abuse or financial exploitations in domestic situations. Notably, the Judicial Branch does not make policy. It interprets statutes and

applies them. Thus, the primary recommendation of the task force was that there should be a group of non-Judicial Branch stakeholders with experience in domestic violence to review existing New Hampshire statutes regarding domestic violence, and if desired, make comprehensive recommendations to the legislature regarding possible statutory changes.

I'm trailing myself with my slide.

Further recommendations about the law that involve the Branch include continuing to work on a project already begun in the office of mediation regarding domestic violence litigants involved in companioned family law cases, reducing case loads to allow judges and staff more time for professional development and hearing those cases that come before them, establishing a working group to consider the interrelatedness of criminal cases with related civil domestic violence cases occurring in different courts.

Our third charge was kind of the easy one, exploring the publication of nonprecedential final orders in domestic violence and stalking cases. Interestingly, of course, this court was not online for many decades because there was no online. In 2004, we began publishing opinions on our website. We also began publishing nonprecedential pre-judge orders on our website, except in confidential cases. Domestic cases aren't confidential, so we were publishing those orders on our website.

As of 2014, we began publishing nonprecedential final orders in all of these nonconfidential cases, which included domestic violence and stalking.

2018, somebody realized that such publication ran afoul of the Violence Against Women's Act. And although no one had sued us yet, we pulled back and stopped publishing domestic violence and stalking orders on our website. The prohibition in the Violence Against Women Act does not prohibit publicly disseminating the orders, but it does prohibit posting them on the internet. Thus, these orders were available on paper by going to the courthouse, but they were not -- and they were able to be posted on our intranet, but they were not able to be posted on our outward facing internet.

That then created a disconnect. So the court had access to nonprecedential orders, which could be relied on to match facts to existing law. The public, unless they came to the courthouse, didn't have easy access to those decisions. So the easy recommendation, which was unanimous, is to find a way to publish these things on our website without running afoul of the Act.

That can be done by redacting information that would identify the plaintiff and/or the circumstances of the case. So and that's not a terribly complex issue, but it does involve some review of how many facts can you put in a case

until someone can figure who's involved. So we're in the process of doing that, and it should be remedied quite shortly.

Our fourth charge was to review current forms. I think there was unanimous or pretty much general consensus that the forms are not as helpful or directive as they could be for people, mostly self-represented folks, filling them out. We now have separate forms for domestic violence cases and stalking orders of protection. They require different information. Domestic violence only applies if you have an intimate partner relationship. Stalking can apply when there is no such relationship.

Also, because of statute, all the forms are in English. There are no alternate language forms. It can deal with some pretty clunky translation applications, but we don't have forms readily available in other languages. The forms require certain technical information to comply with the federal uniform database into which they are entered if granted. The forms provide space for lengthy narratives and are not structured to guide plaintiffs to provide the information required to obtain a protective order. It is difficult for plaintiffs to know which form to file.

The major recommendation with regard to forms is that the Branch should examine how to make the forms more user-friendly, accessible, and directive, much like the e-



filing process has accomplished in other areas, to create a complete and clear petition. Judges report that a comprehensive petition relieves pressure on witnesses at hearings to recall all details and expedites the hearing proves. With a complete comprehensive petition, it leaves few issues for questioning.

Also, to expand access in other languages, both on paper and actually in the courthouse. Other recommendations on forms include creating some kind of flowchart to guide plaintiffs onto which kind of petition they should be finding. Our forms need to be more accessible on the website. Right now, it's a little clunky. You got to know which court you're in before you can find the form. The deadline for filing motions to extend needs to be more clearly indicated. And some notifications to defendants would be helpful in the analog or the companion criminal case.

Our fifth charge was to explore avenues to increase legal and advocate assistance for survivors. There remains a gap in the needs of modest income New Hampshire residents and the legal services available to them. Despite the efforts of New Hampshire Legal Assistance, 603 Legal Aid's DOVE project, and the Bar Association's modest means and fee programs, there is still a gap. Domestic violence and stalking plaintiffs suffer as a result of this gap.

On the advocate side of the ledger, the situation is

not much better. There are 12 community-based crisis centers in the State offering free and confidential services, including safety planning. The crisis centers are funded primarily by grants administered by the Coalition, which also provides support services to the centers. AmeriCorp's Victim Assistance Program augments these services with financial literacy efforts. Some, but not all, victim/witness -- some, but not all, police departments have victim/witness advocates. Two words come from this discussion. We need to expand services and deploy them better.

This slide represents the gap in service. In 2010, 12 years ago, there were 250,000 people eligible for free legal services. That's the whole circle. Of those, 140,000 had legal needs annually. That's the dark red and yellow. Of those with legal needs, New Hampshire Legal Assistance was able to offer services to 8,000. That's the yellow.

Coming up in 2021, plaintiffs seeking domestic violence protection orders, 87 percent, that's the yellow, are self-represented. 13 percent had counsel. On the second circle, those are civil stalking orders. 95 percent were self-represented. Five percent had counsel.

The information required to be conveyed to courts to secure a restraining order is exponentially improved with lawyer representation at the petition drafting stage and in court. Therefore, the answer is more lawyers to take cases on

a pro bono basis, and more funding for agencies such as New Hampshire Legal Assistance to hire more attorneys. Optimally, there would be lawyers, volunteer or paid, at courthouses, in crisis centers, or on-call. Remote access to lawyers at hearings could also expand the provision of legal services. Again, expand and deploy.

In the meantime, we look at other fill the gap resources. Obviously, crisis centers need more funding, too, so that they can increase staff levels and their volunteer base to have advocates available at courthouses or in real time when needed. Other enhancements include crisis center brochures, making them available at the courthouses. Local police departments being encouraged to add victim/witness advocates, although those advocates have limitations as opposed to crisis center advocates because of the source of their authorities.

We were also tasked to look into the state of current relationships among stakeholders. New Hampshire used to be at the forefront of addressing domestic violence in the courts and the community. New Hampshire used to have multiple means of bringing stakeholders together. From the Governor's Commission on Domestic and Sexual Violence, active from 1993 to 2013, when it became partially dormant and lacked a chair. The Commission had several robust multi-disciplinary committees. Some of those committees are still active in one

form or another. Others are not.

We also used to have domestic violence coordinating councils in various regions of the State. The coordinating councils were chaired by a district court judge and brought together court staff, law enforcement, prosecutors, DCYF educators, mental health providers. One coordinating council still meets on a State-wide basis but does not include Judicial Branch members.

Due to the court reorganization in 2013 -- excuse me, in 2011, the merger into the circuit court, which removed some of the local contact between district court judges and the community they served when the, I'll say, centralization occurred. Whether it was time pressures, resource pressures, people being diverted to other areas needing attention, this elaborate and formal sort of level of communication dissipated to the point where the Task Force was pretty unanimous that we should make efforts to reconstitute and reestablish those communication networks.

Currently, there is a Domestic Violence Program manager in the Branch. That's existed in one form or another for 20 years. And so our Domestic Violence Program manager position does solicit feedback, but that is only one avenue. Participation in the Bar Association's Committee on Cooperation with the Courts is another avenue for collaboration between the courts and the Bar and those working

within the courts. That committee could be expanded. Local Bar Association's have these conversations on an ad hoc basis. And the use of these forms of communication are not consistent. So the Task Force agreed we need more and better communication amongst stakeholders and the courts.

Hopefully, we can be at the forefront again. Our primary recommendation is that the governor reinvigorate and reestablish the Commission on Domestic Violence and appoint a chair and identify staffing support. Other recommendations include formalizing, now, informal collaborations. Some crisis centers collaborate well with their respective courts. Others have not that same level of communication. And so we'd like to make efforts to formalize those relationships.

Okay. Finally -- and I'm getting to finally -- we had a seventh charge, which was anything that the Task Force thought needed attention. And through the Task Force's initiative, we considered issues related to transparency and judicial accountability, firearm relinquishment, wiretapping and eavesdropping, and the batterer's intervention programs.

On transparency and accountability, we were most divided on this topic; how to increase the transparency and accountability of the Judicial Branch without sacrificing judicial independence required by New Hampshire's Constitution. Current measures of transparency and accountability include the Judicial Performance Evaluation

system, ongoing for nearly 30 years, governed by statute and court rule, that include self-evaluation surveys and interviews by judicial administrators of the judges. Each judge is reviewed on a three-year rotating basis. The results of those reviews as a group are posted to the courts website.

The Code of Judicial Conduct governs judicial ethics and is overseen by the Judicial Conduct Committee. Data reports are shared on the Judicial Branch website as to how many cases are handled in various courts. The Task Force agreed that more could be done to demystify the Judicial Branch and make the Branch more transparent and accountable to the public it serves.

Some of the ideas were to solicit more immediate feedback from Branch consumers, tasking the Judicial Performance Advisory Committee with reviewing and updating the current Judicial Performance Evaluation system, providing meaningful responses to complaints when able, ask the Judicial Branch's Diversity and Inclusion Steering Committee to look at implicit bias in domestic violence cases. And again, there's plenty more in the report.

We also reviewed the current firearm relinquishment process, and we came to the conclusion that this is a complicated topic to which we were unable to devote sufficient time. The slide summarizes our discussions on firearm relinquishment and points to issues related to search and

seizure that need to further vetted. Some discussions included whether there should be standardized training, regional task forces, or the Office of the Attorney General looking into and developing best practices.

We reviewed the wiretapping and eavesdropping statute. Victims of domestic violence have the burden of proof when they bring petitions for domestic violence or stalking. To support their claims, often a victim will be tempted to record the abuser without his or her knowledge. Currently, this would violate our wiretapping statute. Accordingly, some stakeholders may approach the legislature about creating an exception to the statute for domestic violence survivors.

And a fourth area on the initiative of the Task Force was to review the court-approved batterer's intervention programs. The standards are apparently out of date. There is no court-approved list. And there's no mechanism to certify or monitor such program. This was another topic that deserved more attention than the Task Force was able to give it and will involve more than just the Judicial Branch to address perceived gaps in these services.

There.

So we hope that this report serves as a roadmap for future endeavors of the Judicial Branch and other stakeholders. Some of this can be handled internally by the



Branch in short- and long-term. Others, it's going to take some collaboration of various participants in this Task Force and those outside of it.

Again, I thank these Task Force members and the public for their participation. This report was provided to the court last week.

I would like to bring in our Chief Justice to respond to our report, briefly.

CHF. JUSTICE MACDONALD: Thank you. Good morning, everyone, Justice Hantz-Marconi, members of the Task Force.

The Supreme Court has prepared a statement that will be issued today, and I wanted to read it:

The Task Force on domestic violence cases in the New Hampshire Judicial Branch was created by our order dated December 9th, 2021. We directed it to conduct a systemic review of domestic violence cases in the New Hampshire court system, and to report its conclusions and recommendations in seven categories. This Task Force met its charge. Report sets forth extensive background information, a summary of the information, and testimony received by the Task Force in recommendations in each of the seven categories.

The court thanks the members of the Task Force and its chair, Justice Hantz-Marconi, for their exceptional efforts. It is obvious that the report is a result of a great deal of time, effort, and consideration. The court is

especially grateful for the collaboration across the wide spectrum of perspectives represented by this Task Force.

We've conducted an initial review of the report. Many of its recommendations are directed at the Judicial Branch. Some of those recommendations can be undertaken in the short-term. Others may require more deliberation and planning. And others will require the cooperation of other government officials and stakeholders. We are committed to considering the recommendations and to being transparent about the Judicial Branch's progress.

To that end, the court has immediately adopted recommendation 1.1 and has created a Domestic Violence Committee that's a standing committee within the Judicial Branch. It will be chaired by Diane Martin, who is the director of the Administrative Office of the Courts, and will include judges, administrators, and court staff. The Committee will report directly to the Supreme Court. Its initial charge is to catalog of the Task Force recommendations. It will monitor the implementation of those recommendations that have been adopted or approved by the Judicial Branch.

New Hampshire has an exceptionally strong trial bench. Our colleagues in both of our trail courts are deeply committed to applying the facts to the law fairly and impartially and to treating all those who come before them

with dignity and respect. They are supported by court personnel who are hard-working and highly dedicated in their service to the people of New Hampshire. The circumstances they face can be challenging. Emotions run high. And the volume of cases is significant. In fact, as you heard, across all case types, the circuit court held 174,000 hearings last year.

As a judiciary, we are ready to meet the challenges ahead. And if there are opportunities to improve, we will pursue them, thereby making New Hampshire's already strong judiciary even stronger.

Thank you very much.

MS. HANTZ-MARCONI: Questions?

UNIDENTIFIED SPEAKER: Yeah, I'm a (indiscernible).

MS. HANTZ-MARCONI: Yes?

UNIDENTIFIED SPEAKER: How can the Judicial Branch be transparent and held accountable when the Judicial Branch investigates itself?

MS. HANTZ-MARCONI: In terms of the internal report?

UNIDENTIFIED SPEAKER: The internal -- well, just in general; the Judicial Review process for judges.

MS. HANTZ-MARCONI: The -

UNIDENTIFIED SPEAKER: It's the whole Judicial Branch is what I'm trying to --

MS. HANTZ-MARCONI: There are two. The --

UNIDENTIFIED SPEAKER: -- (Indiscernible) held accountable.

MS. HANTZ-MARCONI: -- Judicial Performance Review Committee --

UNIDENTIFIED SPEAKER: Um-hum.

MS. HANTZ-MARCONI: -- is not simply a Judicial Branch Committee. It includes outside members, members of the legislature, appointees.

You might --

UNIDENTIFIED SPEAKER: Yeah. But according to Court Rules, current Rule 56 --

THE COURT: Um-hum.

UNIDENTIFIED SPEAKER 2: -- the Judiciary Evaluation Committee has legislator leaders and really consults with somebody in the Attorney General's Office. There's -- there's a -- it's a wide spectrum of individuals --

UNIDENTIFIED SPEAKER: Okay.

UNIDENTIFIED SPEAKER 2: -- not just judges.

THE COURT: Not just judges.

UNIDENTIFIED SPEAKER: Right.

UNIDENTIFIED SPEAKER 2: And it's been in existence, the Judicial Performance Evaluation program. It's been in existence, I think, since 1987.

MS. HANTZ-MARCONI: And those are the reports that -- well, they prepare, they review --

UNIDENTIFIED SPEAKER: (Indiscernible).

MS. HANTZ-MARCONI: -- the surveys, if you will.

UNIDENTIFIED SPEAKER: That's --

THE COURT: They're then sent out to the public. They bring them back in, and they review them. And they publish their report annually. It's a comprehensive report.

UNIDENTIFIED SPEAKER: But why are the judges only reviewed once every three years?

MS. HANTZ-MARCONI: That was their determination at the time because there's a process. I think we also had the survey guy from UNH on it, too.

UNIDENTIFIED SPEAKER 2: Yeah. And it's also a statute. RSA 490:32. It says that evaluations have to occur at least every three years.

UNIDENTIFIED SPEAKER: Okay.

THE COURT: So they --

UNIDENTIFIED SPEAKER 2: And they have to include certain components, including the survey. And so the Committee has partnered with UNH.

MS. HANTZ-MARCONI: Um-hum.

UNIDENTIFIED SPEAKER 2: And initially, partnered with a national organization -- who's name I'm forgetting right now --

MS. HANTZ-MARCONI: Right.

UNIDENTIFIED SPEAKER 2: -- to craft the survey

questions.

MS. HANTZ-MARCONI: Right. So that is a committee that puts together the survey as dictated. And then they also review from time to time whether those questions should be updated or revisited. There also is ongoing discussion among that committee whether there should be sort of interim feedback options like we talked about, more immediate. And that's why the recommendation was to ask the Committee to look into more immediate customer-service-type feedback in the courts.

UNIDENTIFIED SPEAKER: Is the -- the surveys -- I mean, the (indiscernible) for surveys barely obscure --

UNIDENTIFIED SPEAKER 2: Can you move up to the microphone?

UNIDENTIFIED SPEAKER: Oh, shoot.

MS. HANTZ-MARCONI: Oh.

UNIDENTIFIED SPEAKER: I'm sorry.

UNIDENTIFIED SPEAKER 2: We want (indiscernible) can hear you.

UNIDENTIFIED SPEAKER: Sorry.

MS. HANTZ-MARCONI: Yeah.

UNIDENTIFIED SPEAKER: Excuse me.

MS. HANTZ-MARCONI: That's okay.

UNIDENTIFIED SPEAKER: So you advertise for these surveys. And you know, it's not through the local paper.

It's -- is it the State Bar?

MS. HANTZ-MARCONI: The surveys, the annual surveys --

UNIDENTIFIED SPEAKER: Right.

MS. HANTZ-MARCONI: -- are rolled out -- I think they're notified in the State Bar newspaper. They're sent to people who --

UNIDENTIFIED SPEAKER: Who --

MS. HANTZ-MARCONI: -- have appeared before that particular judge.

UNIDENTIFIED SPEAKER: Okay. It's --

MS. HANTZ-MARCONI: So people who've appeared in court, they get sent --

UNIDENTIFIED SPEAKER: It -- it does -- it does not appear to be --

MS. HANTZ-MARCONI: -- and then it's also noted on our website, Judicial Branch website --

UNIDENTIFIED SPEAKER: Okay.

MS. HANTZ-MARCONI: -- who is up for review. And there is a survey available on the Judicial Branch 00

UNIDENTIFIED SPEAKER: And the -- and the judges who are up for review are notified of this as well?

MS. HANTZ-MARCONI: Right. I think -- well, sure. They would know, yes.

UNIDENTIFIED SPEAKER: All right. It -- it - it

seems like a fairly close internal role that you -- you've got this review going on. It's not really open. And it's once every three years. And the results, I don't think -- do you publish the results with the names of the judges who've been reviewed and the survey results?

MS. HANTZ-MARCONI: The comprehensive data is published.

UNIDENTIFIED SPEAKER: No, the --

MS. HANTZ-MARCONI: But those comments -- I mean, your comments --

UNIDENTIFIED SPEAKER: Yeah.

MS. HANTZ-MARCONI: -- would be something directed to the Committee that --

UNIDENTIFIED SPEAKER: Okay.

MS. HANTZ-MARCONI: -- does this.

UNIDENTIFIED SPEAKER 2: Or to the legislature.

MS. HANTZ-MARCONI: Or to the legislature.

UNIDENTIFIED SPEAKER 2: Under 490:32, all the information is deemed confidential.

MS. HANTZ-MARCONI: Yes. And so --

UNIDENTIFIED SPEAKER: Okay.

MS. HANTZ-MARCONI: -- we've got --

UNIDENTIFIED SPEAKER: Okay. So. Hm.

MS. HANTZ-MARCONI: The legislature's deemed it confidential because, again, there are privacy personnel

constitutional separation of powers, all that stuff that goes into that --

UNIDENTIFIED SPEAKER: I know. But judges are putting people in jail.

MS. HANTZ-MARCONI: -- policy.

UNIDENTIFIED SPEAKER: They're setting this --

UNIDENTIFIED SPEAKER 2: If the judge is evaluated negatively, fails to meet the --

UNIDENTIFIED SPEAKER: Right.

UNIDENTIFIED SPEAKER 2: -- performance standard two evaluations in a row --

MS. HANTZ-MARCONI: In a row.

UNIDENTIFIED SPEAKER 2: -- then the -- by statute, it would eliminate your right to privacy and confidentiality.

UNIDENTIFIED SPEAKER: Yeah.

UNIDENTIFIED SPEAKER 2: And their results are individually recorded in the annual report.

MS. HANTZ-MARCONI: Right.

UNIDENTIFIED SPEAKER: But -- but when people go before a judge, they don't get two strikes like that to keep it confidential. It's -- it's all out in the open. It's -- courts are public. They're -- I mean, they're public for me or -- or anybody else who goes before a judge, but they're not public -- you know, it's not a public transparent process for the judge. There's -- there's a great imbalance here.

MS. HANTZ-MARCONI: Those, I will say because of the -- and all I can say is because of the separation of powers, those are policy considerations that were discussed and determined by the legislature. So it's not something that the Branch has total control over.

Again, because of the way our system is, the independence of the judiciary, you can't have -- you can't have independent judicial decision-making if there's a score card every day on every decision. So you balance the independent decision-making, and you balance the need for accountability. And that's what happened in the legislature, and also what is evaluated by the Judicial Review Commission. We certainly have asked them to take a second look, but that's the limit of this Task Force's authority and recommendation.

UNIDENTIFIED SPEAKER: Okay. Thank you.

MS. HANTZ-MARCONI: Yeah.

UNIDENTIFIED SPEAKER: I was struck by the number of hearings conducted in a year that are just in this arena, domestic violence and stalking. I'm wondering if there's a -- if you can give me a sense of how that prepares proportionately to the other legal issues that take up time in the judiciary, in the court?

MS. HANTZ-MARCONI: Well, the 174 is this year -- or let me go back because I don't have the stats for 2021 in domestic violence. So 2020, 138,000, that's the universe of



circuit court case hearings.

UNIDENTIFIED SPEAKER: That's all of them?

MS. HANTZ-MARCONI: That's everything.

UNIDENTIFIED SPEAKER 2: So it's about five to six percent.

MS. HANTZ-MARCONI: Right.

UNIDENTIFIED SPEAKER: That -- that was my question.

MS. HANTZ-MARCONI: Yes.

UNIDENTIFIED SPEAKER: My next question, in -- in the work that the Task Force did on this, was there a glaring weakness in the current system that created an ah-ha moment for you all?

MS. HANTZ-MARCONI: I don't -- that's interesting. To me, it became -- well, my ah-ha moment was the communication piece. We had a lot more communication previously, when I went back through history, then we did now in terms of -- there was a bit of -- there's a disconnect or a blockage in terms of sharing information where things could be improved, but there wasn't a good response from the Branch or vis versa, or if the Branch hadn't heard of things that could be improved. And so there was a disconnect in the information flow.

Otherwise, it seemed, to me -- this is my coming into this. It just seemed to me, to be a series of this could be better, and this could be better, and the forms. Like, we

all think -- we're thinking that the forms are straightforward. And I recall back when the family law forms were updated. And to me, there was good, and then it made it more confusing. And so we think the forms are directive, but they're not. And certainly, our experience with online e-filing in other case-types, you end up with something almost like a TurboTax guided interview. If you want this, if you're seeking this, you need to provide this information. That doesn't exist in the domestic violence paper form. It can. Not online, but it can in a paper world. So that, to me, was a big ah-ha moment.

UNIDENTIFIED SPEAKER: I think for -- yeah.

MS. HANTZ-MARCONI: But I don't know -- yeah.

MS. LAFRANCE: I think for me, it always come down to if you break it down to brass tax, it's funding and personnel. There's not enough money. There's not enough people. There's not enough lawyers like me who take volunteer, cases who -- there's not enough advocates that -- it always comes down to that. I think this Task Force, the great work it did, that's what it came down to for me, is that we just need more funding, more people to step up and help out, and that's what it comes down to.

UNIDENTIFIED SPEAKER: So it sounds like the standing committee has been created already. But are there any timelines or deadlines associated with any of these



recommendations?

MS. HANTZ-MARCONI: We've asked. And I suspect my colleagues will allow us to reconvene in six months to take temperature and see what's going on. I know that the chief, from my discussions with him, is going to be expecting routine response from the standing committee, like what have you got on the front burner, what's going to take more time. Some of these are going to take some time. Some of these need funding and some more data collection that we don't currently have the capacity to do because of software and stuff I don't even want to get into.

But some are longer term. But some, as we've identified, are sort of easy things we can do, like posting things on the -- we can figure that out. And I think we can probably work on forms in the short-term. So yes. And we hope to get back together -- because I will miss my friends -- and get an update in six months.

UNIDENTIFIED SPEAKER: I was struck by the eavesdropping and recording thing that came under the catch all, 7 or whatever.

MS. HANTZ-MARCONI: Yeah.

UNIDENTIFIED SPEAKER: That's fascinating. I can totally see a victim being tempted to record. And -- and up to now, is that rejected by the court? And how actionable is -- yes. Sorry.

MS. HORNICK: It is definitely actionable. It's by statute. Certainly, there's some discretion built in there as well. But it was something that caught all of our attention because it comes up in many of these hearings.

UNIDENTIFIED SPEAKER: So what's the current state --

MS. HANTZ-MARCONI: And if I can --

UNIDENTIFIED SPEAKER: -- if I -- if I -- if I'm someone being abused, and I record the abuse, and I want to show the court that, is that not allowed right now?

UNIDENTIFIED SPEAKER 2: That, and it's a crime.

UNIDENTIFIED SPEAKER: So now I've committed a crime?

UNIDENTIFIED SPEAKER 2: Right. I'm not saying --

MS. HANTZ-MARCONI: And it may be --

UNIDENTIFIED SPEAKER: Because I didn't get my abuser's consent to hit record?

UNIDENTIFIED SPEAKER 2: I'm not saying necessarily you'll be prosecuted.

MS. HANTZ-MARCONI: Right. Not saying you'll necessarily be prosecuted. But if I can borrow a page from my defense attorney's book, that's something a defense attorney's going to --

UNIDENTIFIED SPEAKER: Be all over.

MS. HANTZ-MARCONI: -- raise because it's leverage.

And it's perfectly legal (indiscernible).

UNIDENTIFIED SPEAKER 2: And the --

UNIDENTIFIED SPEAKER: And so what's the consensus of this task force? Is this right for legislative action?

MS. HANTZ-MARCONI: I think, yes.

MS. HORNICK: Legislature -- legislative, excuse me, overview. I mean, there are many things just as had been said, that need to be looked at -- the legislature needs to look at because they are the ones that control, obviously, this --

MS. HANTZ-MARCONI: Policy.

MS. HORNICK: -- language.

MS. HANTZ-MARCONI: Yeah, and there could be unintended --

UNIDENTIFIED SPEAKER 2: New Hampshire's 1 in 11 states --

MS. HANTZ-MARCONI: Right.

UNIDENTIFIED SPEAKER 2: New Hampshire is 1 of 11 states where both parties to the communication to have consent. So that might be something the legislature might want to look at.

MS. HANTZ-MARCONI: Right. But there can be unintended consequences -- not speaking for the legislature -- of this carveout exception, how that gets utilized in maybe other situations. So they have to do -- that's what they do,

right? They balance policy.

UNIDENTIFIED SPEAKER: I think as a member of the public, you hear all of this. You got to take a look at this. You got to do another committee.

MS. HANTZ-MARCONI: Right.

UNIDENTIFIED SPEAKER: All of that sounds very bureaucratic. And I'm just wondering --

MS. HANTZ-MARCONI: Right.

UNIDENTIFIED SPEAKER: -- what is the most urgent action item coming out of the body of work that you did over the past two months?

MS. HANTZ-MARCONI: What do we think the most urgent thing is? They are all pieces to a puzzle, I think is hot it came to me. The firearm thing, that can be urgent in a certain situation, what the limitations are on law enforcement in retrieving firearms and search warrants. And again, bureaucracy, red tape, clarifying that, very important.

Clarifying the accountability side because there is -- I mean, to me, that's important because there is, I will say, some level of lack of understanding the limits of what judges can do and what they can't do. Whether judges can reinterpret the law without a case before them that will allow them to do so. So sort of messaging what it is the judge can do in a certain situation, what law enforcement can do in a certain situation. I think that, to me, is critical.

MS. LAFRANCE: I think, also, the more assistance, particularly for pro se plaintiffs who go before the court, you want to make sure that they're presenting the best case they have to that judge as to why they need these restraining orders. So when we're not doing that, when that plaintiff goes before, and they forget to include something, that, to me, is a travesty of justice because they did not put their best case forward. They did not give everything they had.

So it's frustrating as an attorney. I get a client after the fact, and I say, why didn't you tell them this? I don't know. I didn't think it was -- ugh. You know? It's very frustrating. So I think direct assistance to those pro se litigants is important.

MS. HANTZ-MARCONI: Yeah. That's a big one because judges agree. If they get -- in fact, one of the judges on the task force said if she gets a fully filled out comprehensive petition, all she has to do is say to the plaintiff is everything in here true? Yes. That presentation is over.

Instead of having an extremely stressed, unrepresented person trying to remember and fit the facts into the form of what the judge needs to issue an order. That's an impossible task. If you had legal counsel available to fill out that form with everything that the law requires, it makes it a lot simpler. You'll still have cross-examination and all

that, but at least you've got the base facts there.

We also discussed some burden-shifting ideas. Again, that would they need legislative tweaking. But there's a lot we can do right away if we can get those petitions firmed up.

DR. HAMPTON: I just wanted to add, in terms of what seems to be more pressing, sort of taking a step back, I think the most pressing thing was reestablishing these cross-discipline conversations. Because I think what -- with the work that I do with offenders, I notice that abuse thrives whenever they're disconnected between the different people doing the work. We all have different professional obligations and different perspectives. And when there's -- and there are little gaps of abuse that slivers right through those.

And so one of the questions I think is important for all of us when we're trying to address abuse is, whatever we're doing, whatever conversation, whatever convention, whatever law we're passing, whatever we're doing, does that increase or decrease an abuser's inclination to not continue to abuse. And if the answer is yes, it increases it, then we have to step back and say how can we tighten the system?

And we notice that there were a lot of conversation that had fallen by the wayside over the last several years. And I the energy that I saw in this Task Force and the



interest in reinvigorating our work is what makes me most hopeful that we can move it forward.

MS. HORNICK: And also, I think it boils down to protecting people, safety of others. I mean, that's what, really, I think, generated a lot of passion from the (indiscernible).

UNIDENTIFIED SPEAKER: Could I just ask one more question?

MS. HANTZ-MARCONI: Yeah.

UNIDENTIFIED SPEAKER: I could go all day. But I -- I wanted to ask the question about the tool of a restraining order. Are there -- it just seems like that tool is full of holes. And I -- I just wonder -- I don't -- I don't know what I wonder.

MS. HANTZ-MARCONI: Part of what I learned, and certainly from my crisis center colleagues, that is just one tool. There's a whole bucket, if you will, of safety planning that goes with services to domestic violence survivors. So whether the tools is there or not, sometimes -- and I've learned, there might be a criminal case pending, and the victim doesn't want to bring a violence petition. In those -- for many reasons. There can be all kinds of reasons, kids, money, you name it, fear.

In those circumstances, the safety planning piece is what can be done outside of that piece of paper, that

restraining order. And sometimes, if the -- if the instances don't quite fit, there might not be that piece of paper. But again, the safety planning piece, how they access resources, how they get housing, how they keep themselves and their kids safe, that's a whole, equally important level of service that comes into this space.

The court is only -- and I used to do a bunch of family law back in the day. And sometimes, the court can only go so far in deciding who gets the kids on Christmas Day. But there's a whole other piece of how you manage a broken family, and in this instance, how you manage potential danger, that goes into the equation. So yes, there are statistics. We don't have them in our State. There's some national statistics on how effective is that restraining order tool. And that might be something, with a little more data, we could look at deeper here.

UNIDENTIFIED SPEAKER: Because it seems like it's overweighted, maybe because it's in the -- in the media and in the shows we watch. And it seems like a one tool I can get, and then I'm going to have this forcefield of protection. But we talk about cases where the perpetrator didn't even know there was a restraining order, or the victim tried to get one, didn't get one, or the victim gets one, and that insights rage in the abuser, and -- and now you've escalated the violence against the person who is seeking the forcefield. It just

seems --

UNIDENTIFIED SPEAKER 2: I just want to say that an order of protection is one small piece of a (indiscernible). And that may keep an individual survivor safe. But that's why we have crisis center avenues for. They are experts on scene, and they can help someone create a safety plan that works for their particular circumstances. Another reason why it's so vital that those services are available for our survivors.

The protection order is one small piece, and it's in the system. And it doesn't work for everybody. And the legal (indiscernible) part, that's created (indiscernible). I think it was clear in this Task Force that there needs to be these cross-disciplinary conversations so that there are rules for domestic violence survivors, whether it's in the process of (indiscernible).

UNIDENTIFIED SPEAKER: So right now, in New Hampshire, if you obtain -- does a restraining order come with a package deal of the -- of the supportive safety services for the person? It's not a package deal.

MS. HANTZ-MARCONI: Actually, the -- any referral to the crisis center comes at the petition filing stage. So whether or not the person gets a restraining order, they can be hooked up with a crisis center.

UNIDENTIFIED SPEAKER: Okay.

MS. HANTZ-MARCONI: And so we try, from the court



system, to refer people. We can be better at that, getting people with connected with crisis centers. Some people -- and this is one thing we discussed that we need to perhaps involve -- it needs another discussion.

But we need to involve 603 Legal with -- that's our legal services revamped organization. They have a phone contact, and they have a domestic violence person, lawyer/staff attorney, at the end of the phone to talk to people who -- this will sound funny, but some people don't want to go to a crisis center because they think they'll be talked into filing a domestic violence petition. They don't want to be forced, or they think that that could put them in -- someone might find out. If they could make a private phone call to another number and get those considerations addressed, they can be rerouted to the crisis centers.

But there are some people who sort of fall through that referral network. But they have that opportunity right up front. And then, hopefully, we can marry up the crisis center safety planning with some legal assistance with filling out petitions before they even go to court. Then, depending on what happens at court, get the order, don't get the order, there's still additional services available. They don't have to be referred in the way that kids refer for services. The crisis centers are independent, separately funded, not part of the court. And they take all comers.

MS: SCHOLLETT: Restraining orders are really a microcosm of the comprehensive work that this Task Force did. They will be most effective when every discipline you see seated here is actively engaged and privy in the system. Whether that's the forms, whether that's access to the courts, transparency, attorneys, advocates. They are one important tool, but we need everyone here. We need our law enforcement departments to be engaged.

A restraining order will work when a victim's school knows of that, when the victim's employer knows about it, and the people in the victim's community know about it, when the firearm (indiscernible) components work. So they are critical -- excuse me. They are a critical, critical tool. But it is absolutely necessary to have all of the entities that you see here today involved in the enforcement.

UNIDENTIFIED SPEAKER: Yes.

UNIDENTIFIED SPEAKER: I wanted to ask about sort of how survivors with children factor into this? Just because I remember that was a -- a big component of the testimony at the public hearing, was kind of custody issues, and how that intersected with domestic violence in the courts. So I was wondering if there were particular recommendations that might address some of those issues that were raised, or if it's kind of -- just sort of, how -- how children factor into some of these issues?

MS. HANTZ-MARCONI: We identified some sort of critical flashpoints, if you will. There's the domestic violence case. There's the related family law case. Now, you've got to discuss -- you've got to share financial information. You've got to share a lot of personal information. And you've got to discuss and deal with parenting the children. Domestic violence against the partner doesn't necessarily translate to a complete prohibition on contact between the abuser parent and the child.

So those are all things that get weighed in the court system. Also, there's another flashpoint with mediation. There's a big push for mediation in family law cases. How do you do that when there's a restraining order in place, and the victim doesn't want to be face-to-face with their abuser? I mean, who would want to be? So there is a program in our office of mediation within the Branch, along with the Women's --

UNIDENTIFIED SPEAKER 2: Battered Women's Justice Project.

MS. HANTZ-MARCONI: Thank you.

UNIDENTIFIED SPEAKER 2: Providing consultation to our Office of Mediation Arbitration to look at that. That deals with family cases and domestic violence cases, because internally, those are two separate case files. But when an individual is involved, it is one family, one unit. So that

(indiscernible) having to be the court's perspective of two piece (indiscernible) when the family is maybe a struggle that we look at and we work through. And we acknowledge this and (indiscernible).

UNIDENTIFIED SPEAKER 2: And so is that reflected in these recommendations somewhere, or --

UNIDENTIFIED SPEAKER 3: Yes. So the recommendation is that the work that was started -- I think in 2018, is that right? To continue. And I think that it was a funding issue. So to have the funding be sought out so that that work continued. I think that there were surveys. There was focus groups. There was a tremendous amount of work done with the Battered Women's Justice Project and the Office of Mediation and our committee. So it's just continuing that work.

MS. HANTZ-MARCONI: And then perhaps -- I'll speak out of turn, but maybe the protocols can -- it'll dovetail with the protocols, and we can have some that give a little more guidance on how to do deal with those issues. Because these things -- again, my experience listening to everyone, these things all arise from different start points. And it's been a process of pulling it all sort of together and coordinating.

There's services in the criminal side with the victim advocates, victim/witness advocates. But then that stops at the border of the criminal case. And you have the



family law case, which has those considerations, which stop at the border of the family law case. So there really needs to be a coordination. Yeah.

Anything else? All right. I'm getting the thumbs up from my colleague in the back.

I just want to thank all of you. This has been an honor and a pleasure. And thank you for being here today. And thank you. Okay.

UNIDENTIFIED SPEAKER: Thank you.

MS. HANTZ-MARCONI: School's out.

(Proceedings concluded at 5:51 p.m.)

CERTIFICATE

I, Samantha Stewart, a court-approved proofreader, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my professional skills and abilities.

TRANSCRIPTIONIST(S): Amanda J. Orlando, CDLT-260

Samantha Stewart Digitally signed by Samantha Stewart Date: 2022.09.19 22:26:50 -04'00'

SAMANTHA STEWART, CDLT-253 September 12, 2022
Proofreader