# TASK FORCE ON DOMESTIC VIOLENCE CASES IN THE NEW HAMPSHIRE JUDICIAL BRANCH



## REPORT TO THE NEW HAMPSHIRE SUPREME COURT

**March 1, 2022**

## TABLE OF CONTENTS

**Preface** ........................................................................................................ 2

**Recommendations of the Task Force on Domestic Violence Cases in the New Hampshire Judicial System** .................................................. 6

**Charge 1**. Review existing court practice and procedures and identify resources necessary to better support victims of domestic violence.................................... 6

**Charge 2.** Analyze the current status of New Hampshire law regarding domestic violence ........................................................................ 16

**Charge 3.** Recommend criteria for the Judicial Branch to make public on its website appellate decisions related to RSA chapters 173-B and RSA 633:3-a ................ 25

**Charge 4.** Review court forms as they relate to protection from domestic violence and make recommendations for improvement .................................... 28

**Charge 5.** Explore opportunities to provide victims of domestic violence increased access to assistance from attorneys and victim advocate ................................ 32

**Charge 6.** Analyze the current state of relationships between the courts, law enforcement, the criminal defense bar, and domestic violence advocates and steps that can be taken to improve communication ...................................... 38

**Charge 7.** Other Relevant Subject Matters ........................................................ 44
A.  Transparency and Judicial Accountability
B.  Firearm Relinquishment
C.  New Hampshire's Wiretapping and Eavesdropping Statute
D.  Court-Approved Batterer's Intervention Program

**Conclusion** ................................................................................................ 55

**Appendix A** New Hampshire Milestones in Domestic and Sexual Violence .......................................................................... 56

## PREFACE

On November 15, 2021, weeks after a temporary domestic violence protective order was vacated and the case dismissed following a final hearing, the defendant, R.L., shot the plaintiff, L.S., outside her place of work and died by suicide.[1]  Immediately upon learning of the shooting, New Hampshire Supreme Court Chief Justice Gordon J. MacDonald called for an internal review of the case. The Internal Review Committee was tasked with determining whether appropriate procedures were followed and whether the decision reached by the court was permissible within the bounds of current law. The Internal Review Committee submitted its report on November 23, 2021, concluding the trial judge had complied with all applicable laws and protocols, conducted the hearing fairly, and reached a reasonable decision based upon the totality of the record and existing case law.[2]  In addition, the Internal Review Committee identified ways that the civil protection order system might be improved.[3]

Thus, on December 9, 2021, pursuant to its supervisory authority, the Supreme Court established a multidisciplinary Task Force to conduct a systemic review of domestic violence cases in the New Hampshire court system.[4]  The Supreme Court charged the Task Force with the following responsibilities:

(1)    Review existing court practice and procedure in cases involving domestic violence allegations, whether in circuit court, superior court, or both, and identify the resources needed to better support victims of domestic violence throughout the legal process;

(2)    Analyze the current status of New Hampshire law regarding domestic violence, including the legal definition of "abuse" and its relationship to intimate partner violence, in connection with the domestic violence statute and other statutory protections available to abusive behavior;

---

[1] Kathryn Sotnik, "Salem Mass. Shooting Suspect Dead, Victim Hospitalized," NBC Boston (Nov. 15, 2021), available at https://www.nbcboston.com/news/local/police-investigating-shooting-in-salem-mass-2/2567242/

[2] Report of the Internal Review Committee on the Case of L.S. v. R.L at 2 (Nov. 23, 2021), available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-11/report-of-the-internal-review-committee-on-the-case-of-l.s.-v.-r.l.pdf

[3] Id. at 22-26

[4] Order of the New Hampshire Supreme Court (Dec. 9, 2021), available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-12/12-9-21-order-establishing-domestic-violence-task-force.pdf

(3)    Recommend criteria for the Judicial Branch to make publicly available on its website appellate decisions related to RSA chapter 173-B and RSA 633:3-a, while maintaining individual privacy in accordance with state and federal law;

(4)    Conduct a review of court forms as they relate to protection from domestic violence and make recommendations to ensure that all factual information necessary to establishing the applicable burden of proof is elicited in a clear and comprehensive format;

(5)    Explore opportunities available to provide victims of domestic violence increased access to the assistance of legal counsel and victim advocates at protection order hearings and in appellate proceedings;

(6)    Analyze the current state of relationships between the courts, law enforcement, the criminal defense bar, and domestic violence advocates and steps that can be taken to improve communication with respect to domestic violence and other abusive behaviors that warrant judicial relief; and

(7)    Examine any other subject matter, which the Task Force deems relevant to the objective of providing victims of domestic violence full and fair access to the justice system, while maintaining fundamental fairness for all participants.[5]

The Task Force was ordered to "engage relevant stakeholders and report its conclusions and recommendations to the Supreme Court no later than March 1, 2022."[6]

Chief Justice MacDonald appointed Associate Justice Anna Barbara Hantz Marconi to chair and convene the Task Force.  Including Justice Hantz Marconi, the Task Force had 20 members from the bench, bar, and community, all with extensive experience in working on domestic violence matters.[7]  The Task Force did not include policy makers,

---

[5] Order of the New Hampshire Supreme Court (Dec. 9, 2021), available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-12/12-9-21-order-establishing-domestic-violence-task-force.pdf

[6] https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-12/12-9-21-order-establishing-domestic-violence-task-force.pdf

[7] The following community members and members of the New Hampshire bench and bar participated in the Task Force: Associate Justice Anna Barbara Hantz Marconi (chair); Hon. Diane Nicolosi, Superior Court; Hon. Susan B. Carbon, Circuit Court; Hon. John Yazinski, Circuit Court; Mary Barton, Clerk, Circuit Court - Manchester District and Family Division; Merrill Beauchamp, Director, Victim & Witness Program, Hillsborough County Attorney's Office; Kathy Beebe, Executive Director, HAVEN NH; Kristyn Bernier, Investigator, Belknap County Attorney's Office; Steven Endres, Assistant County Attorney, Merrimack County Attorney's Office; Dr. Scott Hampton, Director, Ending the Violence; Chief David Hobbs, Hampton, NH Association of Chiefs of Police; Martha Ann Hornick,

such as legislators, in the first instance, in order to gather input, first-hand, from those working in and with the judicial system on domestic violence cases, which would then frame any issues needing policy adjustments.  A five-member working group aided the Task Force in its work.  The entire Task Force met remotely once in December 2021, on seven occasions in January 2022, and at a final meeting in February 2022.[8]  The Task Force held a public hearing on January 21, 2022, at the Supreme Court.  In addition, members of the public were given the opportunity to forward comments to the Task Force by: (1) emailing a dedicated email address; (2) calling the Court Information Center's toll-free number; or (3) mailing or delivering written comments to the Task Force at the Supreme Court building.

The Task Force's purpose was to identify potential issues with regard to the handling of domestic violence cases in the judicial system.  The Task Force was not charged with vetting or resolving the issues it identified, but, rather, exploring areas for further examination.  In fact, even within the Judicial Branch, these ideas have not yet been vetted, let alone assessed for feasibility, expense, and priority given the branch's significant staffing and funding shortages.  Therefore, this report is but a starting point for the many stakeholders involved to further investigate, evaluate, and analyze the issues identified.

Nonetheless, given the Task Force members' commitment to serving the public to the best of their ability, it was not surprising that preliminary recommendations were offered.  This report captures the potential issues and possible solutions the Task Force identified.  Some of the recommendations are system-wide, whereas others are targeted toward specific stakeholders.  Some of the potential solutions are within the authority of the Judicial Branch; others are governed by the Executive and Legislative branches.  Still others are within the mission of private agencies involved in services related to domestic violence.  Undoubtedly there are many more recommendations that could have been generated had more time been available.  The recommendations set forth in the report

---

Grafton County Attorney; Mary Krueger, Staff Attorney, New Hampshire Legal Assistance; Patricia LaFrance, Partner, The Black Law Group; Betsy Paine, Senior Staff Attorney, CASA NH; Lynda Ruel, Director, Office of Victim/Witness Assistance, New Hampshire Department of Justice; Lyn M. Schollett, Executive Director, New Hampshire Coalition Against Domestic and Sexual Violence; Amanda Grady Sexton, Director of Public Affairs, New Hampshire Coalition Against Domestic and Sexual Violence; Jon Strasburger, o/b/o NH Association of Criminal Defense Attorneys; and David Vicinanzo, Attorney, DOVE Program volunteer. In addition, the Task Force was aided by a working group comprised of: Pam Dodge, DOVE Program Coordinator, 603 Legal Aid; Sarah Freeman, Circuit Court Administrator; Erin Jasina, Director, New Hampshire Legal Assistance Domestic Violence Advocacy Project; Jean Kilham, Domestic Violence Program Manager; and Anne F. Zinkin, Supreme Court Supervisory Law Clerk.

[8] All of the Task Force's meetings were recorded, and the recordings are available on the Judicial Branch's website. https://livestream.com/nhjb/events/10076947

have the support of the Task Force; other recommendations were discussed but are not included as recommendations because the Task Force did not reach a consensus about them.

As we embark upon further work, it is the hope of the Task Force that we will, individually and collectively, effect improvements to the handling of domestic violence cases in the New Hampshire court system.

# RECOMMENDATIONS OF THE TASK FORCE ON DOMESTIC VIOLENCE CASES IN THE NEW HAMPSHIRE JUDICIAL SYSTEM

## Charge 1. *Review existing court practice and procedures and identify resources necessary to better support victims of domestic violence*

### A.  Existing Court Practices and Procedures

Petitions filed by plaintiffs for domestic violence and stalking orders of protection are filed in the Circuit Court.  The Circuit Court, created in 2011, was based upon the success of the Judicial Branch Family Division Pilot Project, which drew family-related cases from three trial-level courts (Superior Court, District Court, and Probate Court).  The Circuit Court now includes three divisions (family, district, and probate), and the former District and Probate Courts have been abolished.  The Circuit Court has more than 30 locations, but only 18 clerks and 32 deputy clerks to oversee them.  Annually, 6,100 new domestic violence and civil stalking cases are filed in the Circuit Court.  This number comprises about 5.4% of the total new cases filed in the Circuit Court each year.[9]

In 1992, under the leadership of Administrative Judge Edwin W. Kelly, the (then) District Court embarked on a multidisciplinary effort to produce domestic violence protocols for guiding uniform court practice.[10]  The protocols were first adopted in 1994 and were subsequently approved by the New Hampshire Supreme Court.  They have been revised on numerous occasions.  In 2007, compliance with the protocols was made mandatory by administrative order.[11]  They were revised, most recently, in 2013.  In September 2021, the Circuit Court began its review of the protocols once again with the goal of aligning them with current statutes and best practices.  As before, subsequent phases will involve soliciting feedback from a range of external stakeholders.

---

[9] Domestic Violence/Stalking Petitions Filed and Temporary Orders Granted/Denied 2019, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/inline-documents/sonh/2019-petitions-and-temp-orders.pdf; Domestic Violence/Stalking Petitions Filed and Temporary Orders Granted/Denied 2020, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/inline-documents/sonh/2020-petitions-and-temp-orders.pdf; Circuit Court New Filings 2011-2020, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-08/2011-2020-circuit-court-filings-compared.pdf

[10] https://www.courts.nh.gov/our-courts/circuit-court/district-division/protocols/domestic-violence-protocols

[11] Family Division Administrative Order 2007-06 and District Court Administrative Order 2007-67 (Sept. 11, 2007), available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-06/fdao0911.pdf

The protocols, though "mandatory," do not have the force of law.  Thus, when there is a statutory or another legal requirement that conflicts with a protocol, the protocol cannot be followed.

The Judicial Branch has endeavored to make information about how it processes petitions for domestic violence and stalking orders of protection transparent and accessible.  The protocols are available on the Judicial Branch's website as are all of the forms necessary to obtain a domestic violence or stalking order of protection.[12]  Additionally, the branch maintains on its website "self-help" information for survivors of domestic violence and stalking, which includes answers to frequently asked questions, such as "What type of protections . . . can the judge order?" and "Where to go to ask for a Domestic Violence or Stalking Order of Protection?"[13]  The self-help available on the Judicial Branch's website also includes a video narrated by Circuit Court Judge Susan B. Carbon, available in multiple languages, which explains "What to Expect at a Final Domestic Violence or Stalking Order of Protection Hearing."[14]

Most recently, the Judicial Branch has allowed petitions for domestic violence or stalking orders of protection to be filed electronically via an email-based system.  This initiative began when the Circuit Court realized that the COVID-19 pandemic had caused a reduction in the number of petitions for such orders being filed.  In March-April 2020, there was a 21% drop in the number of domestic violence petitions filed and a 30% drop in stalking petitions filed as compared to March-April 2019.  Because this reduction presented a serious public safety concern, the Circuit Court quickly convened a working group of judges, court staff, and external stakeholders, including members of the private bar and crisis center advocates, to develop a plan to ensure that domestic violence survivors had access to judicial relief during the pandemic.  This working group developed a program under which individuals may file petitions for domestic violence or civil stalking protective orders by email.  The program began in May 2020.

To file a petition by email, a plaintiff must first contact a crisis center or family justice center.[15]  Working with that center, the plaintiff is given links to the applicable online forms.  The forms are then submitted by email to a central inbox monitored by staff whom the Domestic Violence Program Manager supervises.  Staff review the petition to

---

[12] https://www.courts.nh.gov/our-courts/circuit-court/family-division/forms/domestic-violence

[13] https://www.courts.nh.gov/self-help/restraining-orders

[14] https://livestream.com/nhjb/events/8499577/videos/185166339

[15] Family Justice Centers provide a "one-stop" center offering help to victims and survivors of domestic violence, sexual assault, elder abuse, stalking, and human trafficking.  Such centers co-locate a number of services in one building, which helps victims access the help they need by reducing the number of places they must visit and the number of times they must tell their stories.

ensure that it is complete.  If the petition is incomplete, the Domestic Violence Program Manager, or her designee, works with the crisis center and/or plaintiff as necessary to complete the petition before it is then sent to the local court.  The regular communication between the Domestic Violence Program Manager and local crisis center court staff has created a regular, immediate feedback loop on a range of issues raised by court staff, judges, and advocates.[16]

The branch also endeavors to provide substantial training on domestic violence issues to its judicial and non-judicial staff.  For example, as the Internal Review Committee noted, Circuit Court judges receive training about intimate partner violence during their initial training, as well as through ongoing judicial education programs and specialized national trainings.[17]  Such trainings focus not only upon the statutory definition of "abuse" under RSA chapter 173-B and related case law but also upon the broader concept of intimate partner violence.[18]  Many Circuit Court judges have attended the Enhancing Judicial Skills in Domestic Violence Cases program of the National Judicial Institute on Domestic Violence, which is a partnership of the National Council of Juvenile and Family Court Judges, Futures Without Violence, and the federal Office on Violence Against Women.[19] This is a highly interactive, multi-day training led by national experts in domestic violence.  The Judicial Branch has used federal funds to cover the costs associated with this and related educational opportunities for Circuit Court judges only.

---

[16] New Hampshire Circuit Court Administrative Order 2021-07, available at
https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-07/administrativeordercircuitcourt-2021-07.pdf

[17] Report of the Internal Review Committee at 6, available at
https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-11/report-of-the-internal-review-committee-on-the-case-of-l.s.-v.-r.l.pdf

[18] Under RSA chapter 173-B, a plaintiff seeking a domestic violence order of protection must prove that: (1) the defendant is the plaintiff's family or household member or current or former sexual or intimate partner; (2) the defendant recently committed or attempted to commit one of seven crimes listed in the statute; and (3) the defendant's conduct constitutes a credible present threat to the plaintiff's safety as defined by case law.  Intimate partner violence, on the other hand, is broader concept, referring to a pattern of coercive behaviors used by one partner to maintain power and control over another partner in an intimate relationship, which can encompass interfering with a victim's employment or housing, humiliating or degrading the victim, intimidating or manipulating the victim, controlling the victim's finances, interfering with medical care, damaging the victim's relationship with loved ones, undermining the victim's parenting, and threats of acts of physical or sexual violence.  Thus, there are many forms of intimate partner violence, which although harmful, do not fall within the legal definition of "abuse" for purposes of obtaining a domestic violence order of protection.

[19] The federal Office on Violence Against Women administers grant programs authorized by the Violence Against Women Act (VAWA) of 1994 and subsequent legislation.  One of the grant programs it administers is the STOP Violence Against Women Formula Grant Program, which is awarded to states and territories to help local communities combat violent crimes against women and strengthen services to victims of such crimes.  Each state and territory must allocate 25% for law enforcement, 25% for prosecutors, 30% for victim services, 5% for state and local courts, and 15% for discretionary distribution.

Little training is provided to Superior Court judges on domestic violence and stalking. Although Superior Court judges do not hear domestic violence protection order cases, they do handle civil restraining orders where "abuse" as defined by RSA chapter 173-B may not exist, but there is still a need for protection. They also handle criminal cases involving domestic violence and stalking. There is no training provided by any national organization for appellate court judges regarding domestic violence and stalking, which is an issue recognized by leading judicial educators. Notably, there has never been federal funding available for domestic violence training specifically geared toward appellate judges.

Opportunities for court staff to attend educational programs have been more limited. Fortunately, the Domestic Violence Program Manager is able to participate in local and national trainings related to domestic violence including attending DOVE attorney trainings and the National Council of Juvenile and Family Court Judges Annual Conference. Also, court staff have received extensive training on domestic violence led by the Battered Women's Justice Project. Additionally, in 2022, the Circuit Court intends to send several court staff to a three-day international, multidisciplinary conference focused on sexual assault, intimate partner violence, stalking, human trafficking, and elder abuse, which highlights promising practices and emerging issues for effective response.

In addition to judges and court staff, all court security officers receive training on the dynamics of domestic violence and the domestic violence protocols. The Domestic Violence Program Manager facilitates this training.

State funding for training judicial and non-judicial court staff has waned over the last decade. In the current budget, the branch received slightly less than $100,000 in state funds to provide training to its more than 600 judicial and non-judicial employees. Because of the lack of state funding for judicial education, ongoing training opportunities are extremely limited. For instance, the Circuit Court has only four-to-six days allotted each year for judicial training. With such limited funding, judges at all court levels do not receive regular training on a host of critical issues, including those related to domestic violence and stalking. Likewise, chronic staff shortages in the Circuit Court, coupled with lack of funding, severely limit the ability of staff to engage in professional development.

## B.  Summary of Task Force Discussions

The Task Force generally agreed that the protocols currently in place are effective. However, there was concern that, because they have not been formally revised since

2013, the protocols are out-of-date.  There was also concern that the protocols are not consistently followed.  As the Statewide Domestic Violence Advisory Council convened by the director of the Domestic Violence Advocacy Project at New Hampshire Legal Assistance observed,[20] courts "vary in how and whether [these protocols] are being followed, . . . despite existing Administrative Orders [requiring courts] to follow the protocols."

Specific concerns about Protocols 5-15, 5-19, and 7-7 were raised, as follows:

- Protocol 5-15 requires a trial judge to "have contact with the plaintiff in person or by telephone" before denying a petition seeking a temporary order of protection.  The protocols explain that such a conversation is necessary because "[a]t times the plaintiff does not understand what needs to be included in the petition."  Advocates and survivors report that this protocol is sometimes not followed.  A concern was raised that this protocol may be difficult for judges to comply with because judges may not act as advocates for, or give legal advice to, the parties that appear before them.  Judges have an ethical obligation to remain neutral and impartial, and there is a concern that Protocol 5-15 may be contrary to that obligation.

- Protocol 5-19 allows a trial court to schedule a case for a final hearing without entering a temporary order of protection if it finds that the facts alleged in the petition do not support entry of such an order.  This is because there are different burdens of proof associated with obtaining temporary and final orders of protection.  The protocols note that this course of action "can lead to a potentially volatile situation" where the defendant is served with the hearing notice, but there is no temporary order of protection in place to protect the plaintiff from retaliation.  Accordingly, the protocols advise the court to "discuss the situation with the plaintiff to ascertain whether a viable safety plan is in place" and refer the plaintiff to a shelter as necessary.  The Domestic Violence Advisory Council reported that court staff in some locations are not always referring domestic violence plaintiffs to crisis centers.  However, court staff report that domestic violence plaintiffs are referred to crisis centers, though court locations may differ as to how that referral occurs.  Court staff have reported that crisis centers are increasingly unavailable to respond to the courthouse when called to support an individual filing a petition.  Crisis centers have

---

[20] As discussed later in this report, the advisory council, which includes New Hampshire Legal Assistance, 603 Legal Aid, the New Hampshire Coalition Against Domestic and Sexual Violence and its member crisis centers, and other entities, has been meeting regularly for nearly two decades.  The advisory council seeks to improve access to legal services, while analyzing effective legal representation and identifying systemic issues within the family court system adversely affecting victims/survivors.

reported staffing and funding challenges have impacted their ability to respond to the court when called by court staff.

- Protocol 7-7 provides that if the plaintiff "is accompanied by an advocate, the advocate should be allowed at counsel table and may be allowed limited participation in the proceedings at the request of the plaintiff." However, advocates and members of the public observed that, occasionally, advocates have not been allowed to sit at counsel table without an adequate explanation.

The Task Force further observed that some courthouses lack private conference rooms available for survivors, making it difficult for them to feel safe when filling out petitions in those courthouses. Although Protocol 5-5 provides that "[e]very attempt should be made to provide privacy and security" to the plaintiff when completing a domestic violence or stalking petition, not all courthouses contain sufficient private space for this to occur.

The Task Force also discussed the need for survivors to connect with safety-planning resources as early in the process as possible. When the police arrest a defendant for domestic violence, they use the Lethality Assessment Program screening tool (LAP), which contains 12 questions that identify domestic violence survivors who are at high risk.[21] The LAP was created specifically for law enforcement. The court does not currently use a similar assessment tool. Instead, Protocol 5-6 requires court staff to provide "[i]nformation regarding the availability of local crisis centers" to all individuals filing petitions for domestic violence or civil stalking protection orders. Nevertheless, the Task Force believes that it would be helpful for survivors to have a more thorough understanding of the services that a local crisis center can provide.

---

[21] The LAP was created by the Maryland Network Against Domestic Violence (MNADV) in 2005 as an evidence-based innovative strategy to prevent domestic violence homicides and serious injuries. In 2009, the New Hampshire Attorney's General's Office adopted LAP as a best practice approach for law enforcement to screen for survivors in high-risk situations and connect them to vital crisis center services. LAP became part of the standard domestic violence curriculum for new law enforcement officers attending the recruit academy and was incorporated into the Model Protocol for Law Enforcement (2013). The courts also received training on the LAP and, in acknowledging the valuable insight that the results can provide about a perpetrator's behavior, judges were encouraged to begin asking law enforcement for LAP results in criminal domestic violence related cases. In 2014, a LAP Steering Committee, comprised of representatives from the Attorney General's Office, law enforcement, the courts and advocacy communities, was created to assist the efforts of implementing the LAP statewide. The LAP Steering Committee continues to meet to assess the status of the LAP and develop strategies in continuing to implement and monitor LAP in New Hampshire. In 2021, MNADV announced it was instituting a yearly subscription fee for jurisdictions implementing LAP. The LAP Steering Committee is currently exploring options, including what other risk assessment models or tools it could utilize, that would not be so cost prohibitive.

The Task Force discussed the possibility of creating a domestic violence court, similar to other specialized courts such as the Family Treatment Court currently being piloted in Sullivan County.[22]  The branch has previously explored the possibility of creating a separate domestic violence court.  In 2012-2013, the court secured federal funding to create a dedicated domestic violence docket; however, because no state funds were identified to continue the specialized court once the federal funding lapsed, this effort ceased.

The Statewide Domestic Violence Advisory Council observed that, in some courts, the way that domestic violence cases are scheduled "can require lots of waiting around," causing the plaintiff to testify about domestic violence "in a court room full of strangers," which "is not trauma informed practice."  The advisory council observed that in Windsor County, Vermont, the court "schedules all [domestic violence Final hearings on one day with staggered starts" and "holds a clinic earlier in the day about what to expect at the hearing" so that "[a]dvocates know when they should be scheduled in court."

The family division in Manchester schedules its domestic violence cases on two or three mornings each week, with the days varying slightly based upon judge availability and other factors.  However, not all Circuit Court family division locations have a sufficient number of petitions for domestic violence protection orders to merit the creation of a domestic violence docket similar to the one in Manchester.

Despite the training that Circuit Court judges receive about intimate partner violence, some Task Force members and members of the public perceived some judges to be insensitive to those issues.  Some voiced the concern that some judges may be implicitly biased against survivors of intimate partner violence.  Others voiced the opposite concern, that some judges may be implicitly biased against defendants in domestic violence cases.  The Task Force acknowledged that, in an adversarial system, those who do not prevail are often unhappy with what has occurred and complain about the system or the process, and that it is difficult to discern what is essentially "sour grapes" by an aggrieved party and what is a legitimate problem with the court system or a particular judge.

---

[22] The Family Treatment Court in Sullivan County is a program that a parent with an abuse and neglect case can choose to participate in when substance use is part of the case, including when a child is removed from the home. The program uses a supportive, team approach to increase the family's access to supports and services, accountability and recovery, and likelihood of reunification.  It is a partnership of the court, the Division for Children, Youth and Families, Court Appointed Special Advocates of New Hampshire, parent attorneys, substance use treatment providers, mental health providers, and other community partners.

Similarly, some on the Task Force have heard that some court staff have engaged with domestic violence plaintiffs in a way that is not trauma-informed or consistent with the protocols. The experience of the Judicial Branch members of the Task Force has been that, upon review, some complaints from the public are inaccurate.

The New Hampshire Coalition Against Domestic and Sexual Violence (Coalition) reported some problematic examples, including instances in which plaintiffs were not allowed to bring home domestic violence or stalking petition paperwork. Judicial Branch members observed that, in the past, domestic violence advocates had advised that allowing plaintiffs to bring home petition paperwork put plaintiffs at risk. Accordingly, court staff were trained not to allow plaintiffs to take home such paperwork. However, in response to the COVID-19 pandemic, for the first time, domestic violence and stalking petitions were made available on the Judicial Branch's website. The decision to include the petitions on the website was made in consultation with crisis center advocates with the understanding that the branch would continue to evaluate whether doing so jeopardizes plaintiff safety. Some Task Force members opined that allowing plaintiffs to take paperwork home with them may help them to feel more comfortable and, because they have more time, in a familiar place, to fill out the petition, may result in petitions being drafted more completely.

The Task Force also heard examples of court staff who provided exceptional customer service to plaintiffs in domestic violence cases. In one case, for example, when crisis center staff were unavailable to help, a domestic violence plaintiff whose temporary protection order had been granted, but had not yet been served, telephoned court staff because the defendant was in the home with her, and she was scared. Court staff alerted law enforcement to the imminent safety concern and the need for immediate service of the order.

Judicial branch members of the Task Force expressed the belief that it would be beneficial for the branch to create a standing branch Domestic Violence Committee to assess the viability of some of the Task Force's recommendations for the branch. Areas for review include:

- Mechanisms to ensure that the protocols are being followed consistently
- Whether any screening tools, such as the screening tool(s) developed by the Battered Women's Justice Project or the LAP would be appropriate for use as part of the court process in domestic violence cases
- Drawing upon previous attempts to implement a separate domestic violence docket, whether to create a separate domestic violence court, which could include specially-trained judges, staff, and court security officers

- How clerks of court may schedule dockets in ways that reduce the number of non-associated people in the courtroom and reduces the time that domestic violence plaintiffs must wait until their cases are called
- Mechanisms to ensure orders of protection for survivors are being followed, which could include compliance review hearings in domestic violence cases
- Ways to enhance the physical and emotional safety of survivors when they file domestic violence and stalking petitions, which could include allowing emotional support animals in the courthouse
- Whether to adopt the SAFE tool developed by Battered Women's Justice Project, which assists survivors in identifying types of firearms[23]
- Whether to adopt a process for returning firearms in criminal cases, similar to the process for returning firearms in civil protection order cases
- Whether delivery of the petition and any temporary orders in domestic violence and stalking cases can be "fast-tracked" to crisis center advocates so that those advocates can send completed packets of information to the DOVE program and survivors can get the legal assistance they need more quickly
- How to more effectively solicit specific information from plaintiffs in domestic violence and stalking cases with regard to the defendant's access to firearms
- How best to modify the return of service form to include more detailed information about law enforcement contact with the defendant, relinquishment of firearms and ammunition, third-party possession, and other related information to ensure that if ordered, all firearms are retrieved
- Analysis of the data the Judicial Branch already collects to comply with its obligations as a recipient of federal grants to identify trends in the disposition of domestic violence and stalking cases and recommend responses thereto
- Consistent with confidentiality and privacy concerns and the need for judicial independence, investigate how best to make domestic-violence-related judicial training, administrative oversight, and court assignments more transparent to the public

## C. Task Force Recommendations

**Recommendation 1.1:** The Administrative Council of the Judicial Branch should designate a standing branch Domestic Violence Committee to recommend ongoing improvements to the branch's response to domestic violence cases, as set forth above, and make public reports, similar to the Language Access Committee.

---

[23] https://www.bwjp.org/resource-center/resource-results/safe-tool.html

**Recommendation 1.2:**  The Circuit Court, through its existing protocol working group, should continue its review and revision of the domestic violence protocols, including its practice of seeking meaningful feedback from a range of stakeholders from outside the Judicial Branch.

**Recommendation 1.3:** Court staff should continue to refer all who file a petition for a domestic violence order of protection to the applicable crisis center for safety planning.

**Recommendation 1.4:**  An information sheet or brochure should be created by legal services agencies and/or crisis centers about their services, including safety planning, to help plaintiffs understand the measures that can be taken to enhance their safety before and after the defendant has been served with the protective order.  The information sheet should include the contact information for the local crisis center and could include the contact information for other community resources helpful to survivors.

**Recommendation 1.5:** The Judicial Branch should seek additional state funding for training judicial and non-judicial staff at all court levels on domestic violence issues and trauma-informed practices and ensure that regular training opportunities are provided. Such requests may include funding for additional staff positions to ensure that sufficient staff are available to process emergency filings in the Circuit Court while regular, ongoing professional development takes place.  Further, all Circuit Court judges should have the opportunity to attend the National Judicial Institute on Domestic Violence's Enhancing Judicial Skills program.

**Recommendation 1.6:**  Because some courthouses lack private conference rooms available for parties to meet with their attorneys or advocates, the Judicial Branch should continue exploring the possibility of setting up locations for those without home computers or with travel or other restrictions to access remote hearings and/or meet with their attorneys remotely.

## Charge 2: *Analyze the current status of New Hampshire law regarding domestic violence*

### A.  Current Status of New Hampshire Law

Domestic violence survivors may obtain a domestic violence order of protection under RSA chapter 173-B.  Domestic violence orders of protection can only be issued against a member of the plaintiff's household or family or against a plaintiff's current or former sexual or intimate partner.  In addition to establishing a qualifying relationship, a plaintiff must show that: (1) the defendant committed or attempted to commit one of the seven crimes listed in RSA 173-B:1, I; and (2) the defendant's conduct constitutes a "credible present threat" to the plaintiff's "safety."  If a person knowingly violates a domestic violence protective order, he or she is guilty of a class A misdemeanor.[24]  Enhanced penalties are available for subsequent domestic violence offenses under certain circumstances.[25]

To obtain a domestic violence order of protection, a plaintiff must first file a petition in Circuit Court.[26]  There is no fee for filing a petition.[27]  If the plaintiff can show that he or she is in "immediate and present danger of abuse," the plaintiff may obtain a temporary order of protection with or without actual notice to the defendant.[28]  The temporary order may also include other relief, such as a temporary award of custody of the minor children to one of the parties.  The temporary order of protection may also require the defendant to relinquish his or her firearms.  Once issued, the temporary order of protection must then be served on the defendant by a peace officer,[29] which provides the defendant with an opportunity to be heard before the court issues a final order of protection.[30]  RSA 173-B:3 requires the trial court to hold a hearing within 30 days of when the plaintiff filed the petition or within 10 days of when the petition is served on the defendant by either a peace officer or the sheriff's department, whichever occurs later.  The defendant also has a right to request an expedited hearing.

If the court grants the plaintiff a final order of protection, the order is in effect for up to one year, and may be renewed, for good cause shown, upon the request of the plaintiff.

---

[24] RSA 173-B:9, III (2014)

[25] RSA 173-B:9, IV (2014)

[26] RSA 173-B:3 (2014)

[27] During non-business hours, a plaintiff can also request that law enforcement assist them in seeking an emergency order of protection. If granted, the emergency order is only in effect until the end of the next court business day.

[28] RSA 173-B:4, I (Supp. 2021)

[29] RSA 173-B:8, II (2014)

[30] RSA 173-B:3

The first renewal may be for up to one year; subsequent renewals may be up to five-year increments. When a final domestic violence order of protection is granted, New Hampshire law requires the trial court to direct the defendant to relinquish his or her firearms and ammunition to the police.[31]

If an order meets certain federal qualifications, it will be entered into the National Crime Information Center (NCIC) database, which is an electronic clearinghouse of crime data maintained by the FBI. Orders that are entered into NCIC are visible and accessible to law enforcement agencies nationwide. Only orders meeting the federal requirements can be entered into this national database.

Domestic violence survivors may also obtain a stalking order of protection under RSA 633:3-a. However, unlike a domestic violence order of protection, a stalking order of protection can be issued against anyone, regardless of that person's relationship with the plaintiff. To obtain a stalking order of protection, the plaintiff must show that the defendant engaged in a "course of conduct" that shows a "continuity of purpose" and is not based upon constitutionally-protected activity or conduct that "was necessary to accomplish a legitimate purpose independent of making contact with" the plaintiff.[32] The procedural steps for stalking petitions are identical to those under RSA chapter 173-B.

Restraining orders can also be issued as part of a parenting case[33] or a divorce case.[34] Such orders generally restrain parties from having further contact with one another. Unlike a domestic violence protective order issued under RSA chapter 173-B, a restraining order issued under RSA chapters 458 or 461-A may last indefinitely. Such orders are not entered into the national database. There is no requirement that the court make a finding of abuse. Pursuant to RSA 173-B:9, a person who violates a restraining order in a divorce case is guilty of a class A misdemeanor.[35] Although the parenting statute provides for criminal penalties for violating a restraining order, that statute is not currently cross-referenced in RSA 173-B:9.[36]

Persons who do not qualify for domestic violence or stalking orders or who are not involved in parenting or divorce cases may, nonetheless, obtain a civil restraining order in Superior Court by filing a complaint.[37] To obtain such an order, however, the plaintiff

---

[31] RSA 173-B:5, I (Supp. 2021)

[32] RSA 633:3-a (Supp. 2021)

[33] RSA 461-A:10 (2018)

[34] RSA 458:16 (2018)

[35] RSA 173-B:9, III

[36] RSA 461-A:10, II

[37] COMPLAINT FOR RESTRAINING ORDER, available at
https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-04/nhjb-2960-se.pdf

must demonstrate that he or she has no adequate remedy at law and that the restraining order is warranted by imminent danger of great and irreparable harm.  Unlike domestic violence and stalking cases, a filing fee is required, although a motion to waive filing fees may be filed and granted.

When an abuser is arrested for domestic violence, a criminal bail protection order or a no-contact bail order may be issued.  A criminal bail protection order is available when the survivor was married to, lived with, or had a child with the abuser.[38]  In addition to ordering the defendant to have no contact with the survivor as a condition of being released on bail, a criminal bail protection order will prohibit a defendant from purchasing or possessing firearms and ammunition under the Federal Gun Control Act.[39]  New Hampshire's criminal bail protective order forms have been designed for inclusion in NCIC since 2007.

If the survivor was not married to, did not live with, and did not have a child with the abuser, a no-contact bail order may be issued.  A no-contact bail order prohibits the defendant from having contact with the survivor as a condition of being released on bail.  No-contact bail orders do not qualify for inclusion in NCIC and, thus, do not prohibit a defendant from purchasing or possessing firearms and ammunition under the Federal Gun Control Act.  No-contact bail orders, nonetheless, may include firearm relinquishment as a condition of bail.

Unlike domestic violence and stalking orders of protection, a survivor is not the person asking for the criminal bail protection order or a no-contact bail order.  Instead, the request must come from law enforcement or the prosecutor and may not be what the survivor wants at all.  In addition, the victim in a criminal case is not a party to the case and does not have the ability to terminate the bail order in the same way that the plaintiff in a civil case can withdraw the request for a civil order of protection.

## B.  Summary of Task Force Discussions

There is a growing belief, including among some members of the Task Force, that New Hampshire law does not, but should, extend to what is now understood as intimate partner violence.  The Task Force acknowledged that changing existing law would require either legislation to amend, repeal, or enact new statutes, or would require an

---

[38] Circuit & Superior Court Count of Criminal Bail Protective Orders Granted from 1/1/2020 to 12/31/2020, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/inline-documents/sonh/2020-criminal-bail-protective-orders.pdf; Circuit & Superior Court Count of Criminal Bail Protective Orders Granted from 1/1/2019 to 12/31/2019, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/inline-documents/sonh/2019-criminal-bail-protective-orders.pdf

[39] 18 U.S.C. § 922(g)(8) (2018)

appeal to the New Hampshire Supreme Court that would provide the court with an opportunity to overrule or clarify existing case law.

Some fault the statutory definition of "abuse" under RSA chapter 173-B and its focus on a "credible present threat" to a plaintiff's "safety." Accordingly, some on the Task Force support amending the statutory definition of "abuse" under RSA chapter 173-B. Task Force members noted that one potential risk of broadening the statutory definition is that, unless the defendant "presents a credible threat to the physical safety" of the plaintiff or the protective order expressly prohibits the defendant from using, attempting to use, or threatening to use physical force against the plaintiff, the federal prohibition against abusers possessing or purchasing firearms does not apply.[40] Other Task Force members fear that any attempt to amend the statutory definition of "abuse" would open the entire statute to reconsideration, which could result in fewer protections for domestic violence survivors.

Still others on the Task Force believe that the current statutory definition of "abuse" suffices and fault the New Hampshire Supreme Court for interpreting the word "safety" in RSA 173-B:1, I, to mean "physical safety."[41] As the Internal Review Committee observed, many of the Supreme Court's cases regarding domestic violence were decided decades ago, when RSA chapter 173-B was first enacted and the common understanding of "domestic violence" did not include all of what we know about intimate partner violence.[42] Many of those cases were also decided before the legislature amended the statutory definition of "abuse" in 2011 by adding: "The court may consider evidence of such acts, regardless of their proximity in time to the filing of the petition, which, in combination with recent conduct, reflects an ongoing pattern of behavior which reasonably causes or has caused the petitioner to fear for his or her safety or well-being."[43] Some members of the Task Force expressed the belief that the 2011 amendment to the statutory definition of "abuse" legislatively overruled or revised certain of the Supreme Court's prior cases. Other Task Force members observed that this is a legal issue upon which the court has not yet ruled.

---

[40] 18 U.S.C. § 922(g)(8)

[41] See Knight v. Maher, 161 N.H. 742, 745-46 (2011)

[42] Report of the Internal Review Committee at 21, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-11/report-of-the-internal-review-committee-on-the-case-of-l.s.-v.-r.l.pdf; see, e.g., In the Matter of Alexander and Evans, 147 N.H. 441, 442-43 (2002) (holding that while unwanted telephone calls and rude gestures made by the defendant to the plaintiff were enough to support a finding of harassment, they were insufficient to support a finding that the defendant's conduct constituted a credible threat to the plaintiff's safety).

[43] Laws 2011, 289:2

Many on the Task Force and members of the public commented that some judges fail to apply the law as it currently exists and view "abuse" too narrowly.  As one survivor stated, "Judges must be alert and cognizant of not only the recent harm but ALL harm, and how it escalates over time."  This survivor further noted that although "[d]omestic violence and sexual assault are typically viewed as causing only physical harm, . . . it is the emotional trauma that stays with a survivor for his or her lifetime and causes the most long-term damage.  Unfortunately, the emotional damage is often only recognized by victim advocates, medical professionals, and counselors and is not sufficiently understood and recognized by judges presiding in New Hampshire's courts."  Others on the Task Force observed that judges may recognize behaviors as abusive, but are unable to find that those behaviors constitute "abuse" within the meaning of the statute, as interpreted by the Supreme Court.

Many survivors observed that their abusers engage in litigation abuse as a way of further harassing and controlling them.  One survivor informed the Task Force that her abuser has filed numerous frivolous motions in the parties' parenting case as a means of harassing her.  Notably, the definition of abuse under RSA chapter 173-B specifically mandates that no contact provisions in an order of protection shall not "prevent a defendant . . . from sending the plaintiff copies of any legal pleadings relating to the domestic violence petition or related civil or criminal matters. "[44]

Others expressed concern that litigants in domestic violence cases have submitted false information to the court and suffered no repercussions for doing so.  Members of the public and Task Force members observed that abusers sometimes file false petitions for protective orders, claiming to have been abused by the survivor.

The Task Force recognized that most, if not all, of the New Hampshire Supreme Court's case law related to domestic violence and stalking protection orders has been generated by appeals brought by defendants with orders issued against them.  The Task Force acknowledged that survivors often do not file appeals, not only because they are expensive and time-consuming, but because, upon the denial of a request for a final protective order, survivors are particularly vulnerable.[45]

Much of the testimony that the Task Force heard at its public hearing, many of the emailed comments submitted to the Task Force, and information given by survivors who called the Court Information Center's toll-free number concerned the challenges that domestic violence survivors face when they are involved in a marital or parenting case

---

[44] RSA 173-B:5-a (2014)

[45] Detailed information about how to file an appeal is available on the Judicial Branch's website.
  https://www.courts.nh.gov/our-courts/supreme-court/faq

with their abuser.  For instance, survivors and their advocates told the Task Force that some judges have required survivors to mediate family law disputes with their abusers, even though such mediation is not mandatory when domestic violence is an issue.[46]  One survivor stated that although her ex-husband strangled, violently sexually assaulted, stalked, and harassed her, and although she had obtained a protective order, "the family court prioritized co-parenting strategies and forced frequent and routine communication between us."[47]  Other survivors were distressed when they realized that, although their contact information was confidential in their domestic violence case, they were required to give that information and more to their abuser in the context of a parenting or marital case.  Emily Rice, the City Solicitor in Manchester, observed that "protective orders, parenting plans and other Family Division . . . and District Division orders may cross-reference each other in an ambiguous manner, often causing confusion for victims, many of whom must simultaneously contend with aspects of survivorship in multiple judicial and non-judicial forums."  The Task Force recognized the need for better coordination of such cases as well as the need for better coordination of criminal cases and domestic violence cases involving the same people.

The Task Force was informed that, in 2018, the Judicial Branch's Office of Mediation and Arbitration and the Circuit Court used federal funds to partner with the Battered Women's Justice Project to assess how litigants with a history of domestic violence experienced the processing of divorce and parenting cases.  The Battered Women's Justice Project convened meetings of internal and external stakeholders over the course of a year to conduct the assessment, identify findings, and develop recommendations for how to improve safety and accountability for all families.  The assessment included focus groups, direct observations, interviews, surveys, and "mystery shopper" walk-throughs of courts and other court-based resources.  Building upon those recommendations, the Circuit Court determined additional training for court case managers and court-appointed mediators would be beneficial.  Accordingly, in December 2020, the Battered Women's Justice Project trained case managers on topics such as distinguishing coercive control, the multiple forms of abuse, and the impact of domestic violence.  And, in Fall 2021, the Battered Women's Justice Project conducted a joint training of case managers and mediators on domestic violence.  The Circuit Court continues to advance this project but has been limited in its ability to do so because of severe staffing shortages.

---

[46] RSA 461-A:7, V (2018) ("The court shall not order mediation if there is a finding of domestic violence as defined in RSA 173-B:1, unless all parties agree to mediation.")

[47] RSA 461-A:5, III (2018) ("Where the court finds that abuse as defined in RSA 173-B:1, I has occurred, the court shall consider such abuse as harmful to children and as evidence in determining whether joint decision-making responsibility is appropriate.  In such cases, the court shall make orders for the allocation of parental rights and responsibilities that best protect the children or the abused spouse or both. If joint decision-making responsibility is granted despite evidence of abuse, the court shall provide written findings to support the order.")

A police prosecutor expressed concern that a defendant who evades service is "rewarded," so to speak, by the dismissal of the domestic violence petition brought against him or her.  The Task Force observed that Protocol 6-8 advises that a domestic violence case should not be dismissed for lack of service until a year has passed.[48]  Members of the Task Force also noted that RSA chapter 173-B requires that the petition be served on a defendant by a peace officer or the sheriff's department.[49]  In other kinds of cases, such as a petition for divorce, service may be accomplished by certified mail.[50]  Members of the Task Force expressed concern that service of a domestic violence order of protection by alternate service such as certified mail might be inconsistent with federal firearm provisions, which require a defendant to have actual notice.

Members of the public, including law enforcement officers, observed that existing laws do not adequately protect some crime victims from violence.  For instance, a sexual assault survivor, who lacks a family or dating relationship with the perpetrator, cannot obtain a protective order under RSA chapter 173-B.  As some trial judges have noted, sexual assault is neither a sexual nor an intimate "partnership."  Similarly, although RSA 631:9 criminalizes financial exploitation of an elderly, disabled, or impaired adult, if a domestic violence survivor is not elderly, disabled, or impaired, RSA 631:9 does not apply.  Several members of the public informed the Task Force that their abusers controlled them financially.  One survivor, who is now an advocate, commented that "[a]busers often keep their victims from working, having friends or a support system, or being able to have any disposable income at all."

It was reported to the Task Force that some trial courts have ruled that a no-contact provision of a bail order does not apply when an offender is preventatively detained.[51]  In such cases, offenders have been allowed to contact the victims from jail, which has resulted in harassment and witness tampering.  Judicial members of the Task Force observed that if an additional no-contact order were requested when bail was set, it is possible that one could be issued; the Supreme Court has not yet ruled upon that legal issue.

Task Force members noted another gap in the bail context: if a defendant declines the services of a bail commissioner and is preventatively detained without bail pending

---

[48] https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-06/c6.pdf

[49] RSA 173-B:3, II

[50] RSA 458:9, II(a)(2) (2018)

[51] See State v. Dukette, Case No. 2011-0260, 2013 WL 11983166, at *1 (N.H. Feb. 6, 2013) (in a non-precedential order, a 3JX panel of the Supreme Court ruled that a no-contact condition in a bail order did not apply when a defendant never posted bail and remained incarcerated)

arraignment, there is no automatic prohibition against the defendant contacting the victim.

A member of the public observed that currently, RSA 173-B:9, I(a) allows, but does not require, officers to make an arrest without a warrant within 12 hours when a defendant violates a protective order and the officer has probable cause.  That public member further observed that the statute is silent with regard to when officers should apply for warrants if they are unable to make a warrantless arrest within the 12-hour period.

Megan Ryan, an assistant county attorney in Rockingham County, and Kate Winter, the Victim Witness Coordinator in the Rockingham County Attorney's Office, observed that New Hampshire, unlike many other states, does not require that satisfactory completion of a court-approved batterer's intervention program be made a condition whenever a defendant is convicted of the crime of domestic violence.

Many Task Force members felt that it would be beneficial for stakeholders to review all of the New Hampshire statutes relevant to domestic violence and make comprehensive recommendations to the legislature regarding possible statutory changes.  Some areas for review might include:

- Modifying the current statutory definition of "abuse"
- Adding "coercive control" language to RSA chapter 173-B, similar to the language enacted in California, Connecticut, and Hawaii
- Requiring the defendant, after the plaintiff has established a prima facie case of abuse, to show that he or she did not engage in conduct that posed a credible present threat to the plaintiff's safety
- Adding new civil relief for survivors of sexual assault and of financial abuse
- Adding violations of protective orders issued in parenting cases to RSA 173-B:9, III
- Amending RSA chapter 173-B so that, when a plaintiff appeals the denial of a final domestic violence protective order, the temporary protective order remains in place and the appeal is expedited
- Providing for a grace period for motions to extend domestic violence final orders of protection
- Requiring every defendant convicted of an offense involving domestic violence to complete a batterer's intervention program or, alternatively, mandating that, if a judge waives that requirement, the judge make written findings detailing why requiring the offender to complete such a program is inappropriate
- Amending the bail statute to make clear that no-contact provisions of bail orders apply when an offender has been preventatively detained

- Amending RSA 173-B:9, I(a) to make mandatory the 12-hour period to arrest a defendant without a warrant for violating a protective order and to require officers to apply for a warrant immediately if they are unable to arrest a defendant without a warrant within the 12-hour period
- Enacting legislation to protect the privacy and ensure the safety of a survivor, who has obtained a domestic violence order of protection, when the survivor and the abuser are also involved in a family law case
- Reviewing Washington's comprehensive state statute on litigation abuse
- Amending the applicable statutes to waive fees for obtaining a civil restraining order in Superior Court if the allegations relate to intimate partner violence, elder abuse, or sexual assault
- Amending RSA 490:32, relative to the Judicial Performance Evaluation system

## C.  Task Force Recommendations

**Recommendation 2.1:** Representatives of the Judicial Branch should establish a working group to include criminal defense attorneys, county attorneys, and attorneys representing parties in civil protection order cases to discuss how best to streamline a criminal case and a civil domestic violence case involving the same parties.

**Recommendation 2.2:** The Judicial Branch should seek additional funding to continue the work of the Office of Mediation and Arbitration and the Circuit Court, in partnership with the Battered Women's Justice Project, to improve safety and accountability for litigants with a history of domestic violence who are also involved in family law matters.

**Recommendation 2.3:** The Judicial Branch should seek additional funding such that more educational opportunities are available and judicial and clerical caseloads are sufficiently reduced to allow for additional time to be devoted to education.

**Recommendation 2.4:**  A stakeholder group with expertise in the area of domestic violence should review existing New Hampshire statutes regarding domestic violence and determine whether any of the areas of review, set forth above, should be advanced through the legislative process.

**Charge 3:** *Recommend criteria for the Judicial Branch to make public on its website appellate decisions related to RSA chapters 173-B and RSA 633:3-a*

### A.  Judicial Branch's Current Practice

The New Hampshire Supreme Court decides cases either by issuing an "opinion" or an "order."  The court's opinions constitute "precedent," which is binding on all state courts, including the New Hampshire Supreme Court.  Supreme Court opinions are published in hard-bound books and on the court's website.[52]  Opinions make up only approximately 11% of the court's annual dispositions.

Some Supreme Court orders are procedural and do not decide the merits of a dispute.  Such orders may dismiss, decline, or grant withdrawal of an appeal.  They are not published in books or on the court's website.  These orders comprise approximately 52% of the court's annual dispositions.

Other Supreme Court orders <u>do</u> decide the merits of a dispute.  They are referred to as "final orders."  They have no precedential value, which means that they are not binding authority (except in the cases in which they were issued).  Non-precedential final orders comprise approximately 37% of the court's annual dispositions.

These orders are not published in books, but are posted on the court's website, unless they involve domestic violence or stalking orders of protection or are issued in a case that the legislature has deemed to be "confidential," such as abuse and neglect and juvenile delinquency cases.[53]  Even though the legislature has not designated domestic violence or stalking cases as "confidential," the court does not post its final orders on the merits in those cases so as to comply with the federal Violence Against Women Act (VAWA) of 1994.[54]  The VAWA prohibits a State from making "available publicly on the Internet any information regarding the registration, filing of a petition for, or issuance of a protection order, restraining order, or injunction . . . if such publication would be likely to publicly reveal the identity or location of the party protected under such order."[55]  Although non-precedential final orders in domestic violence and stalking cases are not published on the Supreme Court's website, they are available to the public at the Supreme Court building and in the local case file after the case is resolved.  Moreover,

---

[52] https://www.courts.nh.gov/our-courts/supreme-court/orders-and-opinions/opinions

[53] https://www.courts.nh.gov/our-courts/supreme-court/orders-and-opinions/case-orders

[54] 18 U.S.C. § 2265(d)(3) (2018)

[55] <u>Id</u>.

such orders are circulated to trial judges via email, and, indeed, trial judges can and do consider the Supreme Court's non-precedential final orders when deciding domestic violence cases.

The court's current practice regarding posting non-precedential final orders on its website differs from its past practice.  The court began posting non-precedential final orders issued in non-confidential cases, decided by the court's "3JX" panels in 2004.[56]  In 2014, the court began posting all of its non-precedential final orders issued in non-confidential cases.   The court adopted its current practice of not posting non-precedential final orders issued in domestic violence and stalking cases in 2018.  From 2018-2021, the court issued 23 non-precedential final orders in domestic violence appeals and 10 non-precedential final orders in stalking appeals.

Supreme Court Rules 12-D and 20 allow parties to rely upon non-precedential final orders in their pleadings in any state court, so long as they identify the final order as a non-precedential order and so long as the final order was not issued in a confidential case.

**B.  Task Force Discussions**

The Task Force agreed with the Internal Review Committee that the Supreme Court's relatively recent practice of not posting non-precedential final orders involving domestic violence and civil stalking has created a disconnect between the understanding that the public and practitioners have about the state of the law in such cases and the understanding that trial judges have.[57]  Although such orders are public and are available at the supreme court building and in the local case file, they are more difficult for members of the public to access because they are not posted on the court's website. Although non-precedential final orders are not binding, they constitute persuasive authority upon which trial judges may rely.  To the Task Force's knowledge, no statute or court rule precludes the court from posting non-precedential final orders issued in domestic violence and stalking cases, provided that each order is drafted to omit identifying information and any other information that would compromise the confidentiality required by the VAWA.  Of note, because domestic violence and stalking could be part of a case that the legislature deems to be confidential, such as a juvenile

---

[56] Under Supreme Court Rule 12-D, cases meeting certain criteria may be set for oral argument before a panel of three justices, which is referred to as a "3JX panel."

[57] Report of the Internal Review Committee at 22, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-11/report-of-the-internal-review-committee-on-the-case-of-l.s.-v.-r.l.pdf

case, it is not possible for the court to post on its website <u>every</u> non-precedential final order that pertains in any way to domestic violence or stalking.

**C.  Task Force Recommendation**

**Recommendation 3.1:** Non-precedential final orders in domestic violence and civil stalking cases should be published on the New Hampshire Supreme Court's website without information that would compromise the confidentiality mandated by the VAWA.

## Charge 4: *Review court forms as they relate to protection from domestic violence and make recommendations for improvement*

### A.  Current Court Forms

Currently, petitions for domestic violence and stalking orders of protection use separate forms that are designed so that the orders qualify for inclusion in NCIC.  Form petitions ask plaintiffs to provide unstructured narratives about the alleged abuse.[58]  Although the forms do not list or describe the elements that a plaintiff must prove to obtain relief, the protocols require court staff to assist plaintiffs in completing the forms.  Specifically, Protocol 5-7 requires court staff to "instruct the plaintiff to be specific when completing the petition about the facts causing fear for safety, including dates and times at which events occurred," if known.  The protocol provides that "[i]f the plaintiff has difficulty reading, hearing, writing, or understanding the English language, staff shall fill out the form or provide an interpreter."  In addition, Protocol 5-13 provides that if, after the judge reviews the petition, "the allegations are unclear or purely summary in nature, the plaintiff should be requested and allowed to provide more detail."  Further, Protocol 5-15 requires a judge to have contact with the plaintiff before denying temporary relief.  As the introduction to the protocols explains, "[w]hile it is not the judge's role to 'fill in the holes' in the plaintiff's petition, it is an appropriate expectation that a judge will make inquiries to clarify facts, test credibility and assist the plaintiff in applying the proof in an ex parte hearing."  Because the defendant has a right to notice of the allegations upon which the plaintiff bases his or her petition, it is often incumbent upon the judge to make certain that the petition's written allegations reflect the facts upon which the ex parte order is issued.

The Judicial Branch's Language Access Committee is looking at how to make court forms accessible to non-English speakers given the statutory mandate that all "[w]rits, declarations, processes, indictments, answers, pleadings and entries of record in the courts be in the English language, and in no other."[59]  Through the use of federal grant funds, some forms have already been translated into Arabic, Spanish, and French.

The Internal Review Committee observed that the petition in the case of L.S. v. R.L. was somewhat confusing and difficult to follow.  The Committee concluded that the confusing nature of the petition resulted, in part, from the layout of the form itself, which not only calls for an unstructured narrative but also provides limited space for that narrative.  The Internal Review Committee further observed that the petition is not

---

[58] https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-04/nhjb-2050-df.pdf
[59] RSA 509:1 (2010)

structured to help the plaintiff meet the requisite legal standard, such as providing separate sections for the plaintiff to allege particular acts of abuse and to describe why the defendant is a present credible threat. Additionally, the form does not make clear to the plaintiff that any fact upon which he or she wishes to rely at the final hearing must be alleged, at least generally, in the petition. The Internal Review Committee opined that the addition of clear guidance and structure to the petition might be helpful to plaintiffs.[60]

## B. Summary of the Task Force's Discussions

The Task Force observed that survivors often do not understand the differences between domestic violence and stalking petitions and need information to enable them to make an informed choice about whether to apply for one or other or both. As the Internal Review Committee noted, "[b]oth types of protective orders are available to victims of [intimate partner violence] and provide similar protections, but have different legal standards, meaning that an [intimate partner violence] victim may be entitled to one kind of protection but not the other."[61] The Task Force was informed that, although the protocols envision that court staff will help plaintiffs decide which form to file, this is not happening as regularly as originally envisioned, perhaps because of a concern that doing so would violate the prohibition against giving legal advice to litigants. Circuit Court judges find it frustrating to have to deny a protective order to a plaintiff merely because the plaintiff sought the wrong kind of relief. However, at the final hearing, the court cannot simply convert a petition for one kind of protective order to a petition for a different kind of protective order without providing the defendant notice and an opportunity to be heard.

The Task Force further observed that the forms necessary to file a petition for a domestic violence or civil stalking protection order are not easily located on the Judicial Branch's website[62] and that plaintiffs may not want to complete forms at the court. If forms were more easily accessible on the Judicial Branch's website, plaintiffs could fill them out wherever they feel safest. However, plaintiffs would need access to a computer and printer.

Because the forms for petitions for domestic violence and stalking orders are not directive, survivors and their advocates may not understand what kind of information must be provided so that a survivor can obtain the protection he or she needs.

---

[60] Report of the Internal Review Committee at 22-23. available at
https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-11/report-of-the-internal-review-committee-on-the-case-of-l.s.-v.-r.l.pdf

[61] Id. at 23

[62] https://www.courts.nh.gov/our-courts/circuit-court/family-division/forms/domestic-violence

Another issue concerns extensions of final orders.  A survivor testified at the public hearing that she did not understand that she could have sought to extend her order of protection before the order expired.  Members of the Task Force observed that this information is not prominently displayed on the final order of protection.

Another concern relates to criminal matters.  Assistant County Attorney Ryan and Victim Witness Coordinator Winter noted that the Superior Court lacks an acknowledgment and waiver of rights form that is specific to domestic violence, informing a defendant that a conviction for domestic violence precludes him or her from possessing, purchasing, controlling, or owning firearms and ammunition.

With respect to forms, Manchester City Solicitor Rice urged that "consideration . . . be given to the fact that some victims have limited English proficiency."  She also suggested that "an effort . . . be made to maintain and enhance survivor participation in the justice system through remote access, electronic filing, text-notification, apps and other tools widely available to the public."

Assuming that the Judicial Branch creates a standing branch Domestic Violence Committee, as previously suggested, the Task Force recommended that the committee review, with input from external stakeholders as necessary, the following Task Force ideas:

- Whether to create a petition that would allow someone to apply for both a domestic violence protective order and a civil stalking protective order simultaneously
- How to make form petitions for domestic violence and stalking protection orders more user-friendly and directive so that plaintiffs have a better idea of what is required of them in order to obtain those orders
- Whether it is possible to develop a mechanism to notify a survivor of the upcoming expiration of the protective order to include a reminder of the deadline to apply for an extension, if one is desired, without jeopardizing survivor safety
- Whether forms should bear a QR code through which assistance, including translation, is immediately available
- Whether it is possible and appropriate for petitions for domestic violence or stalking orders of protection to be e-filed, given the confidentiality and safety concerns attendant to those cases and the limitations of the current e-filing software

## C.  Task Force's Recommendations

**Recommendation 4.1:** Stakeholders should create a flowchart that helps plaintiffs decide whether to file a petition for a domestic violence protective order or a civil stalking protective order and provide those materials to survivors directly or, if appropriate, leave them at court locations. [63]

**Recommendation 4.2:** Court forms should be more easily accessible on the Judicial Branch's website. Currently, a plaintiff has to know in what court a petition needs to be filed in order to find a form.

**Recommendation 4.3:** The final order of protection should clearly and visibly include the deadline for filing a motion to extend the order.  Information about renewing orders of protection should be included in the Judicial Branch's website, brochures, and videos to assist litigants in domestic violence and stalking cases.

**Recommendation 4.4:** The Superior Court should notify the defendant, at the time of arraignment, of the consequences of a domestic violence criminal conviction in relation to the possession and ownership of firearms.

---

[63] https://www.nhla.org/assets/customContent/2017.03.16._DV-Pamphlet_in_Publisher_FINAL_pdf.pdf

## Charge 5: *Explore opportunities to provide victims of domestic violence increased access to assistance from attorneys and victim advocates*

### A.  Current State of Legal Assistance and Advocate Assistance for Domestic Violence Survivors

#### 1. Legal Assistance

Few survivors of domestic violence have the financial resources to hire their own attorneys.  As a result, many survivors are forced to navigate our complicated legal system on their own.  Indeed, between 2010 and 2020, only approximately 11.6 percent of those seeking domestic violence protection orders were represented by counsel; only approximately 4.6 percent of those seeking civil stalking orders had counsel.[64]  In 2021, only 13% of those seeking domestic violence orders of protection and only 5% of those seeking stalking orders of protection had counsel.

Survivors who represent themselves in court are at a disadvantage.  Unaware of the various forms of relief available to them, self-represented litigants may not ask for all of the relief they need.  They may end up with court orders that do not include provisions for child support, payment of rent, or safe visitation.  Without this relief, abuse survivors remain at risk, often struggle financially, and may find they have no other choice but to return to the abuser, a choice that can have wide-ranging consequences for them and their children.[65]

Low-income plaintiffs seeking domestic violence and stalking orders of protection may be eligible for free or low-cost legal services in New Hampshire as follows:

- New Hampshire Legal Assistance,[66] through its Domestic Violence Advocacy Project, represents survivors in high-lethality protective order cases and divorce and parenting cases.  Although New Hampshire Legal Assistance has previously provided on-site, unbundled assistance to domestic violence survivors at crisis centers, when

---

[64] Report of the Internal Review Committee at 26, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-11/report-of-the-internal-review-committee-on-the-case-of-l.s.-v.-r.l.pdf

[65] "Children Exposed to Domestic Violence Are at Greatly Increased Risks for All Other Forms of Child Abuse and Family Violence, According to National Study" (Oct. 19, 2010), available at https://www.unh.edu/unhtoday/news/release/2010/10/19/children-exposed-domestic-violence-are-greatly-increased-risks-all-other

[66] New Hampshire Legal Assistance was created in 1971 through the merger of Southern New Hampshire Legal Services and Tri-County Legal Services.  New Hampshire Legal Services provides civil legal services to New Hampshire's poor.

603 Legal Aid was formed,[67] and when the COVID-19 pandemic began, it was decided that New Hampshire Legal Assistance would focus its limited attorney resources on representing survivors in court.

- 603 Legal Aid provides centralized intake and referral for income-eligible litigants seeking civil legal advice and representation.  Crisis center advocates now facilitate online applications for legal services with their clients, which go to 603 Legal Aid for review.  Survivors seeking representation for domestic violence or stalking protective order hearings are connected with 603 Legal Aid's DOVE project to link them either with a volunteer attorney, who takes the case on a pro bono basis, or a New Hampshire Legal Assistance staff attorney. Additionally, survivors seeking representation in family law cases are assigned to 603 Legal Aid's domestic violence staff attorney for assessment and placement with either a volunteer lawyer or New Hampshire Legal Assistance for representation.  This collaboration unites the expertise of domestic violence advocates with specially-trained volunteer lawyers or New Hampshire Legal Aid staff attorneys to respond to survivors seeking advice or representation with their civil legal needs.  If it is not possible for either a volunteer attorney or a New Hampshire Legal Assistance attorney to represent a survivor, 603 Legal Aid's domestic violence staff attorney provides telephone consultations to prepare the survivor for hearings in the survivor's civil cases.  In addition, since 2009, 603 Legal Aid's DOVE Project, in partnership with crisis centers serving Coos, Upper Grafton, and Carroll Counties, has provided unbundled legal services to domestic violence survivors.  In the past, DOVE volunteer attorneys traveled to have in-person consultations with survivors in North Country crisis centers and provided telephone consultations on specific days.  The program now provides telephone consultations only on an as-needed basis.

- The New Hampshire Bar Association Lawyer Referral Service Modest Means Program matches those who prequalify with a licensed New Hampshire attorney, who charges reduced fees to income-eligible applicants.  The Lawyer Referral Service Full Fee Program also links clients for domestic violence and stalking protective orders for those who can afford to pay the full rate.

Despite these efforts, the demand for legal services remains high, and often requests for services are unmet due to a lack of available resources.  There continues to be a gap

---

[67] In June 2021, the Legal Advice & Referral Center and the Pro Bono Referral Program run by the New Hampshire Bar Association merged into a new organization, 603 Legal Aid.  603 Legal Aid hosts a central call center for people seeking civil legal aid and maintains a program to recruit, train, and coordinate volunteer attorneys.  603 Legal Aid also handles intake for connecting New Hampshire Legal Assistance clients to New Hampshire Legal Assistance attorneys and paralegals.

between the needs of low-income New Hampshire residents and the legal services available to them, with domestic violence identified as one of the most pressing needs.[68] The New Hampshire Legal Needs Study commissioned by the New Hampshire Access to Justice Commission and the Legal Advice and Referral Center found that, in 2010, although more than 250,000 people in New Hampshire were financially eligible for free legal assistance, and an estimated 149,101 of these people had legal needs annually, New Hampshire Legal Assistance was able to offer services in only 8,403 cases.[69] There is no evidence that, in the 12 years since the study was conducted, the gap between the needs of low-income New Hampshire residents and the legal services available to them has appreciably diminished.

## 2. Advocate Assistance

In 2019, the State's community crisis centers served 14,500 primary and secondary victims, including victims of domestic violence, victims of sexual assault and stalking victims.[70] New Hampshire has 12 community-based crisis centers. Some crisis centers are their own independent organization; others are embedded in larger agencies or institutions.

The Coalition administers state and federal grants that fund the local crisis centers. The Coalition also provides technical assistance to, and engages in legislative advocacy on behalf of, the crisis centers. In addition, the Coalition operates a 24/7 statewide, toll-free domestic and sexual violence helpline, which provides free and confidential support to anyone who has been impacted by domestic and sexual violence or stalking. Individuals do not need to be in crisis to call.

Each crisis center also operates its own crisis line number that helps connect survivors to confidential advocates. Many crisis centers also operate confidential text messaging and online chat features as additional methods through which survivors can reach a crisis center advocate and seek support.

The primary role of a crisis center advocate is to inform survivors of their options and resources available to them. Advocates support survivors as they make decisions and

---

[68] New Hampshire Supreme Court Access to Justice Commission, <u>The Justice Gap: A Study of the Legal Needs of New Hampshire's Low-Income Residents</u> at 2 (Feb. 2013), available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-07/legal_needs_study.pdf

[69] New Hampshire Supreme Court Access to Justice Commission, <u>The Justice Gap: A Study of the Legal Needs of New Hampshire's Low-Income Residents</u> at 2 (Feb. 2013), available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-07/legal_needs_study.pdf

[70] https://www.nhcadsv.org/victimsserved.html

help them navigate the options they have chosen.  Advocates also provide survivors of domestic violence and stalking with safety planning.  Services that crisis center advocates provide may include accompanying survivors to courts, hospitals, and police departments, and accessing assistance from legal, housing, and economic resources.  All services offered by New Hampshire's crisis centers are free and confidential and are provided by both paid staff and volunteers.  Each crisis center recruits and trains its own advocates, although the content of the training is directed by the Coalition's Program Standards.

Although all crisis centers provide safety planning to survivors seeking a protective order, the level of assistance that a survivor may receive in court from a crisis center advocate may differ.  Some crisis center advocates are able to help plaintiffs more than others.

The communications between a crisis center advocate and a survivor are privileged pursuant to RSA chapter 173-C, provided the statutory requisites are met.  Both full-time advocates and volunteer advocates are required to go through 30 hours of training in order to establish privilege. Many programs utilize volunteer advocates to do court accompaniments in addition to paid staff.  However, because court work is complex and because survivors going to court often seek follow-up support, crisis centers tend to rely upon paid staff, rather than volunteers, to provide court assistance to survivors.  Crisis centers in New Hampshire lack sufficient staff to provide in-court assistance to every survivor who needs it.  Nor do the centers have the staff to maintain a daily presence at all of the courthouses in the State.

In addition to crisis center advocates, some, but not all, police departments have victim advocates.  These victim advocates provide some services to domestic violence survivors when there is an arrest for domestic violence.  However, victim advocates do not help survivors with safety planning and their communications with survivors are not privileged under RSA chapter 173-C.

The AmeriCorps Victim Assistance Program also provides services to domestic violence and stalking victims.  In 2008, New Hampshire had 26 AmeriCorps advocates, many of whom were specifically trained to assist in the filing of domestic violence petitions as part of the safety planning process.  However, the focus of the program has shifted to financial literacy services because of changes in the targeted areas established through the federal grant that funds the program.  Currently, there are only nine AmeriCorps advocates working in New Hampshire crisis centers.

**B.  Summary of Task Force Discussions**

The Task Force discussed, generally, the need to enhance access to legal services and victim advocate services for survivors of domestic violence within current budget and staffing constraints.  The Task Force agreed with the Statewide Domestic Violence Advisory Committee that "having advocates and attorneys available at the earliest moment in the process . . . is the ideal situation" and that "[a] well-crafted petition will assist the court in determining whether to issue an order and will provide an outline for the final hearing."  The Task Force also acknowledged that the past structure of embedding New Hampshire Legal Assistance attorneys within crisis centers was highly beneficial to domestic violence survivors and that maintaining such a structure would require state funding, given the vicissitudes of federal funding.  The Task Force recognized that federal funding for domestic violence survivors is limited and that several entities and agencies compete for federal grant dollars.

**C.  Task Force Recommendations**

**1.  Legal Assistance**

**Recommendation 5.1.1:** The Judicial Branch should publicize the availability of "NH Law About" guides prepared by the New Hampshire Law Library regarding domestic violence protective orders.  The guides are available on the Judicial Branch's website and at the law library.

**Recommendation 5.1.2:** Legal services organizations and law schools should explore whether it is feasible to create on creating a program in which law students, supervised by attorneys, help survivors complete domestic violence petitions.  Perhaps there is a way for law students to work with survivors at crisis centers, with phone access to attorneys.

**Recommendation 5.1.3:** 603 Legal Aid should explore whether projects similar to DOVE could be created to enable volunteer attorneys help survivors draft domestic violence petitions and to represent them on appeal.  Perhaps, the North Country pilot program to provide unbundled legal assistance to domestic violence survivors could be reinstated and expanded.

**Recommendation 5.1.4:** The Judicial Branch should explore the impact and feasibility of regularly allowing volunteer attorneys in domestic violence order of protection cases to appear remotely.

**Recommendation 5.1.5**:  The Access to Justice Commission should continue its efforts to increase the pro bono participation of the private bar, particularly in domestic violence, stalking, restraining order cases, and related appeals.

**Recommendation 5.1.6**: Victim witness advocates should direct survivors in criminal domestic violence cases to the local crisis center for safety planning with a confidential advocate and to 603 Legal Aid for assessment regarding their civil legal needs.

**Recommendation 5.1.7**: New Hampshire Legal Assistance, in consultation with other stakeholders, including those in the Judicial Branch, should create a "What You Need To Know" Fact Sheet for survivors of domestic violence that informs them of the burden of proof necessary to obtain a protective order, the factors that the court considers, a definition section for relevant terms, and an outline of the basic process, with, perhaps, a sample form showing what goes where.  The fact sheet should be made available in court locations around the State.

**Recommendation 5.1.8**:  New Hampshire Legal Assistance, with help from other stakeholders, should seek increased appropriations from the state for legal services to be embedded within crisis centers.

## 2.  Advocate Assistance

**Recommendation 5.2.1**:  The staffing levels and volunteer base for crisis centers should be increased so that there is an advocate trained to provide court-accompaniment available at each Circuit Court location.  Even if an advocate could not be at a courthouse full-time, courts and crisis centers should endeavor to identify ways to maximize availability, perhaps by allowing plaintiffs to have remote, direct access to crisis center advocates while at the courthouses.

**Recommendation 5.2.2**: Local police departments should be encouraged to hire victim witness advocates and to apply for federal grant money to fund those positions.  Local police departments with victim witness advocates should be encouraged to partner with the relevant local crisis center to provide services to domestic violence survivors.

**Recommendation 5.2.3**: Crisis center brochures should be made available in court locations around the state as appropriate.

**Charge 6:** *Analyze the current state of relationships between the courts, law enforcement, the criminal defense bar, and domestic violence advocates and steps that can be taken to improve communication*

In the past, there were a number of means by which private stakeholders and public officials could work together to develop and implement programs to reduce domestic and sexual violence in New Hampshire. One such mechanism was the very successful Governor's Commission on Domestic and Sexual Violence, originally created by the late Governor Stephen E. Merrill. The Commission was active from 1993 until 2013 when its then-chair stepped down, and no new chair was chosen. Subsequent efforts to identify a Chair were unsuccessful.

The Commission was comprised of several committees, each focusing on separate goals. The Commission provided the platform for the subcommittees' work in furthering the Commission's mission. Although the Commission as a whole has not met since 2013, some of its committees have continued to meet and do work. The status of eight of those committees is as follows:

(1) The Public Education Committee has been inactive since 2013. When it began, the committee conducted public hearings around the state and then produced a comprehensive report and video. This committee also produced reports on domestic violence and sexual assault.

(2) The Research Committee has been inactive since 2013. This committee examined the multidisciplinary responses to violence against women in an effort to determine best practice interventions.

(3) The Supervised Visitation Committee has been inactive since 2013. This committee, among other things, produced domestic violence protocols for supervised visitation.

(4) The Batterer's Accountability Committee is still active. This committee published Batterer's Intervention Standards in 2002 and then trained providers and other stakeholders regarding those standards. A workgroup of the committee met in 2018 to discuss updating the Batterer's Intervention Standards but decided that without funding and an agency to oversee the certification and monitoring of batterer's intervention programs, it would be difficult to update the 2002 standards.

(5) The Domestic Violence Fatality Review Committee is inactive currently, although its executive committee remains active. The committee was created by Executive Order of Governor Jeanne Shaheen in July 1999. The committee's purpose is to

review deaths related to domestic violence to recommend improvements to the systemic response to domestic violence and to reduce future fatalities. The committee met until 2019, when it suspended case reviews pending legislation granting it the authority to obtain and share information needed for its work. The Executive Committee of the Domestic Violence Fatality Review Committee continues to meet to examine national best practices for fatality review and explore new models and approaches to conducting case reviews. In addition, the Judicial Branch, Coalition, and Office of the Attorney General continue to provide data to inform the biennial Domestic Violence Fatality Review Report.

(6) The Violence Against Women Campus Consortium Committee remains active. It supports and advises the New Hampshire Campus Consortium Against Sexual and Interpersonal Violence. In 2015, the Office of the Attorney General secured funding to hire a part-time coordinator to assist the consortium.

(7) The Conference and Training Committee remains active. This committee grew out of the First Statewide Conference on Family Violence in 1994. It was supported by state, private, and federal grant funding and co-sponsored by the Judicial Branch, the New Hampshire Bar Association, and the New Hampshire Bar Foundation. In the past, this committee, together with the Office of the Attorney General, coordinated and sponsored an annual statewide two-day professional conference on issues related to domestic and sexual violence and stalking. The Office of Victim/Witness Assistance, which is part of the Office of the Attorney General, has continued to provide leadership and resources to ensure that professionals within the criminal justice system and other allied professionals are provided with current and national best practices and trauma-informed training. This has included the annual Partnering for a Future Without Violence conference, as well as various day-long trainings; these trainings, however, no longer focus exclusively on domestic violence and stalking. Moreover, since the work of this committee has moved to the Office of Attorney General, the focus of the conference has shifted to becoming more prosecution-focused. Accordingly, judges have become concerned that attending such trainings could create the appearance of partiality. All of these training efforts are solely supported through federal grant funding, which, like state funding, has declined significantly over the last decade. Additionally there are considerable restrictions on how the funding may be spent.

(8) The Protocol Committee is still active. Following the lead of the Judicial Branch's protocol effort, this committee developed statewide multidisciplinary protocols on standardizing the handling of domestic violence cases. The Attorney General's Office of Victim/Witness Assistance has continued to provide leadership and

resources ensuring that professionals involved in the civil and criminal justice system are provided with current and national best practices.  In 2020, The Model Protocol for Law Enforcement Response to Domestic Violence was updated. Protocols currently scheduled for update include the Stalking Protocol for Law Enforcement, Domestic Violence Protocol for Prosecutors, Domestic Violence Protocol for Medical and EMS Providers, and Domestic Violence Protocol for Mental Health Providers.

In conjunction with the First Statewide Conference on Family Violence in 1994, the then-District Court (now Circuit Court) launched Domestic Violence Coordinating Councils. Each Council was chaired by a District Court judge.  Participating members included court staff, law enforcement, prosecutors, attorneys, the New Hampshire Division of Children, Youth and Families and others from the New Hampshire Department of Health and Human Services, visitation centers, educators, medical and mental health providers, and batterer's intervention programs.  Currently, only one Coordinating Council regularly meets.

One means by which key stakeholders involved in domestic violence cases coordinate and communicate with one another currently is through New Hampshire Legal Assistance's Statewide Domestic Violence Advisory Council.  The advisory council includes New Hampshire Legal Assistance, 603 Legal Aid, the Coalition and its member crisis centers, the Strafford County Family Justice Center,[71] the Merrimack County Supervised Visitation Center, the State Police, Catholic Charities, and the Attorney General's Office of Victim/Witness Assistance.  The advisory council has been meeting regularly for nearly two decades.  The advisory council seeks to improve access to legal services while analyzing effective legal representation and identifying systemic issues within the family court system adversely affecting survivors.  The Judicial Branch is not part of the advisory council, in part, because judicial participation in the advisory council, as currently configured, could be perceived as partiality.

The Judicial Branch primarily coordinates and communicates with key stakeholders through the Domestic Violence Program Manager position, which has existed in one form or another for more than two decades.  The Domestic Violence Program Manager manages the operations of the Protection Order Registry and works closely with court personnel and external partners at all levels.  This position plays a key role in managing grants for domestic violence and stalking initiatives.  The Domestic Violence Program

---

[71] The Strafford County Family Justice Center provides support and services to victims and survivors of domestic violence, sexual assault, elder abuse, stalking, and human trafficking.  The center coordinates services from a variety of partner agencies under one roof so that victims and survivors can easily and quickly access the help they need, as many times as necessary.  Most services are free.

Manager serves as the liaison between stakeholders and the Judicial Branch for issues related to domestic violence, stalking, and protection orders. The Domestic Violence Program Manager coordinates revisions to the domestic violence protocols and forms as necessary. The current Domestic Violence Program Manager is Attorney Jean Kilham. Attorney Kilham joined the New Hampshire Judicial Branch in 2021 after serving as a prosecutor in Cheshire County for more than 13 years.

In addition, the Judicial Branch participates in the New Hampshire Bar Association's Committee on Cooperation with the Courts. This committee, which has members from both the bench and the bar, "monitors the rules, practices and procedures of the New Hampshire courts and serves as a conduit for information and discussion about such matters between Association members and other entities within the organization and the profession."[72] The committee meets monthly.

## B.  Summary of Task Force Discussions

The Task Force generally agreed that there is a need for more communication and cooperation among and between stakeholders and the Executive and Judicial branches. The Coalition observed that, in years past, it met quarterly with the Administrative Judge for the Circuit Court and others; however, at some point in the last decade, those quarterly meetings ceased. Recently, those meetings have resumed.

The Task Force also heard that since the Circuit Court was created in 2011, and the former district, probate, and family division courts were administratively merged, it has been a challenge for Circuit Court judges and members of stakeholder organizations to meet regularly. The lack of community connectedness may stem in part from a shortage of judicial officers, requiring Circuit Court judges to sit in numerous locations with heavy dockets that allow little time for interdisciplinary meetings. Task Force members recognized the value of having judges who understand the local community by hearing cases in both family and district divisions in the courthouse. Through Chief Justice Gordon MacDonald's leadership, there have been additional judicial positions budgeted, and progress continues toward fully staffing the necessary judicial resources for the Circuit Court, which should increase the capacity for judicial officers to build long-term relationships with the communities they serve.

The Task Force was informed that the Family Justice Center in Strafford County provides a good model for institutionalizing cooperation and coordination among community-

---

[72] https://www.nhbar.org/nhba-committees/#:~:text=Committee%20on%20Cooperation%20with%20the%20Courts%20This%20committee%2C,other%20entities%20within%20the%20organization%20and%20the%20profession.

based and governmental partners that provide services for survivors of domestic violence, sexual assault, and other crimes.

The Task Force also observed that among the agencies involved in domestic violence cases, there are overlapping programs, which have resulted in inefficiencies; if those inefficiencies were addressed, limited resources could be better utilized.  For instance, the Task Force noted that low-income survivors seeking free or reduced rate legal assistance in domestic violence cases are vetted through a centralized intake system coordinated by 603 Legal Aid.  Some on the Task Force wondered whether crisis centers might benefit from some better coordination of services.

## C.  Task Force Recommendations:

**Recommendation 6.1:** The Governor's Commission on Domestic and Sexual Violence should be reconvened, a chairperson should be appointed, and funding should be identified to support a coordinator for the Commission.

**Recommendation 6.2:** A reconvened Governor's Commission on Domestic and Sexual Violence should rekindle the work of the Domestic Violence Fatality Review Committee and expand its purview to include reviewing near-death cases.  If the Commission is not reconvened, the Office of Attorney General should consider this expansion.

**Recommendation 6.3:**  The Domestic Violence Program Manager should continue to convene the quarterly meetings, which recently resumed, between the New Hampshire Coalition Against Domestic and Sexual Violence and the courts' administrative judges.

**Recommendation 6.4:** The Statewide Domestic Violence Advisory Council should continue to share concerns with the Judicial Branch and should consider whether a representative from the Judicial Branch, such as the Domestic Violence Program Manager, could be invited to attend the council's meetings or a part thereof.

**Recommendation 6.5:** Crisis center advocates should continue to share "real-time" issues that arise in specific cases with the Domestic Violence Program Manager.

**Recommendation 6.6:**  The Judicial Branch should seek additional funding so that the Domestic Violence Program Manager has increased administrative support to enhance the work of the proposed Judicial Branch Domestic Violence Committee and related multidisciplinary efforts.

**Recommendation 6.7**:  Relationships between crisis centers and courts in their service areas would be strengthened by regular meetings of court staff, judges, crisis center personnel, prosecutors, New Hampshire Legal Assistance, 603 Legal Aid, and victim witness advocates.  The Domestic Violence Program Manager could coordinate these meetings.

**Recommendation 6.8:** Discussions and outreach among the various agencies working in the domestic violence arena should continue on an ongoing basis to strengthen and coordinate efforts to support survivors.

**Recommendation 6.9**:  If feasible, regional centers, akin to the Strafford County Family Justice Center, should be created.

## Charge 7: *Other Relevant Subject Matters*

### A. Transparency and Judicial Accountability

Over the years, the Judicial Branch has taken measures to ensure public confidence in the court system through accountability and transparency. For instance, for the past 30 years, the Judicial Branch has conducted a judicial performance evaluation for all of its trial court judges. In 2000, with the adoption of Supreme Court Rule 56, the program was expanded to include the Supreme Court, the Chief Justice of the Superior Court, and the Administrative Judges of the Circuit Court. Under the judicial performance evaluation program, all trial court judges and marital masters are evaluated at least once every three years.[73] The trial courts use a standardized evaluation form, and the Supreme Court adopted uniform Trial Court Performance standards in seven categories: (1) performance (including the ability to identify and analyze issues, judgment, and application of the law); (2) temperament and demeanor; (3) judicial management skills; (4) legal knowledge; (5) attentiveness; (6) bias and objectivity; and (7) degree of preparedness.[74]

Each Superior Court and Circuit Court judge being evaluated is furnished a Self-Evaluation Form, which is returned to the Office of the Chief Justice of the Superior Court or the Administrative Judge of the Circuit Court. Court staff supply the Chief Justice or Administrative Judge with the names of lawyers, litigants, witnesses, jurors, court officers, and staff members who have interacted with the justice, judge, or marital master being evaluated during the prior three years. The offices of the Chief Justice and the Administrative Judge then send letters to those individuals requesting completion of a Judicial Performance Evaluation Questionnaire for each justice, judge, or marital master. The performance evaluation questionnaire is sent directly only to the individuals previously identified.

In addition, trial courts use "SurveyMonkey" as their electronic survey tool. The questionnaire for each justice, judge, and marital master being evaluated is posted on the Judicial Branch's website and the names of the justices, judges, and marital masters being evaluated are publicly posted in courthouses and published in the New Hampshire Bar News so that individuals without access to the Internet receive notice of the availability of the questionnaires and may participate in the evaluation process. The electronic survey program was developed with guidance from the Institute for the Advancement of the American Legal System, which has led a nationwide effort to improve judicial accountability.

---

[73] RSA 490:32 (Supp. 2021)
[74] RSA 490:32, II

The results of the evaluations are discussed with each judge who was evaluated and, a correction plan may be put in place when a judge fails to meet a satisfactory performance standard.

The justices of the Supreme Court evaluate each other annually and distribute questionnaires about the court's performance as a whole every three years.[75]  The performance evaluation process for the Supreme Court justices consists of: (1) an annual assessment of whether the court has met objective performance standards; (2) the completion of a self-evaluation form by each justice; (3) a meeting of the justices to evaluate each justice's performance; and (4) every three years, the distribution of questionnaires to a representative sample of attorneys and parties to assess the court's performance.[76]

The judicial performance evaluation program is administered by the Judicial Performance Advisory Committee, whose non-judicial members include the chairs of the Senate and House Judiciary Committees, the Executive Director of the New Hampshire Public Defender, the Deputy Attorney General, and the chair of the New Hampshire Bar's Committee on Cooperation with the Courts (or designee).[77]  Since 2001, the results of the judicial performance evaluation program have been reported to the Governor and legislative leadership.[78]  Copies of all reports are available to the public on the Judicial Branch's website.[79]  In 2014-2015, the Judicial Performance Advisory Committee devoted substantial time to redesigning the evaluation forms for Supreme Court and trial judges and the juror feedback survey with the goal of improving the quality and usefulness of the responses.  The Judicial Performance Advisory Committee has partnered with the University of New Hampshire Survey Center for the purpose of improving the judicial performance evaluation process.  The reports and minutes of all meetings of the Judicial Performance Advisory Committee and background information about the Judicial Performance Evaluation Program are available on the Judicial Branch's website.[80]

By statute, "[a]ll information compiled through" the Judicial Performance Evaluation program "is confidential," except as specifically provided by statute.[81]  "If a judge fails to

---

[75] Sup. Ct. R. 56, III

[76] Sup. Ct. R. 56, III

[77] Sup. Ct. R. 56, I(B)

[78] June 29, 2021 Letter to Governor Sununu, Senate President Morse, Speaker of the House Packard, Senator Carson, and Representative Gordon from Chief Justice Gordon J. MacDonald, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-07/2021-jpe-report.pdf

[79] Annual Reports | New Hampshire Judicial Branch (nh.gov)

[80] https://www.courts.nh.gov/resources/committees/judicial-performance-evaluation-advisory-committee

[81] RSA 490:32, I

achieve an overall satisfactory judicial evaluation in the second of 2 consecutive evaluations, or purposely fails to complete assigned programs, the judge's right to confidentially shall be waived."[82]

The Judicial Branch also maintains on its website court data and reports, which provide insight into how the branch handles various types of cases, including those involving domestic violence.[83]  Each year, the court prepares standard data reports pertaining to domestic violence and stalking cases.  The reports are designed to pull data that the branch is required to submit to the federal Office of Violence Against Women as part of the branch's annual STOP Violence Against Women grant.  Two reports relevant to such matters are posted annually on the Judicial Branch's website: (1) a report regarding criminal bail protective orders;[84] and (2) a report regarding domestic violence and stalking petitions filed and the number of temporary orders granted and denied.[85]  The criminal bail protective order report lists the total number of such orders issued per calendar year for each district division and superior court location and the total number of criminal bail protective orders issued by the court system as a whole.  The domestic violence and stalking petition report lists the number of petitions for domestic violence and stalking orders of protection filed and the number of temporary orders granted or denied in each family division and district division location per calendar year.  Of the temporary orders denied, the report shows the number of hearings scheduled and the number of cases closed.  The number of temporary orders granted and denied may differ from the total number of petitions filed because: (1) if a temporary order is denied, but then after reconsideration is granted, both the order denying the temporary order and the order granting it on reconsideration are counted; (2) the plaintiff may have withdrawn his or her petition before a temporary order could have been granted; or (3) data entry errors.

Other standard data reports pertaining to domestic violence and stalking cases are maintained internally and provide family and district division court-level data about such issues as: (1) the percentage of plaintiffs in domestic violence and stalking cases represented by counsel; (2) numbers of emergency protective orders granted; and (3) civil protective orders granted and denied.

---

[82] RSA 490:32, V(a)

[83] https://www.courts.nh.gov/media/data-reports

[84] See, e.g., Circuit & Superior Court Count of Criminal Bail Protective Orders Granted from 1/1/20 to 12/31/20, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/inline-documents/sonh/2020-criminal-bail-protective-orders.pdf

[85] See, e.g., Domestic Violence/Stalking Petitions Filed and Temporary Orders Granted/Denied 2020, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/inline-documents/sonh/2020-petitions-and-temp-orders.pdf

Outside of the Judicial Branch, and specific to domestic violence issues, the Statewide Domestic Violence Advisory Council coordinates a statewide meeting where members report quarterly to the advisory council problematic and systemic issues identified within in the Circuit Court's family division locations.  Issues so identified are monitored to determine if there is cause for concern, and, if so, then the concerns are brought to the Circuit Court's Domestic Violence Program Manager for review.  If an issue is raised and needs attention before the next scheduled quarterly meeting of the advisory council, the director of New Hampshire Legal Assistance's Domestic Violence Advocacy Project brings the issue to the immediate attention of the court's Domestic Violence Program Manager.  The court's Domestic Violence Program Manager addresses the concerns, which may include bringing them to the attention of the Circuit Court's Administrative Judge, David D. King, or Deputy Administrative Judge, Susan W. Ashley.

### 1.  Summary of Task Force Discussions

The Task Force had many discussions about whether the Judicial Branch should take additional steps to ensure public confidence in the court system through accountability and transparency.  Some on the Task Force expressed the belief that the current system of accountability for judges is sufficient because it includes a judicial code of ethics,[86] a process for citizens to file complaints against judges for illegal or unethical conduct,[87] an impartial disciplinary system that allows for a range of sanctions,[88] a transparent system that provides for public and media access to court proceedings and legal decisions, and a well-established judicial performance program.  These members observed judicial performance could not, and should not, be measured by case outcome because those outcomes depend upon many factors outside a judge's control.  These Task Force members also noted that it is important for judges to have the freedom to decide cases based upon their professional training, experience, and judgment, according to the rule of law and the governing constitutions, without being affected by personal interests or threats or pressure from any source.  These Task Force members further noted that judges take an oath to be accountable to the law and to the New Hampshire and Federal Constitutions.

---

[86] All New Hampshire judges are subject to the Judicial Code of Conduct, see Sup. Ct. R. 38, and may be disciplined by the Judicial Conduct Committee for violating that code.  New Hampshire was among one of the first states to adopt a code of judicial conduct, doing so in 1973.  New Hampshire's Judicial Code of Conduct is modeled after the American Bar Association's Judicial Code of Conduct.

The members of the Judicial Conduct Committee, which operates independently from the New Hampshire Supreme Court, are appointed by the New Hampshire Supreme Court, Governor, New Hampshire Bar Association, Senate President, and Speaker of the House.  Six of the Judicial Conduct Committee's eleven members are non-lawyers.  For more information, see https://www.courts.nh.gov/resources/committees/judicial-conduct-committee

[87] Sup. Ct. R. 40

[88] Id

Others on the Task Force expressed the belief that the current system of accountability is inadequate.  They noted that the judicial performance evaluation program is not well publicized, provides insufficient information, and is conducted too infrequently.  They suggested that, at a minimum, judges should be evaluated more frequently.  They also expressed the belief that New Hampshire's system for judicial performance evaluation should mirror Colorado's.[89]

Like New Hampshire's system, Colorado's judicial performance evaluation program is administered by a statewide commission that includes both attorney and non-attorney members.  Also, as in New Hampshire, Colorado judges complete self-evaluation forms.  In addition, like New Hampshire's system, Colorado sends surveys to individuals involved in court cases with a particular judge and allows other individuals to complete an online survey.  Unlike New Hampshire's system, in Colorado, the surveys are available year-round.  Also, unlike New Hampshire's system, Colorado's system includes district commissions that evaluate county and district judges in their district, and Colorado's system includes a dedicated website where the public can access and review the reports created for each evaluated judge.

Some Task Force members suggested that the monthly data regarding protective order petitions be refined to indicate the number of petitions granted and denied by individual judge, the reasons for denial, and with regard to temporary orders of protection, whether the defendant was ordered to relinquish firearms.. The Judicial Branch Task Force members noted that the annual data about domestic violence and stalking petitions is already collected, and reported, by family division and district division location.  Although there was no consensus about what kind of data should be collected and for what purposes, the Task Force agreed that determining whether there is a systemic issue in the Judicial Branch with regard to the outcomes in domestic violence and stalking cases requires the collection and analysis of data.  Some of that data may already be collected by the Judicial Branch to meet its reporting obligations as a recipient of a STOP Violence Against Women grant.

Some members of the Task Force reported that their concerns about specific judges, when raised to the Judicial Branch's administration, are inadequately addressed.  To the extent that any action is taken with regard to those complaints, that action is not identified and communicated to the complainant because of confidentiality concerns.  These Task Force members seek more specific information about whether or how a concern was addressed.

---

[89] https://www.coloradojudicialperformance.gov/

Other Task Force members believe that oversight of judges is needed.  Some Task Force members expressed the view that the oversight should be by non-judges.  Some of the lawyers on the Task Force expressed concern that any "oversight" of the judicial function by non-judges could violate the New Hampshire Constitution, which vests "[t]he judicial power of the state . . . in the supreme court, a trial court of general jurisdiction known as the superior court, and such lower courts as the legislature may establish."  N.H. CONST., pt. II, art. 72-a.  Other Task Force members suggested that judges could provide oversight, outside of the appellate process.  Some of the lawyers on the Task Force observed that the legislature has not created an intermediate appellate court and that the creation of such a court would represent a major change to the current judicial system.

Ultimately, the Task Force agreed that the Judicial Branch should take additional steps to enhance transparency and accountability, although there are Task Force members who believe that the recommendations set forth below do not go far enough.

### 2.  Task Force Recommendations

**Recommendation 7.A1:** The Judicial Branch should enhance transparency and accountability by:

- Identifying and implementing means of soliciting more immediate feedback from branch "consumers," in addition to the periodic judicial performance surveys

- Charging the Judicial Performance Advisory Committee with reviewing the current judicial performance review process to determine how best to obtain more meaningful data, consistent with the requirements of RSA 490:32 and Supreme Court Rule 56

- Seeking additional appropriations to enhance its ability to collect further data on civil order of protection cases

- Consistent with confidentiality and privacy requirements and applicable collective bargaining provisions, providing meaningful responses to complaints about judicial and non-judicial staff

- Creating a decision tree so that advocates and others know whom to contact when an issue arises at court

- Asking the Judicial Branch's Diversity and Inclusion Steering Committee to include in its strategic plan exploring and addressing implicit gender bias and bias against survivors of, or defendants in, domestic violence cases[90]

## B. Firearm Relinquishment

According to the latest report of the New Hampshire Domestic Violence Fatality Review Committee, between 2018 and 2019, 21 people in New Hampshire lost their lives to domestic violence homicide, "representing 45% of all homicides during that time frame."[91]  According to that report, "[d]omestic violence was a factor in 100% of the state's murder/suicides in 2018 and 44% of the murder/suicides in 2019.[92]  "Firearms were the leading cause of domestic violence homicide" in 2018-2019.[93]

The findings of the New Hampshire Domestic Violence Fatality Review Committee are consistent with data that show "when a woman is killed, it is most likely to be at the hands of an intimate partner with a gun."[94]  "A recent national study found that of the 1,352 intimate partner homicides in 2015, fifty-five percent were committed with firearms."[95]  "Even if the violence is non-lethal, the presence of a firearm increases the severity of intimate partner abuse."[96]

New Hampshire is one of only twenty states that "allows a [trial] court to criminalize the possession of firearms or direct the surrender . . . of an alleged abuser's firearms under an ex parte order for protection."[97]  RSA 173-B:4, I, permits a trial court to require a defendant against whom a temporary domestic violence order of protection has been issued to relinquish "to a peace officer any and all firearms and ammunition" in the defendant's "control, ownership, or possession," or in the possession of "any other person on behalf of the defendant."  When a final domestic violence protection order is granted, New Hampshire law requires the trial court to direct the defendant to relinquish his or her

---

[90] The Supreme Court has established a Steering Committee on Diversity and Inclusion within the Judicial Branch.  Its work will include an internal examination of practices and procedures, taking steps to increase workforce diversity, address institutional racism and cultural bias, and engage in public outreach.  The Committee will be guided by a community-based, multidisciplinary Advisory Board.

[91] New Hampshire Domestic Violence Fatality Review Committee, 2018-2019 Biennial Report at 6, available at https://www.doj.nh.gov/criminal/victim-assistance/documents/domestic-violence-report-2019.pdf

[92] Id.

[93] Id. at 7

[94] Natalie Nanasi, Disarming Domestic Abusers, 14 Harvard L. & Pol'y Rev. 559, 563 (2020)

[95] Id.

[96] Id. at 564

[97] Aaron Edward Brown, This Time I'll be Bulletproof:  Using Ex Parte Firearm Prohibitions to Combat Intimate-Partner Violence, 50 Colum. Hum. Rts. L. Rev. 159, 172 (2020); see id. n.20 (citing statutory provisions, including RSA 173-B:4, I).

firearms and ammunition to the police.[98]  In other words, under New Hampshire law, relinquishment of firearms is mandatory only when a final domestic violence protection order is issued; it is discretionary when a temporary order is issued.

New Hampshire law also permits a court to issue a search warrant authorizing a peace officer to seize any deadly weapons specified in a protective order and any and all firearms and ammunition, provided that the officer has probable cause and provided that the specified weapons are kept in or around the defendant's premises and the court "has reason to believe that all such firearms and ammunition and the specified deadly weapons have not been relinquished."[99]

### 1.  Summary of Task Force Discussions

Some Task Force members raised the concern that judges do not always order a defendant to relinquish firearms in temporary domestic violence and stalking orders of protection.  Other Task Force members observed that law enforcement agencies are inconsistent with regard to the service of domestic violence protection orders and the relinquishment of weapons.  Some police departments rely solely upon the defendant's assertion regarding whether he or she owns firearms.  In addition, despite the statutory mandate that the defendant relinquish the weapons that are in the possession of "any other person" on the defendant's behalf, some law enforcement agencies believe that they lack the authority to obtain those weapons.  There is no mechanism for ensuring that all weapons have been surrendered.  There has been very little standardized training and guidance for law enforcement agencies on these issues.  Further, it was observed that, as a practical matter, although the court is specifically authorized to issue a search warrant for the defendant's home, few law enforcement officers take advantage of this provision. Members of the Task Force noted that issues related to firearms in the context of domestic violence are complex, and only a small portion of one Task Force meeting was dedicated to this topic.

### 2.  Task Force Recommendations

**Recommendation 7.B1:** There should be standardized training and guidance for law enforcement regarding the relinquishment of weapons and the completion of the return of service form in domestic violence cases.

**Recommendation 7.B2:** Regional multi-agency task forces should be created to ensure effective enforcement of domestic violence firearm prohibitions.  The members of each

---

[98] RSA 173-B:5, I
[99] RSA 173-B:4, II (2014)

regional task force should include staff from the local prosecutor's office, the county attorney's office, the sheriff's office, and the police department. One way to accomplish this would be to create Domestic Violence High-Risk Teams.[100] This group should consult the Domestic Violence Program Manager, who supervises the Judicial Branch's Protection Order Registry.

**Recommendation 7.B3:** The Office of the Attorney General should explore the barriers to, and develop best practices for, obtaining a search warrant in a domestic violence case pursuant to RSA 173-B:4, II.

## C. New Hampshire's Wiretapping and Eavesdropping Statute

RSA 570-A:2, I(a) provides that a person commits a crime if he or she "knowingly intercepts a telecommunication or oral communication" without the consent of all parties to the communication. "New Hampshire is one of only 11 states that require all parties to consent to the recording of a conversation."[101] Under RSA 570-A:6, evidence of telecommunication or oral communication that was intercepted without consent of all parties is inadmissible at a hearing.

### 1. Summary of Task Force Discussions

Currently, there is no exception to the wiretapping statute allowing a domestic violence survivor to record the abuser without his or her consent and for that recording to be admissible as evidence. Because such an exception does not exist, theoretically, a domestic violence survivor, who secretly records the abuse, could be charged with violating the wiretapping statute, and the recording would be inadmissible. Some Task Force members found it relevant that there are already defenses that allow individuals to take action that in other circumstances would be illegal. For instance, a person may use force, even deadly force, in some circumstances.[102]

---

[100] Domestic Violence High Risk Team – Start a Domestic Violence High Risk Team (dvhrt.org)

[101] Amy Connolly, Esq., NH Wiretapping Statutes Silence DV Victims, 46 New Hampshire Trial Bar News 72, 72 (Spring 2021) (footnote omitted)

[102] See, e.g., RSA 627:8 (2016) ("A person is justified in using force upon another when and to the extent that he reasonably believes it necessary to prevent what is or reasonably appears to be an unlawful taking of his property, or criminal mischief, or to retake his property immediately following its taking; but he may use deadly force under such circumstances only in defense of a person as prescribed in RSA 627:4.")

**2. Task Force Recommendation**

**Recommendation 7.C1:** Stakeholders should approach the legislature about amending the wiretapping statute to allow a domestic violence survivor to record the abuser without his or her consent and to allow the recording to be admitted into evidence.

**D. Court-Approved Batterer's Intervention Program**

RSA 173-B:5, I(b)(8) authorizes, but does not require, a trial court to direct the defendant in a domestic violence case to attend a batterer's intervention program. Batterer's intervention programs "strive to maximize abuser accountability while not compromising victim and child safety."[103] "Providers, therefore, endeavor to accomplish the following three general goals: (1) educate abusers about treating partners with respect; (2) hold individual abusers accountable for ending the violence; and (3) enhance victim and child safety."[104] "A typical batterer's intervention program meets weekly and lasts six to eight months."[105] "Each program sets its own fees. (sliding fees are often available)."[106] "Offenders are required to meet in a participatory group setting."[107]

**1. Summary of Task Force Discussions**

Assistant County Attorney Ryan and Victim Witness Coordinator Winter observed that, although New Hampshire has many well-established programs that comply with the 2002 standards published by the Batterer's Accountability Committee of the Governor's Commission on Domestic and Sexual Violence, defendants ordered to complete a batterer's intervention program are not required to attend a program that complies with the standards, but are free to choose less strenuous and, therefore, less effective programs. Moreover, no mechanism exists to enforce attendance ordered in civil protection order cases.

Task Force Members noted that the 2002 Batterer's Intervention Standards are out-of-date, and the 2018 effort to update them stalled because of a lack of funding and because there was no agency to certify and monitor batterer's intervention programs. The Task Force agreed with Ryan's and Winter's recommendation that a list of approved batterer's

---

[103] <u>Domestic Violence Protocols</u>, Chapter 19 – Batterer Intervention Programs, at 89, available at https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-06/c19.pdf

[104] <u>Id</u>.

[105] <u>Id</u>.

[106] <u>Id</u>.

[107] <u>Id</u>.

intervention programs should be created, but questioned how such a list could be created given the lack of an agency to certify and monitor such programs.

### 2. Task Force Recommendation

**Recommendation 7.D1:** The Batterer's Accountability Committee of the Governor's Commission on Domestic and Sexual Violence should reconvene to discuss how best to move forward with regard to securing funding to update the 2002 standards and identifying an agency to certify and monitor programs.

## CONCLUSION

There has been substantial progress in the treatment of domestic violence cases in the New Hampshire judicial system since 1992 when the Judicial Branch began the multidisciplinary effort that resulted in the protocols[108] and the Governor's Commission was first convened the following year. Many people, including several members of the Task Force, have devoted considerable time and effort in this area over the course of many years. Their significant accomplishments should be acknowledged and applauded. However, there is more work to do on numerous fronts.

The sad fact is that many promising initiatives have stalled, whether due to funding challenges, changes in personnel, redirection of priorities, or all of these things. On the bright side, numerous organizations, agencies, and individuals are, and have been, committed to resolving domestic violence cases fairly and effectively and to providing the protections critical to the well-being of New Hampshire's survivors and their families.

It is the Task Force's hope that the submission of this report is not the end of the work needed to address domestic violence cases in the Judicial Branch (and beyond), but the beginning. The Task Force intends for this report to serve as a roadmap for future endeavors of the Judicial Branch and all other stakeholders to improve justice for all involved in domestic violence cases. To that end, the Task Force has tried to identify action items and entities positioned to take action, as feasible, after thoughtful investigation and review. We submit this as a springboard to action in every corner that touches domestic violence cases in the court system.

Although the submission of this report completes the Task Force's work as set forth in the Supreme Court's December 9, 2021 order, the Task Force requests that the court expand the charge to allow the Task Force to reconvene in six months so that members can receive updates as to the status of the Task Force's recommendations.

---

[108] https://www.courts.nh.gov/our-courts/circuit-court/district-division/protocols/domestic-violence-protocols

## APPENDIX A

## NEW HAMPSHIRE MILESTONES IN DOMESTIC AND SEXUAL VIOLENCE

**1977**
- New Hampshire Coalition on Battered Women formed

**1978**
- Coalition convenes statewide conference on partner abuse

**Early '80s**
- Coalition changes name to New Hampshire Coalition Against Family Violence

**1981**
- Legislature repeals spousal exception to the state sexual assault statute

**Mid '80s**
- Coalition changes name to the New Hampshire Coalition Against Domestic and Sexual Violence

**Late '80s**
- Coalition convenes conference on Building the Movement to End Violence Against Women

**1987**
- Office of Victim/Witness Assistance created legislatively

**1989**
- Victims' Assistance Fund created

**1991**
- Crime Victims Bill of Rights passed

**1992**

- The District Court begins a multidisciplinary effort to produce domestic violence protocols for guiding uniform court practice

**1994**

- AmeriCorps Victim Assistance Program (AVAP) begins with the AmeriCorps Summer of Safety
- NH District Court Domestic Violence Protocols published following two-year court-led multidisciplinary initiative
- Federal Violence Against Women Act is passed
- First (multidisciplinary) Statewide Conference on Family Violence co-sponsored by New Hampshire District Court, New Hampshire Bar Association, and New Hampshire Bar Foundation
- District Court Coordinating Councils established throughout the state

**1998**

- Sexual Assault Nurse Examiner program established
- Governor's Commission on Domestic Violence expanded to include Sexual Violence (now NHCADSV)
- NH Legal Assistance forms the Domestic Violence Advocacy Project (DVAP)

**1999**

- New Hampshire Domestic Violence Health Initiative formed
- New Hampshire District Court receives Greenbook Project award (collaborative of District Court, DCYF, and Coalition)
- Domestic Violence Fatality Review Committee created by Executive Order
- Administrative Office of the Courts assumes responsibility from NH State Police for entering protective order records into the NCIC Protection Order file

**2000**

- Address Confidentiality Program created legislatively
- Domestic Violence in the Workplace Initiative (training, policy and statewide adoption for state agencies)

**2001**

- Coalition launches statewide sexual assault hotline
- First Domestic Violence Fatality Review Committee report issued

**2004**

- Legislature declares the month of January as Stalking Awareness Month.

**2006**

- Greenbook Project establishes Domestic Violence Specialist (DVS) Program
- Victim notification sheets created for law enforcement
- NHJB redesigns protection order forms to comply with the National Center for State Courts Project Passport initiative for interstate enforcement (Full Faith and Credit under VAWA)
- Lautenberg Amendment passed

**2007**

- Domestic Violence/Stalking Criminal Order of Protection including Orders and Conditions of Bail form created

**2009**

- Lethality Assessment Program pilot project in Merrimack County
- Stalking Protocol for Law Enforcement created
- Initiation of UNH Franklin Pierce School of Law / DOVE Project Partnership

**2010**

- Strangulation becomes a felony level offense
- Lethality Assessment Program expanded statewide
- Unbundled legal services Pilot Project with Bridges Crisis Center (Nashua & Merrimack) launched

**2013**

- Lethality Assessment Program incorporated into curriculum at Police Standards and Training for new law enforcement recruits
- Annual domestic violence conference combined with annual child abuse and neglect conference to create annual "Partnering for a Future Without Violence" conference
- NH Domestic Violence Court Protocols updated

**2014**

- LAP Steering Committee created
- Criminal domestic violence statute passed; effective 1/1/15

**2017**

- Expansion of DOVE Project to Stalking Protective orders including non-intimate partner stalking

**2018**

- Victim Information Notification Everyone (VINE)

**2020**

- Victim Information Card for First Responders
- Fourth edition of domestic violence law enforcement protocol
- NH Circuit Court initiates emailed petition pilot project in response to the pandemic

**2021**

- Pro Bono Referral System and Legal Advice & Referral Center merge to create 603 Legal Aid

**2022**

- Task Force on the Review of Domestic Violence Cases in the NH Judiciary System is formed

# NEW HAMPSHIRE MILESTONES IN DOMESTIC AND SEXUAL VIOLENCE

## 1970s-1980s

**1978**
New Hampshire Coalition on Battered Women formed
Coalition convenes statewide conference on partner abuse

**Early-Mid 1980s**
Coalition changes name to New Hampshire Coalition Against Family Violence and then to the New Hampshire Coalition Against Domestic and Sexual Violence

**1981**
Legislature repeals spousal exception to the state sexual assault statute

**Late 1980s**
Coalition convenes conference on Building the Movement to End Violence Against Women

**1987**
Office of Victim/Witness Assistance created legislatively

**1989**
Victims' Assistance Fund created

## 1991-98

**1991: Crime Victims Bill of Rights passed**

**1992**
The District Court begins a multidisciplinary effort to produce domestic violence protocols for guiding uniform court practice

**1993**
Domestic Violence Emergency (DOVE) Project created (comprised of NHBA, Pro Bono, NHLA, Courts) to link lawyers with petitioners and their advocates in protection order cases
Victim/Witness Programs established in all 10 counties

**1994: Federal Violence Against Women Act is passed**
AmeriCorps Victim Assistance Program (AVAP) begins with the AmeriCorps Summer of Safety
NH District Court Domestic Violence Protocols published following two-year court-led multidisciplinary initiative
First (multidisciplinary) Statewide Conference on Family-Violence co-sponsored by NH District Court, NHBA, and New Hampshire Bar Foundation
District Court Coordinating Councils established throughout the state

**1996**
Second annual multidisciplinary domestic and sexual violence conference held

**1998**
Sexual Assault Nurse Examiner program established
Governor's Commission on Domestic Violence expanded to include Sexual Violence (now NHCADSV)
NH Legal Assistance forms the Domestic Violence Advocacy Project (DVAP)

## 1999-07

**1999**
New Hampshire Domestic Violence Health Initiative formed
New Hampshire District Court receives Greenbook Project award (collaborative of District Court, DCYF, and Coalition)
Domestic Violence Fatality Review Committee created by Executive Order
Administrative Office of the Courts assumes responsibility from NH State Police for entering protective order records into the NCIC Protection Order file

**2000-01**
Address Confidentiality Program created legislatively
Domestic Violence in the Workplace Initiative (training, policy and statewide adoption for state agencies)
Coalition launches statewide sexual assault hotline
First Domestic Violence Fatality Review Committee report issued

**2004**
Legislature declares the month of January as Stalking Awareness Month.

**2006: Lautenberg Amendment passed**
Greenbook Project establishes Domestic Violence Specialist (DVS) Program
Victim notification sheets created for law enforcement
NHJB redesigns protection order forms to comply with the National Center for State Courts Project Passport initiative for interstate enforcement (Full Faith and Credit under VAWA)

**2007**
Domestic Violence/Stalking Criminal Order of Protection including Orders and Conditions of Bail form created

## 2009-14

**2009**
Lethality Assessment Program pilot project in Merrimack County
Stalking Protocol for Law Enforcement created
Initiation of UNH Franklin Pierce School of Law / DOVE Project Partnership

**2010**
Strangulation becomes a felony level offense
Lethality Assessment Program expanded statewide.
Unbundled legal services Pilot Project with Bridges Crisis Center (Nashua & Merrimack) launched

**2013**
Lethality Assessment Program incorporated into curriculum at Police Standards and Training for new law enforcement recruits
Annual domestic violence conference combined with annual child abuse and neglect conference to create annual "Partnering for a Future Without Violence" conference
NH Domestic Violence Court Protocols updated

**2014**
LAP Steering Committee created

Criminal domestic violence statute passed; effective 1/1/15

## 2017-22

**2017**
Expansion of DOVE Project to Stalking Protective orders including non-intimate partner stalking

**2018**
Victim Information Notification Everyone (VINE)

**2020**
Victim Information Card for First Responders
Fourth edition of domestic violence law enforcement protocol
NH Circuit Court initiates emailed petition pilot project in response to the pandemic

**2021**
Pro Bono Referral System and Legal Advice & Referral Center merge to create 603 Legal Aid

**2022**
Task Force on the Review of Domestic Violence Cases in the NH Judiciary System is formed