THE STATE OF NEW HAMPSHIRE
SUPREME COURT

No. 2025-0129

**State of New Hampshire**

v.

**Destinie L. Berard**

Motion for Clarification

NOW COMES the defendant, Destinie L. Berard, by and through her non-attorney representative, Dana Albrecht, and respectfully moves this Court for clarification regarding the objective legal standards it applies when determining whether to accept pre-trial appellate review in a criminal case. In support of this request, the Defendant states:

1. The Defendant's appeal seeks review of multiple **structural constitutional violations**—including the denial of appointed counsel, judicial disqualification, and the scheduling of trial-level constitutional hearings without effective representation. These are not routine procedural matters but go to the integrity of the trial itself and implicate core principles of **due process and equal protection.**

2. In *State v. Cooper*, 127 N.H. 119 (1985),[1] the *Cooper* Court upheld the constitutionality of Supreme Court Rules 3 and 7, which allow discretionary acceptance or declination of appeals. However, the Court also emphasized that such procedures must still comport with state and federal constitutional protections. Specifically, the *Cooper* Court held:

---

[1] A copy of the full text of this *Opinion* is annexed hereto.

> **"[6, 7] The right to appeal in New Hampshire is limited to the right to obtain a discretionary determination by this court as to whether it will accept the appeal. Our State constitutional guarantees of due process and equal protection nonetheless require that each and every defendant be offered a fair and equal opportunity to have his case accepted and thereby to obtain an adjudication on the merits of his appeal."**
>
> — *Cooper*, 127 N.H. at 124.

3. The *Cooper* opinion also recognized that many jurisdictions provide transparent criteria for discretionary appellate review, including: **(1)** the resolution of conflicting authority, **(2)** novel or important legal issues, **(3)** questions of public interest, and **(4)** the exercise of supervisory authority. *See Cooper*, 127 N.H. at 126–27. The Court stated that such considerations "define the contours of our 'desirability' standard" and guide discretionary decisions while avoiding arbitrary or discriminatory application.

4. Despite *Cooper*, the actual **objective criteria** used by this Court when evaluating requests for **pre-trial appellate review in criminal cases** remains unclear—particularly in light of the Court's acceptance of such appeals in:

    - *State v. Mercon*, 174 N.H. 314 (2021)
    - *State v. Brouillette*, 166 N.H. 487 (2014)

5. In both *Mercon* and *Brouillette*, the Court accepted pre-trial criminal appeals to address statutory interpretation and evidentiary issues, respectively. The legal posture of those cases appears materially similar to the present one. The Defendant respectfully requests clarification as to what distinguishable criteria, if any, were applied.

6. The New Hampshire Constitution guarantees both due process and equal protection. N.H. Const. Pt. I, arts. 15 and 10. *See, e.g.*, *Appeal of Portsmouth Trust Co.*, 120 N.H. 753, 756 (1980) (recognizing that Article 15 forbids deprivation of protected interests without adequate process, using bifurcated test); *Opinion of the Justices*, 144 N.H. 374, 376 (1999) (recognizing for over one hundred years that Article 10 is imbued with the principle of equality that

pervades the entire constitution); *State v. Pennoyer*, 65 N.H. 113, 117 (1889)[2] (the N.H. Constitution recognizes "perfect equality of privilege and of burden" as the supreme object of government); *see also* U.S. CONST. amend. XIV; *Griffin v. Illinois*, 351 U.S. 12 (1956).

7. The *Cooper* Court further held:

   **If a State has created appellate courts as "an integral part of the [State] trial system for finally adjudicating the guilt or innocence of a defendant," the procedures used in deciding appeals must comport with due process and equal protection.**

   — *Cooper*, 127 N.H. at 124 (citing *Griffin* and *Evitts v. Lucey*, 469 U.S. 387 (1985))

8. If this Court provides pre-trial appellate review to some criminal defendants but not to others raising factually and legally analogous claims, then equal protection principles require a **rational, objective basis** for the distinction. Without such articulation, the appearance or risk of unconstitutional arbitrariness remains.

9. Accordingly, the Defendant respectfully requests that this Court clarify:

   (a) What objective criteria govern whether the Court will accept or decline pre-trial appellate review in criminal cases; and,

   (b) Whether those criteria are sufficiently defined to satisfy the guarantees of due process and equal protection under both the state and federal constitutions; and,

   (c) Whether and how the Court ensures that similarly situated criminal appellants (such as those in *Mercon* and *Brouillette*) are treated equally when invoking pre-trial appellate procedures.

10. The Defendant further requests that, in the interest of transparency, constitutional consistency, and public trust, the Court issue a written narrative

---

2   A copy of the full text of this *Opinion* is annexed hereto. *Pennoyer* is a classic "equal protection" case whose progeny include *Baker v. State*, 170 Vt. 194, 744 A.2d 864 (1999) and *Obergefell v. Hodges*, 576 U.S. 644 (2015).

order explaining how it ensures compliance with the standards articulated in *State v. Cooper*, 127 N.H. 119 (1985), *Evitts v. Lucey*, 469 U.S. 387 (1985), *Appeal of Portsmouth Trust Co.*, 120 N.H. 753, 756 (1980), *Griffin v. Illinois*, 351 U.S. 12 (1956), and *State v. Pennoyer*, 65 N.H. 113 (1889) when declining to hear pretrial structural constitutional claims, especially those raised by indigent or otherwise disadvantaged defendants.

WHEREFORE, Ms. Berard respectfully requests that this Court:

A) Clarify the objective criteria used for accepting or declining pretrial appellate review in criminal cases; and,

B) Explain how those criteria comply with the Equal Protection Clause of the Fourteenth Amendment and Part I, Article 10 of the New Hampshire Constitution; and,

C) Identify whether this Court applies the same criteria uniformly across requests for pre-trial appellate review, including those in *Mercon*, *Brouillette*, and the instant case; and,

D) To set forth the reasons for its decision in a written, narrative order; and,

E) For any other such relief as is just and equitable.

        Respectfully submitted,

        DESTINIE L. BERARD

        By her non-attorney representative,

        _____
        DANA ALBRECHT
           *Per RSA 311:1*
        131 Daniel Webster Hwy #235
        Nashua, NH 03060
        dana.albrecht@hushmail.com
        **(603) 809-1097**

April 30, 2025

## CERTIFICATE OF SERVICE

I, Dana Albrecht, certify that a copy of this *Motion* will be sent to all parties of record who are registered through the Court's electronic filing system.

_____
DANA ALBRECHT

April 30, 2025

## *State v. Cooper*

Supreme Court of New Hampshire

August 15, 1985

Nos. 84-150, 84-145

**Reporter**
127 N.H. 119 *; 498 A.2d 1209 **; 1985 N.H. LEXIS 375 ***

The State of New Hampshire v. Lon Cooper; The State of New Hampshire v. Elroy J. Dupuis and Diane Therriault

**Prior History:** **[***1]** Appeal from Merrimack County; Appeal from Coos County.

**Disposition:** *Motions for reconsideration denied*.

**Counsel:** *Gregory H. Smith*, attorney general (*Amy L. Ignatius*, assistant attorney general, on the brief, and *Tina Schneider*, attorney, orally), for the State.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendants.

**Judges:** Batchelder, J.  All concurred.

**Opinion by:** BATCHELDER

## Opinion

 **[*121]**   **[**1211]**  These consolidated appeals raise State and federal constitutional challenges to New Hampshire Supreme Court Rules 3 and 7 which permit this court to decline to accept an appeal.  We hold the rules to be constitutional as we construe them in this opinion.

Lon Cooper was convicted by a jury in Merrimack County Superior Court (*Cann*, J.) of operating a motor vehicle after revocation of his driver's license. He was sentenced to serve ninety days in the house of correction, loss of license for an additional year, and a $ 250 fine.  He filed a notice of appeal alleging that the trial court erred: (1) in denying his motion to dismiss at the close of the State's case; (2) in instructing the jury that evidence that notice of revocation was sent **[***2]** to the defendant's last known address is *prima facie* evidence that the defendant was notified of the revocation; and (3) in denying defendant's motion to dismiss on the ground that recent amendments to RSA 263:64, under which the defendant was convicted and sentenced, failed to provide sufficient notice of the conduct forbidden or the punishment authorized.  On June 13, 1984, we declined acceptance of the appeal under Supreme Court Rule 7.

Elroy Dupuis and Diane Therriault were jointly tried before a jury in Coos County Superior Court (*Dickson*, J.).  Both were charged with drug sales to a police informer.  The sales, which occurred on August 29, 1983, involved five tablets of LSD for $ 15 and two grams of marijuana for $ 16.  Both were sentenced to the State prison for terms of two to five years with one year suspended.  Both were released on $ 1,000 personal recognizance bail pending appeal.  Their joint notice of appeal raised the question whether the superior court committed reversible error both in denying defendants' motion for a directed verdict of acquittal and in permitting the State to reopen its case and recall its principal witness for the purpose of identifying **[***3]** the defendants as the persons who conducted the sale.  On June 13, 1984, we declined to accept the appeal.

127 N.H. 119, *121; 498 A.2d 1209, **1211; 1985 N.H. LEXIS 375, ***3

On June 21, 1984, the defendants in both of these appeals moved for reconsideration of the declination orders, challenging the constitutionality of the declination procedure under both the New Hampshire and the United States Constitutions. On July 31, 1984, we consolidated these cases for purposes of considering the constitutionality of Rule 7(1).

Supreme Court Rule 7(1) provides: "The supreme court may, in its discretion, decline to accept an appeal from a lower court after a decision on the merits, or may summarily dispose of such appeal as provided in [supreme court] rule 25." Supreme Court Rule 3 defines "Declination of acceptance order" to mean that: "The supreme court does not deem it desirable to review the issues in a case, as a matter **[*122]** of sound judicial discretion and with no implication whatever regarding its views on the merits."

Defendants contend that, under the State and Federal Constitutions, the declination procedure denies due process, equal protection, and the effective assistance of counsel. Specifically, they argue that: (1) the rules permit **[***4]** this court arbitrarily and capriciously to decline acceptance of an appeal; (2) the "desirability" standard is vague and cannot properly form the basis for deciding which cases this court will or will not accept; (3) the distinctions made pursuant to the declination standard create **[**1212]** irrational distinctions between "meritorious" and "non-meritorious" appeals; and (4) the declination procedure precludes counsel from effectively advocating the interests of his client before the court.

We begin, as we must, by first making an independent analysis of the protections afforded under the New Hampshire Constitution. *State v. Ball, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983)*. In this case, decisions of the United States Supreme Court are particularly helpful as aids in our State constitutional analysis. *See Michigan v. Long, 103 S. Ct. 3469, 3476 (1983)*.

The defendants do not argue that this court must hear all appeals. Federal cases have held that the *Due Process Clause of the fourteenth amendment of the United States Constitution* does not require appellate review by a State supreme court in a criminal case absent State constitutional or statutory authority to the contrary. **[***5]** *See McKane v. Durston, 153 U.S. 684, 687 (1894)*; *Ross v. Moffitt, 417 U.S. 600, 611 (1974)*. The defendants advance no claim that the State Constitution grants such a right. Nevertheless, we have demonstrated by our rules and long-standing practices, a solicitous regard for defendants who desire to obtain appellate review of their convictions. *State v. Howard, 109 N.H. 518, 520, 257 A.2d 17, 19 (1969)*.

The New Hampshire Constitution guarantees both due process and equal protection. N.H. Const. pt. I, arts. 15 and 12; *see Appeal of Portsmouth Trust Co., 120 N.H. 753, 756, 423 A.2d 603, 605 (1980)*; *Gazzola v. Clements, 120 N.H. 25, 29, 411 A.2d 147, 151 (1980)*; *see also* U.S. Const. amend. XIV; *Griffin v. Illinois, 351 U.S. 12 (1956)*. If a State has created appellate courts as "an integral part of the [State] trial system for finally adjudicating the guilt or innocence of a defendant," the procedures used in deciding appeals must comport with due process and equal protection. *Griffin v. Illinois, supra at 18*; *Evitts v. Lucey, 105 S. Ct. 830, 834 (1985)*.

Due process and equal protection guarantee a variety of rights on appeal. N.H. Const. pt. **[***6]** I, art. 15 (indigents' right to counsel **[*123]** at expense of State); *see Griffin v. Illinois supra* (right of indigents to free transcript); *Evitts v. Lucey supra* and *Anders v. California, 386 U.S. 738 (1967)* (right to effective assistance of counsel). The line of demarcation between equal protection and due process in appellate rights cases was aptly stated recently by the United States Supreme Court as follows:

> "In *Griffin*, for instance, the State had in effect dismissed petitioner's appeal because he could not afford a transcript. In establishing a system of appeal as of right, the State had implicitly determined that it was unwilling to curtail drastically a defendant's liberty unless a second judicial decisionmaker, the appellate court, was convinced that the conviction was in accord with law. But having decided that this determination was so important -- having made the appeal the final step in the adjudication of guilt or innocence of the individual -- the State could not in effect make it available only to the wealthy. Such a disposition violated equal protection principles because it distinguished between poor and rich with respect to such a **[***7]** vital right. *But it also violated due process principles because it decided the appeal in a way that was arbitrary with respect to the*

*issues involved*. In *Griffin*, we noted that a court dispensing 'justice' at the trial level by charging the defendant for the privilege of pleading not guilty 'would make the constitutional promise of a fair trial a worthless thing.' Id. at 17. Deciding an appeal on the same basis would have the same obvious -- and constitutionally fatal -- defect."

Evitts v. Lucey, 105 S. Ct. at 840 (emphasis added). The Court concluded:

[**1213] "In cases like *Griffin* and *Douglas* [v. California, 372 U.S. 353 (1963)], due process concerns were involved because the States involved had set up systems of appeals as of right *but had refused to offer each defendant a fair opportunity to obtain an adjudication on the merits of his appeal*."

Evitts v. Lucey, 105 S. Ct. at 841 (emphasis added).

Procedural protections mandated by our State Constitution in discretionary appellate proceedings are less than in appeals as of right. Id. at 836 n.7 (citing Ross v. Moffitt, 417 U.S. 600 (1974)). The Court [***8] in *Moffitt* held that, under the Federal Constitution, counsel for an indigent defendant need not be provided in a discretionary [*124] appeal, where counsel was provided in the defendant's first appeal as of right. *Compare* N.H. Const. pt. I, art. 15 and RSA 604-A:1 (counsel for preparing appeals to this court provided to indigents at the expense of the State). In *Evitts v. Lucey*, the Court carefully scrutinized Kentucky appellate practice to determine that the appeal was an appeal as of right, and not a discretionary appeal. Evitts v. Lucey, 105 S. Ct. at 839. Only then did the Court conclude that the defendant enjoyed a due process right to the effective assistance of counsel on that appeal. Id. at 836, 841.

The defendants' equal protection claim, unlike those in Douglas v. California supra, Griffin v. Illinois, 351 U.S. 12 (1956), and Ross v. Moffitt, 417 U.S. 600 (1974), does not allege disparate treatment as a result of indigency of the appellants. Their claim is that classes of defendants having meritorious appeals and non-meritorious appeals will have their appeals accepted or declined without regard to any ascertainable or rational standard. [***9] The class of persons appealing their cases to this court is a "natural class of persons" sufficient to trigger equal protection concerns. *See* Estate of Cargill v. City of Rochester, 119 N.H. 661, 665-66, 406 A.2d 704, 706 (1979) (tort victims of governmental and private misconduct are a class); Gazzola v. Clements, 120 N.H. at 29, 411 A.2d at 151 (persons whose land is about to be taken by the State for different public purposes are similarly situated); State v. Amyot, 119 N.H. 671, 672-73, 407 A.2d 812, 813 (1979) (truckers carrying different loads in different parts of the State constitute a class). The equal protection question, therefore, like the due process question, becomes one of the rationality and ascertainability of the distinctions made by the declination procedure. Accordingly, our succeeding analysis addresses both equal protection and due process concerns with equal force.

The right to appeal in New Hampshire is limited to the right to obtain a discretionary determination by this court as to whether it will accept the appeal. Our State constitutional guarantees of due process and equal protection nonetheless require that each and every defendant be [***10] offered a fair and equal opportunity to have his case accepted and thereby to obtain an adjudication on the merits of his appeal. N.H. Const. pt. I, arts. 15 and 12; *cf.* Estate of Cargill v. City of Rochester supra (under part I, article 14 of the State Constitution, limits on access to courts are permissible so long as those limits are not arbitrary or discriminatory).

We begin by examining the declination of appeal procedure in New Hampshire. An appeal is initiated by the filing of a notice of appeal within thirty days of the decision in the trial court on the merits. Sup. Ct. R. 7. The following information of consequence to the issues in the case is supplied on the notice of appeal form:

[*125] (a) In a criminal case, an indication whether the defendant is in jail or prison, the sentence, and the place of incarceration;
(b) A brief description of the nature of the case and the result;
(c) Identification of any statutes on which the case was based;

[**1214] (d) Specific questions to be raised on appeal, expressed in terms and circumstances of the case, but without unnecessary detail;

(e) A list of cases supporting moving party's position;

(f) Photocopies [***11] of pleadings, motions, decisions (including findings and rulings); parties' memoranda and requests for findings and rulings; pertinent texts of legal authorities; and other documents;

(g) Transcript and exhibit requests.

With this information, the five members of this court collectively decide whether to accept or decline an appeal.

A declination of acceptance order is not a decision on the merits. The definition in Supreme Court Rule 3 provides that, where there is a declination order: "The supreme court does not deem it desirable to review the issues in [the] case, as a matter of sound judicial discretion and with no implication whatever regarding its views on the merits." *Cf.* Sup. Ct. R. 25 (summary affirmance *on the merits*); *Smith v. Goodnow*, #C83-120-L (D.N.H., September 26, 1983) (procedure by which New Hampshire Supreme Court summarily affirmed conviction *on the merits* as supported by sufficient evidence, in the absence of a transcript, was arbitrary in violation of federal due process clause). A declination of acceptance order expresses no opinion on the quality or correctness of either the decision below or the arguments to be advanced by counsel [***12] on appeal. The declination is not a precedent for future declinations, nor does the opinion below assume any greater or lesser precedential value after the declination than it had before.

The standard governing the making of a declination decision is one of sound judicial discretion with respect to the desirability of our hearing and deciding the case. This standard, though characterized as being "vague" and "unascertainable" by the defendants, nevertheless embodies considerable meaning. The rules are closely tied to our institutional role as supervisory court and court of last resort of this State, *see* N.H. Const. pt. II, arts. 73-a and 72-a, and are essential to our continued fulfillment of that role in a responsible and deliberate manner.

[*126] This court hears appeals and receives transfers from the State's superior, district, municipal and probate courts -- some seventy-two different courts in all -- and from scores of the State's administrative agencies, as well as transfers from the United States District Court and the United States Circuit Court of Appeals. *See* Sup. Ct. R. 34. We also consider petitions for the exercise of original jurisdiction and render [***13] advisory opinions to the Governor and Council and to each house of the State Legislature. *See* N.H. Const. pt. II, art. 74.

Our appellate caseload has mushroomed in recent years. Between 1981 and 1984, the number of cases filed in this court increased from 482 to 603, a 25 percent increase in three years. The number of cases pending at the end of the year has increased between 1980 and 1984 from 244 to 361, a 48 percent increase in only four years. The court's supervision of a unified court system, *see* N.H. Const. pt. II, art. 73-a (adopted in 1978); Laws 1983, ch. 383, has increased the court's workload steadily, requiring it now to be involved in many areas of judicial administration, ranging from adoption of rules of evidence for the State's trial courts to administration of a staff of close to 600 persons.

A similar explosion of cases and workload occurred with the United States Supreme Court sixty years ago. *See* R. Stern & E. Gressman, Supreme Court Practice (4th ed. 1969) at 147-54. There, a burgeoning docket of cases within the Court's obligatory appellate jurisdiction prompted the 1925 passage of legislation giving the Court discretionary jurisdiction over [***14] most of its caseload. Numerous States, as well, facing expanding appellate dockets over the years, have chosen discretionary appellate jurisdiction as a means of controlling the caseloads of their high courts. *See* R. Stern, Appellate Practice in the United States at 22-23, 137-42.

[**1215] The various standards of discretion in use in State courts across the nation have many common features. *See* Stern at 137-42. The rules generally stress that review will be granted where there is a strong public interest to be served by resolving the questions presented, where there is conflict between the decision below and some other controlling precedent, or where the error alleged in the particular case demands attention to prevent injustice.

For example, Illinois Rule 315(a), which was modeled on *United States Supreme Court Rule 17*, *see* Stern at 137, states:

"The following, while neither controlling nor fully measuring the court's discretion, indicate the character of reasons which will be considered: the general importance of the question presented; the existence of a conflict between [*127] the decision sought to be reviewed and a decision of the Supreme Court, [***15] or of another division of the Appellate Court; the need for the exercise of the Supreme Court's supervisory authority; and the final or interlocutory character of the judgment sought to be reviewed."

Tennessee's rule states:

"In determining whether to grant permission to appeal, the following, while neither controlling nor fully measuring the Court's discretion, indicate the character of reasons that will be considered: (1) the need to secure uniformity of decision, (2) the need to secure settlement of important questions of law, (3) the need to secure settlement of questions of public interest, and (4) the need for the exercise of the Supreme Court's supervisory authority."

Tenn. R. App. Pro., Rule 11(a); *cf.* Mass. Gen. Laws Ann. ch. 211A § 11 (West Supp. 1985) (allowing further appellate review "for substantial reasons affecting the public interest or the interests of justice").

These same considerations enter into our decision to accept or decline an appeal, and define the contours of our "desirability" standard for exercising our discretion to accept an appeal. Such factors necessarily leave us broad discretion to control our caseload while performing [***16] our responsibility under our State Constitution to supervise the courts of this State. While these factors are not inclusive of all considerations entering into our declination decisions, our explanation of their relevance should focus the attention of the bench and bar upon appropriate areas of concern in the acceptance or declination procedure and thereby help to dispel the fear of arbitrariness in fact and appearances.

The defendants have argued that an explanation or revision of our declination standard will not adequately address the constitutional infirmities of the declination procedure. They argue under Ross v. Moffitt, 417 U.S. 600 (1974), that such considerations may be adequate where a *first appeal* has been provided *as of right*, but not where the discretionary appeal is the first and only error-correction opportunity available to the defendant in the State justice system. We disagree. Accepting defendants' argument would foreclose all permissible exercises of discretion in accepting or declining appeals and would operate as the functional equivalent of a constitutionally mandated appeal of right. Neither the State Constitution nor the Federal Constitution [***17] requires such a result, directly or indirectly.

[*128] The defendants further argue that acceptance of a criminal case where incarceration is imposed should not be declined because such a case involves a threat to a greater interest than most civil, domestic, or administrative cases, or criminal cases not involving jail terms. While a greater interest of the defendant may be at stake where incarceration has been imposed, that factor *alone* does not compel acceptance of an appeal. Incarceration is a relevant factor in determining whether a potential error below presents a risk of clear injustice and a question of public importance.

From 1978 to 1982, 22.2 percent of our opinions were rendered in criminal cases. The remainder, 77.8 percent, were in civil, administrative, domestic relations and other [**1216] cases. That trend took a dramatic turn in 1983 and 1984, in which 34 percent and 36 percent of our opinions respectively involved criminal subject matter. The average of these latter two figures reflects an increase of criminal cases decided of almost 13 percent over the average for the preceding five years.

Our declination procedure is a necessary and proper [***18] part of our constitutional exercise of the judicial power in this State and of our responsibility for administration of the court system. Were we to accept all criminal appeals, or all criminal appeals involving incarceration, or all cases in any other class, without regard to other factors, we would have to reject cases which we would otherwise have accepted, in order to maintain a manageable docket. This result would be even more arbitrary than the result which the defendants allege is produced by our current rules, for it assumes that all criminal cases present more important or more compelling issues than civil, domestic, administrative or other cases. This is simply not so. Our responsibility is to administer justice and supervise the development of the law "across the board" in this State. Our declination rule, as a discretionary mechanism, is well-

suited to assuring that the opinions of this court address a reasonably balanced blend of cases and are carefully and deliberately decided.

Our State's notice of appeal form provides a flexible and comprehensive format for a litigant to explain the factual posture of his case, the legal questions raised by the appeal and the **[***19]** controlling (or conflicting) precedents. The gravity of the legal issues and any clear injustice is readily apparent from a properly drafted notice of appeal.

We conclude that our declination of appeal procedure is neither arbitrary nor capricious, but rather is rationally related to discharging our responsibilities equitably and effectively. The standard by which we accept or decline appeals, as stated in **[*129]** Supreme Court Rules 3 and 7 and explained in this opinion, is not vague. Accordingly, we find no due process or equal protection violations inherent in this procedure under our State Constitution.

The use we have made of federal constitutional precedents in analyzing our State Constitution in this case leads us to conclude that no broader protection is afforded by the United States Constitution. *See* Michigan v. Long, 103 S. Ct. at 3476. Under federal due process, the question of whether an appeal provided in the State system is one of right or of discretion is a federal question. *See* Evitts v. Lucey, 105 S. Ct. at 839. That determination, however, rests upon applicable State authorities conferring the appellate remedy. *See id.* (analysis of Kentucky **[***20]** Constitution to conclude that appeal in question was an appeal of right for federal due process purposes). The federal constitutional analysis thereafter employs the same standards as are set forth in our State constitutional analysis, and therefore leads us to the same conclusion that the rules do not deny due process and equal protection.

The defendants further allege that our declination procedure denies the effective assistance of counsel under both the State and the Federal Constitutions. Specifically, they argue that the right to effective assistance guarantees a right for counsel to present arguments directed to the merits of the case or, at least, to the declination standard.

The right to the effective assistance of counsel does not grant a defendant who is represented by counsel any broader rights or opportunities to present arguments than those enjoyed by a defendant who is not represented by counsel. This right to present arguments on the merits is a due process issue which we have adequately addressed above.

*Motions for reconsideration denied*.

End of Document

## *State v. Pennoyer*

Supreme Court of New Hampshire

June, 1889

No Number in Original

**Reporter**

65 N.H. 113 *; 18 A. 878 **; 1889 N.H. LEXIS 47 ***

State v. Pennoyer

**Disposition:** [***1] Indictment quashed.

**Counsel:** *S. W. Emery*, solicitor, for the state.

*George E. Hodgdon*, for the defendant.

**Judges:** Blodgett, J., did not sit: the others concurred.

**Opinion by:** CARPENTER

## Opinion

[*113]  [**878] "It shall not be lawful for any person to practise medicine… unless such person shall have obtained a license from some medical society organized under the laws of this state…

"Every medical society organized under the laws of this [**879] state shall… elect a board of censors consisting of three members,… which board shall have authority to examine and license persons to practise medicine…. The board shall issue licenses without examination to all persons who furnish evidence by diploma from some medical school authorized to confer degrees in medicine… when said board is satisfied that the person presenting such diploma has obtained it after pursuing some prescribed course of study and upon due examination.

"Each person receiving a license upon examination shall pay for the use of the society granting the same the sum of five dollars; upon diploma, one dollar.

"If any person shall practise medicine… without being duly authorized as provided in this chapter… he shall [***2] be punished by fine of not more than three hundred dollars for each offence.

"The provisions of the preceding sections shall not apply to persons who have resided and practised their profession in the town or city of their present residence during all the time since January 1st, 1875, nor to physicians residing out of the state when called into the state for consultation with duly licensed physicians, or to attend upon patients in the regular course of business." G. L., *c.* 132, *ss.* 1, 2, 6-8. The General Laws (by which *c.* 18, Laws 1875, was repealed) took effect January 1, 1879. G. L., *c.* 291, *ss.* 1-14. All physicians, except those who practised all the time between January 1, 1875, and January 1, 1879, and during that period did not remove from one town to another, are required to obtain a license, and pay therefor five dollars or one dollar, according as it may be issued upon examination or upon diploma.

[*114]  The law cannot discriminate in favor of one citizen to the detriment of another. The principle of equality pervades the entire constitution. The bill of rights declares expressly that all government is "instituted for the general good, for the common [***3] benefit, protection, and security of the whole community, and not for the private interests or emolument of any one man, family, or class of men;" that "every member of the community has

a right to be protected by it in the enjoyment of his life, liberty, and property… is therefore bound to contribute his share in the expense of such protection," and is "entitled to a certain remedy by having recourse to the laws for all injuries he may receive in his person, property, or character." Bill of Rights, arts. 1, 10, 12, 14. All the declarations of right are imbued with the same spirit. With them the body of the constitution is in full conformity. To secure to all as perfect equality of privilege and of burden as human wisdom permits, was the chief end sought by the framers of the instrument. To this all other purposes were incidental and subordinate. "The bill of rights is a bill of their equal private rights, reserved by the grantors of public power." *State v. Express Co., 60 N.H. 219*. "The reservations could not be more clearly expressed. If the right of equality is not secured by them, it can never be secured by any written instrument…. The legal value of the reservations [***4] is in their ability not to suggest or advocate a theory of human rights, but to carry a theory into practical effect, and insure the enjoyment of the rights reserved." *Gould v. Raymond, 59 N.H. 260*.

All taxation must be equal. *Opinion of the Justices, 4 N.H. 565*; *Smith v. Burley, 9 N.H. 423, 437*; *Morrison v. Manchester, 58 N.H. 538, 548, 550*; *Edes v. Boardman, 58 N.H. 580*; *Carpenter v. Dalton, 58 N.H. 615*; *First National Bank v. Concord, 59 N.H. 75, 77, 78*; *Berry v. Windham, 59 N.H. 288*; Robinson v. Dover, 59 N.H. 521; *Railroad v. State, 60 N.H. 87, 94*; *Mills Co. v. Location, 60 N.H. 156*; *State v. Express Co., 60 N.H. 219*; *Society v. Manchester, 60 N.H. 342, 347*; *Curry v. Spencer, 61 N.H. 624*; *Telephone Co. v. State, 63 N.H. 167, 169*; *Railroad v. State, 63 N.H. 571, 573*; *Boody v. Watson, 64 N.H. 162*; Holt v. Antrim, 64 N.H. 284. This is merely an example of the universal equality of right which the constitution secures to all. The legislature cannot by special act authorize a particular guardian of a minor to make a valid conveyance of his ward's [***5] estate, because the exercise of such a power by the legislature "is in its nature both legislative and judicial," and "under our institutions all men are viewed as equal, entitled to enjoy equal privileges, and to be governed by equal laws. If it be fit and proper that license should be given to one guardian, under particular circumstances, to sell the estate of his ward, it is fit and proper that all other guardians should, under similar circumstances, have the same license. This is the very genius and spirit of our institutions." [*115] *Opinion of the Justices, 4 N.H. 565, 573*. For similar reasons the legislature cannot grant a new trial in a particular action. Such an act is "not to promulgate an ordinance for a whole class of rights in the community, but to make the action of a particular individual an exception to all standing laws on the subject in controversy." "An act which operates on the rights or property of only a few individuals without their consent is a violation of the equality of privileges guaranteed to every subject." *Merrill v. Sherburne, 1 N.H. 199, 212, 214, 215*; *Clark v. Clark, 10 N.H. 380, 385*. It cannot authorize the foreclosure of [***6] a mortgage by a method not applicable to other like mortgages ( *Railroad v. Elliot, 52 N.H. 387, 393, 400)*, require or empower some towns and not others to relieve federal military conscripts from the performance of their public duty by the payment of money, or compel some jurors to perform jury service for less compensation than is paid to others for the same service. *Bowles v. Landaff, 59 N.H. 164, 194, 195*; *Gould v. Raymond, 59 N.H. 260, 277, 278*. No one citizen or class of citizens can by law be charged with the performance of duties or subjected to burdens [**880] not by law made incumbent upon all other citizens in the same circumstances.

The *fourteenth amendment of the constitution of the United States*, providing that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States… nor deny to any person within its jurisdiction the equal protection of the laws," adds nothing to the rights and liberties of the citizens of this state. It merely confirms to them by federal sanction the rights secured by the action of their ancestors a century ago. It has wrought no change in the law of the state. An enactment [***7] obnoxious to this provision of the national constitution is in New Hampshire no more ineffective than it would be in its absence.

The decisions of the federal court are conclusive on the question of the validity of statutes under the federal constitution, and are authority to be weighed on the question of their validity under the constitution of the state. In *Missouri v. Lewis, 101 U.S. 22, 31*, the court say, the amendment "has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." In *Barbier v. Connolly, 113 U.S. 27, 52*, the court say, the fourteenth amendment "undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally

65 N.H. 113, *115; 18 A. 878, **880; 1889 N.H. LEXIS 47, ***7

entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country [***8] for the protection of their persons and property, the prevention [*116] and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition…. Class legislation discriminating against some and favoring others is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment." It was accordingly held that a municipal ordinance prohibiting washing and ironing in public laundries during certain hours within certain territorial limits was not invalid. See, also, Soon Hing v. Crowley, 113 U.S. 703, 708, 709. But an ordinance regulating laundries, which confers upon the municipal officers an arbitrary power to give or withhold consent for persons to carry on the business without regard to their competency, -- which makes arbitrary discrimination founded on difference of race between persons [***9] otherwise in similar circumstances, -- is a violation of the fourteenth amendment. Yick Wo v. Hopkins, 118 U.S. 356. In Hayes v. Missouri, 120 U.S. 68, it was held that a statute allowing the state in capital cases fifteen peremptory challenges to jurors in cities having a population of over 100,000, while only eight are allowed in other places, is not obnoxious to the amendment. The court say (*p.* 71), -- "The fourteenth amendment to the constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." In Minneapolis Railway Co. v. Beckwith, 129 U.S. 26, 29, 30, the doctrine of the foregoing cases is affirmed. "Equality of protection," says *Field*, J., "implies not merely equal accessibility to the courts for the prevention or redress of wrongs and the enforcement of rights, but equal exemption with others in like condition from charges and liabilities [***10] of every kind."

The preservation of the life and health of the people is one of the chief ends of government. The power of the legislature to regulate the practice of medicine by general laws applicable to all who engage in it is as unquestionable as its authority to adopt measures tending to suppress the sources of disease, to avert the spread of contagion, prevent the adulteration of provisions, the sale of unwholesome food, and to legislate in various other particulars for the protection of the public health. G. L., *cc.* 111, 112, 113, 122, 125, 126, 127, 129, 133; State v. Campbell, 64 N.H. 402; State v. Marshall, 64 N.H. 549; *State* v. *Hinman*, ante 103.

The purpose of the statute is to protect the public from the imposture and fraud of quacks and charlatans. Gage v. Censors, 63 N.H. 92, 94. [*117] To this end all who practise medicine, and have not either obtained a license or resided and practised in some one town of the state during the prescribed period, are subjected to a fine. Practitioners are divided into two classes, -- (1) those who have and (2) those who have not resided continuously in some one town of the state during the four [***11] years beginning January 1, 1875. The latter class must, while the former need not, pay five dollars, or one dollar, each, as the case may be, for a license, in order to continue their business. If all physicians alike, as well those who have as those who have not resided and practised during the specified period in a single town, were required to procure and pay for a license, it may be that the statute would be open to no constitutional objection. State v. Green, 112 Ind. 462; State v. Dent, 25 W. Va. 1. Whether it would or not, is not now the question. The present objection is not to the rule of [**881] evidence by which the statute requires qualification to practise to be determined. It is not that residence and practice during the specified time in one place is made sufficient evidence of fitness -- equivalent to a diploma -- rendering an examination unnecessary. It is, that of those physicians who are declared by the statute, or under its provisions are found, qualified to practise, some are and others are not subjected to the burden of obtaining a license. Exemption from the burden is made to depend not upon integrity, education, and medical skill, but upon a continuous [***12] dwelling in one place for a certain time. The test is not merit, but unchanged residence. It is an arbitrary discrimination permitting some and forbidding others to carry on their business, without regard to their competency, or to any material difference in their situation. For the right to continue the pursuit of his profession, one physician is not, while another, his neighbor, who may be his equal or superior in learning, experience, and ability, is, required to pay five dollars. This is not the equality of the constitution. The magnitude of the unequal burden is not material. If any inequality were permissible, the discrimination might be made prohibitory, and a monopoly of the business given to physicians who have resided

65 N.H. 113, *117; 18 A. 878, **881; 1889 N.H. LEXIS 47, ***12

in a town or city for a specified time. *State v. Express Co., 60 N.H. 219, 263*; *McCulloch v. Maryland, 4 Wheat. 316, 427, 431, 432*.

Indictment quashed.

---

**End of Document**