**THE STATE OF NEW HAMPSHIRE**

**HILLSBOROUGH, SS.**                                                      **SUPERIOR COURT**
**NORTHERN DISTRICT**

Jovanna Stewart

v.

Bernard W. Ang, DMD and Bernard W. Ang, DMD, PC d/b/a Amherst Village Dental

Docket No. 216-2019-CV-00305

**ORDER**

The plaintiff brought this action against the defendants alleging medical

negligence and a violation of the New Hampshire Consumer Protection Act ("CPA"),

RSA chapter 358-A.  The defendants move *in limine* to exclude the plaintiff's expert

testimony regarding the link between the dental care at issue and the plaintiff's

subsequent myocardial infarction and to exclude evidence or claims regarding one

portion of the alleged CPA violation.  The plaintiffs object.  For the following reasons,

the defendants' motions are GRANTED.

Factual Background

Dr. Bernard Ang is a dentist who practices in Amherst, New Hampshire.

(Compl. ¶ 2.)  On April 5, 2016, the plaintiff went to Dr. Ang "for treatment of a fallen

bridge."  (*Id*. ¶ 6.)  The plaintiff also agreed to have teeth numbers 6 and 11 removed

and implants installed in their place.  (*Id*. ¶ 7.)  Dr. Ang, however, installed the implants

on teeth 6 and 11 improperly.  (*Id*. ¶¶ 12-13.)  He also "attempted to extract tooth

number 7 without [the plaintiff]'s consent" and "broke off a portion of [her] tooth inside of

her gum."  (*Id*. ¶¶ 8-9.)  The plaintiff is now missing teeth 6, 7, and 11 and is no longer a

candidate for a bridge.  (*Id*. ¶ 15.)  She also "sustained a severe infection that required

This is a Service Document For Case: 216-2019-CV-00305
Hillsborough Superior Court Northern District
12/9/2021 9:12 AM

medical treatment and oral surgery." (Id. ¶ 11.) As a result, the plaintiff suffers pain, anxiety, and embarrassment. (Id. ¶¶ 16-18.)

When the plaintiff went to Dr. Ang for treatment on April 5, he told her that she would not be charged that day and would be charged when she returned for follow-up treatment. (Id. ¶ 21.) She filled out a Wells Fargo application for financing to receive dental care, at Dr. Ang's request. (Id. ¶¶ 20, 22.) The plaintiff learned later that Dr. Ang had "immediately charged $12,000 to a Wells Fargo Account opened in her name." (Id. ¶ 23.) Not only was the plaintiff unaware that Dr. Ang was opening this account, but that amount "far exceeded" what should have been charged for her planned dental care. (Id. ¶ 23-24.) Dr. Ang also billed the plaintiff's dental insurance for the same treatment. (Id. ¶ 25.) While the plaintiff was refunded $9,244, Dr. Ang retained $2,756 and her insurance payments. (Id. ¶ 26.)

The plaintiff disclosed Dr. Robert Baratz as an expert in this case. Dr. Baratz is a licensed physician and dentist, with special qualifications in oral medicine. (Defs.' Mot. in Limine to Exclude Pl.'s Expert's Causation Testimony (hereinafter "Defs.' Mot. in Limine on Causation", Ex. B. at 3.) He "see[s] and manage[s] patients on a daily basis" and is a faculty member at the Boston University School of Medicine and at Tufts University, (id.), but does not practice dentistry anymore. (Baratz Dep. 27:22-23.) He testified at his deposition that a patient of his practice might see him "for a consult in oral pain or complex oral conditions." (Id. at 27:1-9.)

After obtaining his bachelor's degree, Dr. Baratz received his D.D.S. and a Ph.D. in cell biology and anatomy. (Defs.' Mot. in Limine on Causation, Ex. B. at 3.) He then engaged in a post-doctoral study in cell biology and tissue cultures. (Id.) He became a

faculty member at Northeastern University Medical School, and thereafter transferred to the Boston University Goldman School of Dentistry. (*Id.*) "After teaching and doing research for twelve years," Dr. Baratz received his M.D. from Boston University, and completed his residency in internal medicine. (*Id.*) He has twenty-five years "of clinical experience in primary care, emergency medicine, internal medicine, and occupational medicine." (*Id.* at 3-4.) He also maintained a research laboratory at Tufts, where he did research "on wound healing, bone, dental and medical devices including their interactions with the body, and their safety." (*Id.* at 4.) He has authored "numerous scientific papers and textbooks," taught, "review[ed] scientific papers for medical journals, and practice[d] both dentistry and medicine." (*Id.* at 3.)

Dr. Baratz has testified before the United States Senate and the FDA on health care matters, "including the use of supplements in health care, dental care, and dental materials and devices," and testified previously in judicial matters. (*Id.* at 3.) He has been retained by "state licensing boards, federal agencies, insurance companies, and law enforcement agencies to offer expert opinion as to quality of care and standard of care issues in the practice of dentistry and medicine." (*Id.* at 4.) He has been appointed by the Massachusetts Superior Court to medical malpractice review tribunals to screen cases for merit before they can proceed." (*Id.*) For two years, he was the spokesperson for the American Dental Association "on the safety of dental materials." (*Id.* at 4.)

In writing his report, Dr. Baratz reviewed the plaintiff's medical and dental records; "reviewed relevant literature on complications of dental care, and matters

related to the spread of dental infections to other body systems, especially the

cardiovascular system"; and examined the plaintiff in his own office. (*Id*. at 6-7.)

In addition to describing in detail the visit with Dr. Ang on April 5, 2016, Dr.

Baratz's report describes the plaintiff's subsequent dental treatment. On May 23, 2016,

the plaintiff visited Dr. Greene, an oral surgeon. (*Id*. at 12.) Around this time, the

plaintiff "had low energy and was obviously infected." (*Id*. at 13.) However, the plaintiff

needed to wait several months for the infection in her mouth to subside so Dr. Greene

could remove the implants and the root of the broken tooth. (*Id*. at 12-13.) During this

time, the plaintiff needed "several rounds of powerful antibiotics to resolve the

infections." (*Id*. at 12.) She had been proscribed Amoxicillin by Dr. Ang, over a month

after her infection began, which Dr. Greene continued. (*Id*. at 13.) When Dr. Greene

saw the plaintiff on June 10, 2016, she was still infected, and Dr. Greene prescribed her

Clindamycin. (*Id*. at 14.) During this time, the plaintiff "was still in pain . . . and had

considerable malaise." (*Id*. at 13.) Dr. Greene removed the implants and the root of the

broken tooth on September 20, 2016. (*Id*. at 12.)

Dr. Baratz's report discusses the numerous ways in which, in his opinion, Dr. Ang

deviated from the standard of care and the damages that resulted to the plaintiff. (*See*

*generally id*. at 14-23.) Dr. Baratz's report also discusses a link between Dr. Ang's

dental care and two heart attacks the plaintiff suffered. (*See id*. at 18-19.) He writes

that on August 4, 2018, the plaintiff suffered a "major anterior heart attack." (*Id*. at 18.)

An EKG taken and interpreted on that date showed "that she had a pre-existing anterior

damage to her heart from a previous heart attack." (*Id*.) Lipid levels also taken that day

reflected normal levels, "supporting the notion that [the plaintiff's] first [heart attack] was

somewhat silent but caused by her oral infections, that presented as symptoms seen as lethargy and malaise in Dr. Greene's office notes, and that the second one was on top of the original lesion." (*Id.*)  Dr. Baratz also noted that the plaintiff had a normal EKG taken in May 2015.  (*Id.* at 14, 18.)  He concludes:

> Given the wealth of scientific literature that shows many single lesion obstructions of coronary vessels are likely caused by inflammation from infections rather than traditional lipid plaque disease, it is highly likely [the plaintiff]'s earlier heart attack was signaled in the weakness in which she had in June 2016.  Prior to that she had a normal electrocardiogram in 2015. . . .  Without any evidence to the contrary[,] it is highly likely that [the plaintiff]'s two heart attacks were a direct result of the infections which apparently were caused by unnecessary extractions of teeth and improper placing of same day implants in extraction sockets from teeth which may not have been completely healthy . . . .

(*Id.* at 18-19.)

Analysis

I.    *Dr. Baratz's expert testimony regarding myocardial infarction*

The defendants move *in limine* to exclude. Dr. Baratz's testimony regarding the link between Dr. Ang's dental care and the plaintiff's heart attacks because (1) he is not qualified to testify on such a topic, and (2) his expert opinion is based on unreliable methodology.  The plaintiff argues that, as a dentist and a practitioner of internal medicine, Dr. Baratz is qualified to talk about the link between oral health and overall health.  Further, the plaintiff contends that the research Dr. Baratz cited in his report is reliable, and to the extent the defendants disagree with the cited research, that is properly explored through cross-examination.

New Hampshire Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise." "Expert witnesses are called to give their opinions on subjects about which they have special knowledge and experience, upon the assumption that, by reason of these qualifications, they will be able to assist the jury in its search for the truth." *Brown v. Bonnin*, 132 N.H. 488, 494 (1989).

The Court finds that Dr. Baratz is qualified to testify to a causal connection between the plaintiff's oral infection and subsequent heart attacks. Though he does not practice in cardiology, (Baratz Dep. 138:15-20), "the lack of specialization in a particular medical field does not automatically disqualify a doctor from testifying as an expert in that field." *Hodgdon v. Frisbie Mem. Hosp.*, 147 N.H. 286, 289 (2001). Dr. Baratz is both a licensed dentist and physician with twenty-five years of experience in, notably, primary care and internal medicine, with a focus on oral health. Furthermore, Dr. Baratz has conducted research into wound healing and on the interactions of dental and medical devices with the body. This extensive experience qualifies him to speak on the effect infections in the mouth may have on other parts of the body.

That said, "expert testimony must rise to a threshold level of reliability to be admissible." *Baker Valley Lumber, Inc. v. Ingersoll-Rand Co.*, 148 N.H. 609, 614 (2002). In determining the reliability of an expert's testimony, the Court in *Baker Valley* adopted the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993). The State legislature has since codified this framework in RSA 516:29-a, which states:

> I. A witness shall not be allowed to offer expert testimony unless the court finds:
>     (a) Such testimony is based upon sufficient facts or data;

(b) Such testimony is the product of reliable principles and methods; and

(c) The witness has applied the principles and methods reliably to the facts of the case.

II. (a) In evaluating the basis for proffered expert testimony, the court shall consider, if appropriate to the circumstances, whether the expert's opinions were supported by theories or techniques that:

(1) Have been or can be tested;

(2) Have been subjected to peer review and publication;

(3) Have a known or potential rate of error; and

(4) Are generally accepted in the appropriate scientific literature.

(b) In making its findings, the court may consider other factors specific to the proffered testimony.

Under this analysis, "[t]he trial court functions only as a gatekeeper, ensuring a methodology's reliability before permitting the fact-finder to determine the weight and credibility to be afforded an expert's testimony." *Baker Valley*, 148 N.H. at 616. "[A]s long as an expert's scientific testimony rests upon good grounds, . . . it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *State v. Langill*, 157 N.H. 77, 88 (2008); *see also State v. Cressey*, 137 N.H. 402, 405 (1993) ("The reliability of evidence is of special concern when offered through expert testimony because such testimony involves the potential risks that a jury may disproportionally defer to the statements of an expert . . . and that a jury may attach extra importance to an expert's opinion simply because it is given with the air of authority that commonly accompanies an expert's testimony.").

As part of his report, Dr. Baratz considered, among other things, the plaintiff's medical records and his physical examination of the plaintiff. He noted that the plaintiff's EKG taken in May 2015 read normal, but that her EKG taken on August 4,

2018, indicated that she had suffered a prior heart attack.  His report also states that her lipid levels on August 4, 2018, were normal.  From these findings, he concludes that the plaintiff's first heart attack was "caused by her oral infections" and "presented as symptoms seen as lethargy and malaise in Dr. Greene's office notes" from June 2016. (Defs.' Mot. in Limine on Causation, Ex. B. at 18.)  "Without any evidence to the contrary," he states that her heart attacks were a "direct result of the infections" caused by Dr. Ang's dental work.  (*Id*. at 19.)  However, the Court finds that Dr. Baratz's report does not contain a sufficient factual basis to come to this conclusion.

First, Dr. Baratz engages in no analysis about how he came to the conclusion that it was "highly likely" that the heart attack the plaintiff had suffered between May 2015 and August 4, 2018, "was signaled in the weakness which she had in June 2016." (*Id*. at 18.)  He does not discuss the multitude of other factors in existence that could have contributed to the plaintiff's illness, such as the antibiotics she was prescribed and the presence and severity of her infection.  Second, Dr. Baratz only rules out one other cause of the plaintiff's heart attack on August 4, 2018:  high lipid levels.  Though he notes that there is no "evidence to the contrary" supporting her heart attack being caused by a different reason, he identifies no other possible causes and engages in no analysis ruling out those causes.  He merely attributes her two heart attacks as being "caused by unnecessary extractions of teeth and improper placing of same day implants."  (*Id*. at 19.)  Such conclusory testimony does not meet the statutory requirement of admissible expert testimony.

Third,  in coming to this conclusion, Dr. Baratz notes "the wealth of scientific literature that shows many single lesion obstructions of coronary vessels are likely

caused by inflammation from infections rather than traditional lipid plaque disease" and cites to one article titled *Systemic Disease Caused by Oral Infection* "and a large number of similar papers easily found in the National Library of Medicine Pub Med database." (*Id.* at 18.) Even assuming that Dr. Baratz's representation of the state of the literature is true—that the "wealth" of literature shows that the type of heart attack the plaintiff suffered is "likely" caused by an inflammation from infection instead of lipid plaque disease—his report does not apply or analyze that literature in a way that would aid this Court or a jury in determining whether this plaintiff's heart attacks were caused by the defendants' negligence. *See Vasquez v. Mabini*, 606 S.E.2d 809, 811 (Va. 2005) ("Expert testimony founded upon assumptions that have no basis in fact is not merely subject to refutation by cross-examination or by counter-experts; it is inadmissible."). In other words, even if Dr. Baratz had identified other or better literature that supported this causal link, as the defendants contend, his report does not meaningfully apply that literature to the plaintiff's case.

In sum, though Dr. Baratz is qualified to discuss the relationship between oral infections and their effects on the body, including heart attacks, the Court finds that his expert report, as it relates to this topic, employs unreliable methodology. Accordingly, the defendants' motion to exclude Dr. Baratz's testimony about the causal relationship between the plaintiff's heart attacks and the defendant's dental care is GRANTED.

    II.    *RSA chapter 358-A Claims*

The defendant moves *in limine* to exclude evidence or claims that relate to a violation of the CPA based on the defendants' negligence. Though framed as a motion

*in limine*, the Court construes this motion as a motion to dismiss Count III of the complaint insofar as it is based in medical negligence.

In ruling on a motion to dismiss, the Court determines "whether the allegations contained in the pleadings are reasonably susceptible of a construction that would permit recovery." *Pesaturo v. Kinne*, 161 N.H. 550, 552 (2011). The Court rigorously scrutinizes the facts contained on the face of the complaint to determine whether a cause of action has been asserted. *In re Guardianship of Madelyn B.*, 166 N.H. 453, 457 (2014). The Court "assume[s] the truth of the facts alleged by the plaintiff and construe[s] all reasonable inferences in the light most favorable to the plaintiff." *Lamb v. Shaker Reg'l Sch. Dist.*, 168 N.H. 47, 49 (2015). The Court "need not, however, assume the truth of statements that are merely conclusions of law." *Id*. "If the facts do not constitute a basis for legal relief, [the Court will grant] the motion to dismiss." *Graves v. Estabrook*, 149 N.H. 202, 203 (2003).

The CPA states: "It shall be unlawful for any person to use any unfair method of competition or unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2. The statute then "sets forth a list of specific types of conduct that qualify as unfair or deceptive trade practices." *Fat Bullies Farm, LLC v. Devenport*, 170 N.H. 17, 24 (2017); *see also* RSA 358-A:2, I-XVII. However, the list is not exhaustive. "In determining which commercial actions not specifically delineated are covered by the act, [the Court ha[s] employed the 'rascality' test." *Fat Bullies Farm*, 170 N.H. at 24. "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow to someone inured to the rough and tumble of the world of commerce." *Id*. Further, "[a]lthough the general provision of

the CPA is broadly worded, [the Court] ha[s] recognized that not all conduct in the course of trade or commerce falls within its scope." *Id.*

The defendants argue that medical negligence is not actionable under the CPA. The plaintiffs object, arguing that (1) the current version of the CPA does not prohibit claims against professionals subject to a regulatory board, (2) the defendants advertised quality care, but did not perform it, (3) the defendants acted in their own interests when "performing unconsented to dental work," (Pl.'s Obj. to Defs.' Mot. in Limine Regarding RSA ch. 358-A Claims at 16), which meets the rascality test, and (4) the defendants' actions violates public policy.

The New Hampshire Supreme Court, in *Rousseau v. Eshleman*, 128 N.H. 564 (1986) (*Rousseau I*), *reh'g denied*, 129 N.H. 306 (1987) (*Rousseau II*), considered whether the practice of law was exempt from the CPA.  The version of the CPA in effect at the time exempted "trade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of this state." *Rousseau I*, 128 N.H. at 567 (quoting RSA 358-A:3, I (1996).)  A divided supreme court held that "[t]he professional conduct committee . . . is . . . a regulatory board acting under statutory (and constitutional) authority of this State within the meaning of RSA 358-A:3, I." *Id.*  Mindful that "[a]dmission to the practice of law and regulation of the conduct of attorneys in this State has been dealt with as an area of shared responsibility between the legislative and judicial branches of government," the court found that the CPA "exempts attorneys from its application." *Id.* at 567-68; *see also Averill v. Cox*, 145 N.H. 328, 332 (2000) (reaffirming "the holding of *Rousseau I* that the practice of law falls within the scope of the exemption in RSA 358-A:3, I).

Upon reconsideration, the supreme court reiterated its holding that attorneys were exempt under the CPA. *See Rousseau II*, 129 N.H. 306, 309-10 (1987). In a concurring opinion, Justice Thayer discussed "whether the phrase 'trade or commerce' encompasses the conduct of attorneys, and if so, to what extent." *Id*. at 310 (Thayer, J., concurring specially) (citation omitted). Justice Thayer noted that the United States Supreme Court "addressed the question of whether a restraint of 'trade or commerce' violated the Sherman Act when the restraint concerned the price-fixing activities of attorneys" in *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975). *Id*. In *Goldfarb*, the Supreme Court stated

> it is no disparagement of the practice of law as a profession to acknowledge that it has a business aspect . . . . In the modern world it cannot be denied that the activities of lawyers play an important part in commercial intercourse, and that anticompetitive activities by lawyers may exert a restraint on commerce.

421 U.S. at 788. Considering *Goldfarb*, Justice Thayer "agree[d] that the act's prohibition against unfair or deceptive commercial activity applies to the commercial activities of attorneys." *Rousseau II*, 129 N.H. at 311 (Thayer, J., concurring specially). He explained:

> The 'commercial' aspects of attorneys' activities, which would be subject to the act's propositions, may be defined as the way in which the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients. The 'noncommercial' activities of attorneys, which would be beyond the reach of the act, are defined as activities which constitute the actual practice of law, [and] activities requiring the professional judgment of an attorney based upon his or her legal knowledge and skill. In addition, the consumer protection act provides consumers with protection from representation that services are of a particular standard, quality, or grade if they are of another and the advertisement of services with intent not to sell them as advertised.

*Id*. (citations and quotations omitted).

In 2002, the legislature amended the CPA to remove the exemption for "trade or commerce otherwise permitted under laws as administered by any regulatory board." RSA 358-A:3, I (1996). Now, the act exempts "[t]rade or commerce that is subject to the jurisdiction of the bank commissioner, the director of securities regulation, the insurance commissioner, the public utilities commission, the financial institutions and insurance regulators of other states, or federal banking or securities regulators who possess the authority to regulate unfair or deceptive trade practices." RSA 358-A:3, I (2004). Thus, health care providers governed by a regulatory board are no longer *per se* exempt from the CPA.

Since the 2002 amendment, the New Hampshire Supreme Court has not addressed whether professional malpractice claims are within the "trade or commerce" scope of the CPA. Other courts, however, have applied the business/professional distinction from *Goldfarb* in interpreting other states' consumer protection acts, generally concluding that the business aspect of professional services is within the consumer protection act. *See, e.g., Franks v. Sykes*, 600 S.W.3d 908, 912 (Tenn. 2020) (collecting cases applying the *Goldfarb* business/professional distinction "to other learned professionals, including health care providers); *Darviris v. Petros*, 812 N.E.2d 1188, 1193 (Mass. 2004) (collecting cases concluding "consumer protection statutes may be applied to the entrepreneurial and business aspects of providing medical services, for example, advertising and billing, even though those statutes do not reach medical malpractice claims"); *accord Donovan v. Digital Entm't Corp.*, 883 F. Supp. 775, 786 (D.N.H. 1994) (noting that "New Hampshire courts have frequently relied on Massachusetts law when interpreting" the CPA).

The Court is persuaded by the cases—including Justice Thayer's concurrence in *Rousseau II*—that apply a business/professional distinction when interpreting CPA claims against professionals. Though the legislature removed the reference to regulatory board oversight in its 2002 amendment, the definition of "trade or commerce" in RSA 358-A:1, II exhibits no "intent to include the actual performance of medical services or the actual practice of medicine." *Nelson v. Ho*, 564 N.W.2d 482, 486 (Mich. Ct. App. 1997). Interpreting it as such would render "obsolete" the "well-developed body of law concerning medical malpractice." *Id.*

Thus, the Court turns to the allegations pled in the plaintiff's complaint to determine if her CPA claims that the defendants argue are based in negligence are a business or professional service. In her complaint, the plaintiff alleges that the defendants conducted unfair and deceptive business practice by: (1) doing dental work that was not medically necessary, (2) not performing work to the standard that they had promised, and (3) acting in their own monetary interests instead of the plaintiff's. (Compl. ¶¶ 45-47.)

With respect to the plaintiff's allegations that the defendants performed unnecessary dental work and that they acted in their own monetary interests, the Court finds that these claims relate to the professional medical services rendered by the defendants. A medical provider's failure to obtain informed consent for medical procedures "may be within the scope of the [CPA], if it relates to the entrepreneurial aspects of the medical practice." *Quimby v. Fine*, 724 P.2d 403, 406 (Wash. Ct. App. 1986). It "can be based on dishonest and unfair practices used to promote the entrepreneurial aspects of a doctor's practice, such as when the doctor promotes an

operation or service to increase profits and the volume of patients, then fails to adequately advise the patient of risks or alternative procedures." *Id*. However, though the plaintiff alleges that unnecessary dental work was done and that the defendants acted in their own interests, she does not allege any facts that demonstrate this work was done solely for the defendants' financial benefit. *See Darviris*, 812 N.E.2d at 1194 (noting that though the plaintiff consented to a fissurectomy, but underwent a hemorrhoidectomy, "[t]here are doubtless numerous circumstances in which a physician selects to perform one, rather than a different and less expensive, procedure—or no treatment at all. The selection may constitute medical malpractice. But unless a patient can demonstrate that the physician selected the treatment solely for his or her financial benefit . . .evidence that the treatment was more costly than another or no treatment at all is insufficient to establish an unfair or deceptive practice claim.").

As for the plaintiff's claim that the defendants did not perform work to the standard they had promised, she, for the first time in her objection, bases this claim in the defendants' advertising of Dr. Ang as a competent dentist. However, she does not allege those facts in her complaint. The claim, as stated in the complaint, amounts to nothing more than the defendants' ability to perform competent medical services, (*see* Compl. ¶ 46)—a claim wholly removed from their business or entrepreneurial interests. The representation that a health care provider will provide competent services "is simply what all physicians and health care providers represent to the public—that they are licensed and impliedly that they will meet the applicable standards of care." *Haynes v. Yale-New Haven Hosp.*, 699 A.2d 964, 974-75 (Conn. 1997). "If they do fail to meet the

standard of care and harm results, the remedy is not one based upon the [Consumer

Protection Act], but upon malpractice." *Id*.

Based on the foregoing, the Court finds that the allegations that the defendants

performed unnecessary dental work, did not perform services to the standard they

promised, and that they acted in their own best interest do not state a claim under the

CPA.  Accordingly, the defendants' motion is GRANTED and those allegations (Compl.

¶¶ 45–47) are dismissed from Count III.


SO ORDERED.


December 8, 2021
_____
Date

_____
Judge David A. Anderson

Clerk's Notice of Decision
Document Sent to Parties
on  12/09/2021